















JAH    7/27/05    9:32

3:03-CV-00520   MOORE V. BANK OF AMERICA NA

*118*

*DECL.*

ORIGINAL

Robert S. Green (State Bar No. 136183)
Jenelle Welling (State Bar No. 209480)
**GREEN WELLING LLP**
235 Pine Street, 15thFloor
San Francisco, CA 94104
Telephone: (415) 477-6700
Facsimile: (415) 477-6710

Richard M. Pearl (State Bar No. 46351)
**LAW OFFICES OF RICHARD M. PEARL**
1816 Fifth Street
Berkeley, CA 94710
Telephone: (510) 649-0810
Facsimile: (510) 548-5074

Attorneys for Plaintiff
JAMES R. MOORE

FILED

JUL 26 2005

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

NUNC PRO TUNC

JUL 25 2005

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES R. MOORE, individually and on behalf of the general public and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> BANK OF AMERICA, N.A. (USA), <br><br> Defendant. | Case No. 03CV 00520-IEG (BLM) <br><br> **DECLARATION OF JENELLE WELLING IN SUPPORT OF PLAINTIFF'S MOTION FOR AN AWARD OF REASONABLE ATTORNEYS' FEES AND COSTS** <br><br> Date: August 22, 2005 <br> Time:10:30 a.m. <br> Courtroom: 1 <br><br> The Honorable J. Gonzales |

I, Jenelle Welling, declare:

1.     I am a partner in the law firm of Green Welling LLP, attorneys of record for

Plaintiff James R. Moore in the above-entitled action. I make the following statements based on

personal knowledge and if called to testify thereto, I could and would competently do so.

2.     Green Welling specializes in class action and complex litigation. Our portfolio

includes consumer protection litigation, securities litigation, and antitrust litigation. In the past

ten years, we have prosecuted some of the most significant cases involving consumer credit

---

1

JWW Decl. ISO Mot. for Atty Fees & Costs                    CASE NO. 03CV 00520-IEG (BLM)

Fee - JWW decl.wpd

118

1  cards, credit reporting, and mortgage lending. In 1997, Robert Green served as primary counsel

2  in a Truth-in-Lending Act credit card case against First USA Bank that recovered $6 million in

3  cash and credit for card holders. In 2000, he successfully argued before the Ninth Circuit the case

4  of <u>Demando v. Morris (Capital One Bank)</u>, 206 F.3d 300 (9th Cir. 2000), a Truth-in-Lending Act

5  case clarifying the rights of card holders who were promised a low lifetime rate on their credit

6  cards. In 2001, he served as Co-Lead Counsel in a national class action in which Providian

7  Financial Corporation refunded over $100 million to a credit card holder class. I have served as

8  primary counsel in two separate cases involving "Same as Cash" credit card financing against

9  Bank One and GE Capital. Background about the Bank One "Same as Cash" litigation can be

10  found in the reported appellate decision, <u>Prata v. Superior Court</u>, 91 Cal. App. 4th 1128 (2001).

11  The settlements in those cases returned over $5.5 million in cash to duped California cardholders.

12  I also have served as co-lead counsel on a successful mortgage lending class action against Bank

13  United of Texas (later Washington Mutual), represented individuals significant settlements for

14  claims arising under the Fair Credit Reporting Act, and am a member of the Executive

15  Committee in <u>In re Tenet Healthcare Cases II</u>, a class action brought on behalf on overcharged

16  health care consumers. In April 2005, a settlement was reached in <u>Tenet</u> that provides for

17  restitution, injunctive relief and $4 million of cy pres distributions. A true and correct copy of

18  the firm's resume is attached as Exhibit 1.

19        3.     We became involved in this litigation in November 2003 after being contacted by

20  Moore, Brewer, Jones, Tyler, & Wolfe LLP. Led by name partner Duane Tyler, that law firm had

21  been representing Plaintiff in his individual action against Defendant Bank of America, N.A.

22  (USA) ("the Bank") since March 2003. Duane Tyler and his colleagues surmised that a class

23  action may be appropriate. Lacking class action expertise, we were consulted. After evaluating

24  the case (as discussed further below), we entered into a contingency fee representation agreement

25  with Plaintiff and substituted in the action as attorneys of record. Simultaneously, Moore,

26  Brewer, Jones, Tyler, & Wolfe LLP withdrew from the action.

27

28

2

# LODESTAR OVERVIEW

4. Since the inception of this litigation, in accordance with its normal business practices, Green Welling LLP has maintained detailed and contemporaneous records of the time spent by its lawyers, law clerks, and paralegals on this action. I have carefully reviewed the time records and I believe them to be accurate. Exhibit 2 contains chronological billing detail (redacted for attorney client communications) for all hours spent litigating this action from November 2003 to the present. Each time record contains the date, the time keeper's name, the activity code to which the time entry is attributed, the hours spent, and a description of the work conducted. With the exceptions noted below, all of the time we are claiming was reasonably devoted to advancing and protecting the interests of our client and the public in this case, and would be billed to a fee-paying client.

5. Excluding time spent researching and preparing the motion for attorneys' fees and costs (which is addressed separately below), the total number of hours spent on this litigation by my law firm is 1,417.99. The activities giving rise to these hours are more fully detailed below.

6. The hours expended reflect the distinct contributions of each time keeper. Hours billed by associates, law clerks, and paralegals account for the majority of all hours. Generally speaking, associates and law clerks performed legal research, drafted briefs, and maintained day-to-day responsibility for discovery-related tasks, such as participating in meet and confer sessions and reviewing documents. The partners retained primary responsibility for on-going strategic case assessment, communications with the Court and the client, and settlement negotiations. Partners also reviewed and approved discovery requests and responses, as well as documents filed with the Court, to ensure they were accurate and in keeping with the spirit and the letter of the Federal Rules.

7.     The hourly rates and positions of the time keepers who worked on this case are as follows:

| Name | Position | Hourly Rate |
|------|----------|-------------|
| Robert S. Green (RSG) | Partner | $425 |
| Jenelle Welling (JWW) | Partner | $300 |
| John W. Pillette (JWP) | Associate | $275 |
| Kamon D. Naddaf (KDN) | Associate | $225 |
| Brian S. Umpierre (BSU) | Law Clerk | $195 |
| James J. Jim (JJJ) | Law Clerk | $195 |
| Katie P. Brown (KPB) | Paralegal | $140 |
| Monica S. Herman (MSH) | Office Assistant | $100 |

8.     The hourly rates of both partners were approved in 2003 by the Honorable J. Chesney, District Court Judge in the Northern District of California, in a Truth-in-Lending Act action similarly achieving credit reporting protections in a settlement. Exhibit 3 is a true and correct copy of the order approving the rates and the excerpted Declaration setting forth the rates.

9.     My law firm's overall lodestar (again, exclusive of time spent preparing the fee motion), calculated by multiplying the hours expended by the hourly rates, is $403,502.29.

## BILLING JUDGMENT REDUCTIONS TO THE LODESTAR

10.     As would be customary when billing a fee-paying client, we made several reductions to the lodestar. After these reductions, the compensable hours total 1,315.15, for a lodestar of $381,742.63.

11.     We deducted 51.30 hours for administrative tasks necessary to carry out the litigation, but that might not be customarily billed to a fee-paying client. For example, we deducted hours spent by our paralegal loading documents produced by the Bank and various third parties into our electronic document management database (e.g. June 7, 2004, KPB entry of 4.0 hours, denoting "Review errors in scanning and Defendant's document production; coordinate resolution of same"), time spent making copies of relevant regulations reviewed by the lawyers (e.g. May 14, 2004, MSH entry of 5.0 hours, denoting "Copy and PDF Fair Credit Billing 1977

4

per J. Pillette"), and time spent on administrative tasks associated with filing pleadings (e.g., July 8, 2004, KPB entry of 2.0 hours, denoting "Reply ISO Motion to compel assist; finalize filing and confirm compliance with rules; preparation of exhibits; filing & service of same (LRC out)"). These and other such entries are identifiable in Exhibit 2 by a "Do Not Bill" reference.

12.     Although proper calendaring of litigation events is regular function of attorneys and critical to the effective representation of a client, we deducted all minutes billed for calendaring activities (e.g. March 18, 2004, JWP entry of 0.12 hours, denoting "Review motion to dismiss schedule & email K. Brown re: calendar change"). This reduction totals 5.4 hours.

13.     We also reduced the time spent by an associate preparing for a hearing on a successful motion to compel from 10.70 hours to 2 hours.

14.     To work as a team and avoid duplication, at times we needed to confer among ourselves, and when we did, each of us charged for the time expended. We excluded from the lodestar, however, a portion of hours spent collaborating. To do so, we added all of the hours where the time slip entry indicates an intra-office discussion (79.40 hours), and reduced those hours across-the-board by 10%.

15.  ·  Because the time slip detail often reflects both the task at hand and the time collaborating with another lawyer about that task but we included the entire slip value, our methodology over-states time spent in intra-office communications. That is, my December 7, 2004 entry stating, "Revise draft term sheet. Discuss same with R. Green," for example, reflects 0.30 hours for revising a draft settlement agreement and discussing those revisions with my partner. Although only a portion of the time was spent collaborating, and reasonable time spent revising the settlement agreement is compensable, the entire 0.30 hours was included in the amount to which we applied the 10% reduction.

16.     Applying the same methodology, we calculated the time spent communicating with the Court, opposing counsel, and our client to total approximately 100 hours.

17.     Although not always customary when billing a fee-paying client, we also excluded all hours (29.50 total) relating to an unsuccessful motion to amend the protective order. This was

5

Fee - JWW decl.wpd     JWW Decl. ISO Mot. for Atty Fees & Costs     CASE NO. 03CV 00520-IEG (BLM)

1 our only unsuccessful motion.

2 ## DESCRIPTION OF LITIGATION ACTIVITIES PERFORMED

3 18. Time keepers conducting case activities track their time by using case activity

4 codes. Exhibit 2 shows that the hours spent on this litigation fall into 8 categories: Class

5 Certification, Court Appearances, Deposition Discovery, Document Discovery,

6 Meetings/Communications, Pleadings/Briefs/Pre-Trial Motions, Research/Case Assessment, and

7 Settlement.

8 19. Recognizing that a single activity may implicate more than one code, our practice

9 is to select the code representing the primary activity. Legal research necessary to oppose a

10 motion to dismiss, for example, would customarily be billed to Pleadings/Briefs/Pre-Trial

11 Motions rather than to Research/Case Assessment, although either code accurately describes the

12 activity.

13 ## Pleadings/Briefs/Pre-trial Motions

14 20. Pleadings, briefs, and pre-trial motions accounts for 25% of the total hours

15 (350.75 hours out of 1,417.99). Exhibit 2 reflects entries for this activity as "+pldgs/motions."

16 21. A review of Exhibit 2 reveals activity on 12 major pleading-related projects

17 during the course of the litigation. In chronological order, those projects are: Amending the

18 complaint; Moving to enforce the Court's October 30, 2003 discovery order; Moving to allow the

19 filing of an amended complaint; Opposing the Bank's motion to dismiss; Moving to compel

20 further responses to interrogatories and associated document requests; Moving to strike improper

21 defenses asserted in the Bank's Answer; Moving to amend the protective order; Drafting a

22 motion to compel further responses to requests for production and for the production of witnesses

23 in response to deposition notices; and Opposing three motions to compel filed by the Bank. In

24 addition to these major projects, activities in the "+pldgs/motions" code include drafting and

25 negotiating joint discovery conference statements and pre-trial scheduling orders, as well as

26 preparing a withdrawal and substitution of counsel form, initial disclosures, and other similar

27 documents necessary for the orderly conduct of litigation.

28

6

22.     When Mr. Moore first filed his action, it included only individual claims for relief. After discussing the case with Moore, Brewer, Jones, Tyler, & Wolfe LLP, we concluded that a class action seeking changes to the Bank's policies and practices was viable and appropriate. Upon researching and resolving issues relating to substituting into the litigation and representing Mr. Moore, using our expertise, knowledge, and experience, we undertook amending the complaint.

23.     The amended complaint corrected the name of the Bank to match the entity which filed an answer to the original complaint, asserted a claim for violating the Truth in Lending Act (TILA), and added class action allegations pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiff asserted five causes of action in his amended complaint: (1) violation of TILA; (2) Violation of California Business & Professions Code § 17200; (3) violation of the Equal Credit Opportunity Act (ECOA), 15 U.S.C. § 1691(A)(3); (4) violation of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681s-2(b); and (5) breach of contract. Plaintiff asserted violations of TILA and § 17200 on behalf of all credit card holders. All remaining claims were asserted individually. Each of the causes of action addressed the same course of conduct by the Bank. Specifically, each claim was rooted in the Bank's failure to sufficiently investigate Plaintiff's billing error dispute, and its failure to accurately report the status of his account to credit reporting agencies thereafter. Each cause of action was an alternate theory of liability addressing the same problem and involved a common core of facts.

24.     The filing of an amended complaint was contemplated by the parties and the Court in the Scheduling Order Regulating Discovery and Other Pretrial Proceedings, filed November 10, 2003, and as amended on January 22, 2004. The Bank, nonetheless, refused to stipulate to the filing of the amended complaint. Hence, we researched, drafted, and filed a motion authorizing the filing of the amended complaint. The motion was granted.

25.     The Bank moved to dismiss the first, third, fourth, and fifth claims for relief. The Bank's primary contentions were that the statute of limitations barred Plaintiff's TILA and FCRA claims, and that he failed to state a claim under ECOA. We analyzed the Bank's motion,

1  discussed it with our client, read the authorities cited by the Bank, researched the various legal

2  issues raised, consulted the documents the Bank produced to compare the Bank's legal

3  contentions with its policies, and wrote the opposition brief.

4      26.    The Bank's motion was denied in part and granted in part. Specifically, the Court

5  upheld Plaintiff's Section 1666a TILA claim, Plaintiff's FCRA claim, and Plaintiff's breach of

6  contract claim. The Court dismissed Plaintiff's individual claim under ECOA and dismissed his

7  TILA claim in so far as it related to the Bank's alleged violations of Sections 1666 and 1666i.

8      27.    Chronologically, the next major briefing project was Plaintiff's motion to compel

9  further responses to interrogatories and documents relating to the interrogatory requests. The

10  Bank refused to respond to interrogatories aimed at understanding the structure and content of its

11  databases containing card holder information. For instance, Plaintiff asked the Bank to describe

12  the databases used to record, store, track, or retain information relating to billing error disputes

13  and credit reporting disputes, and to describe the systems the Bank used to contact its card

14  holders. Plaintiff did not seek production of the actual data in these systems. Instead, he sought

15  production of information about the systems so that we could then tailor discovery into the

16  underlying data in a careful approach that took into consideration the capacities, limitations, and

17  actual content of the Bank's systems.

18      28.    Plaintiff also sought aggregate data about putative class members, such as the total

19  number of billing error disputes relating to goods or services not being delivered, the total

20  number of chargebacks made upon receipt of a billing error dispute, and the total number of

21  chargebacks that were resubmitted following the Bank's investigation of the dispute.

22      29.    In addition to the extensive meet and confer efforts reflected in the "+discovery"

23  code discussed in the next section, preparing the motion to compel was a fact and time intensive

24  endeavor. We reviewed relevant documents and deposition testimony to select excerpts that

25  demonstrated the capabilities and uses of the Bank's systems in support of our motion. For

26  instance, we highlighted testimony from Tina Buhrman, who explained that in the regular course

27  of business, the Bank electronically sorts billing error disputes by subject matter code. We also

28

8

1 gathered and provided a synopsis of the 3 "sweeps" the Bank made of its electronic systems in an

2 attempt to provide complete records relating to Plaintiff. These factual underpinnings supported

3 the legal research we conducted to address each of the Bank's numerous objections.

4       30.     Magistrate Judge Major conducted a hearing on Plaintiff's motion to compel and

5 ordered a supplemental joint submission following a further meet and confer. The subsequent

6 meet and confer and process, and explaining and delineating the progress made and areas of

7 continued disagreement in a joint letter brief also was a fact and time intensive project. As

8 reflected in the July 23, 2004 joint letter report to Magistrate Judge Major (a true and correct

9 copy of which is attached as Exhibit 4), Plaintiff offered several compromise positions which the

10 Bank rejected. Magistrate Judge Major granted Plaintiff's motion to compel, as modified by

11 Plaintiff's suggestions in the joint supplemental report.

12       31.     While Plaintiff's motion to compel was under submission, we began drafting a

13 third discovery-related motion. The focus of this motion to compel (denoted by some time

14 keepers in Exhibit 2 as "motion to compel #3") was the Bank's refusal to designate a witness to

15 provide testimony about the Bank's current dispute claims procedures, its refusal to produce

16 exemplar merchant service agreements, and the lack of document retention policies it produced

17 despite two orders from the Court directing the Bank to produce its TILA policies and the

18 mandate in 12 C.F.R. § 226.25 that such retention occur.

19       32.     Apparently, at the same time we were researching and drafting our motion, the

20 Bank's counsel also was drafting motions to compel. On September 21, 2004, the Bank served 3

21 motions to compel. Magistrate Judge Major set an expedited briefing schedule on each of the 3

22 motions. Each motion required analysis, legal research, drafting, and re-evaluation of positions

23 taken throughout the meet and confer process to see if further compromise was feasible and

24 appropriate. As more fully discussed below, the parties also began discussing mediating this

25 action, and 2 days before Plaintiff's 3 opposition briefs were due, requested a stay of all

26 proceedings to engage in mediation efforts.

27

28

9

33. Time expended responding to the Bank's 3 motions to compel did not end there, however. When settlement discussions fell apart, additional rounds of meet and confer efforts and renewed attention to finalizing the opposition briefs were necessary in February 2005 and April 2005. Although he was prepared to do so at the proper time, Plaintiff did not file his opposition to the Bank's 3 motions to compel because Magistrate Judge Major successfully resuscitated a settlement in mid-April 2005.

## Document and other Written Discovery

34. The activity code consuming the most time is document and other written discovery. Approximately 31% of all hours were spent on this activity (443.75 hours out of 1,417.99). Exhibit 2 reflects entries for this activity as "+ discovery."

35. As Exhibit 2 reflects, the work billed to this code encompasses traditional litigation activities. We propounded discovery to the Bank, responded to discovery propounded by the Bank, reviewed and produced our client's documents, met and conferred with opposing counsel to resolve discovery disputes, reviewed documents produced by the Bank, issued subpoenas to third parties, and reviewed the documents produced by those parties.

36. One of our earliest document discovery related tasks was assessing the Bank's compliance with the Court's order compelling it to produce its policy, procedures and training manuals. Initially, the Bank produced only 16 pages of documents in response to the order. We reviewed those pages for their merits content, as well as to assess the likelihood that the production was incomplete. We also met and conferred with opposing counsel concerning compliance with the Court's order, and evaluated remedies for the Bank's failure to comply.

37. Following our successful motion to enforce the order, the Bank produced 1,615 pages of documents on January 15, 2004, 739 pages of documents on January 28, 2004, and 60 pages of documents on February 3, 2004. Over the course of the litigation, the Bank produced over 2,500 pages of documents. Exhibit 5 is an excerpt from our document management database, managed by our paralegal, showing the titles of the documents the Bank produced and our summary of the basic content of the documents.

38.     Assuming only 5 minutes per page was required to read and understand each page, it would take 8 hours per day without a break for over 25 days to review all of the documents. In many instances, however, more than 5 minutes per page was required to decipher the documents and relate their content to the claims in the case.

39.     In addition, as our understanding of the Bank's policies and procedures evolved and as the legal and factual contentions in dispute developed and shifted, it was necessary for us to re-review and reconsider the content of many documents (e.g. March 10, 2004 RSG entry of 2.25 hours, noting "Further analysis of discovery and comparison of BofA's treatment of B. Willson w/ its treatment of R. Moore to assess viability of claims;" March 12, 2004 JWW entry of 1 hour, noting "Strategy and analysis with J. Pillette re: documents, interworkings of Visa and BofA"). This was particularly true in order to draft meaningful subsequent discovery requests (e.g. March 2, 2004, JWW entry of 4.75 hours, noting, "Revise discovery. Internet fact research, legal research, and document review for same;" May 6, 2004 RSG entry of 4.00 hours, noting "Further work on discovery issues and interrogatories - compare request language to BofA and VISA documents to ensure requests are focused on correct information"), and to negotiate responses to those requests (e.g. July 20, 2004, JWP entry of 4.70 hours, noting "Fact research for M&C issue re: data from BofA databases; compare VISA 'reason codes' with TILA billing error codes").

40.     Plaintiff propounded 5 sets of requests for production of documents. Our office researched, drafted, and served 4 sets of those requests, totaling 17 distinct requests.

41.     We also researched, drafted, and served three sets of interrogatories, totaling 17 requests.

42.     Finally, we research, drafted, and served 1 set of requests for admission, totaling 7 requests. In its response, a true and correct copy of which is attached as Exhibit 6, the Bank admits that it did not report to the credit reporting agencies that Plaintiff disputed the American Airline charge (RFA No. 6). The Bank also admits that it did not provide to Plaintiff a written notice of the name and address of each person to whom it made a report (RFA No. 7).

JWW Decl. ISO Mot. for Atty Fees & Costs                    CASE NO. 03CV 00520-IEG (BLM)

43. The Bank propounded 2 sets of requests for production of documents, 2 sets of interrogatories, and 1 set of requests for admission, totaling 91 requests. The bulk of these requests, 67 of them, were propounded after we became counsel of record in the action.

44. As a review of Exhibit 2 demonstrates, the parties' discovery generated a significant amount of hours meeting and conferring, researching contentions raised, drafting correspondence, responding to correspondence, consulting with our client, and the like.

45. For example, in April 2004, our associate expended approximately 14 hours (a) reviewing documents produced by the Bank for their responsiveness, (b) conducting legal research on bifurcating merits versus class discovery, an objection asserted by the Bank to avoid producing certain information, on who is the holder of a privacy right, an employee or the company, because the Bank asserted privacy objections, and on interrogatories with subparts to evaluate the Bank's supernumary objections, and (c) drafting meet and confer correspondence. (See, e.g., April 20, 2004, JWP entry of 0.50 hours, noting "Research meet & confer issues (privilege and overbreadth objections);" April 21, 2004, JWP entry of 4.00 hours, noting "Doc review, research meet & confer issues, draft M&C letter;" April 22, 2004, JWP entry of 3.90 hours, noting "Doc review, research meet & confer issues (bifurcation), draft M&C letter;" April 27, 2004, JWP entry of 2.00 hours, noting "Review documents produced by BofA to evaluate responsiveness to written discovery; Research meet & confer issues (holder of privacy right, multiple subparts, merits v. class discovery and timing); Draft M&C letter to J. Fink").

46. Similar work was required for the next several months. For example, on May 7, 2004, our associate met and conferred with Jonathan Fink (0.80 hours), and then researched, reviewed, and drafted a confirming letter of their conversation (6.00 hours). A true and correct copy of the letter sent to Mr. Fink is attached as Exhibit 7. Our associate reviewed Mr. Fink's response to that letter (0.50 hours on May 11, 2004), as well as a second letter by Mr. Fink a few days later (0.30 hours on May 17, 2004), and had a telephonic conference with Mr. Fink on May 20, 2004 (0.20 hours). In June, our associate wrote to Mr. Fink to follow up on outstanding discovery (e.g. June 3, 2004, JWP entry of 0.50 hours, noting "Draft letter to J. Fink re:

outstanding discovery;" June 4, 2004, JWP entry of 0.50 hours, noting "Draft letter to J. Fink re: outstanding discovery). More letters and the telephonic meet and confers they generated occurred in July (e.g. July 1, 2004, JWP entry of 0.20, noting "Review J. Fink corr & doc production, draft letter re: M&C;" July 2, 2004, JWP entry of 0.20, noting "Tel conf w/ J. Fink re: M&C;" July 12, 2004, JWP entry of 2.50 hours, noting "Prep for tel conf w/ J. Fink re: M&C;" July 12, 2004, JWP entry of 0.80 hours, noting "Tel conf. w/ J. Fink re: M&C;" July 12, 2004, JWP entry of 1.40 hours, noting "Draft confirm letter to J. Fink re: M&C").

47.     Plaintiff also conducted a third party discovery campaign. He subpoenaed documents from Visa, and the three major credit reporting bureaus, Equifax, Experian, and TransUnion. In addition to thoughtful drafting, each subpoena required follow up and negotiation. For instance, before Visa would produce documents, it insisted that Plaintiff agree to a separate protective order than the one entered in the litigation. Once it did produce documents, further meet and confer efforts were required to address gaps in the production. Of course, a substantive review of the documents produced also was undertaken. Approximately 41 hours billed to this activity code relate to third party discovery.

### Deposition Discovery

48.     Preparation for and taking or defending depositions accounted for approximately 12% of the hours expended on the litigation (165.20 hours out of 1,417.99). Exhibit 2 reflects entries for this activity as "+depo."

49.     We deposed four Bank employees, Olivia Martinez, Tina Buhrman, Sally McCormac, and Christine Perrino. Some of these witnesses were produced in response to a notice specifically naming them, and some of these witnesses were produced in response to a Rule 30(b)(6) notice containing four topics we noticed in December 2003.

50.     Olivia Martinez was the claims representative who corresponded with Plaintiff concerning his billing error dispute. Tina Buhrman was a consumer claims manager who both handled escalated disputes and oversaw billing error dispute resolution by claims representatives such as Ms. Martinez. Sally McCormac was the senior vice president of risk management

13

1  department for card services. She was responsible for the Banks policies relating to consumer

2  credit cards and implementation of various federal statutes implicated in this action.

3  Christine Perrino was the manager of the data retrievals team. Between the initiation of Plaintiff's

4  billing error dispute and the filing of litigation, the Bank changed computer systems. In response

5  to our requests for documents relating to Plaintiff, the Bank "swept" its computer systems three

6  times, each time generating more data. Ms. Perrino had some knowledge about the systems and

7  the means for retrieving information we sought, such as card holder statements.

8      51.    The majority of time billed to this code reflects Robert S. Green's (denoted as

9  "RSG" on Exhibit 2) and a paralegal's (denoted as "KPB" on Exhibit 2) efforts associated with

10  drafting the deposition notices, collecting and reviewing documents to use in the depositions,

11  communicating with opposing counsel to schedule the depositions, reviewing prior written

12  discovery responses for content relevant to the depositions, outlining questioning, and actually

13  taking the depositions.

14     52.    Disagreements regarding the scope of the notice and the Bank's compliance with

15  the notice not only generated delays in completing the depositions, but also generated additional

16  litigation hours. In fact, as Exhibit 2 reflects, in September and October 2004, the Bank still

17  refused to produce in response to our December 2003 notice a witness knowledgeable about the

18  Bank's credit reporting policies and practices relating to billing error disputes.

19     53.    The Bank took the position that Plaintiff lacked standing to challenge the Bank's

20  current policies and procedures since his dispute was handled years prior, and consequently, a

21  deposition covering the Bank's current policies and procedures was objectionable. A series of

22  letters between our associate and Jonathan Fink on this topic were exchanged. The matter

23  eventually escalated to my desk to evaluate wether motions practice was necessary and

24  appropriate. As Exhibit 2 indicates, toward the end of September 2004, I exchanged emails with

25  Scott Jacobs about the matter, called the court to secure a hearing date, and on October 1, 2004,

26  spent three and one half hours reviewing the prior correspondence and drafting a letter to

27  Jonathan Fink in a final attempt to favorably resolve the issue without motions practice. A true

28

14

and correct copy of that letter is attached as Exhibit 8. My correspondence generated a response from the Bank that required 3 additional hours of legal research and a second letter. A true and correct copy of that second letter is attached as Exhibit 9.

54. Shortly thereafter, the parties agreed to engage in settlement efforts and to exchange the information sought on this Rule 30(b)(6) topic in mediation.

55. A total of approximately 20 hours results from the Bank's deposition of Plaintiff. As reflected on various dates in June 2004 in Exhibit 2, these 20 hours include the time necessary to analyze the hot issues that would likely be covered during the deposition, to prepare documents to be produced at the deposition, to prepare the Plaintiff for his deposition, to travel to defend the deposition, and to actually defend the deposition.

### Settlement

56. Approximately 15% of all hours (218.30 hours out of 1,417.99) were spent negotiating, mediating, drafting, and finalizing the settlement agreement, making this the third most time intensive activity. Exhibit 2 reflects entries for this activity as "+settlement."

57. Settlement efforts span more than one year. In March 2004, the parties attended a Mandatory Settlement Conference with Magistrate Judge Major. Myself, Robert S. Green, and Plaintiff were present for the conference. Jonathan Fink represented the Bank and was accompanied by an employee of the Bank whom we believe had drastically limited, if not zero, authority to negotiate policy or procedural changes sought by Plaintiff.

58. As Exhibit 2 reflects, in preparation for the conference, we researched and drafted a Mandatory Settlement Conference statement, analyzed the strengths and weakness of Plaintiff's claims for injunctive relief, analyzed Plaintiff's individual claims, and met with our client to discuss all claims and agree upon a reasonable settlement strategy.

59. Unfortunately, the April 14, 2004 conference quickly disbanded because the Bank insisted that Plaintiff provide an overall monetary demand that included attorneys' fees prior to discussing any potential relief to the putative class. The ethical barrier for class counsel to provide such a demand prior to agreeing upon relief to the putative class put us in an

15

1 irreconcilable conflict.

2     60.     Approximately two months later, at the end of June 2004, Plaintiff reached out to

3 the Bank by providing a detailed demand letter that addressed the policy and procedural changes

4 he sought on behalf of its card holders. Exhibit 2 reflects the research and drafting necessary to

5 develop the written proposal and to consult with Plaintiff concerning the demand.

6     61.     The Bank never responded to our written demand.

7     62.     In October 2004, while scheduling the deposition of the Bank's designee regarding

8 credit reporting procedures with Scott Jacobs, I clarified that Plaintiff sought information

9 concerning how the Bank's billing error resolution department interacted with the Bank's credit

10 reporting division when a second written dispute was received to ensure the mandates of Section

11 1666a were followed. This conversation was a catalyst to discuss settlement again because both

12 parties believed it would be more economical to exchange the information Plaintiff sought

13 through mediation.

14     63.     Hence, between October 2004 and November 12, 2004, Exhibit 2 reflects

15 conversations with opposing counsel over the choice of a mediator (we agreed upon the

16 Honorable J. Sarokin (ret.)), preparing a settlement package for Judge Sarokin, meeting with our

17 client prior to mediation, and, of course, travel and participation in the mediation.

18     64.     Following the mediation, the parties began drafting a term sheet.

19     65.     The parties' counsel participated in a second mediation with Judge Sarokin in

20 mid-December 2004 in an effort to finalize the term sheet, to discuss the individual relief to our

21 client, and to resolve an impasse over the Bank's desire for appellate rights following the Court's

22 determination of the amount of attorneys' fees.

23     66.     The parties eventually agreed that the Bank could appeal a fee award of any size

24 provided that it paid an agreed portion of the award pending the appeal.

25     67.     Simultaneous with the negotiations over the mechanics of an appeal of an

26 attorneys' fee award, Plaintiff shared lodestar information with the Bank in an effort to settle the

27 entire litigation and avoid the time, delay, and expense of briefing attorneys' fees. We provided

28

16

lodestar information based on old rates that had been approved by the Honorable J. Chesney, District Court Judge in the Northern District of California. We hoped that negotiating from older, previously approved rates would expedite the process and increase the likelihood of a non-litigated resolution. While those discussions were not fruitful, we do not apply for an award based on the current rates of each time keeper because we believe it would be unfair to present the Court with radically different lodestar information than we gave the Bank the opportunity to consider.

68. On February 18, 2005, Scott Jacobs and I called Magistrate Judge Major's chambers to announce that we had reached a settlement in principle, and to request that all then pending litigation events be taken off calendar. The parties then submitted a Joint Notice of Settlement.

69. For the next month, the parties worked to draft a formal settlement agreement from the term sheet. As is often the case, the 'devil is in the details,' and much back and forth discussion between the parties and with our client was necessary to finalize the formal settlement agreement.

70. On March 18, 2005, I received a telephone call from Abe Colman in which he advised me that the Bank was reneging on the settlement. Specifically, the Bank no longer agreed to the mechanics for determining and paying attorneys' fees.

71. We utilized the assistance of Judge Sarokin once more, but were unable to overcome the Bank's refusal to honor the prior agreement.

72. We informed Magistrate Judge Major of the collapse and, at her direction, prepared a letter explaining our view of the situation. Magistrate Judge Major then convened a settlement conference on April 13, 2005.

73. Myself, Robert S. Green and Plaintiff attended the settlement conference. Much like the prior settlement conference, however, the Bank did not send a representative with settlement authority to attend in person. Notwithstanding this hurdle, Magistrate Judge Major was able to successfully settle the issue of the mechanics of an appeal of the attorneys' fee award.

17

| JWW Decl. ISO Mot. for Atty Fees & Costs | CASE NO. 03CV 00520-IEG (BLM) |

1    The parties revised the settlement agreement to reflect the new agreement, and I oversaw making

2    sure Plaintiff understood and timely signed the agreement.

3        74.    In June 2005, I again presented the Bank's counsel with the billing detail

4    information contained in Exhibit 2 in a further effort to avoid the time, delay, and expense of

5    briefing payment of reasonable attorneys' fees and costs.

6        75.    Approximately 345 non-settlement related litigation hours were expended on this

7    action between June 2004 when Plaintiff made a written settlement proposal, and April 2005

8    when Magistrate Judge Major was able to rescue the settlement.

9                            **Research/Case Assessment**

10       76.    Legal and factual research, and other case assessment activities account for

11   approximately 5% of the total hours (69.30 hours out of 1,417.99). Exhibit 2 reflects entries for

12   this activity as "+research."

13       77.    A law clerk (denoted as "JJJ" in Exhibit 2) spent 9 hours over the course of

14   several days in the beginning of December 2003 researching potential TILA claims to assert

15   against the Bank to assist the partners in evaluating whether the case presented a viable class

16   action. Specifically, he researched the implementing regulations of the Fair Credit Billing Act to

17   understand the complete statutory scheme and to determine whether the Bank was required to use

18   specific language in communicating Fair Credit Billing Act rights to its card holders.

19       78.    Approximately 22 hours were spent in January 2004 on various factual and legal

20   matters necessary for drafting the Amended Complaint. Some of the legal issues we researched

21   include the statute of limitations set forth in TILA, as it applies to Sections 1666, 1666a, and

22   1666i (5.25 hours), choice of law (0.5 hours), and the availability of injunctive relief under TILA

23   (5.0 hours). On the factual side, our paralegal researched the Bank's state of incorporation (0.5

24   hours) and its business ties to California (3.5 hours).

25       79.    Approximately 13.5 hours captured in this activity code relates to research for

26   discovery issues. For example, on May 20, 2004, I spent an hour and 15 minutes reviewing our

27   client's facts and relevant case law in order to draft accurate and thorough responses to certain of

28

                                        18

1 | the Bank's requests for admission. On May 21, 2004, I spent 3 hours conducting legal research
2 | regarding the definition of "consumer credit" to draft accurate and thorough objections and
3 | responses to certain of the Bank's interrogatories. Similarly, on June 27, 2004 and June 28, 2004,
4 | an associate conducted a total of 6 hours of legal research to evaluate the strength of certain of
5 | the Bank's objections to discovery we propounded to assist with a meet and confer concerning
6 | those objections.

7 | 80.    The balance of the hours billed to the "+research" code involve on-going case
8 | assessment activities. For instance, one issue raised was the import of Plaintiff having flown on
9 | one leg of his round trip ticket, but disputed the entire charge as a billing error. I spent 45
10 | minutes on May 21, 2004 analyzing this issue and drafting a memorandum to the file containing
11 | my conclusions.

12 | 81.    In August 2004, we became aware of a complaint alleging anti-trust claims
13 | against Visa wherein chargebacks and their attendant financial incentives/disincentives for
14 | merchants and credit card issuers was discussed at some length. The complaint was a valuable
15 | source of information about chargebacks resulting from billing error disputes, and about Visa, an
16 | important third party influencing some of the Bank's conduct at issue in this case. We spent a
17 | total of 3 hours reviewing that complaint and assessing its import to the development of our
18 | litigation.

19 | 82.    As part of our efforts to fully assess the strengths and weakness of our case in
20 | advance of the second mandatory settlement conference and better understand the case overall,
21 | on May 21, 2004, we spent 3 hours researching existing case law that demonstrated how Section
22 | 1666i was intended to operate within the overall structure of the Fair Credit Billing Act. We
23 | concluded that credit reporting protections secured via prosecution of Plaintiff's Section 1666a
24 | claim would similarly effectuate the credit reporting protections of Section 1666i and its related
25 | regulatory provisions. The results of this research were incorporated into our mandatory
26 | settlement conference statement.
27 |
28 |

83. Strategy and analysis of class certification issues accounts for 5% of all hours (75.10 hours out of 1,417.99). Class certification related time entries in Exhibit 2 are denoted by "+class cert."

84. While Plaintiff never moved for class certification, it was essential for us to understand the issues presented by such a motion in order to craft meaningful written discovery, ask appropriate questions in depositions, advise our client, evaluate settlement, and, of course, to prepare such a motion when the time came.

85. One of the central issues presented in every Fair Credit Billing Act case is whether the credit at issue is an extension of "consumer" (as opposed to business) credit triggering TILA's protections. In order for there to be an extension of consumer credit, there first must be an extension of "credit." TILA defines "credit" as "the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment." 15 U.S.C. 1602(e). When a credit card account is opened, the creditor grants the right "to incur debt and defer its payment;" when the card is used, the creditor allows the card holder to "defer payment of debt." Thus, a creditor extends "credit" when it opens (or renews) an account, as well as when the card holder actually uses the credit card to make a purchase.

86. TILA defines the adjective "consumer," when used in reference to a credit transaction, to mean that the transaction is one "in which the party to whom credit is offered or extended is a natural person, and the money, property, or services which are the subject of the transaction are primarily for personal, family, or household purposes." 15 U.S.C. § 1602(h).

87. The Fair Credit Billing Act does not distinguish between the two kinds of transactions included in the definition of "credit" that must satisfy the definition of "consumer." Hence, because every credit card transaction involves at least two extensions of credit — (1) the initial application and issuance of the card to open the account, and (2) the transaction in which the card is used to purchase a good or service — a critical issue at class certification is whether the transaction that must be primarily for personal, family, or household purposes is the initial

20

1  extension of credit or the billing error in question. If the relevant transaction is the latter,

2  individual issues might predominate because a court might need to determine whether each

3  proposed class member's transaction was primarily for personal, family, or household purposes.

4  If it is the former, all credit card accounts opened by consumers (which were distinguished by the

5  Bank from accounts opened by businesses) qualify as "consumer" credit, entitling them to

6  TILA's protections.

7       88.    While the issue is interesting and complex, suffice to say here that courts disagree

8  over the proper analytical framework for deciding whether the credit at issue in a particular case

9  is an extension of "consumer" credit. Thus, to understand the various methodologies used,

10  discern patterns from the contexts in which they were applied, analyze the factual evidence

11  offered in support or in opposition to a particular methodology, and apply each scenario to the

12  facts of our case, we thoroughly researched the consumer versus business credit distinction.

13       89.    We considered the issue critical to succeeding in certifying the Rule 23(b)(2) class

14  pleaded in the complaint. We revisited and reconsidered the strengths and weaknesses of the

15  various approaches as we developed more information through discovery. We also used the

16  resulting research to propound discovery requests to ensure we obtained the factual

17  underpinnings we believed necessary to be successful on a class certification motion.

18       90.    Class certification would have been the next pivotal pre-trial motion briefed had

19  the parties not reached a settlement agreement.

20       91.    We also provided an extensive written analysis of the issue in a letter to our client

21  so that he could participate in case strategy and properly represent the putative class' interests.

22  The time attributable to this essential research, analysis, and advice totals 69.50.

23       92.    The remaining 5 hours and 36 minutes billed to this activity code are attributable

24  to researching the adequacy of Mr. Moore as a class representative. This research was conducted

25  in January 2004 as part of our case assessment prior to filing an amended complaint on behalf of

26  a putative class of card holders. Similarly, we researched challenges to Mr. Moore's adequacy

27  based on his law firm's prosecution of the action on an individual basis for nearly one year prior

28

  JWW Decl. ISO Mot. for Atty Fees & Costs        CASE NO. 03CV 00520-IEG (BLM)

1   to our involvement.

2                                   **Court Appearances**

3          93.    Court appearances account for only 2% of the hours expended (29.20 hours out of

4   1,417.99). Court appearance related time entries in Exhibit 2 are denoted by "+court."

5          94.    Robert S. Green spent 7 hours preparing for and participating in the January 8,

6   2004 hearing on Plaintiff's motion to enforce Plaintiff's motion to compel the Bank's production

7   of policy, procedures, and training manuals. Plaintiff was successful in his motion to enforce the

8   order.

9          95.    A total of 0.50 hours relate to the hearing on Plaintiff's second motion to compel,

10  which also was granted after supplemental submissions. An associate represented Plaintiff at the

11  July 15, 2004 hearing. In advance of the hearing, the associate reviewed electronic discovery

12  materials and factual information about the Bank's computer systems developed in discovery to

13  articulate why, contrary to the Bank's assertions, the Bank could retrieve the information about

14  credit card holders' billing error disputes Plaintiff sought in his interrogatories. The associate also

15  consulted with the partners about which facts and requests to emphasize to the Magistrate Judge,

16  and the scope of his authority should there be a pre-hearing opportunity to informally resolve the

17  impasse. The associate reported the results of the hearing to me after it was concluded. As

18  discussed in Paragraph 13, in the exercise of billing judgment, we reduced the associate's

19  compensable preparation time from 10.70 hours to 2.

20         96.    Just over 7 hours relate to my interactions with the Court concerning settlement.

21  Magistrate Judge Major scheduled several telephonic status conferences to track the progress (or

22  lack thereof, as was occasionally the case) of settlement discussions. The entries on Exhibit 2

23  dated March 25, 2005, April 8, 2004, and May 5, 2005, all coded as "+court," reflect my

24  participation in those telephonic status conferences. My entries on March 8, 2005 and March 24,

25  2005, respectively, reflect my review of the Magistrate's order setting the conference to

26  determine what was required of Plaintiff and the date of the conference, and my review of that

27  order the day before the scheduled conference to ensure Plaintiff had complied with it.

28

                                              22

1    97.    Magistrate Judge Major also scheduled an in-person settlement disposition

2    conference. A 15 minute conversation I had with opposing counsel on April 7, 2005 to determine

3    counsels' availability and the availability of our respective clients is reflected in this activity code,

4    as well as my travel time and participation in that conference (a total of 6 hours logged on April

5    12, 2005 and April 13, 2005).

6    98.    The final hour and a half results from Robert S. Green's preparation and

7    participation in a June 29, 2004 conference with Magistrate Judge Major concerning an extension

8    of the discovery cut-off. Both parties agreed that the then existing deadline should have been

9    moved, but disagreed about the date of the new cut-off. With the input of an associate who had

10    been primarily responsible for conducting discovery meet and confers, we developed a schedule

11    to propose to the Magistrate that realistically accounted for the discovery that needed to be

12    conducted. Magistrate Judge Major rejected the Bank's proposed discovery cut-off in favor of a

13    date premised on Plaintiff's pre-trial schedule.

14    **Meetings/Communications**

15    99.    This activity code represents 1% of the total hours (16.07 hours out of 1,417.99).

16    Exhibit 2 reflects entries for meetings and communications as "+meetings/commu."

17    100.    The majority of the entries in this activity code relate to our firm's initial contacts

18    with Moore, Brewer, Jones, Tyler & Wolfe LLP. In November and December 2003, Exhibit 2

19    reflects conversations with the attorneys at Moore, Brewer, Jones, Tyler, & Wolfe LLP to learn

20    the status of the action, the likelihood of a viable class action for injunctive relief, and gather the

21    factual information necessary for us to independently evaluate the merits of the action. The time

22    entries also reflect our internal meetings to discuss whether the action was appropriate for our

23    expertise, and the existing work load of the attorneys necessary to efficiently and effectively

24    substitute in as counsel of record.

25    101.    Other entries in this activity code reflect communications with the Court and

26    opposing counsel. For example, February 18, 2005, March 10, 2005, and April 6, 2005, I

27    contacted Magistrate Judge Major's clerk regarding scheduling matters and court conferences.

28

1    Similarly, on May 17, 2004, I returned a call from Abe Colman, and on October 6, 2004 and

2    October 19, 2004, I had a telephone conversation with Scott Jacobs regarding scheduling a Rule

3    30(b)(6) deposition on credit reporting issues and regarding an informal exchange of similar

4    information through mediation instead.

5        102.    Exhibit 2 also reflects a telephone conversation my partner, Robert S. Green had

6    with our client regarding the status of the case and the motion to compel further responses to

7    discovery we anticipated the Bank would (and did) file.

8        103.    Finally, 5 hours and 15 minutes were spent over the course of several days in June

9    2004 internally discussing the next steps to take in the litigation and developing a consistent

10   settlement and litigation strategy. These discussions ultimately culminated in a settlement

11   proposal letter sent to the Bank's counsel on June 24, 2004.

12                      **LITIGATION RISKS AND RESULTS**

13       104.    A true and correct copy of The Settlement Agreement and Release is attached as

14   Exhibit 10. A true and correct copy of the Declaration of Tamara Lease Pursuant to Confidential

15   Settlement Agreement is attached as Exhibit 11.

16       105.    The settlement agreement provides benefits relating to billing error investigations

17   and subsequent credit reporting to all credit card holders such that it accomplishes comparable

18   purposes as a successfully litigated certified class of credit card holders would have. We believe

19   the settlement agreement provides significant benefits to a large number of credit card holders,

20   and is a fair, reasonable, and adequate resolution of the claims presented in the amended

21   complaint.

22       106.    The settlement also accomplishes our client's individual objectives. The Bank

23   requested all three credit reporting bureaus delete any reporting of Plaintiff's account from his

24   credit history. The Bank also provided a letter for Plaintiff to show any creditor who may rely on

25   an old copy of his credit report. This letter informs the potential creditor that Plaintiff notified the

26   Bank of his dispute in November of 1999, that it has now been resolved, and that the Bank

27   requested the credit bureaus to delete its reporting on the account. The Bank also paid Plaintiff

28

1  $1,000, the maximum statutory penalty under TILA.

2  107.   The benefits provided by the settlement agreement to Plaintiff and current and

3  future credit card holders are particularly commendable in light of the legal and factual hurdles

4  Plaintiff faced, and the delay in receiving those benefits he and other credit card holders would

5  have otherwise encountered had the litigation continued. For example, it was uncertain which

6  transaction — the initial extension of credit or the use of the credit card for the disputed

7  transaction — would have qualified as "consumer" credit triggering TILA's protections. As

8  discussed previously, this legal issue presented a significant risk at the class certification stage.

9  108.   The transaction triggering Plaintiff's billing error dispute similarly raised litigation

10  risks. Plaintiff contended that the service he purchased, the airline flight, was not delivered to

11  him. It could be argued, however, that what Plaintiff purchased was the right to board the

12  airplane, and that right was delivered to him when he received his electronic ticket. Further, there

13  was a possibility that Plaintiff purchased a non-refundable ticket, which could have given rise to

14  defenses unique to Plaintiff.

15  109.   Due to these and other litigation risks, we expected that, if we prevailed, we

16  would receive more than the hourly rate paid to attorneys on a non-contingent basis.

17  **HOURS SPENT SEEKING PAYMENT OF REASONABLE ATTORNEYS' FEES**

18  110.   Hours spent consulting with experts, and other counsel, and conducting research

19  for and drafting this fee petition also are included in Exhibit 2. The activities appear in various

20  billing codes ("+pldgs/motions," "+research," and "+settlement"), but are clearly identifiable

21  because they specify fee-related work (e.g.. April 29, 2005 RSG entry of 1.7 hours, denoting

22  "Review documents from AFCA litigation and Peregrine bankruptcy where the courts approved

23  hourly rates in connection with preparation for fee application"). As of July 22, 2005, we have

24  spent approximately 192 hours, for a lodestar of $58,182, preparing all of the papers necessary to

25  obtain payment of reasonable attorneys' fees and costs.

26

27

28

JWW Decl. ISO Mot. for Atty Fees & Costs                    CASE NO. 03CV 00520-IEG (BLM)

## OUT-OF-POCKET EXPENSES

111. My firm expended a total of $29,624.65 in unreimbursed out-of-pocket costs and expenses in connection with the prosecution of this litigation. These expenses break down as follows:

| | |
|---|---:|
| Commercial Copies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $72.30 |
| Messenger, Courier Expense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 342.30 |
| Filing Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,397.98 |
| Postage/Delivery Fees (Federal Express) . . . . . . . . . . . . . . . . . . . . . . | 624.27 |
| Reproduction/Copies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,116.80 |
| Telephone & Facsimile . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,926.12 |
| Transcripts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,445.51 |
| Travel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 9,800.37 |
| Process Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 99.00 |
| Expert Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,500.00 |
| Mediation Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 7,300.00 |
| TOTAL . . . . . . . . . . . . . | $29,624.65 |

112. The expenses incurred are for charges pertaining to this case and are reflected in the books and records of this firm. These books and records are prepared from expense vouchers and check records and are an accurate record of the expenses incurred.

113. Upon request, we will provide the Court with copies of documentation for each of the costs itemized above.

114. Travel expenses are customarily billed to fee-paying clients. The travel expenses for which we seek reimbursement relate to attending court hearings, mediation sessions, and depositions. We used discount carrier airlines, such as Southwest Airlines, for all flights.

1     115.     The entry for expert fees is the $2,500 retainer paid to Richard LeFebvre for his

2 work in connection with this motion, as reflected in his Declaration submitted herewith.

3     116.     The entry for mediation services reflects payments made by us to ADR Services,

4 Inc. for our portion of the time Judge Sarokin spent mediating this action.

5                                       **ADDITIONAL DOCUMENTATION**

6     117.     Exhibit 12 contains true and correct copies of letters dated March 15, 2000 (Bates

7 No. JRM0091) and February 7, 2003 (Bates Nos. JRM00116-120) that Plaintiff sent to the Bank.

8     118.     Exhibit 13 is a true and correct copy of the testimony of Edward M. Gramlich, a

9 member of the Board of Governors of the Federal Reserve System, before the U.S. Senate

10 Committee on Banking, Housing, and Urban Affairs, given May 17, 2005.

11     119.     Exhibit 14 is a true and correct copy of the article "Credit Report Accuracy and

12 Access to Credit," published in the Federal Reserve Bulletin, Summer 2004 at 297.

13        I declare under penalty of perjury that the foregoing is true and correct. Executed on

14 July 22, 2005 at San Francisco, California.

15

16                                   

17                          Jenelle Welling

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Exhibits**                                                                                           **Page**

1  Firm Resume of Green Welling LLP                                                                      29

2  Green Welling LLP Chronological Billing Detail                                                        35

3  Order Granting Plaintiffs' Motion for an Award of Attorneys' Fees and
   Reimbursement of Expenses, filed February 28, 2003 (*Mitchell v. Bankfirst*,
   N.D. Cal. Case No. C-97-1421-MMC)                                                                    104

4  Joint Letter Report to Magistrate Judge Major, dated July 23, 2004                                   113

5  Excerpt from Green Welling Document Management Database                                              125

6  Defendant B of A's Response to Requests for Admission, Set No. 1                                     134

7  Letter from J. Pillette to J. Fink, dated May 7, 2004                                                140

8  Letter from J. Welling to J. Fink, dated October 1, 2004                                             144

9  Letter from J. Welling to J. Fink, dated October 7, 2004                                             148

10 Settlement Agreement and Release                                                                     151

11 Declaration of Tamara Lease Pursuant to Confidential Settlement Agreement,
   dated May 23, 2005                                                                                   161

12 Letters from R. Moore to B of A, dated March 15, 2000 and February 7, 2003                           183

13 Testimony of Edward M. Gramlich, given May 17, 2005                                                  189

14 "Credit Report Accuracy and Access to Credit," published in the <u>Federal
   Reserve Bulletin</u>, Summer 2004                                                                     199



G R E E N ■ W E L L I N G L L P

# FIRM RESUME

## Litigation Approach

The Firm's business strategy is to aggressively develop and pursue opportunities in the field of class action litigation. The Firm's principals have many years of experience in class action litigation. The Firm relies heavily on highspeed scanning and paperless distribution through their computer system to generate efficiencies in legal research and drafting, time-keeping, financial control and planning.

The Firm's class action practice involves claims relating to violations of antitrust law, consumer protection laws, truth in lending legislation, financial services, securities offerings, accounting malpractice, breach of fiduciary duties of corporate officers and directors, and products liability.

The aggressive, result-oriented approach to client representation applied by the Firm and its principals has been demonstrated in the following litigation:

- *In Re: Providian Credit Card Cases.* Robert S. Green was appointed co-lead counsel in this national class action brought on behalf of Providian credit card customers who were improperly charged late fees, higher interest rates on balance transfers, and fees for add-on products, including Credit Protection, PricePro, Drive Pro, HealthPro, and credit line increases. The San Francisco Superior Court approved a settlement for $105 million, which covered restitution to Providian customers, "in-kind" payments to customers, and the costs and expenses of the litigation.

- *In re: Tenet Healthcare Cases II.* Jenelle Welling serves on the Plaintiffs' Executive Committee in this consolidated action seeking redress for uninsured consumers who received treatment from one of Tenet Healthcare's 42 California hospitals. The complaint alleged Tenet charged exorbitant and unconscionable prices, for example, marking up prescription drugs 1,038% on average, to increase revenues and profits. A proposed settlement was reached in April 2005 that provides for restitution, injunctive relief and $4 million of cy pres damages.

- *XO Communications, Inc. Securities Litigation.* Green Welling LLP represented shareholders in class litigation pending in Delaware who suffered losses in connection with XO's slide into bankruptcy in 2002. In September 2002, the Supreme Court of New York approved a global settlement of the New York and Delaware class action cases that provided a cash fund of over $8 million to shareholders.

Ex. 1
29

- *McKesson Inc. Derivative Litigation.* McKesson-HBOC, Inc. lost $9 billion in stock market capitalization in one day during April 1999 after announcing that prior financial statements would be restated due to accounting errors. Rather than pursuing the individuals and companies who participated in the conduct that led to the accounting restatements, the company sued its own shareholders in a case that was promptly dismissed by the Ninth Circuit U.S. Court of Appeals. As co-counsel for plaintiff shareholders seeking to recover money on behalf of the corporation from the wrongdoers, the firm obtained an important decision from the Delaware Supreme Court expanding the rights of shareholders to obtain and inspect corporate documents where there is a proper purpose for investigating potential wrongdoing. *See Saito v. McKesson HBOC, Inc.*, 806 A.2d 113 (Del. Supr. 2002). We are continuing to seek recovery in Delaware Chancery Court on behalf of the company.

- *Mitchell v. American Fair Credit Association.* In February 2003, attorneys for Green Welling LLP with co-counsel negotiated an $8.6 million cash fund to be distributed to victims of AFCA's credit repair scheme. Through the settlement, consumers also obtained debt forgiveness for outstanding membership dues and credit repair.

- *Prata v. Bank One.* Green Welling LLP represented the plaintiff class in this case involving "Same as Cash" credit card financing claims. On December 12, 2002, the Superior Court in Los Angeles approved a $3 million cash settlement for California consumers who participated in the "Same as Cash" financing plan.

- *Starkey v. Rusnak BMW.* Jenelle Welling led this class action asserting that expensive BMW wheels on new cars were secretly replaced before sale with lower value after market wheels. The action resulted in a substantial settlement including an agreement by the dealer to refrain from selling after market wheels on new cars.

- *Demando v. Morris (Capital One Bank).* Robert Green served as lead trial and appellate counsel in this TILA class action. The Ninth Circuit Court of Appeals reversed the district court's grant of summary judgment to the defendant and found that Capital One's notice of change in terms higher than that promised constituted a violation of the Truth in Lending Act. *Demando v. Morris*, 206 F.3d 300 (9th Cir. 2000). Overcharges were refunded to all affected cardholders.

- *Prata v. GE Capital.* Green Welling LLP restored another $2.5 million to Californians who were duped by the "Same as Cash" advertising slogan and program that GE bought from Bank One. GE also agreed to refrain from using the "Same as Cash" slogan to advertise financing plans that require minimum monthly payments.

- *Kalhammer v. First USA Bank.* Robert Green served as primary counsel in this consumer class action asserting violations of the Truth in Lending Act and breach of contract. In November 1997, a settlement providing $6 million in cash and credits to First USA credit cardholders was approved by the U.S. District Court for the Northern District of California.

- *Calvin v. Zaken.* Green Welling LLP attorneys represented retired and disabled individuals who were drawn into the Zaken Company's work at home scheme. The case asserted claims under California's elder abuse statutes, the Consumer Legal Remedies Act and California's Unfair Competition Law. Green Welling obtained significant monetary relief for the plaintiffs and an enforceable agreement strictly regulating the advertising and business practices of the defendants.

- *Equitec Roll-Up Litigation.* In 1994, Robert Green was a key member of the trial team in this federal securities class action. Plaintiffs asserted claims in connection with the merger or "roll-up" of ten real estate limited partnerships. By the end of a six month trial, the defendants including Dean Witter, Smith Barney, Hallwood and others had settled for over $30 million.

- *Brauer v. Primetime 24 Joint Venture and DirecTV, Inc.* In this national class action, the Plaintiff sought damages for a class of 900,000 subscribers to satellite TV, whose network programming (ABC, CBS, NBC, Fox) was cut off after DirecTV and PrimeTime were found to have violated the United States Copyright Act by retransmitting the programming to those subscribers. Under a settlement valued at $44 million, the defendants provided a package of free, premium movie programming to the class. The settlement was approved April 2001.

- *In Re: Prison Realty Securities Litigation.* In this lawsuit, shareholders of CCA Prison Realty Trust and Corrections Corporation of America sought damages on behalf of investors against a real estate investment trust and its officers and directors, following defendants' alleged false statements made in the context of a merger between Corrections Corporation of America and CCA Prison Realty Trust and subsequent operation of the merged entity. On February 13, 2001, the Court granted final approval to a settlement for over $104 million in cash and stock.

- *In re Salomon Analyst Litigation.* Green Welling LLP serves as co-lead counsel for the class. Pending in the U.S. District Court for the Southern District of New York, this case asserts claims against the securities analyst, Jack Grubman, and his employers at Solomon Smith Barney for manipulating the price of XO stock in order to gain investment banking business.

- *Isco v. Kraemer (In re UDC Homes, Inc)*. Securities class action against officers and directors of real estate development company and its auditors. Robert Green assumed lead role in obtaining $16.75 million in partial settlements. Mr. Green also participated as trial counsel in a five month trial against the company's outside auditors.

- *In re Bridgestone/Firestone, Inc., ATX, ATX II and Wilderness AT Tires Products Liability Litigation.* Robert Green served as chairman of the Law Committee of this nationwide MDL products liability action brought on behalf of owners of certain Firestone tires and Ford Explorers asserting claims under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 et seq., state consumer protection statutes and common law. In March 2004, a Texas court approved a nationwide settlement with Firestone. Firestone agreed to spend $15.4 million on consumer education for three years and to implement tire design changes to provide better high speed capacity. Firestone also will replace any recalled tires still on consumers' vehicles at no charge. In June 2005, the Superior Court of California certified a class of California residents that purchased Ford Explorers.

## Partners

**Robert S. Green** has practiced extensively in the fields of complex and class action litigation since 1988. Before forming Green Welling, Mr. Green was a partner in the firm of Girard & Green. He graduated with honors from the University of the Pacific, McGeorge School of Law in 1984. Mr. Green received his Masters of Business Administration degree from California State University-Sacramento in 1989 and his undergraduate degree with distinction from Oregon State University in 1981. He is an active member of the National Association of Consumer Attorneys (NACA) and of the Association of Trial Lawyers of America (ATLA), and is an Editorial Advisor for the Consumer Financial Services Law Report. Mr. Green also is a member of the Partners' Council for the National Consumer Law Center and is a former Chairman of the Board of Marin AIDS Interfaith Network.

**Jenelle Welling** graduated from the University of California Hastings College of the Law in 2000, where she was honored with the American Jurisprudence Award in both Moot Court and Trial Advocacy. She also was a member of the Hastings Women's Law Journal. Prior to law school, Ms. Welling received a Masters Degree in Public Policy from the University of California at Berkeley. She graduated with Highest Honors from the University of California at San Diego with a Bachelor of Arts degree in Political Science. Ms. Welling is an active member of the Bar Association of San Francisco (BASF), and the Consumer Attorneys of California (CAOC).

## Associates

**Kamon Naddaf** graduated from UC Berkeley School of Law, Boalt Hall in 2003. She was a member of the Berkeley Women's Law Journal and the Asian Law Journal. Ms. Naddaf received two BAs from UC Berkeley where she graduated with distinction in general scholarship and majored in both Political Science and Rhetoric. After earning her BA, she worked for Americorps focusing on homeless policy reforms in the Bay Area.

**Avin P. Sharma** graduated from UC Hastings College of the Law in 2004. He was a member of the Hastings International and Comparative Law Review. Mr. Sharma was a judicial extern at the San Francisco Superior Court for the Honorable A. James Robertson II, the Honorable James J. McBride, and the Honorable Ronald E. Quidachay. He was also a judicial extern for the Honorable Saundra B. Armstrong of the U.S. District Court for the Northern District of California. Mr. Sharma received a B.A. in Business Economics and a B.A. in Political Science from the University of California at Santa Barbara.

**Brian S. Umpierre** graduated from Villanova University School of Law in 1998. He was an extern for the U.S. Environmental Protection Agency - Region III in Philadelphia, PA and a member of the Latin American Law Students Association. He is a graduate of the University of Scranton, where he was a member of Alpha Kappa Delta, the International Sociology Honor Society. Brian Umpierre is licensed to practice in California.

## Bios on Additional Counsel Who Worked on *Moore v. Bank of America Corporation*

**John W. Pillette** graduated from the University of Maryland School of Law in 1998 and has worked exclusively in the area of complex litigation. Mr. Pillette worked for the Washington, D.C. consumer law firm of Moore & Brown and simultaneously served as an editor, researcher, writer, and consultant with that firm's associated bimonthly legal periodical *Class Action Reports.* He has written the following articles: *Aggregation of Class Action Claims to Satisfy 28 U.S.C. §1332's Amount in Controversy Requirement,* 22 Class Action Rep. 408 (2001); and *The "Plain Meaning Rule"-Constructive or Reductive? (The Split Over 28 U.S.C. § 1367),* 23 Class Action Rep. 1 (2002). He is admitted to practice before the state courts of Maryland and California, the United States District Courts for the Northern, Central, Southern, and Eastern Districts of California, and the Ninth Circuit Court of Appeals. He is a member of the American Trial Lawyers Association (ATLA) and the American Society of Writers on Legal Subjects (Scribes). He received his undergraduate degree from St. John's College.

**James J. Jirn** is a 2002 graduate of the Northeastern University School of Law.

**Selection Criteria**

| Case (hand select) | Include: BOA Moore |
| Dates and Time | 9/22/2001 - Latest: |
| Posting Status | |
| Slip Date | |

Rate Info - identifies rate source and level

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper Activity Case | Units DNB Time / Variance | Rate Rate Info Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45270 11/17/2003 WIP Telephone call with T. Keeley re ▮ and conduct background research re claim | TIME RSG +meetings/commu BOA Moore | 1.30 0.00 | 425.00 T@5 | 552.50 | 552.50 |
| 29536 11/18/2003 WIP Discuss BoA/T. Keeley case with R. Green. Read pleadings re same. | TIME JWW +pldgs/motions BOA Moore | 0.75 0.75 | 300.00 T@5 Do Not Bill | 225.00 | 0.00 |
| 29540 11/19/2003 WIP Phone call with T. Keeley re ▮ | TIME JWW +meetings/commu BOA Moore | 0.25 0.00 | 300.00 T@5 | 75.00 | 75.00 |
| 30206 12/2/2003 WIP Analysis of claims asserted against BoA by R. Moore, research re same | TIME JJJ +research BOA Moore | 2.00 0.00 | 195.00 T@5 | 390.00 | 390.00 |
| 30258 12/2/2003 WIP Phone call with Duane Tyler re ▮ | TIME JWW +meetings/commu BOA Moore | 0.75 0.00 | 300.00 T@5 | 225.00 | 225.00 |
| 30208 12/3/2003 WIP Analysis of claims asserted against BoA by R. Moore, research re same | TIME JJJ +research BOA Moore | 4.00 0.00 | 195.00 T@5 | 780.00 | 780.00 |
| 30272 12/5/2003 WIP | TIME JWW +meetings/commu BOA Moore | 2.00 0.00 | 300.00 T@5 | 600.00 | 600.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper Activity Case | Units DNB Time / Variance | Rate Rate Info Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| Discuss possible BoA case with R. Green, J Jim, R. Jigarian. Call referring attorney re same. | | | | | |
| 30217 12/5/2003 WIP Research Truth and Lending Act re claims | TIME JJJ +research BOA Moore | 0.50 0.00 | 195.00 T@5 | 97.50 | 97.50 |
| 30216 12/5/2003 WIP Meeting with J. Welling to discuss preliminary research re claims | TIME JJJ +meetings/commu BOA Moore | 0.30 0.00 | 195.00 T@5 | 58.50 | ▮ |
| 30282 12/8/2003 WIP Discuss BoA/regulations with J. Jim | TIME JWW +research BOA Moore | 0.25 0.00 | 300.00 T@5 | 75.00 | 75.00 |
| 30220 12/8/2003 WIP Research statutory claims | TIME JJJ +research BOA Moore | 2.50 0.00 | 195.00 T@5 | 487.50 | 487.50 |
| 30219 12/8/2003 WIP Meeting with J Welling to discuss Truth-in-Lending research and further assignments | TIME JJJ +meetings/commu BOA Moore | 0.30 0.00 | 195.00 T@5 | 58.50 | 58.50 |
| 31906 12/11/2003 WIP Review existing complaint and begin work drafting amended complaint with additional claims and class allegations | TIME RSG +pldgs/motions BOA Moore | 3.00 0.00 | 425.00 T@5 | 1275.00 | ▮ |
| 30302 12/11/2003 WIP Participate in conference call with referring counsel and potential client | TIME JWW +meetings/commu BOA Moore | 0.25 0.00 | 300.00 T@5 | 75.00 | 75.00 |
| 30233 12/11/2003 WIP | TIME JJJ +pldgs/motions BOA Moore | 1.50 0.00 | 195.00 T@5 | 292.50 | 292.50 |

Ex. 2
35

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| Conference call with R. Green re claims for complaint<br>31907<br>12/12/2003<br>WIP TIME | RSG<br>+depo<br>BOA.Moore | 1.50<br>0.00 | 425.00<br>T@5 | 637.50 | 637.50 |
| Revise and edit Rule 30(b)(6) deposition notice with focus on describing issues for BoA to designate PMK's and meet and confer letter re documents<br>30535<br>12/12/2003<br>WIP TIME | JWW<br>+meetings/commu<br>BOA.Moore | 0.50<br>0.00 | 300.00<br>T@5 | 150.00 | 150.00 |
| Discuss retainer agreement, referral fee, conflicts with R. Green<br>30236<br>12/12/2003<br>WIP TIME | LU<br>+pldgs/motions<br>BOA.Moore | 2.00<br>2.00 | 195.00<br>T@5<br>Do Not Bill | 390.00 | 0.00 |
| Look for association of counsel form in our file; draft association of counsel pleading<br>30616<br>12/12/2003<br>WIP TIME | KPB<br>+depo<br>BOA.Moore | 1.25<br>0.00 | 140.00<br>T@5 | 175.00 | 175.00 |
| Prepare Deposition Notice to BoA for R. Green<br>30231<br>12/15/2003<br>WIP TIME | LU<br>+pldgs/motions<br>BOA.Moore | 0.50<br>0.00 | 195.00<br>T@5 | 97.50 | 97.50 |
| Review file received from referring counsel to determine status of discovery<br>30044<br>12/15/2003<br>WIP TIME | LU<br>+pldgs/motions<br>BOA.Moore | 0.50<br>0.00 | 195.00<br>T@5 | 97.50 | 97.50 |
| Research/draft mem p&a in supp joint disco conf statement, research Osbourne case pfs attys<br>45031<br>12/16/2003<br>WIP TIME | JWP<br>+pldgs/motions<br>BOA.Moore | 0.50<br>0.00 | 275.00<br>T@5 | 137.50 | 137.50 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| Work on assessing BofA compliance with prior discovery requests and orders<br>31918<br>12/16/2003<br>WIP TIME | RSG<br>+discovery<br>BOA.Moore | 4.00<br>0.00 | 425.00<br>T@5 | 1700.00 | 1700.00 |
| Research/draft mem p&a in supp joint disco conf statement<br>45030<br>12/16/2003<br>WIP TIME | JWP<br>+pldgs/motions<br>BOA.Moore | 0.80<br>0.00 | 275.00<br>T@5 | 220.00 | 220.00 ● |
| Work on amended complaint and class issues<br>31943<br>12/17/2003<br>WIP TIME | RSG<br>+pldgs/motions<br>BOA.Moore | 1.25<br>0.00 | 425.00<br>T@5 | 531.25 | 531.25 |
| Discuss strategy for amended complaint and class allegations with R. Green<br>30556<br>12/18/2003<br>WIP TIME | JWW<br>+pldgs/motions<br>BOA.Moore | 0.75<br>0.00 | 300.00<br>T@5 | 225.00 | 225.00 |
| Assess BoA's failure to produce documents and legal authority for requiring proper production<br>45320<br>12/18/2003<br>WIP TIME | RSG<br>+discovery<br>BOA.Moore | 1.25<br>0.00 | 425.00<br>T@5 | 531.25 | 531.25 |
| Research and drafting TILA & 17200 class claims<br>31946<br>12/18/2003<br>WIP TIME | RSG<br>+pldgs/motions<br>BOA.Moore | 1.00<br>0.00 | 425.00<br>T@5 | 425.00 | 425.00 |
| Research class allegations<br>45032<br>12/19/2003<br>WIP TIME | JWP<br>+pldgs/motions<br>BOA.Moore | 1.90<br>0.00 | 275.00<br>T@5 | 522.50 | ● |
| Research class allegations<br>45033<br>12/22/2003<br>WIP TIME | JWP<br>+pldgs/motions<br>BOA.Moore | 3.80<br>0.00 | 275.00<br>T@5 | 1045.00 | 1045.00 |

Ex. 2
36

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45004   TIME<br>12/23/2003<br>WIP<br>Research class allegations | JWP<br>+pldgs/motions<br>BOA.Moore | 3.00<br>0.00<br><br>0.00 | 275.00<br>T@5 | 825.00 | 825.00 |
| 31924   TIME<br>12/29/2003<br>WIP<br>Analyze BofA discovery violations and proper remedies and discuss w/ J. Welling and D. Tyler; draft discovery conference statement. | RSG<br>+discovery<br>BOA.Moore | 1.30<br>0.00<br><br>0.00 | 425.00<br>T@5 | 552.50 | 552.50 |
| 45321   TIME<br>12/29/2003<br>WIP<br>Further research and drafting for amended complaint and discuss w/ J. Welling | RSG<br>+pldgs/motions<br>BOA.Moore | 0.70<br>0.00<br><br>0.00 | 425.00<br>T@5 | 297.50 | 297.50 |
| 30673   TIME<br>12/29/2003<br>WIP<br>Discuss case management, personnel allocation with R. Green | JWW<br>+meetings/commu<br>BOA.Moore | 0.50<br>0.50<br><br>0.00 | 300.00<br>T@5<br>Do Not Bill | 150.00 | 0.00 |
| 31553   EXP<br>12/31/2003<br>WIP<br>Postage 12/03 | COST<br>pos<br>BOA.Moore | 1 | 1.20 | 1.20 | 1.20 |
| 45036   TIME<br>12/31/2003<br>WIP<br>Research/draft MEM PA in supp joint disco conf statement | JWP<br>+pldgs/motions<br>BOA.Moore | 2.40<br>0.00<br><br>0.00 | 275.00<br>T@5 | 660.00 | 660.00 |
| 31574   EXP<br>12/31/2003<br>WIP<br>Fax Costs 12/03 | COST<br>fax<br>BOA.Moore | 20 | 2.00 | 40.00 | 40.00 |
| 31614   EXP<br>12/31/2003<br>WIP<br>Copies - internal 12/03 | COST<br>cop<br>BOA.Moore | 10 | 0.30 | 3.00 | 3.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45035   TIME<br>12/31/2003<br>WIP<br>Review order re disco conf & email K. Brown re calendar change | JWP<br>+meetings/commu<br>BOA.Moore | 0.20<br>0.20<br><br>0.00 | 275.00<br>T@5<br>Do Not Bill | 55.00 | 0.00 |
| 45037   TIME<br>1/22/2004<br>WIP<br>Research class allegations | JWP<br>+pldgs/motions<br>BOA.Moore | 1.70<br>0.00<br><br>0.00 | 275.00<br>T@5 | 467.50 | 467.50 |
| 34911   TIME<br>1/22/2004<br>WIP<br>Work on briefing re discovery hearing | RSG<br>+pldgs/motions<br>BOA.Moore | 2.00<br>0.00<br><br>0.00 | 425.00<br>T@5 | 850.00 | 850.00 |
| 45038   TIME<br>1/2/2004<br>WIP<br>Research Mem p&a in supp mot enforce prior disco ord & sanctions | JWP<br>+pldgs/motions<br>BOA.Moore | 5.80<br>0.00<br><br>0.00 | 275.00<br>T@5 | 1595.00 | 1595.00 |
| 45039   TIME<br>1/5/2004<br>WIP<br>Research class allegations | JWP<br>+pldgs/motions<br>BOA.Moore | 5.40<br>0.00<br><br>0.00 | 275.00<br>T@5 | 1485.00 | 1485.00 |
| 34918   TIME<br>1/5/2004<br>WIP<br>Review J. Pillette research re motion to enforce prior order and assess strategy for further motions and sanctions. | RSG<br>+pldgs/motions<br>BOA.Moore | 1.00<br>0.00<br><br>0.00 | 425.00<br>T@5 | 425.00 | 425.00 |
| 45040   TIME<br>1/5/2004<br>WIP<br>Research mem p&a in supp mot enforce prior disco ord & sanctions | JWP<br>+pldgs/motions<br>BOA.Moore | 0.70<br>0.00<br><br>0.00 | 275.00<br>T@5 | 192.50 | 192.50 |
| 45042   TIME<br>1/6/2004<br>WIP<br>Research adequacy issue re attorney as class plaintiff | JWP<br>+class cert<br>BOA.Moore | 0.70<br>0.00<br><br>0.00 | 275.00<br>T@5 | 192.50 | 192.50 |

Ex. 2
37

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45041 1/6/2004 WIP **TIME** Research re disco/ sanctions; review pleadings, disco produced | JWP +pldgs/motions BOA.Moore | 0.80 / 0.00 / 0.00 | 275.00 T@5 | 220.00 | 220.00 |
| 34921 1/6/2004 WIP **TIME** Prepare for hearing, review documents to assess claim of BofA counsel that we have no evidence of any other responsive documents not produced. | RSG +pldgs/motions BOA.Moore | 3.25 / 0.00 / 0.00 | 425.00 T@5 | 1381.25 | 1381.25 |
| 45043 1/7/2004 WIP **TIME** Research adequacy issue re attorney as class plaintiff | JWP +class cert BOA.Moore | 3.00 / 0.00 / 0.00 | 275.00 T@5 | 825.00 | 825.00 |
| 34928 1/7/2004 WIP **TIME** Prepare for hearing; telephone conference with C. Wilburn re depo | RSG +pldgs/motions BOA.Moore | 1.50 / 0.00 / 0.00 | 425.00 T@5 | 637.50 | 637.50 |
| 34930 1/9/2004 WIP **TIME** Prepare for and attend hearing on motion to enforce order on motion to compel and follow up re same. | RSG +court BOA.Moore | 7.00 / 0.00 / 0.00 | 425.00 T@5 | 2975.00 | 2975.00 |
| 31161 1/9/2004 WIP **TIME** Review amended complaint. Comment on sufficiency of FCRA and injunctive relief allegations. | JWW +pldgs/motions BOA.Moore | 3.00 / 0.00 / 0.00 | 300.00 T@5 | 900.00 | 900.00 |
| 34932 1/9/2004 WIP **TIME** Work on order and stipulation re motion to compel. | RSG +pldgs/motions BOA.Moore | 1.20 / 0.00 / 0.00 | 425.00 T@5 | 510.00 | 510.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45044 1/9/2004 WIP **TIME** Research pl adequacy issue re: fees, potential conflict; draft ltr memo | JWP +class cert BOA.Moore | 1.90 / 0.00 / 0.00 | 275.00 T@5 | 522.50 | 522.50 |
| 45322 1/9/2004 WIP **TIME** Research re complaint | RSG +research BOA.Moore | 1.30 / 0.00 / 0.00 | 425.00 T@5 | 552.50 | 552.50 ● |
| 45045 1/12/2004 WIP **TIME** Research class allegations for amended complaint | JWP +pldgs/motions BOA.Moore | 1.20 / 0.00 / 0.00 | 275.00 T@5 | 330.00 | 330.00 ● |
| 31164 1/12/2004 WIP **TIME** Discuss amended complaint with J. Pillette, R. Green. | JWW +pldgs/motions BOA.Moore | 0.50 / 0.00 / 0.00 | 300.00 T@5 | 150.00 | 150.00 |
| 31167 1/12/2004 WIP **TIME** Revise web blurb. Discuss same with R. Green, J Pillette | JWW +meetings/commu BOA.Moore | 0.75 / 0.75 | 300.00 T@5 Do Not Bill | 225.00 | 0.00 |
| 34936 1/12/2004 WIP **TIME** Work on order, stipulation, discovery issues, exchange communications with C. Wilburn and D. Tyler re turn of order regarding discovery rulings and slip. re scheduling matters. | RSG +pldgs/motions BOA.Moore | 1.80 / 0.00 / 0.00 | 425.00 T@5 | 765.00 | 765.00 |
| 31168 1/12/2004 WIP **TIME** Meet and confer phone call with C. Wilburn re stipulation modifying pretrial order. Draft confirmation letter re same. | JWW +pldgs/motions BOA.Moore | 1.00 / 0.00 / 0.00 | 300.00 T@5 | 300.00 | 300.00 ● |

Ex. 2
38

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 40909 TIME<br>1/12/2004<br>WIP<br>Work on amended complaint. | RSG<br>+pldgs/motions<br>BOA.Moore | 0.70<br>0.00 | 425.00<br>T@5 | 297.50 | 297.50 |
| 31181 TIME<br>1/14/2004<br>WIP<br>Legal research re TILA and statute of limitations | JWW<br>+research<br>BOA.Moore | 4.00<br>0.00 | 300.00<br>T@5 | 1200.00 | 1200.00 |
| 34951 TIME<br>1/14/2004<br>WIP<br>Work on amended complaint | RSG<br>+pldgs/motions<br>BOA.Moore | 1.25<br>0.00 | 425.00<br>T@5 | 531.25 | 531.25 |
| 45046 TIME<br>1/15/2004<br>WIP<br>Review discovery order | JWW<br>+discovery<br>BOA.Moore | 0.20<br>0.00 | 275.00<br>T@5 | 55.00 | 55.00 |
| 34946 TIME<br>1/15/2004<br>WIP<br>Work on amended complaint; Review documents produced by BofA to determine lack of compliance w/TILA and to revise allegations re same. | RSG<br>+pldgs/motions<br>BOA.Moore | 2.25<br>0.00 | 425.00<br>T@5 | 956.25 | 956.25 |
| 31183 TIME<br>1/15/2004<br>WIP<br>Legal research for amended complaint re statute of limitations and FCBA violations | JWW<br>+research<br>BOA.Moore | 1.25<br>0.00 | 300.00<br>T@5 | 375.00 | 375.00 |
| 31189 TIME<br>1/15/2004<br>WIP<br>Legal research re choice of law | JWW<br>+research<br>BOA.Moore | 0.50<br>0.00 | 300.00<br>T@5 | 150.00 | 150.00 |
| 31190 TIME<br>1/15/2004<br>WIP<br>Document review. Email correspondence to C. Wilburn re same. | JWW<br>+discovery<br>BOA.Moore | 2.00<br>0.00 | 300.00<br>T@5 | 600.00 | 600.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 34905 TIME<br>1/16/2004<br>WIP<br>Review document production to evaluate compliance with order on motion to enforce. | JWW<br>+discovery<br>BOA.Moore | 0.00<br>0.00 | 300.00<br>T@5 | 300.00 | 900.00 |
| 34907 TIME<br>1/16/2004<br>WIP<br>Email C. Wilburn re deficiencies in document production/compliance with court's order | JWW<br>+discovery<br>BOA.Moore | 0.75<br>0.00 | 300.00<br>T@5 | 225.00 | 225.00 |
| 34940 TIME<br>1/16/2004<br>WIP<br>Further revisions to stipulation and research re amended complaint | RSG<br>+research<br>BOA.Moore | 2.00<br>0.00 | 425.00<br>T@5 | 850.00 | 850.00 |
| 31192 TIME<br>1/19/2004<br>WIP<br>Draft amended complaint. | JWW<br>+pldgs/motions<br>BOA.Moore | 8.00<br>0.00 | 300.00<br>T@5 | 2400.00 | 2400.00 |
| 34957 TIME<br>1/20/2004<br>WIP<br>Work on amended complaint and research re TILA claims | RSG<br>+pldgs/motions<br>BOA.Moore | 1.50<br>0.00 | 425.00<br>T@5 | 637.50 | 637.50 |
| 31198 TIME<br>1/20/2004<br>WIP<br>Draft agency allegations and class allegations | JWW<br>+pldgs/motions<br>BOA.Moore | 1.00<br>0.00 | 300.00<br>T@5 | 300.00 | 300.00 |
| 31793 TIME<br>1/20/2004<br>WIP<br>Review Bank of America EDGAR and state incorporation information | KPB<br>+research<br>BOA.Moore | 0.50<br>0.00 | 140.00<br>T@5 | 70.00 | |
| 31201 TIME<br>1/20/2004<br>WIP<br>Legal research re injunctive relief under TILA | JWW<br>+research<br>BOA.Moore | 3.00<br>0.00 | 300.00<br>T@5 | 900.00 | 900.00 |

Ex. 2
39

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 31204 1/21/2004 WIP TIME — Legal research re availability of injunctive relief under TILA. Finalize complaint. Email correspondence with client re ▆▆▆ | JWW +research BOA.Moore | 2.00 / 0.00 | 300.00 T@5 | 600.00 | 600.00 |
| 34965 1/21/2004 WIP TIME — Assess which corporate entities to name as defendants; review and edit draft of Amended Complaint and transmit to client for review. | RSG +pldgs/motions BOA.Moore | 1.00 / 0.00 | 425.00 T@5 | 425.00 | 425.00 |
| 31799 1/21/2004 WIP TIME — Research Bank of America lines, locations, and business acts in California; e-mail memorandum to R. Green re same. | KPB +research BOA.Moore | 3.50 / 0.00 | 140.00 T@5 | 490.00 | 490.00 |
| 45047 1/22/2004 WIP TIME — Review order re pretrial & email K. Brown re calendar change | JWP +meetings/commu BOA.Moore | 0.20 / 0.20 | 275.00 T@5 Do Not Bill | 55.00 | 0.00 |
| 34966 1/22/2004 WIP TIME — Review emails from R. Moore and T. Keeley re assess allegations re business v. consumer claims; interplay between TILA & UCL & significance of Bank's argument that client's claim was "settled." | RSG +pldgs/motions BOA.Moore | 1.25 / 0.00 | 425.00 T@5 | 531.25 | 531.25 |
| 31212 1/23/2004 WIP TIME — Discuss document production gaps and merits of case based on current production with R. Green. | JWW +discovery BOA.Moore | 0.75 / 0.00 | 300.00 T@5 | 225.00 | 225.00 |
| 34971 1/23/2004 WIP TIME | RSG +pldgs/motions BOA.Moore | 4.00 / 0.00 | 425.00 T@5 | 1700.00 | 1700.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| Telephone conference with S. Jacobs and court clerk re discovery matters; review cases, statutes and documents produced | RSG +pldgs/motions BOA.Moore | 3.50 / 0.00 | 425.00 T@5 | 1487.50 | 1487.50 |
| 34973 1/25/2004 WIP TIME — Review cases, statutes and documents produced by BoA in connection with the amended complaint and discovery issues | BOA.Moore | 0.00 | | | ● [REDACTED] |
| 34975 1/26/2004 WIP TIME — Telephone conference with D. Tyler re documents and BofA's refusal to comply with discovery orders or to set deposition dates; work on further discovery issues | RSG +discovery BOA.Moore | 3.25 / 0.00 | 425.00 T@5 | 1381.25 | 1381.25 |
| 45048 1/26/2004 WIP TIME — Review, research, draft disco requests | JWP +discovery BOA.Moore | 2.90 / 0.00 | 275.00 T@5 | 797.50 | 797.50 |
| 31621 1/26/2004 WIP TIME — Participate in conference call with S. Jacobs re document production. Discuss next round of discovery requests with R. Green. | JWW +discovery BOA.Moore | 1.00 / 0.00 | 300.00 T@5 | 300.00 | 300.00 |
| 34981 1/27/2004 WIP TIME — Telephone conference with S. Jacobs re discovery and follow up re order to enforce same. | RSG +pldgs/motions BOA.Moore | 1.25 / 0.00 | 425.00 T@5 | 531.25 | 531.25 |
| 45049 1/27/2004 WIP TIME — Review, research, draft disco requests | JWP +discovery BOA.Moore | 1.00 / 0.00 | 275.00 T@5 | 275.00 | ● [REDACTED] 275.00 |
| 34988 1/29/2004 WIP TIME — Work on document discovery and review | RSG +discovery BOA.Moore | 1.00 / 0.00 | 425.00 T@5 | 425.00 | 425.00 |

Ex. 2

40

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 31643 TIME 1/29/2004 WIP Review recent production by BOA of procedures manuals | JWW +discovery BOA.Moore | 1.75 / 0.00 | 300.00 T@5 | 525.00 | 525.00 |
| 32329 EXP 1/31/2004 WIP Filing Fees 1/22/04- One Legal, Inc- 1/22/04 | COST fil BOA.Moore | 1 | 55.75 | 55.75 | 55.75 |
| 32445 EXP 1/31/2004 WIP Facsimile 1/04 | COST fax BOA.Moore | 70 | 2.00 | 140.00 | 140.00 |
| 32330 EXP 1/31/2004 WIP 1/31/04- R Green 1/8/04 airfare travel to San Diego re hearing on BOA's response to document demand | COST trl BOA.Moore | 1 | 234.00 | 234.00 | 234.00 |
| 32480 EXP 1/31/2004 WIP Copies - Internal 1/04 | COST cop BOA.Moore | 946 | 0.30 | 283.80 | 283.80 |
| 32424 EXP 1/31/2004 WIP Postage 1/04 | COST pos BOA.Moore | 1 | 3.18 | 3.18 | 3.18 |
| 34161 EXP 1/31/2004 WIP Long Distance 12/03 | COST ld BOA.Moore | 1 | 1.60 | 1.60 | 1.60 |
| 32327 EXP 1/31/2004 WIP Process Service 1/14/04- Janney & Janney- 1/13/04 | COST pro BOA.Moore | 1 | 39.00 | 39.00 | 39.00 |
| 32328 EXP 1/31/2004 WIP Overnight Courier 1/16/04- Federal | COST oes BOA.Moore | 1 | 15.00 | 15.00 | 15.00 |

Express-1/12/04

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 36135 TIME 2/2/2004 WIP Telephone conference with C. Wilburn re document productions and follow up re same | RSG +discovery BOA.Moore | 0.75 / 0.00 | 425.00 T@5 | 318.75 | 318.75 |
| 32781 TIME 2/3/2004 WIP Bates stamp and produce J. Moore documents, letter to C. Wilburn, docushare management | KPB +discovery BOA.Moore | 1.50 / 0.00 | 140.00 T@5 | 210.00 | ● |
| 36137 TIME 2/3/2004 WIP Work on discovery and research re claims | RSG +adgal motions BOA.Moore | 1.25 / 0.00 | 425.00 T@5 | 531.25 | 531.25 |
| 36141 TIME 2/4/2004 WIP Telephone conference with S. Jacobs re bank documents and follow up re same | RSG +discovery BOA.Moore | 1.00 / 0.00 | 425.00 T@5 | 425.00 | 425.00 |
| 32235 TIME 2/4/2004 WIP Strategy and analysis of discovery to be propounded | JWW +discovery BOA.Moore | 1.00 / 0.00 | 300.00 T@5 | 300.00 | 300.00 |
| 45354 TIME 2/9/2004 WIP Docushare management of defendants document production | KPB +discovery BOA.Moore | 0.50 / 0.50 | 140.00 T@5 Do Not Bill | 70.00 | 0.00 |
| 45060 TIME 2/9/2004 WIP Review, research, draft disco requests | JWP +discovery BOA.Moore | 7.50 / 0.00 | 275.00 T@5 | 2062.50 | 2062.50 |
| 32827 TIME 2/9/2004 WIP Review document scanning with M. Baldwin | KPB +discovery BOA.Moore | 0.17 / 0.17 | 140.00 T@5 Do Not Bill | 23.33 | 0.00 |

Ex. 2
41

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time Variance | Rate Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45304 TIME<br>2/9/2004<br>WIP<br>Review defendants reply to First Request for Production for J. Pillette, compare to document production, report on which requests were satisfied and which were not | KPB<br>+discovery<br>BOA.Moore | 0.83<br>0.00 | 140.00<br>T@5 | 116.67 | 116.67 |
| 32833 TIME<br>2/10/2004<br>WIP<br>Organize supporting documents to BOA in California research | KPB<br>+research<br>BOA.Moore | 0.75<br>0.75 | 140.00<br>T@5<br>Do Not Bill | 105.00 | 0.00 |
| 45051 TIME<br>2/10/2004<br>WIP<br>Review, research, draft disco requests | JWP<br>+discovery<br>BOA.Moore | 2.90<br>0.00 | 275.00<br>T@5 | 797.50 | 797.50 |
| 45052 TIME<br>2/12/2004<br>WIP<br>Review, research, draft disco requests to 3d parties | JWP<br>+discovery<br>BOA.Moore | 0.70<br>0.00 | 275.00<br>T@5 | 192.50 | 192.50 |
| 36163 TIME<br>2/13/2004<br>WIP<br>Draft stipulation re amended complaint | RSG<br>+pldgs/motions<br>BOA.Moore | 1.00<br>0.00 | 425.00<br>T@5 | 425.00 | 425.00 |
| 32889 TIME<br>2/17/2004<br>WIP<br>Plaintiffs discovery responses to defendants counsel Wilburn | KPB<br>+discovery<br>BOA.Moore | 0.50<br>0.00 | 140.00<br>T@5 | 70.00 | 70.00 |
| 36177 TIME<br>2/20/2004<br>WIP<br>Revise stipulation re amended complaint and further research re claims | RSG<br>+pldgs/motions<br>BOA.Moore | 0.90<br>0.00 | 425.00<br>T@5 | 382.50 | 382.50 |
| 32502 TIME<br>2/20/2004<br>WIP<br>Preparation defendants document production for OCR process, work with M. Baldwin on OCR process | KPB<br>+discovery<br>BOA.Moore | 1.25<br>1.25 | 140.00<br>T@5<br>Do Not Bill | 175.00 | 0.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time Variance | Rate Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45305 TIME<br>2/20/2004<br>WIP<br>Revise and transmit Moore Brewer withdrawal; finalize rsch re proper procedures for representing class | RSG<br>+pldgs/motions<br>BOA.Moore | 0.60<br>0.00 | 425.00<br>T@5 | 255.00 | 255.00 |
| 32712 TIME<br>2/20/2004<br>WIP<br>Discuss OCRing project with M. Baldwin | JWW<br>+discovery<br>BOA.Moore | 0.25<br>0.25 | 300.00<br>T@5<br>Do Not Bill | 75.00 | |
| 32747 TIME<br>2/23/2004<br>WIP<br>Review supplemental RFP response. Review J. Pillette draft discovery. | JWW<br>+discovery<br>BOA.Moore | 3.00<br>0.00 | 300.00<br>T@5 | 900.00 | 900.00 |
| 32669 EXP<br>2/23/2004<br>WIP<br>Overnight Courier: Federal Express: 2/17/04 | COST<br>oes<br>BOA.Moore | 1 | 13.70 | 13.70 | 13.70 |
| 33016 EXP<br>2/23/2004<br>WIP<br>Long Distance 1/04 | COST<br>ld<br>BOA.Moore | 1 | 8.55 | 8.55 | 8.55 |
| 34151 EXP<br>2/23/2004<br>WIP<br>Long Distance 1/04 | COST<br>ld<br>BOA.Moore | 1 | 8.55 | 8.55 | 8.55 |
| 32670 EXP<br>2/23/2004<br>WIP<br>R. Green 1/8/04 taxis travel to San Diego re hearing on BofA's response to document demand | COST<br>trl<br>BOA.Moore | 1 | 11.00 | 11.00 | 11.00 |
| 32671 EXP<br>2/23/2004<br>WIP<br>R. Green 1/8/04 parking travel to San Diego re hearing on BofA's response to document demand | COST<br>trl<br>BOA.Moore | 1 | 20.00 | 20.00 | 20.00 |

Ex. 2
42

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45054<br>3/2/2004<br>WIP  TIME<br>Meet w/ Robert Green re discovery plan | JWP<br>+discovery<br>BOA.Moore | 0.50<br>0.00 | 275.00<br>T@5 | 137.50 | 137.50 |
| 45055<br>3/3/2004<br>WIP  TIME<br>Review settle dates & email: K. Brown re calendar charge | JWP<br>+meetings/commu<br>BOA.Moore | 0.20<br>0.20 | 275.00<br>T@5<br>Do Not Bill | 55.00 | 0.00 ● |
| 36596<br>3/7/2004<br>WIP  TIME<br>Prepare for depositions and discuss same with J Welling | RSG<br>+depo<br>BOA.Moore | 0.50<br>0.00 | 425.00<br>T@5 | 212.50 | 212.50 |
| 33544<br>3/8/2004<br>WIP  TIME<br>Strategy and analysis of discovery, client intake, for class certification | JWW<br>+discovery<br>BOA.Moore | 0.25<br>0.00 | 300.00<br>T@5 | 75.00 | 75.00 |
| 33554<br>3/9/2004<br>WIP  TIME<br>Discuss timing of depositions and briefing on motion to dismiss with R. Green | JWW<br>+depo<br>BOA.Moore | 0.50<br>0.00 | 300.00<br>T@5 | 150.00 | 150.00 |
| 33960<br>3/9/2004<br>WIP  TIME<br>Summation management of defendants document production: Coding | KPB<br>+discovery<br>BOA.Moore | 2.50<br>0.00 | 140.00<br>T@5 | 350.00 | 350.00 |
| 37219<br>3/9/2004<br>WIP  TIME<br>Review issues re depositions as to which deponents will be available in Phoenix and issues to address within: Review communications from S. Jacobs and motions and strategy and conference with J. Welling re same | RSG<br>+pldgs/motions<br>BOA.Moore | 0.50<br>0.00 | 425.00<br>T@5 | 212.50 | 2.. ● |
| 36601<br>3/10/2004<br>WIP  TIME | RSG<br>+discovery<br>BOA.Moore | 2.25<br>0.00 | 425.00<br>T@5 | 956.25 | 956.25 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 33658<br>2/29/2004<br>WIP  EXP<br>Postage 2/04 | COST<br>pos<br>BOA.Moore | 1 | 1.80 | 1.80 | 1.80 |
| 33668<br>2/29/2004<br>WIP  EXP<br>Overnight Courier- Federal Express- 2/3/04 | COST<br>oes<br>BOA.Moore | 1 | 21.26 | 21.26 | 21.26 |
| 32710<br>2/29/2004<br>WIP  EXP<br>Copies - Internal 2/04 | COST<br>cop<br>BOA.Moore | 205 | 0.30 | 61.50 | 61.50 |
| 32739<br>2/29/2004<br>WIP  EXP<br>Facsimile 2/04 | COST<br>fax<br>BOA.Moore | 2 | 2.00 | 4.00 | 4.00 |
| 32935<br>3/1/2004<br>WIP  TIME<br>Defendants document production in summation: Management and coding | KPB<br>+discovery<br>BOA.Moore | 1.58<br>0.00 | 140.00<br>T@5 | 221.67 | 221.67 |
| 45063<br>3/1/2004<br>WIP  TIME<br>Doc. review | JWP<br>+discovery<br>BOA.Moore | 0.30<br>0.00 | 275.00<br>T@5 | 82.50 | 82.50 |
| 33620<br>3/2/2004<br>WIP  TIME<br>Revise discovery, Internet fact research, legal research, and document review for same. | JWW<br>+discovery<br>BOA.Moore | 4.75<br>0.00 | 300.00<br>T@5 | 1425.00 | 1425.00 |
| 32945<br>3/2/2004<br>WIP  TIME<br>Document management of defendants document production January 15 and February 3, 2004 document production | KPB<br>+discovery<br>BOA.Moore | 0.25<br>0.00 | 140.00<br>T@5 | 35.00 | 35.00 |

Ex. 2

43

| Slip ID Dates and Time Posting Status Description | Timekeeper Activity Case | Units DNB Time | Rate Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| | | Variance 0.00 | | | |
| Further analysis of discovery and comparison of BoA's treatment of B. Willson w/s treatment of R. Moore to assess viability of claims. | | | | | |
| 45056 TIME 3/10/2004 WIP | JWP +meetings/commu BOA.Moore | 0.20 0.20 | 275.00 T@S | 55.00 | 0.00 |
| Review answer date & email KPB re calendar change | | | | | |
| 45057 TIME 3/10/2004 WIP | JWP +discovery BOA.Moore | 2.90 0.00 | 275.00 T@S | 797.50 | 797.50 |
| Review, research, draft discovery requests | | | | | |
| 36604 TIME 3/11/2004 WIP | RSG +research BOA.Moore | 2.00 0.00 | 425.00 T@S | 850.00 | 850.00 |
| Review documents and assess discovery issues and relationship to Visa | | | | | |
| 32989 TIME 3/11/2004 WIP | KPB +discovery BOA.Moore | 5.25 0.00 | 140.00 T@S | 735.00 | 735.00 |
| Management of defendants document production in summation Coding | | | | | |
| 32991 TIME 3/12/2004 WIP | KPB +discovery BOA.Moore | 2.00 0.00 | 140.00 T@S | 280.00 | 280.00 |
| Management of defendants document production in Summation Coding | | | | | |
| 45058 TIME 3/12/2004 WIP | JWP +discovery BOA.Moore | 6.70 0.00 | 275.00 T@S | 1842.50 | 1842.50 |
| Review, research, draft discovery requests | | | | | |
| 32994 TIME 3/12/2004 WIP | KPB +discovery BOA.Moore | 2.25 2.25 | 140.00 T@S Do Not Bill | 315.00 | 0.00 |
| Management of defendants document production. Resolve document link failures | | | | | |
| 33570 TIME 3/12/2004 WIP | JWW +discovery BOA.Moore | 1.00 0.00 | 300.00 T@S | 300.00 | 300.00 |

| Slip ID Dates and Time Posting Status Description | Timekeeper Activity Case | Units DNB Time | Rate Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| | | Variance 0.00 | | | |
| Strategy and analysis with J. Pillerie re documents, innerworkings of Visa and BOA. | | | | | |
| 32996 TIME 3/12/2004 WIP | KPB +pldgs;motions BOA.Moore | 0.25 0.00 | 140.00 T@S | 35.00 | 35.00 |
| Defendants disclosures to J. Pillerie | | | | | |
| 45059 TIME 3/15/2004 WIP | JWP +discovery BOA.Moore | 1.70 0.00 | 275.00 T@S | 467.50 | 46● |
| Review, research, draft discovery requests | | | | | |
| 32999 TIME 3/15/2004 WIP | KPB +discovery BOA.Moore | 0.75 0.75 | 140.00 T@S Do Not Bill | 105.00 | 0.00 |
| Resolution of document link failure in summation issue | | | | | |
| 33000 TIME 3/16/2004 WIP | KPB +discovery BOA.Moore | 0.75 0.75 | 140.00 T@S Do Not Bill | 105.00 | 0.00 |
| Defendants document production central filing management | | | | | |
| 33131 TIME 3/16/2004 WIP | KPB +discovery BOA.Moore | 2.50 2.50 | 140.00 T@S Do Not Bill | 350.00 | 0.00 |
| Resolve unsearchable PDF document issues | | | | | |
| 45060 TIME 3/16/2004 WIP | JWP +discovery BOA.Moore | 2.50 0.00 | 275.00 T@S | 687.50 | 687.50 |
| Review, research, draft discovery requests | | | | | |
| 33577 TIME 3/16/2004 WIP | JWW +discovery BOA.Moore | 1.00 0.00 | 300.00 T@S | 300.00 | 30● |
| Review supplemental RFP response. | | | | | |
| 33581 TIME 3/17/2004 WIP | JWW +pldgs;motions BOA.Moore | 1.00 0.00 | 300.00 T@S | 300.00 | 300.00 |
| Read motion to dismiss. Discuss same with R. Green. | | | | | |

Ex. 2
44

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 36619 3/22/2004 WIP — TIME — Review motion to dismiss and discuss with J. Welling. | RSG +pldgs/motions BOA.Moore | 1.00 / 0.00 | 425.00 T@5 | 425.00 | 425.00 |
| 33177 3/18/2004 WIP — TIME — Summation management of defendants document production; CODING; email to J. Welling re same | KPB +discovery BOA.Moore | 3.25 / 0.00 | 140.00 T@5 | 455.00 | 455.00 |
| 45061 3/18/2004 WIP — TIME — Review motion to dismiss schedule & email K. Brown re calendar change | JMP +pldgs/motions BOA.Moore | 0.20 / 0.20 | 275.00 T@5 Do Not Bill | 55.00 | 0.00 |
| 33473 3/19/2004 WIP — TIME — Review complaint; draft consumer response email; reply to consumer inquiries | KPB +pldgs/motions BOA.Moore | 1.25 / 0.00 | 140.00 T@5 | 175.00 | 175.00 |
| 33474 3/19/2004 WIP — TIME — Client document review and Summation management of same | KPB +discovery BOA.Moore | 1.67 / 0.00 | 140.00 T@5 | 233.33 | 233.33 |
| 45062 3/22/2004 WIP — TIME — Review brief in support of mot. dismiss, research SOL issues. | JMP +pldgs/motions BOA.Moore | 5.60 / 0.00 | 275.00 T@5 | 1540.00 | 1540.00 |
| 33537 3/22/2004 WIP — TIME — Review 16666a case law re SOL. Email J. Pilette re same. | JWW +pldgs/motions BOA.Moore | 0.50 / 0.00 | 300.00 T@5 | 150.00 | 150.00 |
| 39628 3/22/2004 WIP — TIME — Telephone conferences with S. Jacobs re deposition and initial preparation for same | RSG +depo BOA.Moore | 1.50 / 0.00 | 425.00 T@5 | 637.50 | 637.50 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 33484 3/22/2004 WIP — TIME — Westlaw case retrieval for J. Pilette re authorities cited in defendants opposition to motion to compel | KPB +pldgs/motions BOA.Moore | 1.50 / 0.00 | 140.00 T@5 | 210.00 | 210.00 |
| 33485 3/22/2004 WIP — TIME — Client document review and Summation management of same, scanning and OCR | KPB +discovery BOA.Moore | 4.50 / 0.00 | 140.00 T@5 | 630.00 | 6●● |
| 36634 3/23/2004 WIP — TIME — Exchange emails with client re BoA's p's and a's in support of its motion to dismiss and determine strategy and research points for addressing these issues. | RSG +pldgs/motions BOA.Moore | 0.50 / 0.00 | 425.00 T@5 | 212.50 | 212.50 |
| 45063 3/23/2004 WIP — TIME — Research for opp to mot dismiss | JWP +pldgs/motions BOA.Moore | 5.80 / 0.00 | 275.00 T@5 | 1595.00 | 1595.00 |
| 33636 3/23/2004 WIP — TIME — Strategy and analysis for MSC | JWW +settlement BOA.Moore | 1.50 / 0.00 | 300.00 T@5 | 450.00 | 450.00 |
| 33494 3/24/2004 WIP — TIME — Summation Management of document productions; OCR Loading | KPB +discovery BOA.Moore | 1.75 / 1.75 | 140.00 T@5 Do Not Bill | 245.00 | 0.00 |
| 45064 3/24/2004 WIP — TIME — Research for opp to mot dismiss | JWP +pldgs/motions BOA.Moore | 3.60 / 0.00 | 275.00 T@5 | 990.00 | 99● |
| 36639 3/24/2004 WIP — TIME — Conference with J. Welling and J. Pilette re motions to dismiss and settlement conference, further work and preparation re | RSG +settlement BOA.Moore | 1.25 / 0.00 | 425.00 T@5 | 531.25 | 531.25 |

Ex. 2

45

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45330 / 3/24/2004 TIME / WIP / Discuss opp to motion to dismiss re: statute of limitations args re: 1666 claim w/ R. Green. | JWW / +pldgs/motions / BOA.Moore | 0.25 / 0.00 / 0.00 | 300.00 / T@5 | 75.00 | 75.00 |
| 45487 / 3/24/2004 TIME / WIP / Coding of BofA production | KPB / +discovery / BOA.Moore | 1.00 / 0.00 / 0.00 | 140.00 / T@5 | 140.00 | 140.00 |
| 33606 / 3/24/2004 TIME / WIP / Discuss MSC strategies, strong factual points and weak legal positions with R. Green. | JWW / +pldgs/motions / BOA.Moore | 0.25 / 0.00 / 0.00 | 300.00 / T@5 | 75.00 | 75.00 |
| 33608 / 3/24/2004 TIME / WIP / Draft MSC | JWW / +settlement / BOA.Moore | 3.00 / 0.00 / 0.00 | 300.00 / T@5 | 900.00 | 900.00 |
| 33482 / 3/24/2004 TIME / WIP / Respond to consumer inquiry about case | KPB / +meetings/commu / BOA.Moore | 0.10 / 0.00 / 0.00 | 140.00 / T@5 | 14.00 | 14.00 |
| 45356 / 3/25/2004 TIME / WIP / Evaluate commentary, regulations for 1666 and 1666 in connection w/drafting specific revisions that BofA needs to take to be in compliance for settlement purposes. | RSG / +settlement / BOA.Moore | 4.00 / 0.00 / 0.00 | 425.00 / T@5 | 1700.00 | 1700.00 |
| 33612 / 3/25/2004 TIME / WIP / Discuss opposition to motion to dismiss approach with R. Green. | JWW / +pldgs/motions / BOA.Moore | 0.25 / 0.00 / 0.00 | 300.00 / T@5 | 75.00 | 75.00 |
| 36644 / 3/25/2004 TIME / WIP | RSG / +pldgs/motions / BOA.Moore | 2.00 / 0.00 / 0.00 | 425.00 / T@5 | 850.00 | 850.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| same / Work on opposition to motion to dismiss. Detailed review of FCRA statutes w/related regs and staff commentary; compare to BofA's written policies and positions taken in re motion to dismiss to prepare opposition brief core themes | | / 0.00 | | | 2● |
| 45065 / 3/25/2004 TIME / WIP / Research, begin drafting opp to mot dismiss | JWW / +pldgs/motions / BOA.Moore | 1.00 / 0.00 | 275.00 / T@5 | 275.00 | 275.00 |
| 33814 / 3/25/2004 TIME / WIP / Draft MSC | JWW / +settlement / BOA.Moore | 3.75 / 0.00 | 300.00 / T@5 | 1125.00 | 1125.00 |
| 33821 / 3/26/2004 TIME / WIP / Draft MSC | JWW / +settlement / BOA.Moore | 4.00 / 0.00 | 300.00 / T@5 | 1200.00 | 1200.00 |
| 45066 / 3/26/2004 TIME / WIP / Draft opp to mot dismiss | JWW / +pldgs/motions / BOA.Moore | 3.00 / 0.00 | 275.00 / T@5 | 825.00 | 825.00 |
| 36648 / 3/26/2004 TIME / WIP / Case analysis re interplay of FCRA statutes in TILA and ECOA claims | RSG / +research / BOA.Moore | 2.00 / 0.00 | 425.00 / T@5 | 850.00 | 850.00 |
| 33826 / 3/29/2004 TIME / WIP / Draft MSC. Legal research re 1666 for same | JWW / +settlement / BOA.Moore | 6.00 / 0.00 | 300.00 / T@5 | 1800.00 | 1800.00 |
| 45067 / 3/29/2004 TIME / WIP / Draft opp to mot dismiss | JWW / +pldgs/motions / BOA.Moore | 4.90 / 0.00 | 275.00 / T@5 | 1347.50 | 1347.50 |

Ex. 2
46

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 34352 TIME<br>3/30/2004 WIP<br>Summarization management of discovery | KPB<br>+discovery<br>BOA.Moore | 3.50<br>3.50<br>0.00 | 140.00<br>T@5<br>Do Not Bill | 490.00 | 0.00 |
| 33632 TIME<br>3/30/2004 WIP<br>Revise MSC. | JWW<br>+settlement<br>BOA.Moore | 0.75<br>0.00<br>0.00 | 300.00<br>T@5 | 225.00 | 225.00 |
| 33707 EXP<br>3/31/2004 WIP<br>Overnight Courier- Federal Express- 2/13/04 | COST<br>oes<br>BOA.Moore | 1 | 7.56 | 7.56 | 7.56 |
| 33708 EXP<br>3/31/2004 WIP<br>Overnight Courier- Federal Express- 3/01/04 | COST<br>oes<br>BOA.Moore | 1 | 13.90 | 13.90 | 13.90 |
| 45357 TIME<br>3/31/2004 WIP<br>Discuss MSC with J. Welling | RSG<br>+settlement<br>BOA.Moore | 0.30<br>0.00<br>0.00 | 425.00<br>T@5 | 127.50 | 127.50 |
| 40306 TIME<br>3/31/2004 WIP<br>Draft emails re depos | RSG<br>+depo<br>BOA.Moore | 0.20<br>0.00<br>0.00 | 425.00<br>T@5 | 85.00 | 85.00 |
| 33637 TIME<br>3/31/2004 WIP<br>Revise MSC. Discuss same with R. Green. | JWW<br>+settlement<br>BOA.Moore | 4.00<br>0.00<br>0.00 | 300.00<br>T@5 | 1200.00 | 1200.00 |
| 33706 EXP<br>3/31/2004 WIP<br>Overnight Courier- Federal Express- 2/19/04 | COST<br>oes<br>BOA.Moore | 1 | 15.07 | 15.07 | 15.07 |
| 34060 EXP<br>3/31/2004 WIP<br>Copies - Internal 3/04 | COST<br>cop<br>BOA.Moore | 147 | 0.30 | 44.10 | 44.10 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 34084 EXP<br>3/31/2004 WIP<br>Facsimile 3/04 | COST<br>tax<br>BOA.Moore | 4 | 2.00 | 8.00 | 8.00 |
| 34113 EXP<br>3/31/2004 WIP<br>Postage 3/04 | COST<br>pos<br>BOA.Moore | 1 | 2.03 | 2.03 | 2.03 |
| 45068 TIME<br>4/1/2004 WIP<br>Draft opp to mot dismiss | JWP<br>+pldgs/motions<br>BOA.Moore | 3.30<br>0.00 | 275.00<br>T@5 | 907.50 | 907.50 |
| 33918 TIME<br>4/1/2004 WIP<br>Edit opp to motion to dismiss. | JWW<br>+pldgs/motions<br>BOA.Moore | 4.50<br>0.00<br>0.00 | 300.00<br>T@5 | 1350.00 | 1350.00 |
| 36869 TIME<br>4/1/2004 WIP<br>Work on opposition to motion to dismiss, particularly focus on TILA statutes and regs and advisory comments and supporting case law re same | RSG<br>+pldgs/motions<br>BOA.Moore | 2.00<br>0.00 | 425.00<br>T@5 | 850.00 | 850.00 |
| 45069 TIME<br>4/2/2004 WIP<br>Finalize opp to mot dismiss and docts. | JWP<br>+pldgs/motions<br>BOA.Moore | 6.00<br>0.00 | 275.00<br>T@5 | 1650.00 | 1650.00 |
| 33921 TIME<br>4/2/2004 WIP<br>Final hard edit to opp. to motion to dismiss. | JWW<br>+pldgs/motions<br>BOA.Moore | 2.75<br>0.00 | 300.00<br>T@5 | 825.00 | 825.00 |
| 36865 TIME<br>4/2/2004 WIP<br>Work on opposition to motion to dismiss, coordinate case theory approach w/ J. Welling and J. Fillette as reflected in draft; review and incorporate comments from D. Tyler on draft opposition. | RSG<br>+pldgs/motions<br>BOA.Moore | 1.00<br>0.00 | 425.00<br>T@5 | 425.00 | 425.00 |

Ex. 2
47

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 36982    TIME<br>4/5/2004<br>WIP<br>Telephone conference with S. Jacobs re discovery and schedule issues and planning and follow up re same | RSG<br>+discovery<br>BOA.Moore | 1.50<br>0.00<br>0.00 | 425.00<br>T@5 | 637.50 | 637.50 |
| 45252    TIME<br>4/6/2004<br>WIP<br>Work on scheduling depositions under Rule 300(k)6). | RSG<br>+depo<br>BOA.Moore | 0.50<br>0.00<br>0.00 | 425.00<br>T@5 | 212.50 | 212.50 |
| 33932    TIME<br>4/6/2004<br>WIP<br>Revise MSC per D. Tyler's email | JWW<br>+settlement<br>BOA.Moore | 1.00<br>0.00<br>0.00 | 300.00<br>T@5 | 300.00 | 300.00 |
| 34564    TIME<br>4/8/2004<br>WIP<br>Document review and coding | KPB<br>+discovery<br>BOA.Moore | 1.50<br>0.00<br>0.00 | 140.00<br>T@5 | 210.00 | 210.00 |
| 36875    TIME<br>4/9/2004<br>WIP<br>Begin analysis of settlement process and strategy and assess viability of class and injunctive claims | RSG<br>+settlement<br>BOA.Moore | 2.25<br>0.00<br>0.00 | 425.00<br>T@5 | 956.25 | 956.25 |
| 45488    TIME<br>4/8/2004<br>WIP<br>Summation management and doc integrity maintenance | KPB<br>+discovery<br>BOA.Moore | 0.50<br>0.00<br>0.00 | 140.00<br>T@5 | 70.00 | 70.00 |
| 34571    TIME<br>4/9/2004<br>WIP<br>Process further document production from defendants | KPB<br>+discovery<br>BOA.Moore | 1.50<br>0.00<br>0.00 | 140.00<br>T@5 | 210.00 | 210.00 |
| 45324    TIME<br>4/12/2004<br>WIP<br>Preparation for depos; telephone conference with J. Fink re same; review documents for depositions including BofA's responses to | RSG<br>+depo<br>BOA.Moore | 2.20<br>0.00<br>0.00 | 425.00<br>T@5 | 935.00 | 935.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| RFA's, RFP's and interrogatories. | | | | | |
| 33964    TIME<br>4/12/2004<br>WIP<br>Strategy and analysis with R. Green in preparation for MSC. | JWW<br>+settlement<br>BOA.Moore | 1.00<br>0.00<br>0.00 | 300.00<br>T@5 | 300.00 | 300.00 |
| 36885    TIME<br>4/12/2004<br>WIP<br>Work on settlement issues. | RSG<br>+settlement<br>BOA.Moore | 1.30<br>0.00<br>0.00 | 425.00<br>T@5 | 552.50 | ● 5 |
| 45358    TIME<br>4/13/2004<br>WIP<br>Preparation for MSC; meet with client for same | JWW<br>+settlement<br>BOA.Moore | 3.00<br>0.00<br>0.00 | 300.00<br>T@5 | 900.00 | 900.00 |
| 33965    TIME<br>4/13/2004<br>WIP<br>Draft timeline of Moore's events for MSC | JWW<br>+settlement<br>BOA.Moore | 0.50<br>0.00<br>0.00 | 300.00<br>T@5 | 150.00 | 150.00 |
| 45359    TIME<br>4/13/2004<br>WIP<br>Meet with client and prepare for settlement conference | RSG<br>+settlement<br>BOA.Moore | 3.00<br>0.00<br>0.00 | 425.00<br>T@5 | 1275.00 | 1275.00 |
| 36889    TIME<br>4/13/2004<br>WIP<br>Prepare for settlement conference and depositions | RSG<br>+settlement<br>BOA.Moore | 4.50<br>0.00<br>0.00 | 425.00<br>T@5 | 1912.50 | 1912.50 |
| 36890    TIME<br>4/13/2004<br>WIP<br>Travel to San Diego for MSC. | RSG<br>+settlement<br>BOA.Moore | 3.00<br>0.00<br>0.00 | 425.00<br>T@5 | 1275.00 | ● 12 |
| 34578    TIME<br>4/13/2004<br>WIP<br>Deposition prep, determine and organize underlying documents necessary to follow allegations in amended complaint; rw same with R. Green and amend as necessary. | KPB<br>+depo<br>BOA.Moore | 4.50<br>0.00<br>0.00 | 140.00<br>T@5 | 630.00 | 630.00 |

Ex. 2
48

other doc. preps for deposing PMKs

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 33969 TIME<br>4/13/2004 WIP<br>Travel to San Diego for MSC. | JWP<br>+settlement<br>BOA.Moore | 3.00<br>0.00 | 300.00<br>T@5 | 900.00 | 900.00 |
| 33972 TIME<br>4/14/2004 WIP<br>Preparation for and attend MSC. Strategy and analysis for litigation with R. Green after MSC. | JWW<br>+settlement<br>BOA.Moore | 6.00<br>0.00 | 300.00<br>T@5 | 1800.00 | 1800.00 |
| 45070 TIME<br>4/14/2004 WIP<br>Review, research, 3d party subpoena (Visa) | JWP<br>+discovery<br>BOA.Moore | 4.40<br>0.00 | 275.00<br>T@5 | 1210.00 | 1210.00 |
| 34580 TIME<br>4/14/2004 WIP<br>Document preparation for depositions of PMKs | KPB<br>+depo<br>BOA.Moore | 1.50<br>0.00 | 140.00<br>T@5 | 210.00 | 210.00 |
| 34582 TIME<br>4/14/2004 WIP<br>Process defendants document production of 49 for J. Pollette. | KPB<br>+discovery<br>BOA.Moore | 1.00<br>0.00 | 140.00<br>T@5 | 140.00 | 140.00 |
| 33974 TIME<br>4/15/2004 WIP<br>Travel-return from San Diego | JWW<br>+settlement<br>BOA.Moore | 3.00<br>0.00 | 300.00<br>T@5 | 900.00 | 900.00 |
| 33978 TIME<br>4/15/2004 WIP<br>Strategy and analysis for next round of discovery and depositions with R. Green, J. Pollette. | JWW<br>+discovery<br>BOA.Moore | 1.00<br>0.00 | 300.00<br>T@5 | 300.00 | 300.00 |
| 45071 TIME<br>4/15/2004 WIP<br>Review, research, draft 3d party subpoena (Visa) | JWP<br>+discovery<br>BOA.Moore | 2.10<br>0.00 | 275.00<br>T@5 | 577.50 | 577.50 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45075 TIME<br>4/15/2004 WIP<br>Doc review re 4/21-22 depos | JWP<br>+depo<br>BOA.Moore | 5.00<br>0.00 | 275.00<br>T@5 | 1375.00 | 1375.00 |
| 36892 TIME<br>4/15/2004 WIP<br>Travel - Return from San Diego. | RSG<br>+discovery<br>BOA.Moore | 3.00<br>0.00 | 425.00<br>T@5 | 1275.00 | 1275.00 |
| 34593 TIME<br>4/15/2004 WIP<br>Document review and preparation for PMK depositions | KPB<br>+depo<br>BOA.Moore | 4.50<br>0.00 | 140.00<br>T@5 | 630.00 | 630.00 |
| 33981 TIME<br>4/16/2004 WIP<br>Analyze reply brief to evaluate need for supplemental submission | JWW<br>+pldgs/motions<br>BOA.Moore | 0.50<br>0.00 | 300.00<br>T@5 | 150.00 | 150.00 |
| 45325 TIME<br>4/16/2004 WIP<br>Prepare for depositions; review selected documents for use in depos | KPB<br>+depo<br>BOA.Moore | 2.00<br>0.00 | 425.00<br>T@5 | 850.00 | 850.00 |
| 45073 TIME<br>4/16/2004 WIP<br>Doc review re 4/21-22 depos | JWP<br>+depo<br>BOA.Moore | 7.50<br>0.00 | 275.00<br>T@5 | 2062.50 | 2062.50 |
| 45074 TIME<br>4/16/2004 WIP<br>Review, research, draft 3d party subpoena (Amer Airlines) | JWP<br>+discovery<br>BOA.Moore | 0.70<br>0.00 | 275.00<br>T@5 | 192.50 | 192.50 |
| 36899 TIME<br>4/16/2004 WIP<br>Work on preparation for hearing. | RSG<br>+depo<br>BOA.Moore | 1.00<br>0.00 | 425.00<br>T@5 | 425.00 | 425.00 |
| 34597 TIME<br>4/16/2004 WIP<br>Document review and preparation for PMK | KPB<br>+depo<br>BOA.Moore | 6.75<br>0.00 | 140.00<br>T@5 | 945.00 | 945.00 |

Ex. 2
49

depositions

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 33987 / 4/19/2004 / WIP / TIME — Strategy and analysis of class issues to prep R. Green for depos. Review documents for same. | JWW +depo BOA.Moore | 4.00 / 0.00 / 0.00 | 300.00 T@5 | 1200.00 | 1200.00 |
| 36902 / 4/19/2004 / WIP / TIME — Preparation for depositions; review of selected documents related to BofA treatment of Moore's dispute and BofA's process for handling disputes | RSG +depo BOA.Moore | 8.50 / 0.00 / 0.00 | 425.00 T@5 | 3612.50 | 3612.50 |
| 45075 / 4/19/2004 / WIP / TIME — Doc review re 4/21-22 depos | JWP +depo BOA.Moore | 8.30 / 0.00 / 0.00 | 275.00 T@5 | 2282.50 | 2282.50 |
| 34599 / 4/19/2004 / WIP / TIME — Document review and preparation for PMK depositions | KPB +depo BOA.Moore | 7.50 / 0.00 / 0.00 | 140.00 T@5 | 1050.00 | 1050.00 |
| 34603 / 4/20/2004 / WIP / TIME — Document review and preparation for PMK depositions | KPB +depo BOA.Moore | 9.50 / 0.00 / 0.00 | 140.00 T@5 | 1330.00 | 1330.00 |
| 45079 / 4/20/2004 / WIP / TIME — Review, research, draft 3d party subpoena (Visa) | JWP +discovery BOA.Moore | 1.00 / 0.00 / 0.00 | 275.00 T@5 | 275.00 | 275.00 |
| 33993 / 4/20/2004 / WIP / TIME — Legal research re 230(f)(2) certification for R. Green deposition preparation. | JWW +depo BOA.Moore | 0.50 / 0.00 / 0.00 | 300.00 T@5 | 150.00 | 150.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 35544 / 4/20/2004 / WIP / TIME — Assist K. Brown in copying documents for depositions in Phoenix for R. Green | MSH +depo BOA.Moore | 4.00 / 4.00 / 0.00 | 100.00 T@5 Do Not Bill | 400.00 | 0.00 |
| 36904 / 4/20/2004 / WIP / TIME — Preparation for depositions | RSG +depo BOA.Moore | 8.50 / 0.00 / 0.00 | 425.00 T@5 | 3612.50 | 3612.50 |
| 45076 / 4/20/2004 / WIP / TIME — Doc review re 4/21-22 depos | JWP +depo BOA.Moore | 3.30 / 0.00 / 0.00 | 275.00 T@5 | 907.50 | 907.50 |
| 45077 / 4/20/2004 / WIP / TIME — Review pretrial dates & email K. Brown re calendar change | JWP +meetings/commu BOA.Moore | 0.30 / 0.30 / 0.00 | 275.00 T@5 Do Not Bill | 82.50 | 0.00 |
| 45078 / 4/20/2004 / WIP / TIME — Research meet & confer issues (privilege and overbreadth objections) | JWP +discovery BOA.Moore | 0.50 / 0.00 / 0.00 | 275.00 T@5 | 137.50 | 137.50 |
| 34607 / 4/21/2004 / WIP / TIME — Document review and continuing preparation for PMK depositions; memo to file re case comments screen and chronology of production, document integrity | KPB +depo BOA.Moore | 6.00 / 0.00 / 0.00 | 140.00 T@5 | 840.00 | 840.00 |
| 45080 / 4/21/2004 / WIP / TIME — Review, research, draft 3d party subpoena (Visa) | JWP +discovery BOA.Moore | 0.50 / 0.00 / 0.00 | 275.00 T@5 | 137.50 | 137.50 |
| 45081 / 4/21/2004 / WIP / TIME — Doc review, research meet & confer issues, draft M&C letter | JWP +discovery BOA.Moore | 4.00 / 0.00 / 0.00 | 275.00 T@5 | 1100.00 | 1100.00 |

Ex. 2

50

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DWB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 34633 — TIME<br>WIP  4/28/2004<br>Powerpoint presentation: doc modification for inclusion in slides | KPB<br>+dctgs/motions<br>BOA.Moore | 1.00<br>1.00<br>0.00 | 140.00<br>T@5<br>Do Not Bill | 140.00 | 0.00 |
| 38926 — TIME<br>WIP  4/28/2004<br>Work on discovery issues raised as a result of 30(b)(6) depos | RSG<br>+depo<br>BOA.Moore | 1.25<br>0.00<br>0.00 | 425.00<br>T@5 | 531.25 | 531.25 |
| 45087 — TIME<br>WIP  4/29/2004<br>Review, research, draft 3d party subpoena (Visa) | JWP<br>+discovery<br>BOA.Moore | 0.60<br>0.00<br>0.00 | 275.00<br>T@5 | 165.00 | 165.00 |
| 45088 — TIME<br>WIP  4/29/2004<br>Doc review | JWP<br>+discovery<br>BOA.Moore | 1.60<br>0.00<br>0.00 | 275.00<br>T@5 | 440.00 | 440.00 |
| 45089 — TIME<br>WIP  4/29/2004<br>Confer w/ R Green, J Welling re discovery status, issues | JWP<br>+discovery<br>BOA.Moore | 1.50<br>0.00<br>0.00 | 275.00<br>T@5 | 412.50 | 412.50 |
| 34175 — TIME<br>WIP  4/29/2004<br>Strategy and analysis of next round of discovery with R. Green, J. Pallate. | JWW<br>+discovery<br>BOA.Moore | 1.50<br>0.00<br>0.00 | 300.00<br>T@5 | 450.00 | 450.00 |
| 34638 — TIME<br>WIP  4/29/2004<br>Visa chargeback codes and rules to J. Welling and J. Pallate | KPB<br>+discovery<br>BOA.Moore | 0.25<br>0.00<br>0.00 | 140.00<br>T@5 | 35.00 | 35.00 |
| 34645 — TIME<br>WIP  4/29/2004<br>Deposition exhibit management | KPB<br>+depo<br>BOA.Moore | 0.75<br>0.00<br>0.00 | 140.00<br>T@5 | 105.00 | 105.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DWB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45086 — TIME<br>WIP  4/29/2004<br>Review, research, draft rogs | JWP<br>+discovery<br>BOA.Moore | 1.60<br>0.00<br>0.00 | 275.00<br>T@5 | 440.00 | 440.00 |
| 36929 — TIME<br>WIP  4/29/2004<br>Work on analysis and discovery re claims, compare BoA policies to TILA requirements in FCBA | RSG<br>+research<br>BOA.Moore | 2.00<br>0.00 | 425.00<br>T@5 | 850.00 | 850.00<br>● |
| 34648 — TIME<br>WIP  4/30/2004<br>Deposition exhibit management | KPB<br>+depo<br>BOA.Moore | 1.50<br>0.00<br>0.00 | 140.00<br>T@5 | 210.00 | 210.00 |
| 34292 — EXP<br>WIP  4/30/2004<br>Overnight Courier- Federal Express- 4/14/04 | COST<br>oes<br>BOA.Moore | 1 | 14.33 | 14.33 | 14.33 |
| 34137 — EXP<br>WIP  4/30/2004<br>Long Distance 3/04 | COST<br>ld<br>BOA.Moore | 1 | 2.30 | 2.30 | 2.30 |
| 45090 — TIME<br>WIP  4/30/2004<br>Doc review | JWP<br>+discovery<br>BOA.Moore | 6.60<br>0.00<br>0.00 | 275.00<br>T@5 | 1815.00 | 1815.00 |
| 34283 — EXP<br>WIP  4/30/2004<br>R. Green 4/13/04 airfare travel to San Diego re settlement conference | COST<br>trl<br>BOA.Moore | 1 | 234.20 | 234.20 | 234.20 |
| 34284 — EXP<br>WIP  4/30/2004<br>R. Green 4/13/04 lodging travel to San Diego re settlement conference | COST<br>ld<br>BOA.Moore | 1 | 209.96 | 209.96 | 209.96<br>● |

Ex. 2

52

| Slip ID / Dates and Time / Posting Status / Description | | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into / Bill Status | Slip Value | Billed SV / Adjustment / Markup |
|---|---|---|---|---|---|---|
| 34381 4/30/2004 WIP Postage 4/04 | EXP | COST pos BOA.Moore | 1 | 7.38 | 7.38 | 7.38 |
| 34380 4/30/2004 WIP Filing Fees- One Legal, Inc.- 4/2/04 | EXP | COST fil BOA.Moore | 1 | 211.00 | 211.00 | 211.00 |
| 34325 4/20/2004 WIP Facsimile 4/04 | EXP | COST fax BOA.Moore | 144 | 2.00 | 288.00 | 288.00 |
| 34359 4/20/2004 WIP Copies - Internal 4/04 | EXP | COST cop BOA.Moore | 1257 | 0.30 | 377.10 | 377.10 |
| 34285 4/30/2004 WIP J. Welling 4/13/04 lodging travel to San Diego re settlement conference | EXP | COST lod BOA.Moore | 1 | 209.96 | 209.96 | 209.96 |
| 34281 4/30/2004 WIP Filing Fees- One Legal, Inc.- 4/2/04 | EXP | COST fil BOA.Moore | 1 | 43.50 | 43.50 | 43.50 |
| 34812 5/3/2004 WIP Prepare chart of full text of all discovery requested (RPDs, Rogs, RFAs) for J. Pillette | TIME | KPB +discovery BOA.Moore | 1.75 0.00 | 140.00 T@5 | 245.00 | 245.00 |
| 45091 5/3/2004 WIP Doc review | TIME | JWP +discovery BOA.Moore | 8.30 0.00 | 275.00 T@5 | 2282.50 | 2282.50 |
| 34660 5/3/2004 WIP Discuss ruling on motion to dismiss, and bringing motion for reconsideration re: | TIME | JWW +pldgs/motions BOA.Moore | 0.25 0.00 | 300.00 T@5 | 75.00 | 75.00 |

| Slip ID / Dates and Time / Posting Status / Description | | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into / Bill Status | Slip Value | Billed SV / Adjustment / Markup |
|---|---|---|---|---|---|---|
| ECOA claim. | | | | | | |
| 45092 5/4/2004 WIP Doc review | TIME | JWP +discovery BOA.Moore | 1.70 0.00 | 275.00 T@5 | 467.50 | 467.50 |
| 37002 5/4/2004 WIP Work on discovery issues re documents describing Bank's policies and procedures for compliance with billing error requirements | TIME | RSG +discovery BOA.Moore | 3.50 0.00 | 425.00 T@5 | 1487.50 | ● 14... |
| 34662 5/4/2004 WIP Email correspondence with J. Pillette re discovery follow up | TIME | JWW +discovery BOA.Moore | 0.25 0.00 | 300.00 T@5 | 75.00 | 75.00 |
| 34674 5/5/2004 WIP Review draft interrogatory Set 2. Discuss same with R. Green. | TIME | JWW +discovery BOA.Moore | 2.00 0.00 | 300.00 T@5 | 600.00 | 600.00 |
| 34831 5/5/2004 WIP Visa "Guide to Transactions" terms defined to Robert S. Green | TIME | KPB +discovery BOA.Moore | 0.17 0.00 | 140.00 T@5 | 23.33 | 23.33 |
| 45093 5/5/2004 WIP Doc review | TIME | JWP +discovery BOA.Moore | 2.50 0.00 | 275.00 T@5 | 687.50 | 687.50 |
| 37007 5/5/2004 WIP Work on discovery; Review and edit draft interrogatories designed to require BofA to state its policies for resolving billing error disputes and to determine the number of occurrences of each type of relevant and charge back. | TIME | RSG +discovery BOA.Moore | 2.50 0.00 | 425.00 T@5 | 1062.50 | ● 10... |

Ex. 2

53

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Mark-up |
|---|---|---|---|---|---|
| 37010 5/6/2004 WIP TIME — Further work on discovery issues and interrogatories - compile request language to BofA and VISA documents to ensure requests are focused on correct information. | RSG +discovery BOA.Moore | 4.00 0.00 | 425.00 T@5 | 1700.00 | 1700.00 |
| 34843 5/6/2004 WIP TIME — Draft subpoena to Visa USA, Inc. | KPB +discovery BOA.Moore | 0.50 0.00 | 140.00 T@5 | 70.00 | 70.00 |
| 45094 5/6/2004 WIP TIME — Doc review | JWP +discovery BOA.Moore | 0.30 0.00 | 275.00 T@5 | 82.50 | 82.50 |
| 45095 5/6/2004 WIP TIME — Research FCBA claim, legal history, to find support for our position on the meaning of "settled" in section 1666e | JWP +research BOA.Moore | 2.00 0.00 | 275.00 T@5 | 550.00 | 550.00 |
| 34840 5/6/2004 WIP TIME — Research 'Federal Register' for John W. Pilente, coordinate doc retrieval of same via Spancyvice. | KPB +pldgs/motions BOA.Moore | 0.50 0.00 | 140.00 T@5 | 70.00 | 70.00 |
| 37011 5/7/2004 WIP TIME — Work on discovery issues: telephone conference with S. Jacobs re schedule and draft letter re same | RSG +discovery BOA.Moore | 4.00 0.00 | 425.00 T@5 | 1700.00 | 1700.00 |
| 45096 5/7/2004 WIP TIME — Telephonic M&C w/ J Fink re discovery responses | JWP +discovery BOA.Moore | 0.80 0.00 | 275.00 T@5 | 220.00 | 220.00 |
| 45097 5/7/2004 WIP TIME — | JWP +discovery BOA.Moore | 6.00 0.00 | 275.00 T@5 | 1650.00 | 1650.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Mark-up |
|---|---|---|---|---|---|
| Research, review, draft confirm letter re telephonic M&C w/ J Fink. | | -4.00 0.00 | | | 140.00 |
| 34849 5/7/2004 WIP TIME — Finalize subpoena to Visa USA, Inc.; draft Notice of Subpoena, coordinate service | KPB +discovery BOA.Moore | 1.00 0.00 | 140.00 T@5 | 140.00 | 140.00 |
| | | 0.00 | | | ● |
| 34850 5/7/2004 WIP TIME — Process 'Federal Register' citations ret'rieved for John W. Pilente | KPB +pldgs/motions BOA.Moore | 0.50 0.00 | 140.00 T@5 | 70.00 | 70.00 |
| 34724 5/10/2004 WIP TIME — Research for J Pilente regarding attorney fees and a judge profile. | KDN +research BOA.Moore | 5.00 0.00 | 225.00 T@5 | 1125.00 | 1125.00 |
| 45098 5/10/2004 WIP TIME — Review corresp betw R Green & J Fink re 4/22 depo issues | JWP +depo BOA.Moore | 0.50 0.00 | 275.00 T@5 | 137.50 | 137.50 |
| 45099 5/11/2004 WIP TIME — Subpoena follow up (Visa) | JWP +discovery BOA.Moore | 0.90 0.00 | 275.00 T@5 | 247.50 | 247.50 |
| 45100 5/11/2004 WIP TIME — Comm w/ R Green, J Weling re discovery deadline | JWP +discovery BOA.Moore | 0.30 0.00 | 275.00 T@5 | 82.50 | 82.50 |
| 45101 5/11/2004 WIP TIME — Review BoA requests, prepare responses thereto | JWP +discovery BOA.Moore | 0.70 0.00 | 275.00 T@5 | 192.50 | 192.50 ● |
| 45102 5/11/2004 WIP TIME — Review 5/10 J Fink letter, prepare response | JWP +discovery BOA.Moore | 0.50 0.00 | 275.00 T@5 | 137.50 | 137.50 |

Ex. 2
54

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate Info Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| thereto | | | | | |
| 45103   TIME<br>5/11/2004<br>WIP<br>Research FCBA claim, legs history, to find suppor for our position on the meaning of "settled" in section 1666i, | JWP<br>+research<br>BOA Moore | 2.10<br>0.00 | 275.00<br>T@5 | 577.50 | 577.50 |
| 34698   TIME<br>5/12/2004<br>WIP<br>Draft scheduling order stipulation. | JWW<br>+pldgs/motions<br>BOA Moore | 0.25<br>0.00 | 300.00<br>T@5 | 75.00 | 75.00 |
| 45104   TIME<br>5/12/2004<br>WIP<br>Review O Martinez depo trans | JWP<br>+discovery<br>BOA Moore | 1.50<br>0.00 | 275.00<br>T@5 | 412.50 | 412.50 |
| 45105   TIME<br>5/12/2004<br>WIP<br>Review doc production, outline mot to compel | JWP<br>+pldgs/motions<br>BOA Moore | 1.80<br>0.00 | 275.00<br>T@5 | 495.00 | 495.00 |
| 45106   TIME<br>5/12/2004<br>WIP<br>Research SD rules re mot compel | JWP<br>+pldgs/motions<br>BOA Moore | 0.60<br>0.00 | 275.00<br>T@5 | 165.00 | 165.00 |
| 34701   TIME<br>5/12/2004<br>WIP<br>Review discovery propounded by the Bank. Forward to client. | JWW<br>+discovery<br>BOA Moore | 0.50<br>0.00 | 300.00<br>T@5 | 150.00 | 150.00 |
| 34705   TIME<br>5/13/2004<br>WIP<br>Begin drafting responses to interrogatories. Review prior discovery to evaluate duplicative requests. | JWW<br>+discovery<br>BOA Moore | 5.75<br>0.00 | 300.00<br>T@5 | 1725.00 | 1725.00 |
| 45107   TIME<br>5/13/2004<br>WIP<br>Review doc production, outline mot to compel | JWP<br>+pldgs/motions<br>BOA Moore | 2.20<br>0.00 | 275.00<br>T@5 | 605.00 | 605.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate Info Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45108   TIME<br>5/13/2004<br>WIP<br>Outline re mot compel | JWP<br>+pldgs/motions<br>BOA Moore | 0.40<br>0.00 | 275.00<br>T@5 | 110.00 | 110.00 |
| 45109   TIME<br>5/13/2004<br>WIP<br>Comm w/ R Green, J Welling re discovery issues, RFA #3 | JWP<br>+discovery<br>BOA Moore | 0.40<br>0.00 | 275.00<br>T@5 | 110.00 | 110.00 |
| 45110   TIME<br>5/13/2004<br>WIP<br>Review, research, draft 3d party subpoenas (CRAs) | JWW<br>+discovery<br>BOA Moore | 1.00<br>0.00 | 275.00<br>T@5 | 275.00 | 275.00 |
| 34706   TIME<br>5/13/2004<br>WIP<br>Review R. Green highlights of Martinez deposition. Issue codes for same. | JWW<br>+depo<br>BOA Moore | 1.00<br>1.00 | 300.00<br>Do Not Bill | 300.00 | 0.00 |
| 34707   TIME<br>5/14/2004<br>WIP<br>Draft interrogatory responses, RFP responses, RFA responses | JWW<br>+discovery<br>BOA Moore | 7.00<br>0.00 | 300.00<br>T@5 | 2100.00 | 2100.00 |
| 34708   TIME<br>5/14/2004<br>WIP<br>Review CRA subpoena | JWW<br>+discovery<br>BOA Moore | 0.25<br>0.00 | 300.00<br>T@5 | 75.00 | 75.00 |
| 35733   TIME<br>5/14/2004<br>WIP<br>Copy and PDF Fair Credit Billing 1977 per J Patene | MSH<br>+research<br>BOA Moore | 5.00<br>5.00 | 100.00<br>Do Not Bill | 500.00 | 0.00 |
| 45111   TIME<br>5/14/2004<br>WIP<br>Review doc production, outline mot to compel | JWP<br>+pldgs/motions<br>BOA Moore | 4.10<br>0.00 | 275.00<br>T@5 | 1127.50 | 1127.50 |

Ex. 2

55

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45111 / 5/14/2004 / WIP / TME — Review discovery dates & email K. Brown re calendar change | JWP +meetings/commu BOA.Moore | 0.20 / 0.20 / 0.00 | 275.00 T@5 / Do Not Bill | 55.00 | 0.00 |
| 45113 / 5/14/2004 / WIP / TME — Review, research, draft 3d party subpoenas (CRAS), serve | JWP +discovery BOA.Moore | 1.00 / 0.00 / 0.00 | 275.00 T@5 | 275.00 | 275.00 |
| 45114 / 5/14/2004 / WIP / TME — Comm w/ R Green, J Welling re status subpoenas, discovery responses | JWP +discovery BOA.Moore | 0.50 / 0.00 / 0.00 | 275.00 T@5 | 137.50 | 137.50 |
| 45115 / 5/14/2004 / WIP / TME — Comm w/ R Green, J Welling re motion to compel | JWP +pldgs/motions BOA.Moore | 0.50 / 0.00 / 0.00 | 275.00 T@5 | 137.50 | 137.50 |
| 34711 / 5/14/2004 / WIP / TME — Strategy and analysis of next depositions. Discuss same with R. Green. | JWW +depo BOA.Moore | 0.75 / 0.00 / 0.00 | 300.00 T@5 | 225.00 | 225.00 |
| 35263 / 5/17/2004 / WIP / TME — Document review and coding in Summation | KPB +discovery BOA.Moore | 3.75 / 0.00 / 0.00 | 140.00 T@5 | 525.00 | 525.00 |
| 35000 / 5/17/2004 / WIP / TME — Return A. Colman's call | JWW +meetings/commu BOA.Moore | 0.27 / 0.00 / 0.00 | 300.00 T@5 | 80.00 | 80.00 |
| 45116 / 5/17/2004 / WIP / TME — Doc review | JWP +discovery BOA.Moore | 5.00 / 0.00 / 0.00 | 275.00 T@5 | 1375.00 | 1375.00 |
| 45117 / 5/17/2004 / WIP / TME | JWP +discovery BOA.Moore | 0.30 / 0.00 / 0.00 | 275.00 T@5 | 82.50 | 82.50 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| ... Review 5/13, 5/10 J Fink letters, prepare response thereto | | | | | |
| 36790 / 5/17/2004 / WIP / TME — Copy and PDF Fair Credit Billing Manual | MSH +research BOA.Moore | 4.00 / 4.00 / 0.00 | 100.00 T@5 / Do Not Bill | 400.00 | 0.00 |
| 35267 / 5/18/2004 / WIP / TME — Document research and retrieval of Daily Appellate Report of May 13 re TILA case | KPB +pldgs/motions BOA.Moore | 1.00 / 0.00 / 0.00 | 140.00 T@5 | 140.00 | 140.00 |
| 45119 / 5/18/2004 / WIP / TME — Review C Palmei, T Burhman, S McCormack depo trans re mot compel | JWP +pldgs/motions BOA.Moore | 2.80 / 0.00 / 0.00 | 275.00 T@5 | 770.00 | 770.00 |
| 45120 / 5/18/2004 / WIP / TME — Research, draft mot compel | JWP +pldgs/motions BOA.Moore | 0.60 / 0.00 / 0.00 | 275.00 T@5 | 165.00 | 165.00 |
| 35271 / 5/18/2004 / WIP / TME — Defendant's and plaintiff's document production review and coding | KPB +discovery BOA.Moore | 4.58 / 0.00 / 0.00 | 140.00 T@5 | 641.67 | 641.67 |
| 35266 / 5/18/2004 / WIP / TME — "Federal Register" docushare management of authority for John W. Pillette | KPB +pldgs/motions BOA.Moore | 0.17 / 0.00 / 0.00 | 140.00 T@5 | 23.33 | 23.33 |
| 45118 / 5/18/2004 / WIP / TME — Research FCBA claim, legis history, to find suppor for our position on the meaning of "settled" in section 1666. | JWP +research BOA.Moore | 3.10 / 0.00 / 0.00 | 275.00 T@5 | 852.50 | 852.50 |
| 35010 / 5/19/2004 / WIP / TME — Strategy and analysis with R. Green of next | JWW +class cert BOA.Moore | 0.50 / 0.00 / 0.00 | 300.00 T@5 | 150.00 | 150.00 |

Ex. 2
56

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper Activity Case | Units DNB Time Variance | Rate Rate Info Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 35013 5/19/2004 WIP **TIME** — Read deposition transcripts to understand BofA's internal database systems to propound further written discovery and follow up on existing RFP requests. | JWW +discovery BOA.Moore | 1.00 / 0.00 | 300.00 T@5 | 300.00 | 300.00 |
| 35272 5/19/2004 WIP **TIME** — Defendant's and plaintiffs document production review and coding | KPB +discovery BOA.Moore | 6.75 / 0.00 | 140.00 T@5 | 945.00 | 945.00 |
| 45123 5/20/2004 WIP **TIME** — 3d party, tel conf w/ Trans Union re release | JWP +discovery BOA.Moore | 0.20 / 0.00 | 275.00 T@5 | 55.00 | 55.00 |
| 45124 5/20/2004 WIP **TIME** — 3d party, tel conf w/ J Moore re release for credit bureaus to give info | JWP +discovery BOA.Moore | 0.20 / 0.00 | 275.00 T@5 | 55.00 | 55.00 |
| 35016 5/20/2004 WIP **TIME** — Develop issue codes for Summation based on content of initial depositions compared to document production. | JWW +depo BOA.Moore | 1.00 / 1.00 | 300.00 T@5 Do Not Bill | 300.00 | 0.00 |
| 35024 5/20/2004 WIP **TIME** — Fact and legal research re single transaction for responses to RFAs. | JWW +research BOA.Moore | 1.25 / 0.00 | 300.00 T@5 | 375.00 | 375.00 |
| 35018 5/20/2004 WIP **TIME** — Strategy and analysis of next steps for Moore. Draft letter to S. Jacobs re 26(f) meeting. | JWW +pldgs/motions BOA.Moore | 1.33 / 0.00 | 300.00 T@5 | 400.00 | 400.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper Activity Case | Units DNB Time Variance | Rate Rate Info Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 35019 5/19/2004 WIP **TIME** — Message to S. Jacobs re pretrial schedule | JWW +pldgs/motions BOA.Moore | 0.25 / 0.00 | 300.00 T@5 | 75.00 | 75.00 |
| 35021 5/20/2004 WIP **TIME** — Phone call re rescheduling in Moore | JWW +pldgs/motions BOA.Moore | 0.25 / 0.00 | 300.00 T@5 | 75.00 | ● |
| 45121 5/20/2004 WIP **TIME** — Research, draft mot compel | JWP +pldgs/motions BOA.Moore | 1.50 / 0.00 | 275.00 T@5 | 412.50 | 412.50 |
| 35320 5/20/2004 WIP **TIME** — Defendant's and plaintiffs document production review and coding | KPB +discovery BOA.Moore | 3.75 / 0.00 | 140.00 T@5 | 525.00 | 525.00 |
| 35026 5/20/2004 WIP **TIME** — Review interrogatory responses. Rewrite objections. | JWW +discovery BOA.Moore | 1.00 / 0.00 | 300.00 T@5 | 300.00 | 300.00 |
| 45122 5/20/2004 WIP **TIME** — Tel conf w/ J Fink | JWP +discovery BOA.Moore | 0.20 / 0.00 | 275.00 T@5 | 55.00 | 55.00 |
| 35023 5/20/2004 WIP **TIME** — Read/rest draft motion to compel re Rogs 9-13. Discuss same with J. Pillette. | JWW +pldgs/motions BOA.Moore | 1.00 / 0.00 | 300.00 T@5 | 300.00 | 300.00 |
| 35274 5/20/2004 WIP **TIME** — Defendant's and plaintiffs document production review and coding | KPB +discovery BOA.Moore | 1.00 / 0.00 | 140.00 T@5 | 140.00 | 140.00 |
| 35322 5/21/2004 WIP **TIME** — Defendant's and plaintiffs document | KPB +discovery BOA.Moore | 7.75 / 0.00 | 140.00 T@5 | 1085.00 | 1085.00 |

Ex. 2
57

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| production review and coding | | | | | |
| 35028 5/21/2004 WIP  TIME — Draft memorandum to file re impact of Moore taking half flight but disputing all | JWW +research BOA Moore | 0.75 / 0.00 / 0.00 | 300.00 T@5 | 225.00 | 225.00 |
| 35029 5/21/2004 WIP  TIME — Legal research for cases to demonstrate how 1666 should work. | JWW +research BOA Moore | 3.00 / 0.00 / 0.00 | 300.00 T@5 | 900.00 | 900.00 |
| 35032 5/21/2004 WIP  TIME — Legal research re "consumer credit" for interrogatory responses | JWW +research BOA Moore | 3.00 / 0.00 / 0.00 | 300.00 T@5 | 900.00 | 900.00 |
| 45125 5/24/2004 WIP  TIME — Research, draft mot compel | JWP +pldgs/motions BOA Moore | 2.00 / 0.00 / 0.00 | 275.00 T@5 | 550.00 | 550.00 |
| 37030 5/24/2004 WIP  TIME — Work on discovery and scheduling. Assess adequacy of plaintiff's response to BofA discovery requests; communicate with client re scheduling his deposition and ensuring complete production of documents. | RSG +discovery BOA Moore | 3.00 / 0.00 / 0.00 | 425.00 T@5 | 1275.00 | 1275.00 |
| 35034 5/24/2004 WIP  TIME — Letter to client and legal research re | JWW +class cert BOA Moore | 7.00 / 0.00 / 0.00 | 300.00 T@5 | 2100.00 | 2100.00 |
| 35025 5/24/2004 WIP  TIME — Defendant's and plaintiff's document production review and coding; original credit application and "decision summary" review per Jenelle Welling | KPB +discovery BOA Moore | 1.17 / 0.00 / 0.00 | 140.00 T@5 | 163.33 | 163.33 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 35027 5/25/2004 WIP  TIME — Defendant's and plaintiff's document production review and coding | KPB +discovery BOA Moore | 4.33 / 0.00 / 0.00 | 140.00 T@5 | 606.67 | 606.67 |
| 37032 5/25/2004 WIP  TIME — Analysis of claims, research case law re consumer business issues | RSG +class cert BOA Moore | 3.75 / 0.00 / 0.00 | 425.00 T@5 | 1593.75 | 1593.75 ● |
| 45126 5/26/2004 WIP  TIME — 36 party, tel conts w/ & letters to Visa, Experian, Trans Union, Equifax | JWP +discovery BOA Moore | 1.10 / 0.00 / 0.00 | 275.00 T@5 | 302.50 | 302.50 |
| 45127 5/26/2004 WIP  TIME — 36 party, tel conf w/ J Beach (Visa) | JWP +discovery BOA Moore | 0.20 / 0.00 / 0.00 | 275.00 T@5 | 55.00 | 55.00 |
| 45128 5/26/2004 WIP  TIME — 36 party, tel cont w/ J Quintana (Visa), M&C re subpoena | JWP +discovery BOA Moore | 1.00 / 0.00 / 0.00 | 275.00 T@5 | 275.00 | 275.00 |
| 45129 5/26/2004 WIP  TIME — Research, draft mot compel | JWP +pldgs/motions BOA Moore | 0.70 / 0.00 / 0.00 | 275.00 T@5 | 192.50 | 192.50 |
| 35037 5/26/2004 WIP  TIME — Research outside sources for "Fare K" class type airfare for Jenelle Welling, telephone call with American Airlines and Travelocity re same, research fare basis code v. fare class code | KPB +discovery BOA Moore | 1.50 / 0.00 / 0.00 | 140.00 T@5 | 210.00 | 210.00 ● |
| 35039 5/26/2004 WIP  TIME — Read respondent's brief in Kraemer in preparation for class cert related discovery. | JWW +class cert BOA Moore | 2.00 / 0.00 / 0.00 | 300.00 T@5 | 600.00 | 600.00 |

Ex. 2

58

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment MarkUp |
|---|---|---|---|---|---|
| 35332  TIME  5/26/2004  WIP  Defendant's and plaintiffs document production review and coding | KPB +discovery BOA.Moore | 1.58 / 0.00  0.00 | 140.00 T@S | 221.67 | 221.67 |
| 37034  TIME  5/26/2004  WIP  Work on further analysis and development of claims; compare billing error guidelines with statutory requirements; work on PowerPoint re same | RSG +research BOA.Moore | 2.00 / 0.00  0.00 | 425.00 T@S | 850.00 | 850.00 |
| 45331  TIME  5/26/2004  WIP  Discuss next steps, class certification, legal issues presented with R. Green. | JWW +discovery BOA.Moore | 2.75 / 0.00  0.00 | 300.00 T@S | 825.00 | 825.00 |
| 35334  TIME  5/26/2004  WIP  Review requests for admission for Jenelle Weling and provide document support for admission or denial of same | KPB +discovery BOA.Moore | 1.00 / 0.00  0.00 | 140.00 T@S | 140.00 | 140.00 |
| 35336  TIME  5/26/2004  WIP  Company research of VISA headquarters and contact phone in San Francisco for John W. Pillette | KPB +discovery BOA.Moore | 0.33 / 0.00  0.00 | 140.00 T@S | 46.67 | 46.67 |
| 35344  TIME  5/27/2004  WIP  Redraft subpoena to Experian for issuance by Magistrate Judge per John W. Pillette, review rules re same, draft letter to clerk; process same | KPB +discovery BOA.Moore | 1.00 / 0.00  0.00 | 140.00 T@S | 140.00 | 140.00 |
| 35345  TIME  5/27/2004  WIP  Review renewal of 2/00 annual fee for Jenelle Weling and any correspondence with credit reporting agencies post 3/00 | KPB +discovery BOA.Moore | 1.00 / 0.00  0.00 | 140.00 T@S | 140.00 | 140.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment MarkUp |
|---|---|---|---|---|---|
| 35346  TIME  5/27/2004  WIP  Defendant's and plaintiff's document production review and coding | KPB +discovery BOA.Moore | 1.25 / 0.00  0.00 | 140.00 T@S | 175.00 | 175.00 |
| 45130  TIME  5/27/2004  WIP  Research, draft mot compel | JWW +pldgs/motions BOA.Moore | 2.70 / 0.00  0.00 | 275.00 T@S | 742.50 | 742.50 |
| 45131  TIME  5/27/2004  WIP  3d party, letter to J Quintana (Visa), M&C re subpoena | JWW +discovery BOA.Moore | 0.30 / 0.00  0.00 | 275.00 T@S | 82.50 | 82.50 |
| 35045  TIME  5/27/2004  WIP  Legal research re "consumer credit" for letter to client | JWW +class cert BOA.Moore | 4.00 / 0.00  0.00 | 300.00 T@S | 1200.00 | 1200.00 |
| 35046  TIME  5/27/2004  WIP  Finalized draft rog responses for client review | JWW +discovery BOA.Moore | 1.00 / 0.00  0.00 | 300.00 T@S | 300.00 | 300.00 |
| 35042  TIME  5/27/2004  WIP  Review/edit motion to compel | JWW +pldgs/motions BOA.Moore | 1.25 / 0.00  0.00 | 300.00 T@S | 375.00 | 375.00 |
| 35701  EXP  5/31/2004  WIP  J. Weling - 4/15/04 airfare travel San Diego to SFO re settlement conference | COST In BOA.Moore | 1 | 308.10 | 308.10 | 308.10 |
| 35706  EXP  5/31/2004  WIP  Overnight Courier: Federal Express- 5/17/04 | COST oos BOA.Moore | 1 | 26.95 | 26.95 | 26.95 |

Ex. 2

59

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 35698 EXP<br>5/31/2004<br>WIP<br>Filing Fees- One Legal, Inc.- 5/13/04 | COST<br>fi<br>BOA.Moore | 1 | 75.00 | 75.00 | 75.00 |
| 35292 EXP<br>5/31/2004<br>WIP<br>Postage 5/04 | COST<br>pos<br>BOA.Moore | 1 | 4.98 | 4.98 | 4.98 |
| 35746 EXP<br>5/31/2004<br>WIP<br>4/14/04- R. Green parking travel to San Diego re settlement conference | COST<br>tr<br>BOA.Moore | 1 | 16.00 | 16.00 | 16.00 |
| 35702 EXP<br>5/31/2004<br>WIP<br>4/15/04 parking travel San Diego to SFO re settlement conference | COST<br>tr<br>BOA.Moore | 1 | 50.00 | 50.00 | 50.00 |
| 35752 EXP<br>5/31/2004<br>WIP<br>4/21/04- R. Green car rental travel to Phoenix re depositions of O. Martinez, C. Penno, T. Buhrman, S. McCormick. | COST<br>tr<br>BOA.Moore | 1 | 159.50 | 159.50 | 159.50 |
| 35703 EXP<br>5/31/2004<br>WIP<br>R. Green & J. Welling - 4/15/04 meal travel to San Diego re settlement conference | COST<br>lod<br>BOA.Moore | 1 | 105.52 | 105.52 | 105.52 |
| 35747 EXP<br>5/31/2004<br>WIP<br>4/21/04- R. Green meals travel to Phoenix re depositions of O. Martinez, C. Penno, T. Buhrman, S. McCormick | COST<br>lod<br>BOA.Moore | 1 | 11.99 | 11.99 | 11.99 |
| 35748 EXP<br>5/31/2004<br>WIP<br>4/21/04- R. Green meals travel to Phoenix re depositions of O. Martinez, C. Penno, T. Buhrman, S. McCormick. | COST<br>lod<br>BOA.Moore | 1 | 28.05 | 28.05 | 28.05 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 35743 EXP<br>5/31/2004<br>WIP<br>4/15/04- R. Green car rental travel to San Diego re settlement conference | COST<br>rr<br>BOA.Moore | | 104.79 | 104.79 | 104.79 |
| 35310 EXP<br>5/31/2004<br>WIP<br>Facsimile 5/04 | COST<br>fax<br>BOA.Moore | 141 | 2.00 | 282.00 | 282.00 |
| 35642 EXP<br>5/31/2004<br>WIP<br>Copies - Internal 5/04 | COST<br>cop<br>BOA.Moore | 600 | 0.30 | 180.00 | 180.00 |
| 35691 EXP<br>5/31/2004<br>WIP<br>Overnight Courier- Federal Express- 4/2004 | COST<br>oes<br>BOA.Moore | 1 | 122.49 | 122.49 | 122.49 |
| 35692 EXP<br>5/31/2004<br>WIP<br>Overnight Courier- Federal Express- 4/2004 | COST<br>oes<br>BOA.Moore | 1 | 87.11 | 87.11 | 87.11 |
| 35749 EXP<br>5/31/2004<br>WIP<br>4/21/04- R. Green meals travel to Phoenix re depositions of O. Martinez, C. Penno, T. Buhrman, S. McCormick | COST<br>lod<br>BOA.Moore | 1 | 14.99 | 14.99 | 14.99 |
| 35694 EXP<br>5/31/2004<br>WIP<br>Overnight Courier- Federal Express- 4/23/04 | COST<br>oes<br>BOA.Moore | 1 | 39.13 | 39.13 | 39.13 |
| 35697 EXP<br>5/31/2004<br>WIP<br>Filing Fees- One Legal, Inc.- 5/20/04 | COST<br>fi<br>BOA.Moore | 1 | 59.00 | 59.00 | 59.00 |
| 35750 EXP<br>5/31/2004<br>WIP<br>4/21/04- R. Green meals travel to Phoenix re depositions of O. Martinez, C. Penno, T. Buhrman, S. McCormick | COST<br>lod<br>BOA.Moore | 1 | 9.84 | 9.84 | 9.84 |

Ex. 2
60

**Buhman, S. McCormick**

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | | Units DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV / Adjustment / Markup |
|---|---|---|---|---|---|---|
| 35753 / 5/31/2004 / WIP / 4/21/04- R. Green lodging travel to Phoenix re depositions of O. Martinez, C. Penno, T. Buhman, S. McCormick | COST / lod / BOA.Moore | EXP | 1 | 464.91 | 464.91 | 464.91 |
| 35693 / 5/31/2004 / WIP / Overnight Courier- Federal Express- 4/23/04 | COST / oes / BOA.Moore | EXP | 1 | 39.13 | 39.13 | 39.13 |
| 35698 / 5/31/2004 / WIP / R. Green - 4/20/23/04 parking travel to Phoenix re depositions of O. Martinez, C. Penno, T. Buhman and S. McCormick | COST / trf / BOA.Moore | EXP | 1 | 18.00 | 18.00 | 18.00 |
| 35704 / 5/31/2004 / WIP / R. Green & J. Weling  4/14/04 meal travel to San Diego re settlement conference | COST / lod / BOA.Moore | EXP | 1 | 51.79 | 51.79 | 51.79 |
| 35695 / 5/31/2004 / WIP / R. Green - 4/20/04 airfare travel to Phoenix re depositions of O. Martinez, C. Penno, T. Buhman and S. McCormick | COST / pro / BOA.Moore | EXP | 1 | 60.00 | 60.00 | 60.00 |
| 35699 / 5/31/2004 / WIP / Process Service- Janney & Janney Attorney Service- refund overcharge 5/7/04 | COST / trf / BOA.Moore | EXP | 1 | 326.20 | 326.20 | 326.20 |
| 35700 / 5/31/2004 / WIP / R. Green - 4/15/04 airfare travel San Diego to SFO re settlement conference | COST / trf / BOA.Moore | EXP | 1 | 308.10 | 308.10 | 308.10 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | | Units DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV / Adjustment / Markup |
|---|---|---|---|---|---|---|
| 35744 / 5/31/2004 / WIP / 4/15/04- R. Green parking travel to San Diego re settlement conference | COST / trf / BOA.Moore | EXP | 1 | 40.00 | 40.00 | 40.00 ● |
| 35707 / 5/31/2004 / WIP / Overnight Courier- Federal Express- 5/13.04 | COST / oes / BOA.Moore | EXP | 1 | 29.95 | 29.95 | 29.95 |
| 35705 / 5/31/2004 / WIP / R. Green & J. Weling - 4/14/04 meal travel to San Diego re settlement conference | COST / lod / BOA.Moore | EXP | 1 | 83.15 | 83.15 | 83.15 |
| 35745 / 5/31/2004 / WIP / 4/15/04- R. Green meal travel to San Diego re settlement conference | COST / lod / BOA.Moore | EXP | 1 | 17.00 | 17.00 | 17.00 |
| 35751 / 5/31/2004 / WIP / 4/21/04- R. Green parking travel to Phoenix re depositions of O. Martinez, C. Penno, T. Buhman, S. McCormick | COST / trf / BOA.Moore | EXP | 1 | 60.00 | 60.00 | 60.00 |
| 35708 / 5/31/2004 / WIP / Long Distance- 4/14/04 Omni Cutting (internet access) | COST / lg / BOA.Moore | EXP | 1 | 12.00 | 12.00 | 12.00 |
| 35709 / 6/1/2004 / WIP / Defendant's and plaintiffs document production review and coding | KPB / +discovery / BOA.Moore | TME | 6.00 / 0.00 | 140.00 T@S | 840.00 | ● |
| 45132 / 6/1/2004 / WIP / Email exchange w/ J.Moore re release for credit reporting agencies to give info | JWP / +discovery / BOA.Moore | TME | 0.40 / 0.00 | 275.00 T@S | 110.00 | 110.00 |

Ex. 2
61

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45133 / 6/1/2004 / WIP — TIME<br>3d party, review slip prod and re Visa subpoena response | JWP / +discovery / BOA Moore | 0.50 / 0.00 | 275.00 / T@5 | 137.50 | 137.50 |
| 45134 / 6/1/2004 / WIP — TIME<br>3d party, release to Experian | JWP / +discovery / BOA Moore | 0.30 / 0.00 | 275.00 / T@5 | 82.50 | 82.50 |
| 35718 / 6/2/2004 / WIP — TIME<br>Case planning and objective meeting with Robert S. Green, John W. Pillette, and Jenelle Welling | KPB / +pldgs/motions / BOA Moore | 2.00 / 0.00 | 140.00 / T@5 | 280.00 | 280.00 |
| 37328 / 6/2/2004 / WIP — TIME<br>Team meeting re discovery and other case strategy and organizational issues; conference with client ▮▮▮ review last document production | RSG / +discovery / BOA Moore | 3.25 / 0.00 | 425.00 / T@5 | 1381.25 | 1381.25 |
| 45135 / 6/2/2004 / WIP — TIME<br>Tel conf w/ Denise (MBJTW) | JWP / +meetings/commu / BOA Moore | 0.20 / 0.20 | 275.00 / T@5 / Do Not Bill | 55.00 | 0.00 |
| 45136 / 6/2/2004 / WIP — TIME<br>Research, draft mot compel | JWP / +pldgs/motions / BOA Moore | 2.50 / 0.00 | 275.00 / T@5 | 687.50 | 687.50 |
| 35065 / 6/2/2004 / WIP — TIME<br>Review draft schedule stipulation. Email correspondence with S. Jacobs re same. | JWW / +pldgs/motions / BOA Moore | 0.75 / 0.00 | 300.00 / T@5 | 225.00 | 225.00 |
| 35066 / 6/2/2004 / WIP — TIME<br>Read amended answer to Moore complaint. Analyze denials for discovery and affirmative defenses | JWW / +pldgs/motions / BOA Moore | 1.00 / 0.00 | 300.00 / T@5 | 300.00 | 300.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 35067 / 6/2/2004 / WIP — TIME<br>Case strategy and discovery meeting with R. Green, J. Pillette, K. Brown. | JWW / +discovery / BOA Moore | 2.00 / 0.00 | 300.00 / T@5 | 600.00 | 600.00 |
| 45137 / 6/2/2004 / WIP — TIME<br>Conf w/ R Green J Welling K Brown re BoA doc production | JWP / +discovery / BOA Moore | 1.70 / 0.00 | 275.00 / T@5 | 467.50 | 467.50 ▮ |
| 45138 / 6/2/2004 / WIP — TIME<br>3d party, subpoenas, expert witnesses, Visa | JWP / +discovery / BOA Moore | 0.60 / 0.00 | 275.00 / T@5 | 165.00 | 165.00 |
| 35060 / 6/2/2004 / WIP — TIME<br>Email correspondence with S. Jacobs re scheduling stipulation | JWW / +pldgs/motions / BOA Moore | 0.10 / 0.00 | 300.00 / T@5 | 30.00 | 30.00 |
| 35717 / 6/2/2004 / WIP — TIME<br>Defendant's and plaintiff's document production review and coding | KPB / +discovery / BOA Moore | 1.50 / 0.00 | 140.00 / T@5 | 210.00 | 210.00 |
| 35064 / 6/2/2004 / WIP — TIME<br>Strategy and analysis of next steps, briefing and settlement w/ R. Green. | JWW / +meetings/commu / BOA Moore | 2.00 / 0.00 | 300.00 / T@5 | 600.00 | 600.00 |
| 45332 / 6/3/2004 / WIP — TIME<br>Fact research for RFA responses. | JWW / +discovery / BOA Moore | 1.00 / 0.00 | 300.00 / T@5 | 300.00 | 300.00 ▮ |
| 35720 / 6/3/2004 / WIP — TIME<br>Defendant's and plaintiff's document production review and coding; memos and emails re same, review characterization of flight and accounts, etc. | KPB / +discovery / BOA Moore | 7.00 / 0.00 | 140.00 / T@5 | 980.00 | 980.00 |

Ex. 2
62

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 35071 / 6/3/2004 / WIP — TIME / Strategy and analysis of issue codes. Summation set up. Discuss same w/in R Green. | JWW / +discovery / BOA.Moore | 1.25 / 1.25 / 0.00 | 300.00 T@S / Do Not Bill | 375.00 | 0.00 |
| 35073 / 6/3/2004 / WIP — TIME / Meet with B. Umpierre to discuss approach for motion to strike | JWW / +pldgs/motions / BOA.Moore | 0.25 / 0.00 | 300.00 T@S | 75.00 | 75.00 |
| 45326 / 6/3/2004 / WIP — TIME / Research re class certification issues under 230(h2) and review transcript of T. Buhrman deposition to determine aspects of BoA policies that are subject to in junctive relief. | RSG / +class cert / BOA.Moore | 3.75 / 0.00 | 425.00 T@S | 1593.75 | 1593.75 |
| 45139 / 6/3/2004 / WIP — TIME / Research, draft mot compel | JWP / +pldgs/motions / BOA.Moore | 2.50 / 0.00 | 275.00 T@S | 687.50 | 687.50 |
| 45140 / 6/3/2004 / WIP — TIME / 3d party, tel call J Quitana (Visa) | JWP / +discovery / BOA.Moore | 0.10 / 0.00 | 275.00 T@S | 27.50 | 27.50 |
| 45141 / 6/3/2004 / WIP — TIME / Review BoA requests, prepare responses thereto | JWP / +discovery / BOA.Moore | 1.50 / 0.00 | 275.00 T@S | 412.50 | 412.50 |
| 45142 / 6/3/2004 / WIP — TIME / Draft letter to J Frink re outstanding discovery | JWP / +discovery / BOA.Moore | 0.50 / 0.00 | 275.00 T@S | 137.50 | 137.50 |
| 45143 / 6/3/2004 / WIP — TIME / Tel calls to USDC, SD Cal | JWP / +meetings/commu / BOA.Moore | 0.20 / 0.00 | 275.00 T@S | 55.00 | 55.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 37325 / 6/3/2004 / WIP — TIME / Work on plaintiff's discovery responses; conference with client re same. | RSG / +discovery / BOA.Moore | 3.50 / 0.00 | 425.00 T@S | 1487.50 | 1487.50 |
| 35076 / 6/3/2004 / WIP — TIME / Review discovery responses with R. Green. Discuss same with client. | JWW / +discovery / BOA.Moore | 4.00 / 0.00 | 300.00 T@S | 1200.00 | 1200.00 ● |
| 36311 / 6/4/2004 / WIP — TIME / Summation management of Transcripts. Prepare Depo exhibit binders; cross-check official exhibits with those marked in Summation. Continue review and coding of Defendant's and plaintiff's document production. | KPB / +discovery / BOA.Moore | 6.75 / 0.00 | 140.00 T@S | 945.00 | 945.00 |
| 45148 / 6/4/2004 / WIP — TIME / Conf w/ J Welling re RFAs | JWP / +discovery / BOA.Moore | 0.40 / 0.00 | 275.00 T@S | 110.00 | 110.00 |
| 35080 / 6/4/2004 / WIP — TIME / Finalize Req Set 2 responses. Discuss adding word "consumer" to Req No. 19 with R. Green. | JWW / +discovery / BOA.Moore | 1.00 / 0.00 | 300.00 T@S | 300.00 | 300.00 |
| 45144 / 6/4/2004 / WIP — TIME / Draft letter to J Frink re outstanding discovery | JWP / +discovery / BOA.Moore | 0.50 / 0.00 | 275.00 T@S | 137.50 | 137.50 ● |
| 45145 / 6/4/2004 / WIP — TIME / 3d party, tel conf w/ J Quitana (Visa) re subpoena | JWP / +discovery / BOA.Moore | 0.60 / 0.00 | 275.00 T@S | 165.00 | 165.00 |

Ex. 2

63

**Page 59**

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45147 — 6/4/2004 — WIP — TIME<br>Research, draft mot compel | JWP<br>+pldgs/motions<br>BOA.Moore | 0.60 / 0.00 | 275.00 T@5 | 165.00 | 165.00 |
| 35079 — 6/4/2004 — WIP — TIME<br>Memo to file re chronology for annual fee issue. Email client re same. | JWW<br>+discovery<br>BOA.Moore | 1.50 / 0.00 | 300.00 T@5 | 450.00 | 450.00 |
| 37332 — 6/4/2004 — WIP — TIME<br>Work on document requests and deposition follow up issues re further discovery | RSG<br>+discovery<br>BOA.Moore | 3.25 / 0.00 | 425.00 T@5<br>Do Not Bill | 1381.25 | 1381.25 |
| 35077 — 6/4/2004 — WIP — TIME<br>Arrange travel for deposition | JWW<br>+depo<br>BOA.Moore | 0.25 / 0.25 | 300.00 T@5 | 75.00 | 75.00 |
| 35078 — 6/4/2004 — WIP — TIME<br>Draft letter to R. Montblanco re Experian subpoena | JWW<br>+discovery<br>BOA.Moore | 0.25 / 0.00 | 300.00 T@5 | 75.00 | 75.00 |
| 35081 — 6/4/2004 — WIP — TIME<br>Phone call with S. Jacobs re extension on discovery, modification of protective order. MSC | JWW<br>+discovery<br>BOA.Moore | 0.50 / 0.00 | 300.00 T@5 | 150.00 | 150.00 |
| 45150 — 6/7/2004 — WIP — TIME<br>Research, draft mot compel | JWP<br>+pldgs/motions<br>BOA.Moore | 0.60 / 0.00 | 275.00 T@5 | 165.00 | 165.00 |
| 45151 — 6/7/2004 — WIP — TIME<br>Cont w/ J Welling re RFAs | JWP<br>+discovery<br>BOA.Moore | 0.40 / 0.00 | 275.00 T@5 | 110.00 | 110.00 |
| 36198 — 6/7/2004 — WIP — TIME | JWW<br>+discovery<br>BOA.Moore | 0.50 / 0.00 | 300.00 T@5 | 150.00 | 150.00 |

**Page 60**

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 6/7/2004 — WIP — TIME<br>Read K. Brown memorandum re Moore document production. Review documents to be produced. Email client. | JWW<br>+discovery<br>BOA.Moore | 0.50 / 0.50 | 300.00 T@5 | 150.00 | 0.00 |
| 36193 — 6/7/2004 — WIP — TIME<br>Discuss revamped Summation coding with K. Brown. | JWW<br>+discovery<br>BOA.Moore | 0.00 | 300.00 T@5<br>Do Not Bill | | ● |
| 36200 — 6/7/2004 — WIP — TIME<br>Phone call with client to discuss RFA responses. Discuss same with R. Green. Edit responses. | JWW<br>+discovery<br>BOA.Moore | 2.00 / 0.00 | 300.00 T@5 | 600.00 | 600.00 |
| 36197 — 6/7/2004 — WIP — TIME<br>Edit RFAs per Rule 36 | JWW<br>+discovery<br>BOA.Moore | 0.25 / 0.00 | 300.00 T@5 | 75.00 | 75.00 |
| 45152 — 6/7/2004 — WIP — TIME<br>3d party. letter to J Qustana (Visa) | JWP<br>+discovery<br>BOA.Moore | 0.40 / 0.00 | 275.00 T@5 | 110.00 | 110.00 |
| 36201 — 6/7/2004 — WIP — TIME<br>Memo to file, J. Pillette, K. Brown re Moore paying United | JWW<br>+discovery<br>BOA.Moore | 0.50 / 0.00 | 300.00 T@5 | 150.00 | 150.00 |
| 40331 — 6/7/2004 — WIP — TIME<br>Case strategy and analysis with R. Green re priorities and next steps. | JWW<br>+meetings/commu<br>BOA.Moore | 0.25 / 0.00 | 300.00 T@5 | 75.00 | ● |
| 45634 — 6/7/2004 — WIP — TIME<br>Continue review and coding of Defendant's and plaintiffs document production. | KPB<br>+discovery<br>BOA.Moore | 4.00 / 0.00 | 140.00 T@5 | 560.00 | 560.00 |
| 36313 — 6/7/2004 — WIP — TIME | KPB<br>+discovery<br>BOA.Moore | 4.00 / 4.00 | 140.00 T@5<br>Do Not Bill | 560.00 | 0.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| Review errors in scanning of Defendant's document production; coordinate resolution of same | | | | | |
| 36210<br>6/8/2004<br>WIP<br>TIME<br>Phone call with S. Jacobs, J. Fink, R. Green re settlement proposal. Discuss same with R. Green. | JWW<br>+settlement<br>BOA.Moore | 1.00<br>0.00 | 300.00<br>T@5 | 300.00 | 300.00 |
| 45155<br>6/9/2004<br>WIP<br>TIME<br>Review BoA discovery responses | JWP<br>+discovery<br>BOA.Moore | 1.40<br>0.00 | 275.00<br>T@5 | 385.00 | 385.00 |
| 37341<br>6/9/2004<br>WIP<br>TIME<br>Work on issues re motion to compel. | RSG<br>+pldgs/motions<br>BOA.Moore | 0.40<br>0.00 | 425.00<br>T@5 | 170.00 | 170.00 |
| 36314<br>6/9/2004<br>WIP<br>TIME<br>Continue review of parties' document productions; Review documents withheld on plaintiffs production for responsiveness; draft memorandum re same; review letter from Experian Custodian of Records re compliance with Subpoena issued May 14, 2004; review authorities relied upon in same; review FTC commentary on FCRA re overriding privacy issues governing the production of a credit report; prepare Clerk issued Subpoena and coordinate service on Experian | KPB<br>+discovery<br>BOA.Moore | 8.00<br>0.00 | 140.00<br>T@5 | 1120.00 | 1120.00 |
| 45153<br>6/9/2004<br>WIP<br>TIME<br>Confer w/ R Green J Welling re mot to compel | JWP<br>+pldgs/motions<br>BOA.Moore | 1.00<br>0.00 | 275.00<br>T@5 | 275.00 | 275.00 |
| 36208<br>6/9/2004<br>WIP<br>TIME<br>Finesse scheduling stipulation per court request. Email S. Jacobs re same. | JWW<br>+pldgs/motions<br>BOA.Moore | 0.25<br>0.00 | 300.00<br>T@5 | 75.00 | 75.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45327<br>6/8/2004<br>WIP<br>TIME<br>Telephone conference with S. Jacobs and J. Fink re settlement issues and below up re same. | RSG<br>+settlement<br>BOA.Moore | 0.75<br>0.00 | 425.00<br>T@5 | 318.75 | 318.75 |
| 45154<br>6/9/2004<br>WIP<br>TIME<br>Research, draft mot compel | JWP<br>+pldgs/motions<br>BOA.Moore | 0.90<br>0.00 | 275.00<br>T@5 | 247.50 | 247.50 |
| 45156<br>6/9/2004<br>WIP<br>TIME<br>Research, draft mot compel | JWP<br>+pldgs/motions<br>BOA.Moore | 4.00<br>0.00 | 275.00<br>T@5 | 1100.00 | 1100.00 |
| 38213<br>6/9/2004<br>WIP<br>TIME<br>Message to R. Momblanco re Experian subpoena | JWW<br>+discovery<br>BOA.Moore | 0.10<br>0.00 | 300.00<br>T@5 | 30.00 | 30.00 |
| 36316<br>6/9/2004<br>WIP<br>TIME<br>Continuing review of parties' document productions; continue review of authorities relied upon by Experian in not responding to document Subpoena; finalize memorandum re responsiveness of pitts documents withheld | KPB<br>+discovery<br>BOA.Moore | 5.50<br>0.00 | 140.00<br>T@5 | 770.00 | 770.00 |
| 40333<br>6/9/2004<br>WIP<br>TIME<br>Work on motion to strike claims. | RSG<br>+pldgs/motions<br>BOA.Moore | 0.40<br>0.00 | 425.00<br>T@5 | 170.00 | 170.00 |
| 45157<br>6/9/2004<br>WIP<br>TIME<br>3d party, letter to R Haas (Experian) | JWP<br>+discovery<br>BOA.Moore | 0.40<br>0.00 | 275.00<br>T@5 | 110.00 | 110.00 |
| 36306<br>6/9/2004<br>WIP<br>TIME<br>Moore Depo preparation, Doc review, coordinate with J. Welling, Bates stamp and | KPB<br>+depo<br>BOA.Moore | 2.50<br>0.00 | 140.00<br>T@5 | 350.00 | 350.00 |

Ex. 2
65

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| prepare for service | | | | | |
| 36218 6/9/2004 WIP TIME — Final read through and signature of discovery responses. Discuss RFA No. 12 with J. Frink re reference to paragraph 16. | JWW +discovery BOA.Moore | 1.25 / 0.00 0.00 | 300.00 T@5 | 375.00 | 375.00 |
| 36223 6/9/2004 WIP TIME — Analyze hot deposition issues in preparation for client preparation session. | JWW +depo BOA.Moore | 1.50 / 0.00 0.00 | 300.00 T@5 | 450.00 | 450.00 |
| 45328 6/9/2004 WIP TIME — Research case law on settlement of Rule 23(b)(2) claims and consideration of items of settlement. | RSG +settlement BOA.Moore | 1.10 / 0.00 0.00 | 425.00 T@5 | 467.50 | 467.50 |
| 36224 6/10/2004 WIP TIME — Travel to San Diego. | JWW +depo BOA.Moore | 3.00 / 0.00 0.00 | 300.00 T@5 | 900.00 | 900.00 |
| 4591 6/10/2004 WIP TIME — Prepare Plaintiff for deposition. | JWW +depo BOA.Moore | 4.00 / 0.00 0.00 | 300.00 T@5 | 1200.00 | 1200.00 |
| 45158 6/10/2004 WIP TIME — Research, draft mot compel | JWP +pldgs/motions BOA.Moore | 7.80 / 0.00 0.00 | 275.00 T@5 | 2145.00 | 2145.00 |
| 37356 6/11/2004 WIP TIME — Work on motion to compel pleadings and motion to strike affirmative defenses | RSG +pldgs/motions BOA.Moore | 1.00 / 0.00 0.00 | 425.00 T@5 | 425.00 | 425.00 |
| 45360 6/11/2004 WIP TIME — Conference with J. Welling re deposition and review documents re same | RSG +depo BOA.Moore | 0.75 / 0.00 0.00 | 425.00 T@5 | 318.75 | 318.75 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 36325 6/11/2004 WIP TIME — Review local rules re Motion Practice; determine filing dates and requirements; email re same | KPB +pldgs/motions BOA.Moore | 0.75 / 0.00 0.00 | 140.00 T@5 | 105.00 | 105.00 |
| 45159 6/11/2004 WIP TIME — Research, draft mot compel | JWP +pldgs/motions BOA.Moore | 4.60 / 0.00 0.00 | 275.00 T@5 | 1265.00 | 12 |
| 36225 6/11/2004 WIP TIME — Defend Plaintiffs deposition. Return travel | JWW +depo BOA.Moore | 8.00 / 0.00 0.00 | 300.00 T@5 | 2400.00 | 2400.00 |
| 45160 6/14/2004 WIP TIME — Research, draft mot compel | JWP +pldgs/motions BOA.Moore | 6.60 / 0.00 0.00 | 275.00 T@5 | 1815.00 | 1815.00 |
| 36226 6/14/2004 WIP TIME — Discuss deposition with K. Brown. | JWW +depo BOA.Moore | 0.25 / 0.25 0.00 | 300.00 T@5 Do Not Bill | 75.00 | 0.00 |
| 36328 6/14/2004 WIP TIME — Case Calendaring | KPB +pldgs/motions BOA.Moore | 0.25 / 0.25 0.00 | 140.00 T@5 Do Not Bill | 35.00 | 0.00 |
| 36237 6/15/2004 WIP TIME — Review/revise draft demand letter. | JWW +settlement BOA.Moore | 0.50 / 0.00 0.00 | 300.00 T@5 | 150.00 | 150.00 |
| 36236 6/15/2004 WIP TIME — Outline deposition questions for credit reporting aspects of claims. | JWW +depo BOA.Moore | 0.50 / 0.00 0.00 | 300.00 T@5 | 150.00 | 150 |
| 37369 6/16/2004 WIP TIME — Prepare for credit reporting deposition and review documents and legal issues re same | RSG +depo BOA.Moore | 3.50 / 0.00 0.00 | 425.00 T@5 | 1487.50 | 1487.50 |

Ex. 2

66

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Mark-up |
|---|---|---|---|---|---|
| 36399 6/15/2004 WIP TIME — Coordinate document retrieval from Visa Headquarters of responsive documents to Visa Subpoena | KPB +discovery BOA.Moore | 0.25 0.00 | 140.00 T@5 | 35.00 | 35.00 |
| 36402 6/16/2004 WIP TIME — Deposition prep for PMK deposition re Credit Reporting; potential exhibit review; relevant document research and review; prep same for Robert S. Green review | KPB +depo BOA.Moore | 2.75 0.00 | 140.00 T@5 | 385.00 | 385.00 |
| 37371 6/17/2004 WIP TIME — Prepare for credit reporting deposition | RSG +depo BOA.Moore | 2.25 0.00 | 425.00 T@5 | 956.25 | 956.25 |
| 36403 6/17/2004 WIP TIME — Deposition prep for PMK depo re Credit Reporting; potential exhibit review; relevant document research and review; prep same for Robert S. green review; meeting with Robert S. Green re same | KPB +depo BOA.Moore | 5.50 0.00 | 140.00 T@5 | 770.00 | 770.00 |
| 36407 6/18/2004 WIP TIME — Deposition prep for PMK depo re Credit Reporting; relevant document research and review | KPB +depo BOA.Moore | 1.25 0.00 | 140.00 T@5 | 175.00 | 175.00 |
| 37828 6/21/2004 WIP TIME — Work on settlement strategy; drafting demand letter and putting together documents to assess settlement positions | RSG +settlement BOA.Moore | 1.50 0.00 | 425.00 T@5 | 637.50 | 637.50 |
| 36261 6/21/2004 WIP TIME — Discuss settlement proposal with R. Green. | JWW +settlement BOA.Moore | 0.50 0.00 | 300.00 T@5 | 150.00 | 150.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Mark-up |
|---|---|---|---|---|---|
| 36412 6/21/2004 WIP TIME — Summation maintenance of plaintiffs and defendant's document productions; Moore Bank Statement separation and coding | KPB +discovery BOA.Moore | 1.00 0.00 | 140.00 T@5 | 140.00 | 140.00 |
| 36414 6/21/2004 WIP TIME — Process Third-party VISA document production | KPB +discovery BOA.Moore | 0.75 0.00 | 140.00 T@5 | 105.00 | 105.00 |
| 36415 6/22/2004 WIP TIME — Process and review Third-party VISA document production; Draft letter to Haas, Custodian of Records at Experian, directing compliance with Subpoena per Mag. Judge Order | KPB +discovery BOA.Moore | 7.25 0.00 | 140.00 T@5 | 1015.00 | 1015.00 |
| 36365 6/22/2004 WIP TIME — Review letter from J. Fink re Moore discovery responses. Email J. Paltette re same. | JWW +discovery BOA.Moore | 0.25 0.00 | 300.00 T@5 | 75.00 | 75.00 |
| 37832 6/22/2004 WIP TIME — Work on demand letter re settlement issues | RSG +settlement BOA.Moore | 0.50 0.00 | 425.00 T@5 | 212.50 | 212.50 |
| 36419 6/23/2004 WIP TIME — Case Calendaring | KPB +pldgs/motions BOA.Moore | 0.25 0.25 | 140.00 T@5 Do Not Bill | 35.00 | 0.00 |
| 37834 6/23/2004 WIP TIME — Work on revisions to settlement demand letter | RSG +settlement BOA.Moore | 3.00 0.00 | 425.00 T@5 | 1275.00 | 1275.00 |
| 37840 6/24/2004 WIP TIME | RSG +settlement BOA.Moore | 5.50 0.00 | 425.00 T@5 | 2337.50 | 2337.50 |

Ex. 2
67

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| Work on settlement letter, review cases on Rule 23(b) settlements and meet with team re case strategy and open items | | 0.00 | | | |
| 36426 6/24/2004 WIP  TIME — Review of PEGA documents; note inconsistencies; trends re consumer letter w/o and w/ direct bank communication; discovery meeting re document tasks with Robert S. Green, Jenelle Welling, John W. Pillette | KPB +discovery BOA.Moore | 1.50 0.00 | 140.00 T@S | 210.00 | 210.00 |
| 36282 6/24/2004 WIP  TIME — Review settlement letter. Discuss with R. Green. Correspondence with Moore re ▉ | JWW +settlement BOA.Moore | 0.50 0.00 | 300.00 T@S | 150.00 | 150.00 |
| 36283 6/24/2004 WIP  TIME — Preparation for scheduling meeting/case tasks with R. Green, J. Pillette. Meet with R. Green, J. Pillette re same. | JWW +meetings/commu BOA.Moore | 3.00 0.00 | 300.00 T@S | 900.00 | 900.00 |
| 36464 6/25/2004 WIP  TIME — Pulled together documents produced by the parties to help J. Pillette research various discovery objections for his MC. | KDN +discovery BOA.Moore | 1.00 0.00 | 225.00 T@S | 225.00 | 225.00 |
| 36465 6/27/2004 WIP  TIME — Legal research re discovery objections for J. Pillette's MC. | KDN +research BOA.Moore | 1.00 0.00 | 225.00 T@S | 225.00 | 225.00 |
| 36433 6/28/2004 WIP  TIME — Plaintiff and Defendant document production coding in Summation | KPB +discovery BOA.Moore | 2.25 0.00 | 140.00 T@S | 315.00 | 315.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 37848 6/28/2004 WIP  TIME — Research case law on the consumer/business issues under TILA | RSG +class cert BOA.Moore | 2.50 0.00 | 425.00 T@S | 1062.50 | 1062.50 |
| 36466 6/28/2004 WIP  TIME — Researched discovery objections for J. Pillette's MC. | KDN +research BOA.Moore | 2.00 0.00 | 275.00 T@S | 450.00 | 450.00 |
| 45161 6/29/2004 WIP  TIME — Confer w/ R. Green re prep for hearing re extension of discovery cut off. Develop schedule for R. Green to work from that incorporates status of meet and confers on existing requests. | JWP +discovery BOA.Moore | 0.70 0.00 | 275.00 T@S | 192.50 | 192.50 |
| 45162 6/29/2004 WIP  TIME — Research, draft mot compel | JWP +pldgs/motions BOA.Moore | 1.80 0.00 | 275.00 T@S | 495.00 | 495.00 |
| 36440 6/29/2004 WIP  TIME — Plaintiff and Defendant document production coding in Summation | KPB +discovery BOA.Moore | 4.00 0.00 | 140.00 T@S | 560.00 | 560.00 |
| 37851 6/29/2004 WIP  TIME — Prepare for and participate in court conference call re discovery cut-off and pre-trial schedule | RSG +court BOA.Moore | 1.50 0.00 | 425.00 T@S | 637.50 | 637.50 |
| 37640 6/30/2004 WIP  EXP — Filing Fees: One Legal, Inc. - 6/10/04 | COST M BOA.Moore | 1 | 115.00 | 115.00 | 115.00 |

Ex. 2
68

| Slip ID / Dates and Time / Posting Status / Description | | Timekeeper Activity Case | Units DNB Time Variance | Rate Rate info Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|---|
| 37641 6/30/2004 WIP Filing Fees- One Legal, Inc. - 6/14/04 | EXP | COST fil BOA.Moore | 1 | 199.00 | 199.00 | 199.00 |
| 37646 6/30/2004 WIP J.Welling - 6/7/04 lodging travel to San Diego re deposition of Randy Moore | EXP | COST lod BOA.Moore | 1 | 197.80 | 197.80 | 197.80 |
| 37257 6/30/2004 WIP Postage 6/04 | EXP | COST pos BOA.Moore | 1 | 24.81 | 24.81 | 24.81 |
| 37647 6/30/2004 WIP J.Welling - 6/11/04 parking travel to Los Angeles re deposition of Randy Moore | EXP | COST trl BOA.Moore | 1 | 59.00 | 59.00 | 59.00 |
| 36470 6/30/2004 WIP Research objections for J. Pillette meet and confer | TME | KDN +discovery BOA.Moore | 2.00 / 0.00 / 0.00 | 225.00 T@5 | 450.00 | 450.00 |
| 37642 6/30/2004 WIP Filing Fees- One Legal, Inc. - 6/15/04 | EXP | COST fil BOA.Moore | 1 | 41.75 | 41.75 | 41.75 |
| 37648 6/30/2004 WIP Transcripts/Depos/Document Retrieval- Century Court Reporters- 6/11/04 Copy of transcript of J Moore | EXP | COST dep BOA.Moore | 1 | 628.75 | 628.75 | 628.75 |
| 37275 6/30/2004 WIP Facsimile 6/04 | EXP | COST fax BOA.Moore | 172 | 2.00 | 344.00 | 344.00 |
| 37643 6/30/2004 WIP | EXP | COST trl BOA.Moore | 1 | 50.00 | 50.00 | 50.00 |

| Slip ID / Dates and Time / Posting Status / Description | | Timekeeper Activity Case | Units DNB Time Variance | Rate Rate info Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|---|
| J.Welling - 6/9/04 taxis re preparation for J Moore deposition | | | | | | |
| 36471 6/30/2004 WIP Researched discovery responses/objections re relevance for J.Pillette meet and confer | TME | KDN +discovery BOA.Moore | 1.50 / 0.00 0.00 | 225.00 T@5 | 337.50 | 337.50 |
| 37644 6/30/2004 WIP J.Welling - 6/10-11/04 airfare travel to San Diego re deposition of Randy Moore | EXP | COST trl BOA.Moore | 1 | 294.90 | 294.90 | 294.90 |
| 37649 6/30/2004 WIP Overnight Courier- Federal Express- 6/9/04 | EXP | COST oes BOA.Moore | 1 | 15.21 | 15.21 | 15.21 |
| 37634 6/30/2004 WIP J.Welling - 4/13-15/04 airfare travel to San Diego re settlement conference | EXP | COST trl BOA.Moore | 1 | 117.10 | 117.10 | 117.10 |
| 37631 6/30/2004 WIP Transcripts/Depos/Document Retrieval- Esquire Deposition Services, L- 5/27/04 services provided 4/22/04 C. Penino, T. Buhman, S. McCormac | EXP | COST dep BOA.Moore | 1 | 1256.95 | 1256.95 | 1256.95 |
| 37645 6/30/2004 WIP J.Welling - 6/11/04 meal travel to San Diego re deposition of Randy Moore | EXP | COST lod BOA.Moore | 1 | 30.42 | 30.42 | 30.42 |
| 37637 6/30/2004 WIP Filing Fees- One Legal, Inc. - 6/4/04 | EXP | COST fil BOA.Moore | 1 | 31.62 | 31.62 | 31.62 |

Ex. 2
69

| Slip ID / Dates and Time / Posting Status / Description | | Timekeeper Activity Case | Units DNB Time Variance | Rate Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|---|
| 37638 6/30/2004 WIP | EXP | COST fil BOA.Moore | 1 | 71.62 | 71.62 | 71.62 |
| Filing Fees- One Legal, Inc.- 6/7/04 | | | | | | |
| 36450 6/30/2004 WIP | TIME | KPB +discovery BOA.Moore | 0.25 0.00 | 140.00 T@5 | 35.00 | 35.00 |
| Process VISA document production | | | | | | |
| 37633 6/30/2004 WIP | EXP | COST mes BOA.Moore | 1 | 106.00 | 106.00 | 106.00 |
| Messenger- Spincycle- 05/04 | | | | | | |
| 37650 6/30/2004 WIP | EXP | COST mes BOA.Moore | 1 | 25.00 | 25.00 | 25.00 |
| Messenger- Spincycle 6/16/04 | | | | | | |
| 37504 6/30/2004 WIP | EXP | COST cop BOA.Moore | 2173 | 0.30 | 651.90 | 651.90 |
| Copies - Internal 6/04 | | | | | | |
| 37632 6/30/2004 WIP | EXP | COST dep BOA.Moore | 1 | 893.80 | 893.80 | 893.80 |
| Transcripts/Depos/Document Retrieval- Esquire Deposition Services; L-521/04 services provided 4/21/04 O. Martinez | | | | | | |
| 37635 6/30/2004 WIP | EXP | COST lod BOA.Moore | 1 | 28.06 | 28.06 | 28.06 |
| J. Welling - 4/13-15/04 meals travel to Los Angeles re settlement conference | | | | | | |
| 37636 6/30/2004 WIP | EXP | COST oes BOA.Moore | 1 | 13.83 | 13.83 | 13.83 |
| Overnight Courier- Federal Express- 5/27/04 | | | | | | |
| 37639 6/30/2004 WIP | EXP | COST fil BOA.Moore | 1 | 31.62 | 31.62 | 31.62 |
| Filing Fees- One Legal, Inc.- 6/9/04 | | | | | | |

| Slip ID / Dates and Time / Posting Status / Description | | Timekeeper Activity Case | Units DNB Time Variance | Rate Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|---|
| 45163 7/1/2004 WIP | TIME | JWP +discovery BOA.Moore | 0.20 0.00 | 275.00 T@5 | 55.00 | 55.00 |
| Review J Fink corr & doc production, draft letter re M&C | | | | | | |
| 36474 7/1/2004 WIP | TIME 12:00 AM | KDN +discovery BOA.Moore | 2.00 0.00 | 225.00 T@5 | 450.00 | 450.00 |
| Legal research for J. Pollette re vague overbreadth objections | | | | | | |
| 45164 7/1/2004 WIP | TIME | JWP +pldgs/motions BOA.Moore | 0.30 0.00 | 275.00 T@5 | 82.50 | 82.50 |
| Review opp to mot compel | | | | | | |
| 36477 7/1/2004 WIP | TIME | KDN +discovery BOA.Moore | 4.50 0.00 | 225.00 T@5 | 1012.50 | 1012.50 |
| Legal research re propriety of objections for J Palette | | | | | | |
| 40962 7/1/2004 WIP | TIME | RSG +pldgs/motions BOA.Moore | 2.25 0.00 | 425.00 T@5 | 956.25 | 956.25 |
| Work on response to motion to compel | | | | | | |
| 45166 7/2/2004 WIP | TIME | JWP +discovery BOA.Moore | 0.20 0.00 | 275.00 T@5 | 55.00 | 55.00 |
| Tel conf w/ J Fink re M&C | | | | | | |
| 45166 7/2/2004 WIP | TIME | JWP +pldgs/motions BOA.Moore | 3.10 0.00 | 275.00 T@5 | 852.50 | 852.50 |
| Research, draft reply in supp mot compel | | | | | | |
| 36494 7/2/2004 WIP | TIME | JWW +discovery BOA.Moore | 0.25 0.00 | 300.00 T@5 | 75.00 | 75.00 |
| Letter to J. Fink re responses | | | | | | |
| 45167 7/6/2004 WIP | TIME | JWP +pldgs/motions BOA.Moore | 5.80 0.00 | 275.00 T@5 | 1595.00 | 1595.00 |
| Research, draft reply in supp mot compel | | | | | | |

Ex. 2
70

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 37435 / 7/7/2004 / WIP — TIME — Defendant's and plaintiffs document production review and coding | KPB / +discovery / BOA.Moore | 1.63 / 0.00 | 140.00 T@5 | 228.20 | 228.20 |
| 36517 / 7/7/2004 / WIP — TIME — Review draft reply in support of motion to compel in Moore | JWW / +pldgs/motions / BOA.Moore | 1.00 / 0.00 | 300.00 T@5 | 300.00 | 300.00 |
| 45168 / 7/7/2004 / WIP — TIME — Research, draft reply in supp mot compel | JWP / +pldgs/motions / BOA.Moore | 7.80 / 0.00 | 275.00 T@5 | 2145.00 | 2145.00 |
| 37437 / 7/8/2004 / WIP — TIME — Reply RSO Motion to compel assist; finalize filing and confirm compliance with rules; preparation of exhibits; filing & service of same [LRC OUT] | KPB / +pldgs/motions / BOA.Moore | 2.00 / 2.00 | 140.00 Do Not Bill | 280.00 | 0.00 |
| 37438 / 7/8/2004 / WIP — TIME — Subpoena follow-up with credit reporting agencies; review and reply to email and attached proposed letter to credit reporting agencies from defense counsel Fink; telephone call with Experians' custodian of records, Rick Haas, re compliance with subpoena, research ACDV (Automated Consumer Dispute Verification) and email Jerelle Welling and John W. Pillette detailing same and relaying Haas response | KPB / +discovery / BOA.Moore | 1.33 / 0.00 | 140.00 T@5 | 186.67 | 186.67 |
| 45169 / 7/8/2004 / WIP — TIME — Research, draft & file reply in supp mot compel | JWP / +pldgs/motions / BOA.Moore | 4.20 / 0.00 | 275.00 T@5 | 1155.00 | 1155.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45170 / 7/12/2004 / WIP — TIME — Tel conf w/ J.Fink re M&C | JWP / +discovery / BOA.Moore | 0.80 / 0.00 | 275.00 T@5 | 220.00 | 220.00 |
| 45171 / 7/12/2004 / WIP — TIME — Prep for tel conf w/ J.Fink re M&C | JWP / +discovery / BOA.Moore | 2.50 / 0.00 | 275.00 T@5 | 687.50 | 687.50 |
| 45172 / 7/12/2004 / WIP — TIME — Review Visa doc production | JWP / +discovery / BOA.Moore | 1.00 / 0.00 | 275.00 T@5 | 275.00 | 275.00 |
| 45173 / 7/12/2004 / WIP — TIME — Draft confirm letter to J.Fink re M&C | JWP / +discovery / BOA.Moore | 1.40 / 0.00 | 275.00 T@5 | 385.00 | 385.00 |
| 45174 / 7/12/2004 / WIP — TIME — Prep for mot compel hrg, outline argument | JWP / +pldgs/motions / BOA.Moore | 2.00 / 0.00 | 275.00 T@5 | 550.00 | 550.00 |
| 45175 / 7/13/2004 / WIP — TIME — Prep for mot compel hrg, outline argument | JWP / +court / BOA.Moore | 2.30 / 0.00 | 275.00 T@5 | 632.50 | 632.50 |
| 45176 / 7/13/2004 / WIP — TIME — Research, draft reply in supp mot strike | JWP / +pldgs/motions / BOA.Moore | 1.10 / 0.00 | 275.00 T@5 | 302.50 | 302.50 |
| 36552 / 7/13/2004 / WIP — TIME — Email correspondence with J.Fink re amendment to Moore protective order | JWW / +discovery / BOA.Moore | 0.10 / 0.00 | 300.00 T@5 | 30.00 | 30.00 |
| 37169 / 7/14/2004 / WIP — TIME — Conducted legal research re protective orders and scope in similar litigation | KDN / +research / BOA.Moore | 4.00 / 4.00 | 225.00 Do Not Bill | 900.00 | 0.00 |

Ex. 2
71

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| **36661** TIME<br>7/14/2004 WIP<br>Assist J. Pillette in preparation for MTC oral argument; Discuss core points to make and need for info for class cert. | JWW<br>+court<br>BOA.Moore | 0.50<br>0.00 | 300.00<br>T●S | 150.00 | 150.00 |
| **36566** TIME<br>7/14/2004 WIP<br>Meet with J. Pillette re meet and confer letter to J. Frink | JWW<br>+discovery<br>BOA.Moore | 0.75<br>0.00 | 300.00<br>T●S | 225.00 | 225.00 |
| **36557** TIME<br>7/14/2004 WIP<br>Read opposition to MTS in Moore and draft reply | JWP<br>+pldgs/motions<br>BOA.Moore | 0.75<br>0.00 | 300.00<br>T●S | 225.00 | 225.00 |
| **45177** TIME<br>7/14/2004 WIP<br>Prep for mot compel hg | JWP<br>+court<br>BOA.Moore | 5.60<br>0.00 | 275.00<br>T●S | 1540.00 | 1540.00 |
| **45178** TIME<br>7/14/2004 WIP<br>Prep for mot compel hg; review computer exp declaration | JWP<br>+court<br>BOA.Moore | 0.80<br>0.00 | 275.00<br>T●S | 220.00 | 220.00 |
| **45179** TIME<br>7/15/2004 WIP<br>Travel to/from SD for hg | JWP<br>+court<br>BOA.Moore | 6.00<br>0.00 | 275.00<br>T●S | 1650.00 | 1650.00 |
| **45493** TIME<br>7/15/2004 WIP<br>Appear at hg re mot compel | JWP<br>+court<br>BOA.Moore | 0.50<br>0.00 | 275.00<br>T●S | 137.50 | 137.50 |
| **37529** TIME<br>7/15/2004 WIP<br>Call with J. Pillette re outcome of motion to compel hearing | JWW<br>+court<br>BOA.Moore | 0.20<br>0.00 | 300.00<br>T●S | 60.00 | 60.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| **45190** TIME<br>7/16/2004 WIP<br>Confer w/ J Weiling re ltg re mot compel | JWP<br>+discovery<br>BOA.Moore | 0.20<br>0.00 | 275.00<br>T●S | 55.00 | 55.00 |
| **37531** TIME<br>7/16/2004 WIP<br>Discuss joint letter requested by Magistrate to resolve motion to compel with J. Pillette | JWW<br>+discovery<br>BOA.Moore | 0.20<br>0.00 | 300.00<br>T●S | 60.00 | 60.00 ● |
| **37540** TIME<br>7/19/2004 WIP<br>Final read of reply in support of strike in Moore for filing | JWW<br>+pldgs/motions<br>BOA.Moore | 0.50<br>0.00 | 300.00<br>T●S | 150.00 | 150.00 |
| **37541** TIME<br>7/19/2004 WIP<br>Email correspondence with R. Moore re ▮▮▮ Email L. Cuesta re corrections page | JWP<br>+depo<br>BOA.Moore | 0.25<br>0.00 | 300.00<br>T●S | 75.00 | 75.00 |
| **45181** TIME<br>7/20/2004 WIP<br>Draft letter to J Frink re motion compel | JWP<br>+discovery<br>BOA.Moore | 1.50<br>0.00 | 275.00<br>T●S | 412.50 | 412.50 |
| **45182** TIME<br>7/20/2004 WIP<br>Confer w/ J Weiling re motion compel | JWP<br>+discovery<br>BOA.Moore | 0.30<br>0.00 | 275.00<br>T●S | 82.50 | 82.50 |
| **45183** TIME<br>7/20/2004 WIP<br>Fact research for M&C issue re data from BofA databases; compare VISA "reason" codes with TILA billing error codes. | JWP<br>+discovery<br>BOA.Moore | 4.70<br>0.00 | 275.00<br>T●S | 1292.50 | 1292.50 ● |
| **37553** TIME<br>7/20/2004 WIP<br>Draft motion to amend protective order | JWW<br>+pldgs/motions<br>BOA.Moore | 0.75<br>0.00 | 300.00<br>T●S | 225.00 | 225.00 |

Ex. 2
72

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 37555 TIME 7/20/2004 WIP Review computer meet/confer per minute order on motion to compel | JWW +discovery BOA.Moore | 0.25 0.00 | 300.00 T@5 | 75.00 | 75.00 |
| 37564 TIME 7/21/2004 WIP Memorandum to file re legal research of consumer v. business | JWW +class cert BOA.Moore | 0.75 0.00 | 300.00 T@5 | 225.00 | 225.00 |
| 45184 TIME 7/21/2004 WIP Tel conf w/ J.Fink re M&C | JWP +discovery BOA.Moore | 0.50 0.00 | 275.00 T@5 | 137.50 | 137.50 |
| 45185 TIME 7/21/2004 WIP Confer w/ J Welling re M&C | JWP +discovery BOA.Moore | 0.30 0.00 | 275.00 T@5 | 82.50 | 82.50 |
| 45186 TIME 7/21/2004 WIP Research, draft joint letter brief | JWP +pldgs/motions BOA.Moore | 1.00 0.00 | 275.00 T@5 | 275.00 | 275.00 |
| 37562 TIME 7/21/2004 WIP Review meet and confer letter | JWW +discovery BOA.Moore | 0.25 0.00 | 300.00 T@5 | 75.00 | 75.00 |
| 37568 TIME 7/22/2004 WIP Memorandum to file re consumer v. business transaction under TILA with eye toward class certification motion | JWW +class cert BOA.Moore | 1.75 0.00 | 300.00 T@5 | 525.00 | 525.00 |
| 37571 TIME 7/22/2004 WIP Read draft supplemental submission per court's order re motion to compel | JWW +pldgs/motions BOA.Moore | 4.00 0.00 | 300.00 T@5 | 1200.00 | 1200.00 |
| 45188 TIME 7/22/2004 WIP | JWP +meetings/commu BOA.Moore | 0.20 0.20 | 275.00 T@5 Do Not Bill | 55.00 | 0.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| Review dates & email K. Brown re calendar change | | 0.00 | | | |
| 45189 7/22/2004 WIP Research, draft joint letter brief | JWP +pldgs/motions BOA.Moore | 2.00 0.00 | 275.00 T@5 | 550.00 | 550.00 |
| 45187 7/22/2004 WIP Research, draft confirm letter to J.Fink re July 12 M&C | JWP +discovery BOA.Moore | 3.00 0.00 | 275.00 T@5 | 825.00 | |
| 45191 7/23/2004 WIP Research, draft, & file joint letter brief | JWP +pldgs/motions BOA.Moore | 3.90 0.00 | 275.00 T@5 | 1072.50 | 1072.50 |
| 37574 7/23/2004 WIP Memorandum to file re business v. consumer for class certification analysis | JWW +class cert BOA.Moore | 3.00 0.00 | 300.00 T@5 | 900.00 | 900.00 |
| 45190 7/23/2004 WIP Draft response to 7/22 J.Fink letter | JWP +discovery BOA.Moore | 0.30 0.00 | 275.00 T@5 | 82.50 | 82.50 |
| 45192 7/26/2004 WIP Draft response to 7/22 J.Fink letter | JWP +discovery BOA.Moore | 0.30 0.00 | 275.00 T@5 | 82.50 | 82.50 |
| 37580 7/26/2004 WIP Memorandum to file re business v. consumer for class certification | JWW +class cert BOA.Moore | 2.50 0.00 | 300.00 T@5 | 750.00 | |
| 45335 7/27/2004 WIP Review and reload documents with errors. | KPB +discovery BOA.Moore | 1.40 1.40 | 140.00 T@5 Do Not Bill | 196.00 | 0.00 |

Ex. 2
73

7/22/2005
2:31 PM

Green Welling LLP
Slip Listing

Page 79

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45193 TME<br>7/27/2004<br>WIP<br>Analyze and code depositions for issues that are relevant to TILA/VISA procedures. | JNP<br>+discovery<br>BOA.Moore | 5.20<br>0.00<br>0.00 | 275.00<br>T@5 | 1430.00 | 1430.00 |
| 37467 TME<br>7/27/2004<br>WIP<br>Defendant's and plaintiffs document production review and coding. | KPB<br>+discovery<br>BOA.Moore | 2.00<br>0.00<br>0.00 | 140.00<br>T@5 | 280.00 | 280.00 |
| 45194 TME<br>7/28/2004<br>WIP<br>Review 7/27 J Fink letter | JNP<br>+discovery<br>BOA.Moore | 0.40<br>0.00<br>0.00 | 275.00<br>T@5 | 110.00 | 110.00 |
| 37478 TME<br>7/29/2004<br>WIP<br>Review and reload Defendant's documents with errors; review coding deposition transcripts with codes with John W. Pillette | KPB<br>+discovery<br>BOA.Moore | 0.50<br>0.50<br>0.00 | 140.00<br>T@5<br>Do Not Bill | 70.00 | 0.00 |
| 45195 TME<br>7/29/2004<br>WIP<br>Draft letter to J Quitana (Visa) re subpoena | JNP<br>+discovery<br>BOA.Moore | 0.30<br>0.00<br>0.00 | 275.00<br>T@5 | 82.50 | 82.50 |
| 45196 TME<br>7/30/2004<br>WIP<br>Confer w/ J Welling re request for client diaries, calendars, billing records | JNP<br>+discovery<br>BOA.Moore | 0.20<br>0.00<br>0.00 | 275.00<br>T@5 | 55.00 | 55.00 |
| 45197 TME<br>7/30/2004<br>WIP<br>Draft & mail letter to J Quitana (Visa) re subpoena | JNW<br>+discovery<br>BOA.Moore | 0.20<br>0.00<br>0.00 | 275.00<br>T@5 | 55.00 | 55.00 |
| 37811 TME<br>7/30/2004<br>WIP<br>Discuss production of notes/diaries in Moore with J. Pillette and motions practice. | JNW<br>+discovery<br>BOA.Moore | 0.20<br>0.00<br>0.00 | 300.00<br>T@5 | 60.00 | 60.00 |

7/22/2005
2:31 PM

Green Welling LLP
Slip Listing

Page 80

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 38099 EXP<br>7/31/2004<br>WIP<br>Filing Fees- One Legal, Inc.- 7/19/04 | COST<br>fi<br>BOA.Moore | 1 | 31.00 | 31.00 | 31.00 |
| 37786 EXP<br>7/31/2004<br>WIP<br>Copies - Internal 7.04 | COST<br>cop<br>BOA.Moore | 334 | 0.30 | 100.20 | 100.20 |
| 37744 EXP<br>7/31/2004<br>WIP<br>Postage 7/04 | COST<br>pos<br>BOA.Moore | 1 | 8.00 | 8.00 | 8.00 |
| 38100 EXP<br>7/31/2004<br>WIP<br>Filing Fees- One Legal, Inc. - 7/21/04 | COST<br>fi<br>BOA.Moore | 1 | 76.75 | 76.75 | 76.75 |
| 38096 EXP<br>7/31/2004<br>WIP<br>Overnight Courier- Federal Express- 7/1/04 | COST<br>oes<br>BOA.Moore | 1 | 13.83 | 13.83 | 13.83 |
| 37760 EXP<br>7/31/2004<br>WIP<br>Postage 7/04 | COST<br>fax<br>BOA.Moore | 127 | 2.00 | 254.00 | 254.00 |
| 38095 EXP<br>7/31/2004<br>WIP<br>Overnight Courier- Federal Express- 6/23/04 | COST<br>oes<br>BOA.Moore | 1 | 17.46 | 17.46 | 17.46 |
| 38097 EXP<br>7/31/2004<br>WIP<br>Filing Fees- One Legal, Inc. - 7/8/04 | COST<br>fi<br>BOA.Moore | 1 | 64.50 | 64.50 | 64.50 |
| 38098 EXP<br>7/31/2004<br>WIP<br>Filing Fees- One Legal, Inc. - 7/9/04 | COST<br>fi<br>BOA.Moore | 1 | 30.00 | 30.00 | 30.00 |

Ex. 2
74

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate into / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45198 TIME<br>8/2/2004<br>WIP<br>Depo Summation coding | JWP<br>+discovery<br>BOA.Moore | 3.50<br>0.00 | 275.00<br>T@S | 962.50 | 962.50 |
| 37797 TIME<br>8/2/2004<br>WIP<br>Defendant's and plaintiff's document production review and coding | KPB<br>+discovery<br>BOA.Moore | 0.75<br>0.00 | 140.00<br>T@S | 105.00 | 105.00 |
| 37803 TIME<br>8/4/2004<br>WIP<br>Defendant's and plaintiff's document production review and coding | KPB<br>+discovery<br>BOA.Moore | 2.00<br>0.00 | 140.00<br>T@S | 280.00 | 280.00 |
| 38153 TIME<br>8/4/2004<br>WIP<br>Finalize memorandum to file re consumer v. business for class certification | JWW<br>+class cert<br>BOA.Moore | 4.00<br>0.00 | 300.00<br>T@S | 1200.00 | 1200.00 |
| 38157 TIME<br>8/5/2004<br>WIP<br>Draft memorandum to file re business v. consumer | JWW<br>+class cert<br>BOA.Moore | 3.50<br>0.00 | 300.00<br>T@S | 1050.00 | 1050.00 |
| 37806 TIME<br>8/5/2004<br>WIP<br>Defendant's and plaintiff's document production review and coding | KPB<br>+discovery<br>BOA.Moore | 5.00<br>0.00 | 140.00<br>T@S | 700.00 | 700.00 |
| 37808 TIME<br>8/6/2004<br>WIP<br>Defendant's and plaintiff's document production review and coding | KPB<br>+discovery<br>BOA.Moore | 6.00<br>0.00 | 140.00<br>T@S | 840.00 | 840.00 |
| 38153 TIME<br>8/6/2004<br>WIP<br>Draft memorandum to file re consumers v. business for class certification analysis | JWW<br>+class cert<br>BOA.Moore | 4.00<br>0.00 | 300.00<br>T@S | 1200.00 | 1200.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate into / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 38161 TIME<br>8/9/2004<br>WIP<br>Review finalized memorandum re business v. consumer for class certification | JWW<br>+class cert<br>BOA.Moore | 0.25<br>0.00 | 300.00<br>T@S | 75.00 | 75.00 |
| 38578 TIME<br>8/9/2004<br>WIP<br>Defendant's and plaintiff's document production review and coding | KPB<br>+discovery<br>BOA.Moore | 0.75<br>0.00 | 140.00<br>T@S | 105.00 | 105.00 |
| 38170 TIME<br>8/9/2004<br>WIP<br>Legal research re challenges to consumers/business purpose after class certified/class certification as a means of managing individual issues | JWW<br>+class cert<br>BOA.Moore | 1.00<br>0.00 | 300.00<br>T@S | 300.00 | 300.00 |
| 38172 TIME<br>8/9/2004<br>WIP<br>Class certification legal research re evidentiary proof offered for consumer v. business and need for individualized inquiry w/TILA claim. | JWW<br>+class cert<br>BOA.Moore | 2.00<br>0.00 | 300.00<br>T@S | 600.00 | 600.00 |
| 38586 TIME<br>8/10/2004<br>WIP<br>Rw all discovery requests and determine if any requests for representative examples of applications for business credit cards and consumer credit cards were made. | KPB<br>+discovery<br>BOA.Moore | 0.75<br>0.00 | 140.00<br>T@S | 105.00 | 105.00 |
| 38177 TIME<br>8/10/2004<br>WIP<br>Legal research re class certification in TILA(b)(2) case with business v. consumer | JWW<br>+class cert<br>BOA.Moore | 1.75<br>0.00 | 300.00<br>T@S | 525.00 | 5... |
| 45199 TIME<br>8/11/2004<br>WIP<br>Confer w/ K. Brown re discovery responses chart | JWP<br>+discovery<br>BOA.Moore | 0.50<br>0.00 | 275.00<br>T@S | 137.50 | 137.50 |

Ex. 2
75

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 38395 TIME<br>8/11/2004<br>WIP<br>Review documents for credit reporting print-out detail produced by Defendant for Jonn W. Pillette, create table of all discovery requests in new format for Jonn W. Pillette | KPB<br>+discovery<br>BOA.Moore | 2.00<br>0.00 | 140.00<br>T@5 | 280.00 | 280.00 |
| 38346 TIME<br>8/12/2004<br>WIP<br>Draft motion to amend protective order. | BSU<br>+pldgs/motions<br>BOA.Moore | 2.00<br>0.00 | 195.00<br>T@5 | 390.00 | 390.00 |
| 45201 TIME<br>8/12/2004<br>WIP<br>Research, draft reply in supp amend stip order | JWP<br>+pldgs/motions<br>BOA.Moore | 5.00<br>0.00 | 275.00<br>T@5 | 1375.00 | 1375.00 |
| 44281 TIME<br>8/12/2004<br>WIP<br>Research cases and law reviews; read distinction between business and consumer fact patterns applying the Fair Credit Billing Act and TILA cases | RSG<br>+class cert<br>BOA.Moore | 3.50<br>0.00 | 425.00<br>T@5 | 1487.50 | 1487.50 |
| 45200 TIME<br>8/12/2004<br>WIP<br>Tel confs w/ J.Fink re depo scheduling | JWP<br>+depo<br>BOA.Moore | 0.40<br>0.00 | 275.00<br>T@5 | 110.00 | 110.00 |
| 40227 TIME<br>8/12/2004<br>WIP<br>Research re TILA definitions that apply to business/consumer definition and law reviews re same | RSG<br>+class cert<br>BOA.Moore | 3.50<br>0.00 | 425.00<br>T@5 | 1487.50 | 1487.50 |
| 38347 TIME<br>8/13/2004<br>WIP<br>Reply in support of motion to amend protective order. | BSU<br>+pldgs/motions<br>BOA.Moore | 5.00<br>0.00 | 195.00<br>T@5 | 975.00 | 975.00 |
| 45202 TIME<br>8/13/2004<br>WIP | JWP<br>+pldgs/motions<br>BOA.Moore | 6.50<br>0.00 | 275.00<br>T@5 | 1787.50 | 1787.50 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 38395 TIME<br>Research, draft reply in supp amend slip order | | 0.00 | | | |
| 45203 TIME<br>8/13/2004<br>WIP<br>Tel confs w/ J.Fink, S.Jacobs J.Welling re depo scheduling | JWP<br>+depo<br>BOA.Moore | 0.50<br>0.00 | 275.00<br>T@5 | 137.50 | 137.50 |
| 38500 TIME<br>8/13/2004<br>WIP<br>Review documents produced by Defendant for confidentiality and redaction markings, and determine page count and percentages of same for Jonn W. Pillette in preparation of Plaintiffs Reply in Support of His Motion to Amend Stipulated Protective Order (Moore) | KPB<br>+discovery<br>BOA.Moore | 3.00<br>0.00 | 140.00<br>T@5 | 420.00 | 420.00 |
| 45204 TIME<br>8/16/2004<br>WIP<br>Research, draft & file reply and declaration in supp amend stip order | JWP<br>+pldgs/motions<br>BOA.Moore | 6.10<br>0.00 | 275.00<br>T@5 | 1677.50 | 1677.50 |
| 38200 TIME<br>8/16/2004<br>WIP<br>Deposition scheduling with S. Jacobs. Email confirming same. | JWW<br>+depo<br>BOA.Moore | 0.25<br>0.00 | 300.00<br>T@5 | 75.00 | 75.00 |
| 45205 TIME<br>8/16/2004<br>WIP<br>Confer w/ R.Green re motion to compel #3 | JWP<br>+pldgs/motions<br>BOA.Moore | 0.20<br>0.00 | 275.00<br>T@5 | 55.00 | 55.00 |
| 38605 TIME<br>8/16/2004<br>WIP<br>Re-review and confirm confidentiality and redaction markings, page count and percentages of documents produced by Defendant in preparation of Plaintiffs Reply in Support of His Motion to Amend Stipulated Protective Order (Moore). Continuing document review and coding | KPB<br>+discovery<br>BOA.Moore | 4.00<br>0.00 | 140.00<br>T@5 | 560.00 | 5 |

Ex. 2

76

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper Activity Case | Units / DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment MarkUp |
|---|---|---|---|---|---|
| (continued) asserted against VISA to assess viability of adding VISA as named defendant | | | | | |
| 45208 8/24/2004 WIP TIME — Research motion to compel #3 | JWP +pldgs/motions BOA Moore | 0.90 0.00 | 275.00 T@5 | 247.50 | 247.50 |
| 45209 8/24/2004 WIP TIME — Confer w/ R Green J Welling re motion to compel #3 | JWP +discovery BOA Moore | 0.40 0.00 | 275.00 T@5 | 110.00 | |
| 40975 8/25/2004 WIP TIME — Research and analysis of class certification issues; work on memorandum re same | RSG +class cert BOA Moore | 2.50 0.00 | 425.00 T@5 | 1062.50 | 1062.50 |
| 45211 8/25/2004 WIP TIME — Research, draft motion to compel #3 | JWP +pldgs/motions BOA Moore | 7.40 0.00 | 275.00 T@5 | 2035.00 | 2035.00 |
| 38476 8/26/2004 WIP TIME — Class certification research (evidence sufficient to support predominance findings) | JWP +class cert BOA Moore | 4.00 0.00 | 300.00 T@5 | 1200.00 | 1200.00 |
| 38480 8/26/2004 WIP TIME — Draft class certification memorandum re predominance and business v. consumer | JWW +class cert BOA Moore | 4.00 0.00 | 300.00 T@5 | 1200.00 | 1200.00 |
| 45212 8/26/2004 WIP TIME — Research, draft motion to compel #3 | JWP +pldgs/motions BOA Moore | 6.40 0.00 | 275.00 T@5 | 1760.00 | 176... |
| 45213 8/26/2004 WIP TIME — Tel conf w/ J Quriana (Visa) re subpoena, stip protective order | JWP +discovery BOA Moore | 0.20 0.00 | 275.00 T@5 | 55.00 | 55.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper Activity Case | Units / DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment MarkUp |
|---|---|---|---|---|---|
| 38610 8/16/2004 WIP TIME — Finalize discovery charts of all discovery requests for John W. Pillette's use in motions practice | KPB +discovery BOA Moore | 1.75 0.00 | 140.00 T@5 | 245.00 | 245.00 |
| 38617 8/18/2004 WIP TIME — Revisit determination of and email to J. Welling and J. Pillette re discovery requests for representative examples of credit applications | KPB +discovery BOA Moore | 0.25 0.00 | 140.00 T@5 | 35.00 | 35.00 |
| 38450 8/19/2004 WIP TIME — Fact research: read PSW complaint against Visa to understand chargeback incentive structures | JWW +research BOA Moore | 1.00 0.00 | 300.00 T@5 | 300.00 | 300.00 |
| 38620 8/19/2004 WIP TIME — Continuing coding and review of documents produced by Plaintiffs and Defendant | JWP +discovery BOA Moore | 2.00 0.00 | 140.00 T@5 | 280.00 | 280.00 |
| 45206 8/20/2004 WIP TIME — Research, draft motion to compel #3 | JWP +pldgs/motions BOA Moore | 2.90 0.00 | 275.00 T@5 | 797.50 | 797.50 |
| 45207 8/23/2004 WIP TIME — Research, draft motion to compel #3 | JWP +pldgs/motions BOA Moore | 4.00 0.00 | 275.00 T@5 | 1100.00 | 1100.00 |
| 38468 8/24/2004 WIP TIME — Meet with R. Green, J. Pillette re status of work; MTC3; Answer; Visa subpoena | JWW +discovery BOA Moore | 0.50 0.00 | 300.00 T@5 | 150.00 | 150.00 |
| 40968 8/24/2004 WIP TIME — Research re PSW action involving claims | RSG +research BOA Moore | 2.00 0.00 | 425.00 T@5 | 850.00 | 850.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 38300   TIME<br>8/26/2004<br>W/P<br>+pldgs/motions<br>Legal research re objections to discovery; land case law for/on motion to compel | KDN<br>BOA.Moore | 1.00<br>0.00 | 225.00<br>T@S | 225.00 | 225.00 |
| 40985   TIME<br>8/30/2004<br>W/P<br>+class cert<br>Research on issues related to injunctive relief as a basis for a Rule 23(b)(2) class action | RSG<br>BOA.Moore | 2.25<br>0.00 | 425.00<br>T@S | 956.25 | 956.25 |
| 40993   TIME<br>8/30/2004<br>W/P<br>+class cert<br>Further review of classwide relief issues | RSG<br>BOA.Moore | 1.75<br>0.00 | 425.00<br>T@S | 743.75 | 743.75 |
| 38863   EXP<br>8/31/2004<br>W/P<br>Barkley Court Reporters transcript copy of Christana Eriksson | COST<br>dep<br>BOA.Moore | 1 | 640.01 | 640.01 | 640.01 |
| 38855   EXP<br>8/31/2004<br>W/P<br>7/15/04 J. Pillette parking travel to travel to San Diego re hearing | COST<br>trf<br>BOA.Moore | 1 | 20.00 | 20.00 | 20.00 |
| 38853   EXP<br>8/31/2004<br>W/P<br>Filing Fees One Legal 8/13/04 | COST<br>fil<br>BOA.Moore | 1 | 44.00 | 44.00 | 44.00 |
| 38786   EXP<br>8/31/2004<br>W/P<br>Facsimile 8/04 | COST<br>fax<br>BOA.Moore | 114 | 2.00 | 228.00 | 228.00 |
| 38851   EXP<br>8/31/2004<br>W/P<br>Overnight Courier Federal Express 8/16/04 | COST<br>oes<br>BOA.Moore | 1 | 14.50 | 14.50 | 14.50 |
| 38856   EXP<br>8/31/2004<br>W/P | COST<br>trf<br>BOA.Moore | 1 | 8.53 | 8.53 | 8.53 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 7/15/04 J. Pillette meal travel to travel to San Diego re hearing | | | | | |
| 38857   EXP<br>8/31/2004<br>W/P<br>7/15/04 J. Pillette meal travel to travel to San Diego re hearing | COST<br>trf<br>BOA.Moore | 1 | 6.38 | 6.38 | 6.38 |
| 38858   EXP<br>8/31/2004<br>W/P<br>7/15/04 J. Pillette meal travel to travel to San Diego re hearing | COST<br>trf<br>BOA.Moore | 1 | 6.24 | 6.24 | 6.24 |
| 38859   EXP<br>8/31/2004<br>W/P<br>7/15/04 J. Pillette airfare travel to San Diego re hearing | COST<br>trf<br>BOA.Moore | 1 | 238.20 | 238.20 | 238.20 |
| 38862   EXP<br>8/31/2004<br>W/P<br>Commercial Copies Unischbe 8/20/04 | COST<br>ocs<br>BOA.Moore | 1 | 72.30 | 72.30 | 72.30 |
| 38860   EXP<br>8/31/2004<br>W/P<br>One Legal 8/16/04 | COST<br>fil<br>BOA.Moore | 1 | 64.50 | 64.50 | 64.50 |
| 38817   EXP<br>8/31/2004<br>W/P<br>Copies - internal 8/04 | COST<br>cop<br>BOA.Moore | 612 | 0.30 | 183.60 | 183.60 |
| 38762   EXP<br>8/31/2004<br>W/P<br>Postage 8/04 | COST<br>pos<br>BOA.Moore | 1 | 15.39 | 15.39 | |
| 38854   EXP<br>8/31/2004<br>W/P<br>7/15/04 J. Pillette taxis travel to San Diego re hearing | COST<br>trf<br>BOA.Moore | 1 | 9.00 | 9.00 | 9.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 41399 / 9/1/2004 / WIP / Prepare for hearing on motion to compel. TIME | RSG +pldgs/motions BOA.Moore | 4.50 / 0.00 / 0.00 | 425.00 T@s | 1912.50 | 1912.50 |
| 41401 / 9/2/2004 / WIP / Meet with J. Pallette re hearing on Motion to Compel, preparation and analysis re same. TIME | RSG +court BOA.Moore | 3.00 / 0.00 / 0.00 | 425.00 T@s | 1275.00 | 1275.00 |
| 45214 / 9/2/2004 / WIP / Draft letter to J Quitana (Visa) re subpoena, stip protective order TIME | JWP +discovery BOA.Moore | 0.30 / 0.00 / 0.00 | 275.00 T@s | 82.50 | 82.50 |
| 45215 / 9/7/2004 / WIP / Draft letter to Judge Gonzalez re status of Wilson case TIME | JWP +discovery BOA.Moore | 0.50 / 0.00 / 0.00 | 275.00 T@s | 137.50 | 137.50 |
| 39067 / 9/7/2004 / WIP / Defendant's and plaintiffs document production review and coding, some scanning and OCR procedures TIME | KPB +discovery BOA.Moore | 3.00 / 0.00 / 0.00 | 140.00 T@s | 420.00 | 420.00 |
| 39070 / 9/8/2004 / WIP / Calendar relevant case deadlines TIME | KPB +meetings/commu BOA.Moore | 0.25 / 0.25 / 0.00 | 140.00 T@s Do Not Bill | 35.00 | 0.00 |
| 45216 / 9/8/2004 / WIP / Depo Summation coding in lieu of summary of depositions TIME | JWP +discovery BOA.Moore | 5.90 / 0.00 / 0.00 | 275.00 T@s | 1622.50 | 1622.50 |
| 39076 / 9/9/2004 / WIP / Defendant's and plaintiffs document production review and coding, some scanning and OCR procedures TIME | KPB +discovery BOA.Moore | 1.25 / 0.00 / 0.00 | 140.00 T@s | 175.00 | 175.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45217 / 9/13/2004 / WIP / Draft & mail letter to Judge Gonzalez re stay of Wilson case TIME | JWP +discovery BOA.Moore | 0.70 / 0.00 / 0.00 | 275.00 T@s | 192.50 | 192.50 |
| 38729 / 9/13/2004 / WIP / Assisted J. Weling with calendaring (relating to notice of orders) TIME | KDN +meetings/commu BOA.Moore | 0.50 / 0.50 / 0.00 | 225.00 T@s Do Not Bill | 112.50 | ● |
| 41443 / 9/16/2004 / WIP / Communications with client re status of claims. TIME | RSG +meetings/commu BOA.Moore | 1.75 / 0.00 / 0.00 | 425.00 T@s | 743.75 | 743.75 |
| 38926 / 9/22/2004 / WIP / Email S. Jacobs re 30(b)(6) depo TIME | JWW +depo BOA.Moore | 0.10 / 0.00 / 0.00 | 300.00 T@s | 30.00 | 30.00 |
| 38927 / 9/22/2004 / WIP / Email J. Frik re BofA's compliance with motion to compel TIME | JWW +discovery BOA.Moore | 0.10 / 0.00 / 0.00 | 300.00 T@s | 30.00 | 30.00 |
| 38932 / 9/24/2004 / WIP / Calendar opposition dates to motion to compel TIME | JWW +pldgs/motions BOA.Moore | 0.10 / 0.10 / 0.00 | 300.00 T@s Do Not Bill | 30.00 | 0.00 |
| 38937 / 9/24/2004 / WIP / Email correspondence with S. Jacobs re 300)(6) credit reporting deposition. TIME | JWW +depo BOA.Moore | 0.10 / 0.00 / 0.00 | 300.00 T@s | 30.00 | 30.0● |
| 39440 / 9/29/2004 / WIP / Draft RPD 4 re exemplar applications TIME | KPB +discovery BOA.Moore | 1.00 / 0.00 / 0.00 | 140.00 T@s | 140.00 | 140.00 |

Ex. 2
79

| Slip ID / Dates and Time / Posting Status / Description | TimeKeeper / Activity / Case | Units DNB Time (Variance) | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 39322 / 9/30/2004 / WIP / EXP — Filing Fees Janney & Janney 9/8/04 | COST ht BOA.Moore | 1 | 45.00 | 45.00 | 45.00 |
| 39323 / 9/30/2004 / WIP / EXP — 8/16/04 R. Green parking travel to case management conference | COST trf BOA.Moore | 1 | 12.00 | 12.00 | 12.00 |
| 39249 / 9/30/2004 / WIP / EXP — Facsimile 9/04 | COST fax BOA.Moore | 12 | 2.00 | 24.00 | 24.00 |
| 39318 / 9/30/2004 / WIP / EXP — 7/15-04 J. Pilette meals travel to San Diego re hearing motion to compel | COST mea BOA.Moore | 1 | 8.53 | 8.53 | 8.53 |
| 39321 / 9/30/2004 / WIP / EXP — 7/15-04 J. Pilette airfare travel to San Diego re hearing motion to compel | COST trf BOA.Moore | 1 | 238.20 | 238.20 | 238.20 |
| 39264 / 9/30/2004 / WIP / EXP — Internal Copies 9/04 | COST cop BOA.Moore | 16 | 0.30 | 4.80 | 4.80 |
| 39317 / 9/30/2004 / WIP / EXP — 7/15-04 J. Pilette parking travel to San Diego re hearing motion to compel | COST trf BOA.Moore | 1 | 20.00 | 20.00 | 20.00 |
| 39319 / 9/30/2004 / WIP / EXP — 7/15-04 J. Pilette meals travel to San Diego re hearing motion to compel | COST mea BOA.Moore | 1 | 6.38 | 6.38 | 6.38 |
| 39324 / 9/30/2004 / WIP / EXP | COST trf BOA.Moore | 1 | 10.00 | 10.00 | 10.00 |

| Slip ID / Dates and Time / Posting Status / Description | TimeKeeper / Activity / Case | Units DNB Time (Variance) | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 7/15-04 J. Pilette taxis travel to San Diego re hearing on motion to compel | COST ht BOA.Moore | 1 | 26.00 | 26.00 | ● (redacted) |
| 39314 / 9/30/2004 / WIP / EXP — Catherine Lucano RPR, 9/2/04 Wilson Hearing Transcript | COST dep BOA.Moore | | | | 26.00 |
| 39320 / 9/30/2004 / WIP / EXP — 7/15-04 J. Pilette meals travel to San Diego re hearing motion to compel | COST mea BOA.Moore | 1 | 6.24 | 6.24 | 6.24 |
| 39371 / 9/30/2004 / WIP / EXP — Postage 9/04 | COST pos BOA.Moore | 1 | 0.37 | 0.37 | 0.37 |
| 39191 / 9/30/2004 / WIP / TIME — Call clerk re Motion to compel date for deposition of person most knowledgeable, discuss same with J. Fink | JWW +depo BOA.Moore | 0.75 / 0.00 | 300.00 T@5 | 225.00 | 225.00 |
| 39315 / 9/30/2004 / WIP / EXP — Messenger Sprcycle 8/04 | COST mes BOA.Moore | 1 | 60.00 | 60.00 | 60.00 |
| 39316 / 9/30/2004 / WIP / EXP — 7/15-04 J. Pilette taxis travel to San Diego re hearing motion to compel | COST trf BOA.Moore | 1 | 9.00 | 9.00 | 9.00 |
| 39442 / 9/30/2004 / WIP / TIME — Draft RPD 4 re exemplar applications | KPB +discovery BOA.Moore | 1.00 / 0.00 | 140.00 T@5 | 140.00 | ● 140.00 |
| 39460 / 10/1/2004 / WIP / TIME — Respond to consumer inquiries re inclusion in lawsuit | KPB +meetings/commu BOA.Moore | 0.25 / 0.00 | 140.00 T@5 | 35.00 | 35.00 |

Ex. 2
80

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 39812 / 10/1/2004 / WIP / TIME — Draft letter to J. Fink re person most knowledgable deposition, review prior correspondence re same | JWW / +depo / BOA.Moore | 3.50 / 0.00 | 300.00 / T@5 | 1050.00 | 1050.00 |
| 39813 / 10/1/2004 / WIP / TIME — Call with S. Jacobs re deposition scheduling | JWW / +depo / BOA.Moore | 0.25 / 0.00 | 300.00 / T@5 | 75.00 | 75.00 |
| 39836 / 10/6/2004 / WIP / TIME — Call with S. Jacobs re credit reporting deposition, settlement | JWW / +meetings/commu / BOA.Moore | 1.00 / 0.00 | 300.00 / T@5 | 300.00 | 300.00 |
| 39845 / 10/7/2004 / WIP / TIME — Legal research re standing for current billing error person; draft letter to Fink re same | JWW / +depo / BOA.Moore | 3.00 / 0.00 | 300.00 / T@5 | 900.00 | 900.00 |
| 39847 / 10/7/2004 / WIP / TIME — Review BoA's motion to compel (all 3) | HSG / +pldgs/motions / BOA.Moore | 2.00 / 0.00 | 300.00 / T@5 | 600.00 | 600.00 |
| 41665 / 10/8/2004 / WIP / TIME — Work on case coordination issues re depositions, further discovery and strategy | JWW / +pldgs/motions / BOA.Moore | 2.00 / 0.00 | 425.00 / T@5 | 850.00 | 850.00 |
| 39657 / 10/11/2004 / WIP / TIME — Call with S. Jacobs re depositions, settlement, utopia | JWW / +discovery / BOA.Moore | 1.00 / 0.00 | 300.00 / T@5 | 300.00 | 300.00 |
| 39655 / 10/13/2004 / WIP / TIME — Call clerk re motion to compel; call S. Jacobs re same | JWW / +discovery / BOA.Moore | 0.10 / 0.00 | 300.00 / T@5 | 30.00 | 30.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45218 / 10/14/2004 / WIP / TIME — Review, research, draft oppo to motion to compel | JWP / +pldgs/motions / BOA.Moore | 6.30 / 0.00 | 275.00 / T@5 | 1732.50 | 1732.50 |
| 45219 / 10/14/2004 / WIP / TIME — Confer w/ J Welling re status of discovery | JWP / +discovery / BOA.Moore | 0.20 / 0.00 | 275.00 / T@5 | 55.00 | 55.00 |
| 39641 / 10/15/2004 / WIP / TIME — Call S. Jacobs re person most knowledgable depositions | JWW / +depo / BOA.Moore | 0.10 / 0.00 | 300.00 / T@5 | 30.00 | 30.00 |
| 45220 / 10/15/2004 / WIP / TIME — Review, research, draft opp to motion to compel | JWP / +pldgs/motions / BOA.Moore | 1.60 / 0.00 | 275.00 / T@5 | 440.00 | 440.00 |
| 45221 / 10/15/2004 / WIP / TIME — Tel conf w/ J Moore re ▓▓▓▓ | JWP / +discovery / BOA.Moore | 0.20 / 0.00 | 275.00 / T@5 | 55.00 | 55.00 |
| 45222 / 10/15/2004 / WIP / TIME — Research, draft letter to J Fink re motion to compel | JWP / +discovery / BOA.Moore | 0.70 / 0.00 | 275.00 / T@5 | 192.50 | 192.50 |
| 45223 / 10/18/2004 / WIP / TIME — Review, research, draft opp to motion to compel | JWP / +pldgs/motions / BOA.Moore | 3.00 / 0.00 | 275.00 / T@5 | 825.00 | 8▇ |
| 39626 / 10/19/2004 / WIP / TIME — Review correspondence re BOA motion to compel | JWW / +pldgs/motions / BOA.Moore | 0.10 / 0.00 | 300.00 / T@5 | 30.00 | 30.00 |

Ex. 2
81

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 41098 / 10/19/2004 / TIME / WIP / Preparation for settlement mediation | RSG / +settlement / BOA.Moore | 1.00 / 0.00 / 0.00 | 425.00 T@S | 425.00 | 425.00 |
| 45224 / 10/19/2004 / TIME / WIP / Review, research, draft opp to motion to compel | JWP / +pldgs/motions / BOA.Moore | 9.00 / 0.00 / 0.00 | 275.00 T@S | 2475.00 | 2475.00 |
| 39615 / 10/19/2004 / TIME / WIP / Call with S. Jacobs re mediation; call court re same | JWW / +settlement / BOA.Moore | 0.50 / 0.00 / 0.00 | 300.00 T@S | 150.00 | 150.00 |
| 39617 / 10/20/2004 / TIME / WIP / Call with S. Jacobs re mediation; call with court clerk re stipulation | JWW / +settlement / BOA.Moore | 0.25 / 0.00 / 0.00 | 300.00 T@S | 75.00 | 75.00 |
| 39618 / 10/20/2004 / TIME / WIP / Draft stipulation re mediation/scheduling | JWW / +pldgs/motions / BOA.Moore | 0.75 / 0.00 / 0.00 | 300.00 T@S | 225.00 | 225.00 |
| 45225 / 10/20/2004 / TIME / WIP / Review, research, draft opp to motion to compel | JWP / +pldgs/motions / BOA.Moore | 7.30 / 0.00 / 0.00 | 275.00 T@S | 2007.50 | 2007.50 |
| 39605 / 10/22/2004 / TIME / WIP / Email S. Jacobs re mediators | JWW / +settlement / BOA.Moore | 0.25 / 0.00 / 0.00 | 300.00 T@S | 75.00 | 75.00 |
| 39672 / 10/27/2004 / TIME / WIP / Email correspondence with S. Jacobs re mediators. Phone/email message to Meghan Lettington re same | JWW / +settlement / BOA.Moore | 0.25 / 0.00 / 0.00 | 300.00 T@S | 75.00 | 75.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45206 / 10/28/2004 / TIME / WIP / Review dates & email K. Brown re calendar change | JWP / +meetings/commu / BOA.Moore | 0.20 / 0.20 / 0.00 | 275.00 T@S / Do Not Bill | 55.00 | 0.00 |
| 39799 / 10/31/2004 / EXP COST / WIP / Filing Fees One Legal 10/20 04 | COST fi / BOA.Moore | 1 | 36.37 | 36.37 | 36.37 |
| 39979 / 10/31/2004 / EXP COST / WIP / Copies - internal 1004 | COST cop / BOA.Moore | 26 | 0.30 | 7.80 | 7.80 |
| 40024 / 10/31/2004 / EXP COST / WIP / Postage 10/04 | COST pos / BOA.Moore | 1 | 0.97 | 0.97 | 0.97 |
| 40049 / 10/31/2004 / EXP COST / WIP / Facsimile 1004 | COST fax / BOA.Moore | 18 | 2.00 | 36.00 | 36.00 |
| 40521 / 11/2/2004 / TIME / WIP / Call with S. Jacobs regarding mediator. | JWW / +settlement / BOA.Moore | 0.25 / 0.00 / 0.00 | 300.00 T@S | 75.00 | 75.00 |
| 45227 / 11/10/2004 / TIME / WIP / Review dates & email K. Brown re calendar change | JWP / +meetings/commu / BOA.Moore | 0.20 / 0.20 / 0.00 | 275.00 T@S / Do Not Bill | 55.00 | 0.00 |
| 40262 / 11/15/2004 / TIME / WIP / Work on settlement strategy and mediation statement | RSG / +settlement / BOA.Moore | 3.75 / 0.00 / 0.00 | 425.00 T@S | 1593.75 | 159... |
| 45228 / 11/15/2004 / TIME / WIP / Draft mediation statement | JWP / +settlement / BOA.Moore | 2.00 / 0.00 / 0.00 | 275.00 T@S | 550.00 | 550.00 |

**Ex. 2**
82

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 42056 / 11/16/2004 / WIP / TIME<br>Work on and finalize mediation statement. | RSG<br>+settlement<br>BOA.Moore | 2.25 / 0.00<br>0.00 | 425.00<br>T@S | 956.25 | 956.25 |
| 45229 / 11/16/2004 / WIP / TIME<br>Draft & file mediation statement | JWP<br>+settlement<br>BOA.Moore | 2.80 / 0.00<br>0.00 | 275.00<br>T@S | 770.00 | 770.00 |
| 42145 / 11/17/2004 / WIP<br>Preparation for settlement mediation; prepare mediation binder; review documents and depositions for facts re bank policies on billing errors and credit reporting that can be addressed as a settlement | RSG<br>+settlement<br>BOA.Moore | 3.00 / 0.00<br>0.00 | 425.00<br>T@S | 1275.00 | 1275.00 |
| 42147 / 11/18/2004 / WIP / TIME<br>Further preparation for mediation; compile client documents for mediation, assess bank position that dispute letter not received; compare client experience to bank policies | RSG<br>+settlement<br>BOA.Moore | 2.50 / 0.00<br>0.00 | 425.00<br>T@S | 1062.50 | 1062.50 |
| 42150 / 11/19/2004 / WIP / TIME<br>Preparation for mediation. Review statutory requirements of FCBA and interplay between credit reporting and dispute resolution. | RSG<br>+settlement<br>BOA.Moore | 2.00 / 0.00<br>0.00 | 425.00<br>T@S | 850.00 | 850.00 |
| 40499 / 11/22/2004 / WIP / TIME<br>Prepare for mediation | JWW<br>+settlement<br>BOA.Moore | 3.00 / 0.00<br>0.00 | 300.00<br>T@S | 900.00 | 900.00 |
| 45497 / 11/22/2004 / WIP / TIME<br>Travel for mediation. | JWW<br>+settlement<br>BOA.Moore | 3.00 / 0.00<br>0.00 | 300.00<br>T@S | 900.00 | 900.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 42159 / 11/22/2004 / WIP<br>Preparation for mediation: review lodestar information and reassess overall settlement position; communication with client re settlement positions and coordinating availability. | RSG<br>+settlement<br>BOA.Moore | / <br>0.00 | 425.00<br>T@S | 1062.50 | 1062.50 |
| 42162 / 11/23/2004 / WIP / TIME<br>Prepare for, attend and follow up re mediation. | RSG<br>+settlement<br>BOA.Moore | 10.00 / 0.00<br>0.00 | 425.00<br>T@S | 4250.00 | 4250 |
| 43632 / 11/23/2004 / WIP / TIME<br>Participate in Mediation. | JWW<br>+settlement<br>BOA.Moore | 4.00 / 0.00<br>0.00 | 300.00<br>T@S | 1200.00 | 1200.00 |
| 40158 / 11/23/2004 / WIP / TIME<br>Fax documents to J. Welling regarding settlement | MSH<br>+settlement<br>BOA.Moore | 0.15 / 0.15<br>0.00 | 100.00<br>T@S<br>Do Not Bill | 15.00 | 0.00 |
| 42163 / 11/24/2004 / WIP / TIME<br>Return travel from mediation. | RSG<br>+settlement<br>BOA.Moore | 3.00 / 0.00<br>0.00 | 425.00<br>T@S | 1275.00 | 1275.00 |
| 43633 / 11/24/2004 / WIP / TIME<br>Return travel from mediation. | JWW<br>+settlement<br>BOA.Moore | 3.00 / 0.00<br>0.00 | 300.00<br>T@S | 900.00 | 900.00 |
| 42167 / 11/29/2004 / WIP / TIME<br>Further review of settlement proposals and analysis and revision of same. | RSG<br>+settlement<br>BOA.Moore | 1.50 / 0.00<br>0.00 | 425.00<br>T@S | 637.50 | 6 |
| 40490 / 11/29/2004 / WIP / TIME<br>Calendar settlement dates. | JWW<br>+meetings/commu<br>BOA.Moore | 0.10 / 0.10<br>0.00 | 300.00<br>T@S<br>Do Not Bill | 30.00 | 0.00 |

Ex. 2
83

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|---|
| 40756 11/30/2004 WIP — Facsimile - November 2004 | COST fax BOA.Moore | EXP | 9 | 2.00 | 18.00 | 18.00 |
| 40727 11/30/2004 WIP — Postage | COST pos BOA.Moore | EXP | 1 | 1.34 | 1.34 | 1.34 |
| 40681 11/30/2004 WIP — Professional Services - 11/1/04 Mediation ; ADR Services, Inc. | COST prf BOA.Moore | EXP | 1 | 2800.00 | 2800.00 | 2800.00 |
| 40682 11/30/2004 WIP — Overnight Courier - Federal Express 11/11/04 | COST oes BOA.Moore | EXP | 1 | 8.49 | 8.49 | 8.49 |
| 45231 12/6/2004 WIP — Review dates & email K. Brown re calendar change | JWP +meetings/commu BOA.Moore | TIME | 0.20 0.20 / 0.00 | 275.00 T@S Do Not Bill | 55.00 | 0.00 |
| 40446 12/6/2004 WIP — Review draft term sheet. Call/e-mail S. Jacobs regarding same. | JWW +settlement BOA.Moore | TIME | 0.33 0.00 / 0.00 | 300.00 T@S | 100.00 | 100.00 |
| 40436 12/6/2004 WIP — Revise draft term sheet. Call with S. Jacobs regarding same and fees. | JWW +settlement BOA.Moore | TIME | 0.50 0.00 / 0.00 | 300.00 T@S | 150.00 | 150.00 |
| 40447 12/6/2004 WIP — Review timeslips for future fee briefing and for providing summary to S. Jacobs in lieu of briefing | JWW +settlement BOA.Moore | TIME | 1.50 0.00 / 0.00 | 300.00 T@S | 450.00 | 450.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|---|
| 42454 12/7/2004 WIP — Work on memo re settlement issues in the Moore action | RSG +settlement BOA.Moore | TIME | 3.20 0.00 / 0.00 | 425.00 T@S | 1360.00 | 1360.00 |
| 40432 12/7/2004 WIP — Revise draft term sheet. Discuss same with R. Green. | JWW +settlement BOA.Moore | TIME | 0.50 0.00 / 0.00 | 300.00 T@S | 150.00 | 150.00 ⬤ |
| 42459 12/8/2004 WIP — Further work on settlement term sheet and conference with R. Moore re ████ | RSG +settlement BOA.Moore | TIME | 1.40 0.00 / 0.00 | 425.00 T@S | 595.00 | 595.00 |
| 40416 12/8/2004 WIP — Call with R. Moore ████ | JWW +settlement BOA.Moore | TIME | 0.50 0.00 / 0.00 | 300.00 T@S | 150.00 | 150.00 |
| 40413 12/13/2004 WIP — Call S. Jacobs regarding mediation | JWW +settlement BOA.Moore | TIME | 0.10 0.00 / 0.00 | 300.00 T@S | 30.00 | 30.00 |
| 42481 12/15/2004 WIP — Review issues in Moore action for mediation | RSG +settlement BOA.Moore | TIME | 2.50 0.00 / 0.00 | 425.00 T@S | 1062.50 | 1062.50 |
| 40906 12/15/2004 WIP — Meeting with R. Green re preparation for mediation | JWW +settlement BOA.Moore | TIME | 0.50 0.00 / 0.00 | 300.00 T@S | 150.00 | 150.00 ⬤ |
| 40913 12/15/2004 WIP — Call with A. Colman, S. Jacobs re draft term sheet. | JWW +settlement BOA.Moore | TIME | 0.75 0.00 / 0.00 | 300.00 T@S | 225.00 | 225.00 |

Ex. 2

84

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 40915 / 12/15/2004 / WIP / TIME / Preparation for mediation. | JWW / +settlement / BOA.Moore | 3.00 / 0.00 / 0.00 | 300.00 T@5 | 900.00 | 900.00 |
| 42488 / 12/15/2004 / WIP / TIME / Prepare for and participate in mediation of claims re Moore. | RSG / +settlement / BOA.Moore | 3.50 / 0.00 / 0.00 | 425.00 T@5 | 1487.50 | 1487.50 |
| 40759 / 12/16/2004 / WIP / EXP / Travel - Mediation - cabfare | COST / trf / BOA.Moore | 1 | 15.00 | 15.00 | 15.00 |
| 40760 / 12/16/2004 / WIP / EXP / Travel - Mediation - parking 12/16/04 San Francisco | COST / trf / BOA.Moore | 1 | 28.00 | 28.00 | 28.00 |
| 40761 / 12/16/2004 / WIP / EXP / Travel - Mediation - J. Welling airport parking | COST / trf / BOA.Moore | 1 | 30.00 | 30.00 | 30.00 |
| 40762 / 12/16/2004 / WIP / EXP / Mediation 12/15/04 - Room Charge (Stanwood, San Diego) | COST / trf / BOA.Moore | 1 | 257.99 | 257.99 | 257.99 |
| 40763 / 12/16/2004 / WIP / EXP / Travel - Mediation 12/15/04 airport parking | COST / trf / BOA.Moore | 1 | 30.00 | 30.00 | 30.00 |
| 40764 / 12/16/2004 / WIP / EXP / Travel - Mediation - Oakland | COST / trf / BOA.Moore | 1 | 0.00 | 0.00 | 0.00 |
| 40765 / 12/16/2004 / WIP / EXP / Travel -Mediation - Lunch 12/16/04 | COST / trf / BOA.Moore | 1 | 11.84 | 11.84 | 11.84 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 40766 / 12/16/2004 / WIP / EXP / Travel - Mediation - Parking 12/16/04 | COST / trf / BOA.Moore | 1 | 18.00 | 18.00 | 18.00 |
| 40767 / 12/16/2004 / WIP / EXP / Travel - Mediation - cabfare 12/15/04 | COST / trf / BOA.Moore | 1 | 11.00 | 11.00 | 11.00 |
| 40768 / 12/16/2004 / WIP / EXP / Travel - Mediation 12/15/04 - Room Charge (Stanwood, San Diego) : $219.99 charge (Rice Restaurant) : 120.60 Restaurant | COST / trf / BOA.Moore | 1 | 340.59 | 340.59 | 340.59 |
| 40917 / 12/16/2004 / WIP / TIME / Participate in Mediation. | JWW / +settlement / BOA.Moore | 7.00 / 0.00 / 0.00 | 300.00 T@5 | 2100.00 | 2100.00 |
| 42555 / 12/31/2004 / WIP / TIME / Confirm AOR fees and payments for all parties. | KPB / +settlement / BOA.Moore | 0.25 / 0.25 / 0.00 | 140.00 T@5 Do Not Bill | 35.00 | 0.00 |
| 42045 / 12/31/2004 / WIP / EXP / 11/22/04 R. Green airfare travel to Los Angeles re mediation | COST / lod / BOA.Moore | 1 | 238.20 | 238.20 | 238.20 |
| 42034 / 12/31/2004 / WIP / EXP / 11/22/04 - J. Welling parking travel to Los Angeles re mediation | COST / trf / BOA.Moore | 1 | 28.00 | 28.00 | 28.00 |
| 42035 / 12/31/2004 / WIP / EXP / 11/22 24/04 J. Welling airport parking travel to Los Angeles re mediation | COST / trf / BOA.Moore | 1 | 40.00 | 40.00 | 40.00 |

Ex. 2
85

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Mark-up |
|---|---|---|---|---|---|
| 41197 EXP<br>12/31/2004<br>WIP<br>Copies - internal 12/04 | COST<br>cop<br>BOA.Moore | 123 | 0.30 | 36.90 | 36.90 |
| 41216 EXP<br>12/31/2004<br>WIP<br>Facsimile 12/04 | COST<br>fax<br>BOA.Moore | 18 | 2.00 | 36.00 | 36.00 |
| 42044 EXP<br>12/31/2004<br>WIP<br>11/22/04 R. Green lodging travel to Los Angeles re mediation | COST<br>lod<br>BOA.Moore | 1 | 573.20 | 573.20 | 573.20 |
| 41308 EXP<br>12/31/2004<br>WIP<br>Professional Services Mediator ADR Services, Inc 12/16/04 | COST<br>prf<br>BOA.Moore | 1 | 2000.00 | 2000.00 | 2000.00 |
| 42043 EXP<br>12/31/2004<br>WIP<br>11/22/04 R. Green and J. Weling meals travel to Los Angeles re mediation | COST<br>lod<br>BOA.Moore | 1 | 150.03 | 150.03 | 150.03 |
| 41735 TIME<br>1/6/2005<br>WIP<br>Call S. Jacobs re settlement of Moore. | JWW<br>+settlement<br>BOA.Moore | 0.50<br>0.00 | 300.00<br>T@5 | 150.00 | 150.00 |
| 41739 TIME<br>1/6/2005<br>WIP<br>Review Case Management Conference Statement; Email to S. Jacobs. | JWW<br>+pldgs/motions<br>BOA.Moore | 0.25<br>0.00 | 300.00<br>T@5 | 75.00 | 75.00 |
| 41942 TIME<br>1/27/2005<br>WIP<br>Email S. Jacobs re next steps in light of new scheduling order. | JWW<br>+settlement<br>BOA.Moore | 0.10<br>0.00 | 300.00<br>T@5 | 30.00 | 30.00 |
| 42127 EXP<br>1/31/2005<br>WIP | COST<br>trl<br>BOA.Moore | 1 | 18.00 | 18.00 | 18.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Mark-up |
|---|---|---|---|---|---|
| EXP<br>12/15-16/04 R. Green parking travel to San Diego re mediation | COST | 1 | 240.20 | 240.20 | ●30 |
| 42126 EXP<br>1/31/2005<br>WIP<br>12/15/04 R. Green airfare travel to San Diego re mediation | COST<br>trl<br>BOA.Moore | 1 | 240.20 | 240.20 | 240.20 |
| 42125 EXP<br>1/31/2005<br>WIP<br>12/17/04 R. Green lodging travel to San Diego re mediation | COST<br>lod<br>BOA.Moore | 1 | 384.38 | 384.38 | 384.38 |
| 42350 EXP<br>1/31/2005<br>WIP<br>Postage 1/05 | COST<br>pos<br>BOA.Moore | 1 | 0.60 | 0.60 | 0.60 |
| 42121 EXP<br>1/31/2005<br>WIP<br>11/23/04 R. Green meals travel to Los Angeles re mediation | COST<br>lod<br>BOA.Moore | 1 | 15.80 | 15.80 | 15.80 |
| 42122 EXP<br>1/31/2005<br>WIP<br>Messenger 11/17/04 American Messenger plaintiffs mediation statement | COST<br>mte<br>BOA.Moore | 1 | 52.80 | 52.80 | 52.80 |
| 42124 EXP<br>1/31/2005<br>WIP<br>12/16/04 R. Green airport parking travel to San Diego re mediation | COST<br>trl<br>BOA.Moore | 1 | 30.00 | 30.00 | 30.00 |
| 41957 TIME<br>2/1/2005<br>WIP<br>Crunch numbers for Moore fee negotiation. | JWW<br>+settlement<br>BOA.Moore | 0.25<br>0.00 | 300.00<br>T@5 | 75.00 | ●75.00 |
| 41965 TIME<br>2/2/2005<br>WIP<br>Draft email to S. Jacobs re hours, activities to negotiate fee arrangement. | JWW<br>+settlement<br>BOA.Moore | 2.00<br>0.00 | 300.00<br>T@5 | 600.00 | 600.00 |

Ex. 2
86

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 41974 / 2/4/2006 / WIP / TIME — Call with S. Jacobs re: content / specificity in fee application vis a vis information provided to him. | JWW / +settlement / BOA.Moore | 0.25 / 0.00 | 300.00 T@5 | 75.00 | 75.00 |
| 45232 / 2/10/2006 / WIP / TIME — Tel conf w/ J.Fink re motion to compel | JWP / +pldgs/motions / BOA.Moore | 0.30 / 0.00 | 275.00 T@5 | 82.50 | 82.50 |
| 45233 / 2/10/2006 / WIP / TIME — Draft & mail joint letter to Judge Major re motion to compel | JWP / +pldgs/motions / BOA.Moore | 0.80 / 0.00 | 275.00 T@5 | 220.00 | 220.00 |
| 45234 / 2/11/2006 / WIP / TIME — Tel conf w/ Judge Majors chambers | JWP / +pldgs/motions / BOA.Moore | 0.20 / 0.00 | 275.00 T@5 | 55.00 | 55.00 |
| 45235 / 2/11/2006 / WIP / TIME — Emails to J Weling R Green re status of motion to compel | JWP / +pldgs/motions / BOA.Moore | 0.30 / 0.00 | 275.00 T@5 | 82.50 | 82.50 |
| 45244 / 2/14/2006 / WIP / TIME — Review and analyze litigation posture in light of Court's decision not to grant anymore extensions of the settlement negotiations stay and to put the case on litigation track; assess litigation items that were pending at the time the settlement stay began to determine appropriate strategy for proceeding with litigation; communicate with client and other GW attorneys re same | RSG / +settlement / BOA.Moore | 0.75 / 0.00 | 425.00 T@5 | 318.75 | 318.75 |
| 41986 / 2/14/2006 / WIP / TIME — Call with S. Jacobs re: mechanics of an appeal of fees for term sheet. | JWW / +settlement / BOA.Moore | 0.25 / 0.00 | 300.00 T@5 | 75.00 | 75.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 41991 / 2/14/2006 / WIP / TIME — Call with S. Jacobs re: To Whom It May Concern letter for R. Moore. | JWW / +settlement / BOA.Moore | 0.25 / 0.00 | 300.00 T@5 | 75.00 | 75.00 ● |
| 45236 / 2/15/2006 / WIP / TIME — Tel conf, emails w/ J.Fink re motion to compel | JWP / +pldgs/motions / BOA.Moore | 0.40 / 0.00 | 275.00 T@5 | 110.00 | 110.00 ● |
| 45237 / 2/15/2006 / WIP / TIME — Review, research, draft opp to motion to compel | JWP / +pldgs/motions / BOA.Moore | 2.10 / 0.00 | 275.00 T@5 | 577.50 | 577.50 |
| 45245 / 2/15/2006 / WIP / TIME — Further assessment of outstanding litigation matters re open discovery items going both directions; motion for class certification scheduling and necessary discovery to initiate, as well as reassess open items re settlement negotiations | RSG / +pldgs/motions / BOA.Moore | 1.25 / 0.00 | 425.00 T@5 | 531.25 | 531.25 |
| 43875 / 2/15/2006 / WIP / TIME — Research and draft internal memorandum re Status of Defs Compliance with Order Dated September 9, 2004 re Pltfs MTC | KPB / +discovery / BOA.Moore | 1.75 / 0.00 | 140.00 T@5 | 245.00 | 245.00 |
| 42635 / 2/16/2006 / WIP / TIME 6:30 AM — Review Moore settlement terms w/RSG in preparation for for discussion w/client | JWW / +settlement / BOA.Moore | 0.75 / 0.00 | 300.00 T@5 | 225.00 | 225.00 ● |
| 42641 / 2/17/2006 / WIP / TIME — Call w/client re ▬▬▬ Call S. Jacobs re: same. | JWW / +settlement / BOA.Moore | 0.50 / 0.00 | 300.00 T@5 | 150.00 | 150.00 |

Ex. 2
87

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment MarkUp |
|---|---|---|---|---|---|---|
| 45238 2/17/2005 WIP Tel confs, emails w/ J Fink re motion to compel | JWP +pldgs/motions BOA.Moore | TIME | 0.60 0.00 | 275.00 T@5 | 165.00 | 165.00 |
| 45239 2/17/2005 WIP Research, draft motion to compel #3 | JWP +pldgs/motions BOA.Moore | TIME | 1.50 0.00 | 275.00 T@5 | 412.50 | 412.50 |
| 42644 2/17/2005 WIP Call w/S. Jacobs re: Moore settlement/letter language. Discuss same w/RSG. | JWW +settlement BOA.Moore | TIME | 0.75 0.00 | 300.00 T@5 | 225.00 | 225.00 |
| 45240 2/18/2005 WIP Research, draft motion to compel #3, review notice re same | JWP +pldgs/motions BOA.Moore | TIME | 0.60 0.00 | 275.00 T@5 | 165.00 | 165.00 |
| 42646 2/18/2005 WIP Email corresp w/S. Jacobs re: call to Court re: scheduling. | JWW +settlement BOA.Moore | TIME | 0.10 0.00 | 300.00 T@5 | 30.00 | 30.00 |
| 42652 2/18/2005 WIP Call w/S. Jacobs and w/Court re: settlement in principle and necessary documentation. Discuss drafting w/S. Jacobs. | JWW +settlement BOA.Moore | TIME | 0.75 0.00 | 300.00 T@5 | 225.00 | 225.00 |
| 42654 2/18/2005 WIP Call w/Mag. clerk re: opp to Motion to compel and vacating schedule. | JWW +meetings/commu BOA.Moore | TIME | 0.25 0.00 | 300.00 T@5 | 75.00 | 75.00 |
| 45246 2/22/2005 WIP Telephone call with R. Pearl, potential consultant or expert re attorney fee application | RSG +pldgs/motions BOA.Moore | TIME | 0.50 0.00 | 425.00 T@5 | 212.50 | 212.50 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment MarkUp |
|---|---|---|---|---|---|---|
| 42663 2/22/2005 WIP Email S. Jacobs re. slp to Court re settlement in principle. Call w/him re same | JWP +settlement BOA.Moore | TIME | 0.20 0.00 | 300.00 T@5 | 60.00 | 60.00 |
| 42669 2/22/2005 WIP Read draft slip re. settlement in Moore. Email corresp. w/S. Jacobs re fee submission. Call w/him re same. Call Clerk for fax number. | JWW +pldgs/motions BOA.Moore | TIME | 0.35 0.00 | 300.00 T@5 | 105.00 | 105.00 ● |
| 42673 2/23/2005 WIP Call w/S. Jacobs re. credit reporting change v. letter. | JWW +settlement BOA.Moore | TIME | 0.42 0.00 | 300.00 T@5 | 125.00 | 125.00 |
| 45241 2/24/2005 WIP Email J Weling re final papers | JWP +settlement BOA.Moore | TIME | 0.20 0.20 | 275.00 T@5 Do Not Bill | 55.00 | 0.00 |
| 42678 2/24/2005 WIP Discuss letter v. charged credit report w/ R Green. Give R. Green notes from call w/S. Jacobs for call to client. | JWW +settlement BOA.Moore | TIME | 0.25 0.00 | 300.00 T@5 | 75.00 | 75.00 |
| 43451 2/28/2005 WIP 12/15-16/04 J Weling parking travel to San Diego re mediation | COST trl BOA.Moore | EXP | 1 | 28.00 | 28.00 | 28.00 |
| 43448 2/28/2005 WIP 12/15-16/04 J Weling taxis travel to San Diego re mediation | COST trl BOA.Moore | EXP | 1 | 15.00 | 15.00 | 15.00 ● |
| 43452 2/28/2005 WIP 11/22-24/04 R Green taxis travel to Los | COST trl BOA.Moore | EXP | 1 | 55.00 | 55.00 | 55.00 |

Ex. 2
88

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| Diego re mediation | | | | | |
| 42981 / 2/28/2006 / WIP / Copies - internal 2/05 — EXP | COST cop BOA.Moore | 5 | 0.30 | 1.50 | 1.50 |
| 42989 / 2/28/2005 / WIP / Facsimile 2/05 — EXP | COST fax BOA.Moore | 5 | 2.00 | 10.00 | ● 10 |
| 45242 / 3/1/2005 / WIP / Tel conf w/ & mail papers to R Pearl — TIME | JWP +pldgs/motions BOA.Moore | 0.30 / 0.30 | 275.00 T@S Do Not Bill | 82.50 | 0.00 |
| 45247 / 3/3/2005 / WIP / Begin process of assessing documents and information that would be relevant to a fee application; review Timeslips entries and J. Welling analysis of time; organize and cause documents to be transmitted to consultant R. Pearl — TIME | RSG +pldgs/motions BOA.Moore | 2.40 / 0.00 | 425.00 T@S | 1020.00 | 1020.00 |
| 43153 / 3/3/2005 / WIP / Email to S. Jacobs re: Court's voice mail on scheduling in Moore. — TIME | JWW +settlement BOA.Moore | 0.10 / 0.00 | 300.00 T@S | 30.00 | 30.00 |
| 43133 / 3/4/2005 / WIP / Call w/ S. Jacobs re: method for resolving disputes during documentation phase. — TIME | JWW +settlement BOA.Moore | 0.25 / 0.00 | 300.00 T@S | 75.00 | 75.00 |
| 43128 / 3/7/2005 / WIP / Email S. Jacobs re: calling Judge's clerk to schedule fee briefing/hearing — TIME | JWW +pldgs/motions BOA.Moore | 0.10 / 0.00 | 300.00 T@S | 30.00 | ● 30.00 |
| 43125 / 3/8/2005 / WIP — TIME | JWW +court BOA.Moore | 0.10 / 0.00 | 300.00 T@S | 30.00 | 30.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| Angeles re mediation | | | | | |
| 43650 / 2/28/2005 / WIP / 12/15-16/04 J. Welling parking travel to San Diego re mediation — EXP | COST trl BOA.Moore | 1 | 30.00 | 30.00 | 30.00 |
| 43449 / 2/28/2005 / WIP / 12/15-16/04 J. Welling lodging travel to Los Angeles re mediation — EXP | COST lod BOA.Moore | 1 | 257.99 | 257.99 | 257.99 |
| 43445 / 2/28/2005 / WIP / 11/22-24/05 J. Welling taxi travel to Los Angeles re mediation — EXP | COST trl BOA.Moore | 1 | 45.00 | 45.00 | 45.00 |
| 43444 / 2/28/2005 / WIP / 11/22-24/04 J. Welling airfare travel to San Diego re mediation — EXP | COST trl BOA.Moore | 1 | 218.20 | 218.20 | 218.20 |
| 43446 / 2/28/2005 / WIP / 11/22-24/04 J. Welling meal travel to Los Angeles re mediation — EXP | COST lod BOA.Moore | 1 | 11.86 | 11.86 | 11.86 |
| 43442 / 2/28/2005 / WIP / 12/15-16/04 R. Green taxis travel to San Diego re mediation — EXP | COST trl BOA.Moore | 1 | 11.00 | 11.00 | 11.00 |
| 43443 / 2/28/2005 / WIP / 12/15-16/04 R. Green and J. Welling meals travel to San Diego re mediation — EXP | COST lod BOA.Moore | 1 | 11.84 | 11.84 | 11.84 |
| 43447 / 2/28/2005 / WIP / 12/15-16/04 J. Welling airfare travel to San — EXP | COST trl BOA.Moore | 1 | 240.20 | 240.20 | 240.20 |

Ex. 2
89

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment MarkUp |
|---|---|---|---|---|---|
| Review order setting settlement disposition conference. | | 0.00 | | | |
| 45243 — 3/8/2005 — WIP — Review dates & email K. Brown re calendar change. | TIME — JNP +meetings/commu BOA.Moore | 0.20 / 0.20 | 275.00 T@5 Do Not Bill | 55.00 | 0.00 |
| 43126 — 3/8/2005 — WIP — Call w/S. Jacobs re: reducing term sheet to formal agreement; review consumer education program. Discuss furtherance of Sarokin. | TIME — JWW +settlement BOA.Moore | 0.50 / 0.00 | 300.00 T@5 | 150.00 | 150.00 |
| 43118 — 3/9/2005 — WIP — Meet w/expert re fee application. | TIME — JWW +pldgs/motions BOA.Moore | 0.50 / 0.00 | 300.00 T@5 | 150.00 | 150.00 |
| 45248 — 3/9/2005 — WIP — Review of documents related to fee application and recent fee decision in preparation for and spend time meeting with R. Pearl in connection with potential fee application | TIME — RSG +pldgs/motions BOA.Moore | 2.10 / 0.00 | 425.00 T@5 | 892.50 | 892.50 |
| 43112 — 3/10/2005 — WIP — Call w/Court re: scheduling the brief conversation w/S. Jacobs re: same. | TIME — JWW +meetings/commu BOA.Moore | 0.25 / 0.00 | 300.00 T@5 | 75.00 | 75.00 |
| 43081 — 3/15/2005 — WIP — Phone call w/S. Jacobs re: Sarokin being final decision maker and tentative call within | TIME — JWW +settlement BOA.Moore | 0.10 / 0.00 | 300.00 T@5 | 30.00 | 30.00 |
| 43329 — 3/16/2005 — WIP — Call w/Sarokin & S. Jacobs re: his continuing oversight. | TIME — JWW +settlement BOA.Moore | 0.25 / 0.00 | 300.00 T@5 | 75.00 | 75.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment MarkUp |
|---|---|---|---|---|---|
| 43306 — 3/16/2005 — WIP — Call w/A. Coleman re: attorney lee settlement provision not being final. | TIME — JWW +settlement BOA.Moore | 0.50 / 0.00 | 300.00 T@5 | 150.00 | 150.00 ● |
| 43308 — 3/18/2005 — WIP — Read draft settlement agreement. Revise same. | TIME — JWW +settlement BOA.Moore | 0.50 / 0.00 | 300.00 T@5 | 150.00 | 150.00 |
| 43289 — 3/21/2005 — WIP — Edit stipulation of settlement. Redline same. Correspondence w/RSG re: same. Draf email to S. Jacobs re: same. | TIME — JWW +settlement BOA.Moore | 0.75 / 0.00 | 300.00 T@5 | 225.00 | 225.00 |
| 43292 — 3/22/2005 — WIP — Email correspondence w/S. Jacobs re: 2.2.7 of the settlement slip and timing for call w/J. Sarokin. | TIME — JWW +settlement BOA.Moore | 0.10 / 0.00 | 300.00 T@5 | 30.00 | 30.00 |
| 43279 — 3/23/2005 — WIP — Email correspondence w/S. Jacobs re: mediation and letter for settlement. | TIME — JWW +settlement BOA.Moore | 0.25 / 0.00 | 300.00 T@5 | 75.00 | 75.00 |
| 43290 — 3/24/2005 — WIP — Call w/S. Jacobs re: subjects for J. Sarokin. | TIME — JWW +settlement BOA.Moore | 0.10 / 0.00 | 300.00 T@5 | 30.00 | 30.00 |
| 43251 — 3/24/2005 — WIP — Call w/S. Jabobs cofirming cancellation of Sarokin conference, setting up time to call Court. | TIME — JWW +settlement BOA.Moore | 0.10 / 0.00 | 300.00 T@5 | 30.00 | 30.00 ● |
| 43262 — 3/24/2005 — WIP — Review Court's order re: settlement in | TIME — JWW +court BOA.Moore | 0.10 / 0.00 | 300.00 T@5 | 30.00 | 30.00 |

Ex. 2
90

preparation for call/hearing.

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 43267 / 3/24/2005 / WIP / Call w/client re: | TIME / JWW / +settlement / BOA.Moore | 0.50 / 0.00 / 0.00 | 300.00 T@S | 150.00 | 150.00 |
| 45249 / 3/24/2005 / WIP / Telephone calls with client and district court re settlement issues | TIME / RSG / +settlement / BOA.Moore | 0.60 / 0.00 / 0.00 | 425.00 T@S | 255.00 | 255.00 |
| 43273 / 3/24/2005 / WIP / Email S. Jacobs re: acceptance of letter & cancel Sarokin mediation. | TIME / JWW / +settlement / BOA.Moore | 0.00 / 0.00 / 0.00 | 300.00 T@S | 0.00 | 0.00 |
| 43255 / 3/25/2005 / WIP / Call w/Magistrate re: failure to have signed settlement agreement. Phone call w/A. Coleman & S. Jacobs re: same. Discuss same w/RSG. | TIME / JWW / +court / BOA.Moore | 0.75 / 0.00 / 0.00 | 300.00 T@S | 225.00 | 225.00 |
| 43267 / 3/25/2005 / WIP / Email S. Jacobs re: payment arrangements for J. Sarokin. | TIME / JWW / +settlement / BOA.Moore | 0.10 / 0.00 / 0.00 | 300.00 T@S | 30.00 | 30.00 |
| 43234 / 3/29/2005 / WIP / Email correspondence w/S. Jacobs re: Thursday w/Sarokin. Call ADR services re: same. | TIME / JWW / +settlement / BOA.Moore | 0.10 / 0.00 / 0.00 | 300.00 T@S | 30.00 | 30.00 |
| 43238 / 3/29/2005 / WIP / Discuss settlement status conference, mediation w/JWP. | TIME / JWW / +settlement / BOA.Moore | 0.50 / 0.00 / 0.00 | 300.00 T@S | 150.00 | 150.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 43237 / 3/29/2005 / WIP / Email correspondence w/S. Jacobs re: mediation timing and client availability. | TIME / JWW / +settlement / BOA.Moore | 0.10 / 0.00 | 300.00 T@S | 30.00 | 30.00 |
| 43231 / 3/30/2005 / WIP / Strategy and analysis for mediation statement contents. Draft same. | TIME / JWW / +settlement / BOA.Moore | 4.25 / 0.00 | 300.00 T@S | 1275.00 | 1275.00 |
| 43232 / 3/30/2005 / WIP / Call w/S. Jacobs re: absence preparation for mediation | TIME / JWW / +settlement / BOA.Moore | 0.25 / 0.00 | 300.00 T@S | 75.00 | 75.00 |
| 45333 / 3/30/2005 / WIP / Discuss mediation statement contents and positioning w/ R. Green. | TIME / JWW / +settlement / BOA.Moore | 0.75 / 0.00 | 300.00 T@S | 225.00 | 225.00 |
| 43822 / 3/31/2005 / WIP / Copies - Internal 3/05 | EXP / COST / cop / BOA.Moore | 223 | 0.30 | 66.90 | 66.90 |
| 43226 / 3/31/2005 / WIP / Discuss travel logistics w/ R. Green. | TIME / JWW / +settlement / BOA.Moore | 0.10 / 0.10 | 300.00 T@S Do Not Bill | 30.00 | 0.00 |
| 43943 / 3/31/2005 / WIP / Messenger, Spincycle. | EXP / COST / mes / BOA.Moore | 1 | 30.00 | 30.00 | 30.00 |
| 43225 / 3/31/2005 / WIP / Travel OAK to Los Angeles for mediation | TIME / JWW / +settlement / BOA.Moore | 3.00 / 0.00 | 300.00 T@S | 900.00 | 900.00 |
| 45500 / 3/31/2005 / WIP / Preparation for mediation, participated in | TIME / JWW / +settlement / BOA.Moore | 5.00 / 0.00 | 300.00 T@S | 1500.00 | 1500.00 |

Ex. 2
91

mediation.

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45250    TIME<br>3/31/2005<br>WIP<br>Prepare for, participate and follow up re mediation | RSG<br>+settlement<br>BOA.Moore | 9.70<br>0.00<br>0.00 | 425.00<br>T@5 | 4122.50 | 4122.50 |
| 44004    EXP<br>3/31/2005<br>WIP<br>Professional Services; ADR Services, Inc. - Mediation Hon. H. Lee Sarokin. | COST<br>prf<br>BOA.Moore | 1 | 2500.00 | 2500.00 | 2500.00 |
| 43501    EXP<br>3/31/2005<br>WIP<br>Facsimile 3:05 | COST<br>fax<br>BOA.Moore | 62 | 2.00 | 124.00 | 124.00 |
| 45501    TIME<br>4/1/2005<br>WIP<br>Email correspondence w/S. Jacobs re call to court. | JWW<br>+settlement<br>BOA.Moore | 0.20<br>0.00<br>0.00 | 300.00<br>T@5 | 60.00 | 60.00 |
| 44918    TIME<br>4/1/2005<br>WIP<br>Discovery status for letter to Judge Major | KPB<br>+discovery<br>BOA.Moore | 0.50<br>0.00<br>0.00 | 140.00<br>T@5 | 70.00 | 70.00 |
| 44269    TIME<br>4/1/2005<br>WIP<br>Call w/Court re settlement disposition conference. Discuss settlement w/S. Jacobs, A. Coleman, R. Green. | JWW<br>+settlement<br>BOA.Moore | 1.50<br>0.00<br>0.00 | 300.00<br>T@5 | 450.00 | 450.00 |
| 45251    TIME<br>4/1/2005<br>WIP<br>Follow up to mediation and work on strategy and discovery plan for ongoing litigation, review and assess open factual issues necessary to begin preparation for completing discovery | RSG<br>+pldgs/motions<br>BOA.Moore | 3.20<br>0.00<br>0.00 | 425.00<br>T@5 | 1360.00 | 1360.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 44266    TIME<br>4/1/2005<br>WIP<br>Travel from Los Angeles to San Francisco from mediation. | JWW<br>+settlement<br>BOA.Moore | 3.00<br>0.00<br>0.00 | 300.00<br>T@5 | 900.00 | 900.00 |
| 44254    TIME<br>4/4/2005<br>WIP<br>Email S. Jacobs and A. Colman re: authority for arbitration suggestion. | JWW<br>+settlement<br>BOA.Moore | 0.10<br>0.00<br>0.00 | 300.00<br>T@5 | 30.00 | ● 30.00 |
| 44257    TIME<br>4/4/2005<br>WIP<br>Email correspondence re: status of discovery w/JWP. Assign RFP/deposition notice tasks. Review K. Brown memorandum. | JWW<br>+discovery<br>BOA.Moore | 0.10<br>0.00<br>0.00 | 300.00<br>T@5 | 30.00 | 30.00 |
| 44265    TIME<br>4/4/2005<br>WIP<br>Letter to Court re: collapse of settlement and next proceedings. | JWW<br>+settlement<br>BOA.Moore | 3.00<br>0.00<br>0.00 | 300.00<br>T@5 | 900.00 | 900.00 |
| 44219    TIME<br>4/5/2005<br>WIP<br>Letter to Court re: collapse of settlement. | JWW<br>+settlement<br>BOA.Moore | 3.25<br>0.00<br>0.00 | 300.00<br>T@5 | 975.00 | 975.00 |
| 44239    TIME<br>4/5/2005<br>WIP<br>Review opposition to motions to compel. | JWW<br>+pldgs/motions<br>BOA.Moore | 0.75<br>0.00<br>0.00 | 300.00<br>T@5 | 225.00 | 225.00 |
| 45329    TIME<br>4/6/2005<br>WIP<br>Communications with J. Welling re defendant's arbitration proposal; communications with client re depositions, discovery schedule and settlement issues | RSG<br>+meetings/commu<br>BOA.Moore | 0.90<br>0.00<br>0.00 | 425.00<br>T@5 | 382.50 | 3● |

Ex. 2
92

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 44237 TIME<br>4/6/2005 WP<br>Call w/M.J. Major's clerk re: conference. | JWW<br>+meetings/commu<br>BOA.Moore | 0.10<br>0.00<br>0.00 | 300.00<br>T@5 | 30.00 | 30.00 |
| 44244 TIME<br>4/6/2005 WP<br>Review/revise RFP set 5, 300(b)(6) notices. Discuss same w/RSG. | JWW<br>+discovery<br>BOA.Moore | 3.25<br>0.00<br>0.00 | 300.00<br>T@5 | 975.00 | 975.00 |
| 44227 TIME<br>4/7/2005 WP<br>Final edits to RFD set 3 and disposition notice | JWW<br>+discovery<br>BOA.Moore | 0.25<br>0.00<br>0.00 | 300.00<br>T@5 | 75.00 | 75.00 |
| 44219 TIME<br>4/7/2005 WP<br>Email and phone correspondence w/S. Jacobs re: conference date w/M. J. Major. | JWW<br>+court<br>BOA.Moore | 0.25<br>0.00<br>0.00 | 300.00<br>T@5 | 75.00 | 75.00 |
| 44221 TIME<br>4/8/2005 WP<br>Call w/Court re: scheduling settlement disposition conference, call w/client re: same | JWW<br>+court<br>BOA.Moore | 0.50<br>0.00<br>0.00 | 300.00<br>T@5 | 150.00 | 150.00 |
| 45259 TIME<br>4/10/2005 WP<br>Review dates & email K. Brown re calendar change | JWP<br>+meetings/commu<br>BOA.Moore | 0.20<br>0.20<br>0.00 | 275.00<br>Do Not Bill | 55.00 | 0.00 |
| 44164 TIME<br>4/12/2005 WP<br>Email correspondence w/client, R. Green re appearance/participation in settlement conference | JWW<br>+settlement<br>BOA.Moore | 0.10<br>0.00<br>0.00 | 300.00<br>T@5 | 30.00 | 30.00 |
| 44160 TIME<br>4/12/2005 WP<br>Travel to S.D. for settlement disposition conference. | JWW<br>+court<br>BOA.Moore | 3.00<br>0.00<br>0.00 | 300.00<br>T@5 | 900.00 | 900.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45253 TIME<br>4/13/2005 WP<br>Prepare for, participate in and follow up re: mediation | RSG<br>+settlement<br>BOA.Moore | 10.10<br>0.00<br>0.00 | 425.00<br>T@5 | 4292.50 | 4292.50 ● |
| 44162 TIME<br>4/13/2005 WP<br>Return travel from San Diego to OAK. | JWW<br>+court<br>BOA.Moore | 3.00<br>0.00<br>0.00 | 300.00<br>T@5 | 900.00 | 900.00 |
| 44161 TIME<br>4/13/2005 WP<br>Meet w/client. Participate in settlement disposition conference. | JWW<br>+settlement<br>BOA.Moore | 6.00<br>0.00<br>0.00 | 300.00<br>T@5 | 1800.00 | 1800.00 |
| 44152 TIME<br>4/14/2005 WP<br>Email J. Pillete outlining legal research request re: "prevailing party" and Buckhannon vis a vis the settlement agreement. | JWW<br>+settlement<br>BOA.Moore | 0.25<br>0.00<br>0.00 | 300.00<br>T@5 | 75.00 | 75.00 |
| 44706 TIME<br>4/22/2005 WP<br>Emails S. Jacobs seeking status of settlement agreement. | JWW<br>+settlement<br>BOA.Moore | 0.10<br>0.00<br>0.00 | 300.00<br>T@5 | 30.00 | 30.00 |
| 44698 TIME<br>4/25/2005 WP<br>Review revised appellate terms following magistrate mediation. Revise terms (release, Bank's obligations.) Draft letter to S. Jacobs detailing objections to his draft and attaching our corrections | JWW<br>+settlement<br>BOA.Moore | 1.25<br>0.00<br>0.00 | 300.00<br>T@5 | 375.00 | 375.00 ● |
| 44689 TIME<br>4/25/2005 WP<br>Call w/S. Jacobs re: my edits. Discuss fax signatures versus original signatures. Discuss mode of candidate notice for Bank's obligations. | JWW<br>+settlement<br>BOA.Moore | 0.25<br>0.00<br>0.00 | 300.00<br>T@5 | 75.00 | 75.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment / Mark up |
|---|---|---|---|---|---|
| 44676 4/26/2005 WIP — TIME<br>Phone call w/S. Jacobs re: final language of settlement agreement & opportunity to resolve the case without briefing fees. | JWW +settlement BOA.Moore | 0.25 0.00 0.00 | 300.00 T@5 | 75.00 | 75.00 |
| 44674 4/27/2005 WIP — TIME<br>Review final settlement agreement transmitted by S. Jacobs. Call S. Jacobs re: same. Transmit same to client w/instructions for original signature. | JWW +settlement BOA.Moore | 0.40 0.00 0.00 | 300.00 T@5 | 120.00 | 120.00 |
| 45254 4/27/2005 WIP — TIME<br>Begin research and review of case law re attorney fees | RSG +research BOA.Moore | 2.10 0.00 0.00 | 425.00 T@5 | 892.50 | 892.50 |
| 44656 4/27/2005 WIP — TIME<br>Call w/Magistrate J. Major re status conference of getting settlement signed. | JWW +settlement BOA.Moore | 0.10 0.00 0.00 | 300.00 T@5 | 30.00 | 30.00 |
| 44964 4/28/2005 WIP — TIME<br>Research re reasonable attorney fee rates in preparation of supportive argument re GW and like-firms hourly rates passed by federal judge. | KPB +research BOA.Moore | 4.00 0.00 0.00 | 140.00 T@5 | 560.00 | 560.00 |
| 45255 4/28/2005 WIP — TIME<br>Review documents from AFCA litigation and Paragine bankruptcy where the courts approved hourly rates in connection with preparation for fee application | RSG +research BOA.Moore | 1.70 0.00 0.00 | 425.00 T@5 | 722.50 | 722.50 |
| 44415 4/30/2005 WIP — EXP<br>4/12/05 J. Weling lodging travel to Los Angeles re hearing on 4/13/05 | COST trl BOA.Moore | 1 | | 209.00 | 209.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment / Mark up |
|---|---|---|---|---|---|
| 44405 4/30/2005 WIP — EXP<br>3/31/05 R. Green airfare travel to Los Angeles re mediation | COST trl BOA.Moore | | 222.40 | 222.40 | 222.40 ● |
| 44766 4/30/2005 WIP — EXP<br>Facsimile 4.05 | COST fax BOA.Moore | 15 | 2.00 | 30.00 | 30.00 |
| 44406 4/30/2005 WIP — EXP<br>4/1/05 R. Green airport parking travel to Los Angeles re mediation | COST trl BOA.Moore | 1 | 26.00 | 26.00 | 26.00 |
| 44403 4/30/2005 WIP — EXP<br>3/31/05 R. Green and J. Weling meals travel to Los Angeles re mediation | COST trl BOA.Moore | 1 | 104.77 | 104.77 | 104.77 |
| 44407 4/30/2005 WIP — EXP<br>4/1/05 R. Green car rental travel to Los Angeles re mediation | COST trl BOA.Moore | 1 | 69.81 | 69.81 | 69.81 |
| 44399 4/30/2005 WIP — EXP<br>4/1/05 R. Green and J. Weling meals travel to Los Angeles re mediation | COST lod BOA.Moore | 1 | 17.50 | 17.50 | 17.50 |
| 44409 4/30/2005 WIP — EXP<br>4/1/05 R. Green lodging travel to Los Angeles re mediation | COST lod BOA.Moore | 1 | 181.39 | 181.39 | 181.39 ● |
| 44411 4/30/2005 WIP — EXP<br>3/31/05 R. Green parking travel to Los Angeles re mediation | COST trl BOA.Moore | 1 | 27.00 | 27.00 | 27.00 |

Ex. 2
94

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 44414 / 4/30/2005 / WIP / EXP / 4/12/05 J. Weling airfare travel to San Diego re hearing on 4/13/05 | COST / tr / BOA.Moore | 1 | 242.40 | 242.40 | 242.40 |
| 44401 / 4/30/2005 / WIP / EXP / 4/11/05 R. Green hotal praking travel to Los Angeles re mediation | COST / trl / BOA.Moore | 1 | 25.00 | 25.00 | 25.00 |
| 44805 / 4/30/2005 / WIP / EXP / Copies - Internal 4/05 | COST / cop / BOA.Moore | 168 | 0.30 | 50.40 | 50.40 |
| 44735 / 4/30/2005 / WIP / EXP / Postage 4/05 | COST / pos / BOA.Moore | 1 | 4.68 | 4.68 | 4.68 |
| 45792 / 5/3/2005 / WIP / TIME / Research re reasonable attorney lee rates in preparation of supponive argument re GW and like-firms hourly rates passed by federal judge. | KPB / +research / BOA.Moore | 0.83 / 0.00 | 140.00 T@S | 116.67 | 116.67 |
| 45256 / 5/4/2005 / WIP / TIME / Research case law re fee issues | RSG / +research / BOA.Moore | 1.30 / 0.00 | 425.00 T@S | 552.50 | 552.50 |
| 44583 / 5/4/2005 / WIP / TIME / Call w/S. Jacobs re status of getting an executed settlement agreement. | JWW / +settlement / BOA.Moore | 0.10 / 0.00 | 300.00 T@S | 30.00 | 30.00 |
| 44578 / 5/4/2005 / WIP / TIME / Call w/Mag. Major re: status conference of executing settlement documentation. | JWW / +court / BOA.Moore | 0.10 / 0.00 | 300.00 T@S | 30.00 | 30.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 44581 / 5/4/2005 / WIP / TIME / Email correspondence w/client re: signing settlement agreement | JWW / +settlement / BOA.Moore | 0.10 / 0.00 | 300.00 T@S | 30.00 | 30.00 |
| 44575 / 5/4/2005 / WIP / TIME / Call to client re: executed settlement agreement. | JWW / +settlement / BOA.Moore | 0.10 / 0.00 | 300.00 T@S | 30.00 | 30.00 ● |
| 45795 / 5/5/2005 / WIP / TIME / Research re reasonable attorney fee rates in preparation of supportive argument re GW and like-firms hourly rates passed by federal judge. | KPB / +research / BOA.Moore | 1.72 / 0.00 | 140.00 T@S | 240.33 | 240.33 |
| 45360 / 5/5/2005 / WIP / TIME / Review dates & email K. Brown re calendar change | JWP / +meetings/commu / BOA.Moore | 0.20 / 0.00 | 275.00 Do Not Bill | 55.00 | 0.00 |
| 45025 / 5/9/2005 / WIP / TIME / Email S. Jacobs re: receipt of orignal signatures and calendaring of the 10 day trigger. | JWW / +settlement / BOA.Moore | 0.10 / 0.00 | 300.00 T@S | 30.00 | 30.00 |
| 44993 / 5/11/2005 / WIP / TIME / Call w/S. Jacobs re: timing of affidavit and dismissal. Email J. Pinette to take care of same. | JWW / +settlement / BOA.Moore | 0.10 / 0.00 | 300.00 T@S | 30.00 | 30.00 ● |
| 45261 / 5/11/2005 / WIP / TIME / Research, draft fee brief issues memo | JWP / +pleadings/motions / BOA.Moore | 1.30 / 0.00 | 275.00 T@S | 357.50 | 357.50 |

Ex. 2
95

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate into / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45262 / 5/13/2005 / WIP — TIME<br>Research, draft fee brief issues memo | JWP / +pldgs/motions / BOA.Moore | 2.10 / 0.00 | 275.00 / T@S | 577.50 | 577.50 |
| 45259 / 5/13/2005 / WIP — TIME<br>Fee Brief Research and supporting document retrieval in preparation of settlement | KPB / +research / BOA.Moore | 4.25 / 0.00 | 140.00 / T@S | 595.00 | 595.00 |
| 45263 / 5/13/2005 / WIP — TIME<br>Fee Matrix research for Bay Area lawyers at various practicing levels for J Pillette | KPB / +research / BOA.Moore | 1.75 / 0.00 | 140.00 / T@S | 245.00 | 245.00 |
| 45257 / 5/13/2005 / WIP — TIME<br>Research case law re fee issues | RSG / +research / BOA.Moore | 1.50 / 0.00 | 425.00 / T@S | 637.50 | 637.50 |
| 44988 / 5/13/2005 / WIP — TIME<br>Meet w/ R. Green to plan fee brief schedule and allocation of associates | JWW / +pldgs/motions / BOA.Moore | 0.25 / 0.25 | 300.00 / T@S / Do Not Bill | 75.00 | 0.00 |
| 44990 / 5/13/2005 / WIP — TIME<br>Call S. Jacobs re availability for fee hearing. Call court re same. | JWW / +pldgs/motions / BOA.Moore | 0.10 / 0.00 | 300.00 / T@S | 30.00 | 30.00 |
| 45263 / 5/13/2005 / WIP — TIME<br>Research, draft fee brief issues memo | JWP / +pldgs/motions / BOA.Moore | 0.50 / 0.00 | 275.00 / T@S | 137.50 | 137.50 |
| 45264 / 5/13/2005 / WIP — TIME<br>Draft slip dismissal, email same to S Jacobs | JWP / +pldgs/motions / BOA.Moore | 0.80 / 0.00 | 275.00 / T@S | 220.00 | 220.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate into / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45258 / 5/16/2005 / WIP — TIME<br>Meet with J. Weiling and J. Pillete to lay out strategy and schedule for completing fee application | RSG / +pldgs/motions / BOA.Moore | 1.10 / 0.00 | 425.00 / T@S | 467.50 | 467.50 |
| 44965 / 5/17/2005 / WIP — TIME<br>Strategy and analysis of tasks & legal research necessary for fee application. Discuss legal research projects needed w/ R. Green, J Pillette. | JWW / +pldgs/motions / BOA.Moore | 0.75 / 0.00 | 300.00 / T@S | 225.00 | 22● |
| 45265 / 5/17/2005 / WIP — TIME<br>Research, draft fee brief issues memo, standards under TILA and 17200 | JWP / +pldgs/motions / BOA.Moore | 3.90 / 0.00 | 275.00 / T@S | 1072.50 | 1072.50 |
| 45266 / 5/17/2005 / WIP — TIME<br>Reese slip dismissal per S Jacobs edits, email same to S Jacobs, file | JWP / +pldgs/motions / BOA.Moore | 0.30 / 0.00 | 275.00 / T@S | 82.50 | 82.50 |
| 45267 / 5/18/2005 / WIP — TIME<br>Research, draft fee brief issues memo. | JWP / +pldgs/motions / BOA.Moore | 2.10 / 0.00 | 275.00 / T@S | 577.50 | 577.50 |
| 45268 / 5/19/2005 / WIP — TIME<br>Research, draft fee brief issues memo, standards under TILA and 17200 | JWP / +pldgs/motions / BOA.Moore | 2.00 / 0.00 | 275.00 / T@S | 550.00 | 550.00 |
| 45269 / 5/20/2005 / WIP — TIME<br>Research, draft fee brief issues memo, review Graham case for fee brief; analyze same | JWP / +pldgs/motions / BOA.Moore | 3.10 / 0.00 | 275.00 / T@S | 852.50 | 852.50 |

Ex. 2
96

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| **45391** 5/23/2005 WIP — TIME — Work w/ L. Cuesta to arrange time slip detail by date, time keeper, activity. Analyze slips for duplication in preparation for fee brief. | JWW +pldgs/motions BOA.Moore | 0.75 / 0.00 | 300.00 TO5 | 225.00 | 225.00 |
| **45390** 5/23/2005 WIP — TIME — Review J. Palette memorandum re: fee awards/standards. Discuss same w/ R. Green. Develop approach. Assess need for expert analysis. | JWW +pldgs/motions BOA.Moore | 3.50 / 0.00 | 300.00 TO5 | 1050.00 | 1050.00 |
| **45887** 5/24/2005 WIP — TIME — Legal research re: determination of allowable hours for intra-office conferences. | JWW +research BOA.Moore | 0.50 / 0.00 | 300.00 TO5 | 150.00 | 150.00 |
| **45383** 5/24/2005 WIP — TIME — Review time/slip detail for administrative and/or duplicative or erroneous entries for fee application | JWW +pldgs/motions BOA.Moore | 5.25 / 0.00 | 300.00 TO5 | 1575.00 | 1575.00 |
| **45887** 5/25/2005 WIP — TIME — Determine hourly rates awarded in Federal AFCA case; email same to R. Green and J. Welling | KPB +pldgs/motions BOA.Moore | 0.10 / 0.00 | 140.00 TO5 | 14.00 | 14.00 |
| **45388** 5/25/2005 WIP — TIME — Identify possible commingled time in slip detail for further analysis for fee application. | JWW +pldgs/motions BOA.Moore | 0.90 / 0.00 | 300.00 TO5 | 270.00 | 270.00 |
| **45919** 5/31/2005 WIP — EXP — R. Green and J. Welling 4/12/03 dinner, travel to San Diego re: hearing. | COST trt BOA.Moore | 1 | 143.87 | 143.87 | 143.87 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| **45920** 5/31/2005 WIP — EXP — R. Green 4/12/05 airfare, travel to San Diego re hearing. | COST trt BOA.Moore | 1 | 242.40 | 242.40 | 242.40 |
| **45916** 5/31/2005 WIP — EXP — R. Green and J. Welling 4/13.05 meals travel to San Diego re: hearing. | COST trt BOA.Moore | 1 | 41.78 | 41.78 | 41.78 |
| **45917** 5/31/2005 WIP — EXP — R. Green 4/13/05 lodging San Diego re: hearing. | COST trt BOA.Moore | 1 | 230.95 | 230.95 | 230.95 |
| **45921** 5/31/2005 WIP — EXP — R. Green 4/13/05 parking, travel to San Diego re hearing. | COST trt BOA.Moore | 1 | 32.00 | 32.00 | 32.00 |
| **45918** 5/31/2005 WIP — EXP — R. Green 4/13/05 parking, travel to San Diego re: hearing. | COST trt BOA.Moore | 1 | 28.45 | 28.45 | 28.45 |
| **45922** 5/31/2005 WIP — EXP — One Legal 5/17/05 | COST tt BOA.Moore | 1 | 71.00 | 71.00 | 71.00 |
| **45923** 5/31/2005 WIP — EXP — R. Green 4/13/05 taxis and parking, travel to San Diego re hearing. | COST trt BOA.Moore | 1 | 90.00 | 90.00 | 90.00 |
| **45937** 5/31/2005 WIP — TIME — Review time/slip detail for mis-entered/mis-allocated time; make corrections. | JWW +pldgs/motions BOA.Moore | 0.30 / 0.00 / 0.00 | 300.00 TO5 | 90.00 | 90.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45732<br>5/31/2005<br>WIP EXP<br>Copies - Internal 5/05 | COST<br>cop<br>BOA.Moore | 211<br>0.00<br>0.00 | 0.30<br>T@S | 63.30 | 63.30 |
| 45709<br>5/31/2005<br>WIP EXP<br>Facsimile 5/05 | COST<br>fax<br>BOA.Moore | 12 | 2.00 | 24.00 | 24.00 |
| 45691<br>5/31/2005<br>WIP EXP<br>Postage 5/05 | COST<br>pos<br>BOA.Moore | 1 | 1.11 | 1.11 | 1.11 |
| 46757<br>6/1/2005<br>WIP TIME<br>Research for Memorandum regarding compensation for travel time for J. Welling and R. Green | FHW<br>+research<br>BOA.Moore | 6.00<br>0.00<br>0.00 | 0.00<br>T@S | 0.00 | 0.00 |
| 45830<br>6/1/2005<br>WIP TIME<br>Meet w/both summer associates to explain legal research projects needed for fee brief (recoverable costs and travel time). | JWW<br>+research<br>BOA.Moore | 1.00<br>0.00<br>0.00 | 300.00<br>T@S | 300.00 | 300.00 |
| 45822<br>6/1/2005<br>WIP TIME<br>Edit 2003 timeslip entries to translate internal short-hand into slips court can decide. | JWW<br>+pldgs/motions<br>BOA.Moore | 1.10<br>0.00<br>0.00 | 300.00<br>T@S | 330.00 | 330.00 |
| 46748<br>6/2/2005<br>WIP TIME<br>Finish Moore memorandum and make revisions | HEA<br>+research<br>BOA.Moore | 2.00<br>0.00<br>0.00 | 0.00<br>T@S | 0.00 | 0.00 |
| 46417<br>6/2/2005<br>WIP TIME<br>Call S. Jacobs to set up call to discuss parameters of sharing time slip detail in effort to resolve the case. | JWW<br>+settlement<br>BOA.Moore | 0.10<br>0.00<br>0.00 | 300.00<br>T@S | 30.00 | 30.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 45806<br>6/2/2005<br>WIP TIME<br>Call S. Jacobs to set up call to discuss parameters of sharing time slip detail in effort to resolve the case. | JWW<br>+settlement<br>BOA.Moore | 0.10<br>0.00<br>0.00 | 300.00<br>T@S | 30.00 | 30.00 |
| 46759<br>6/2/2005<br>WIP TIME<br>Redraft Memorandum to address new concerns | FHW<br>+research<br>BOA.Moore | 5.00<br>0.00<br>0.00 | 0.00<br>T@S | 0.00 | ● |
| 45812<br>6/2/2005<br>WIP TIME<br>Review timeslip entries w/ K. Brown for clarification of tasks. Request more detail from J. Pilette re: entries w/ "research M & C" | JWW<br>+pldgs/motions<br>BOA.Moore | 0.30<br>0.00<br>0.00 | 300.00<br>T@S | 90.00 | 90.00 |
| 45816<br>6/2/2005<br>WIP TIME<br>Review HEA and FHW research re: cost recoverable and travel time recoverability. | JWW<br>+research<br>BOA.Moore | 0.75<br>0.00<br>0.00 | 300.00<br>T@S | 225.00 | 225.00 |
| 45800<br>6/2/2005<br>WIP TIME<br>Call w/S. Jacobs re: providing advance look at fee information to avoid expense of briefing. | JWW<br>+settlement<br>BOA.Moore | 0.30<br>0.00<br>0.00 | 300.00<br>T@S | 90.00 | 90.00 |
| 45785<br>6/6/2005<br>WIP TIME<br>Review revised memorandum re: travel time reimbursement and costs. Give feedback to FHW aon HEA re: same. | JWW<br>+pldgs/motions<br>BOA.Moore | 0.30<br>0.00<br>0.00 | 300.00<br>T@S | 90.00 | ● |
| 45769<br>6/7/2005<br>WIP TIME<br>Review time to redact Atty-client priv. and clarify meet and confer topics. | JWW<br>+pldgs/motions<br>BOA.Moore | 1.70<br>0.00<br>0.00 | 300.00<br>T@S | 510.00 | 510.00 |

Ex. 2
98

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV / Adjustment / Markup |
|---|---|---|---|---|---|
| 45773 / 6/7/2005 / WIP / TIME — Telephonic status conference w/J. Major. | JWW +court BOA.Moore | 0.10 / 0.00 | 300.00 T@5 | 30.00 | 30.00 |
| 46706 / 6/10/2005 / WIP / TIME — Legal research re: discretion to award amount of fees under TILA and how courts have exercised that discretion. | JWW +research BOA.Moore | 3.00 / 0.00 | 300.00 T@5 | 900.00 | 900.00 |
| 46620 / 6/14/2005 / WIP / TIME — Return S. Jacobs call re: exchange of slip detail in an offer of proof prior to fee briefing. | JWW +pldgs/motions BOA.Moore | 0.20 / 0.00 | 300.00 T@5 | 60.00 | 60.00 |
| 46602 / 6/17/2005 / WIP / TIME — Call w/S. Jacobs to clarify no waiver of a-c privilege or w-p protection; discuss scope of confidentiality clause vis a vis experts and briefing. Email him detail. | JWW +pldgs/motions BOA.Moore | 0.20 / 0.00 | 300.00 T@5 | 60.00 | 60.00 |
| 46533 / 6/27/2005 / WIP / TIME — Outline argument for fee brief. | JWW +research BOA.Moore | 0.60 / 0.00 | 300.00 T@5 | 180.00 | 180.00 |
| 46634 / 6/27/2005 / WIP / TIME — Review case notes for recent TILA fee opinions. | JWW +research BOA.Moore | 0.40 / 0.00 | 300.00 T@5 | 120.00 | 120.00 |
| 46622 / 6/28/2005 / WIP / TIME — Renew TILA case law re: prevailing party and standard for fee award to draft legal standard section. | JWW +meetings/commu BOA.Moore | 2.00 / 0.00 | 300.00 T@5 | 600.00 | 600.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Info / Bill Status | Slip Value | Billed SV / Adjustment / Markup |
|---|---|---|---|---|---|
| 46794 / 6/30/2005 / WIP / EXP — Long Distance 6/05 | COST ld BOA.Moore | | 3.12 | 3.12 | 3.12 |
| 46821 / 6/30/2005 / WIP / EXP — Spincycle 5/13/05 | COST mes BOA.Moore | 1 | 68.50 | 68.50 | 68.50 ● |
| 46822 / 6/30/2005 / WIP / EXP — 3/31/05 J. Welling meals travel to Los Angeles | COST trl BOA.Moore | 1 | 8.30 | 8.30 | 8.30 |
| 46434 / 6/30/2005 / WIP / EXP — Postage 6/05 | COST pos BOA.Moore | 1 | 2.03 | 2.03 | 2.03 |
| 46823 / 6/30/2005 / WIP / EXP — Federal Express 5/26/05 | COST oes BOA.Moore | 1 | 15.50 | 15.50 | 15.50 |
| 46702 / 7/3/2005 / WIP / TIME — Legal research to assist in determine best bases for fee award and alternate bases. Read Graham, Beasley. | JWW +research BOA.Moore | 1.50 / 0.00 | 300.00 T@5 | 450.00 | 450.00 |
| 46866 / 7/5/2005 / WIP / TIME — Conference with R. Pearl to discuss timing of fee petition, evidence regarding reasonable rates, structure and arguments to be included | RSG +meetings/commu BOA.Moore | 0.50 / 0.00 | 425.00 T@5 | 212.50 | 212.50 ● |
| 46687 / 7/5/2005 / WIP / TIME — Read Leallao, Thayer; note areas where expert declaration is needed and useful ways of explaining/comparing work for fee app. | JWW +research BOA.Moore | 2.00 / 0.00 | 300.00 T@5 | 600.00 | 600.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate Info Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 46898 TIME / 7/5/2005 / WIP / Email S. Jacobs re: analysis of time to see if briefing expenses can be avoided. | JWW +settlement BOA.Moore | 0.10 / 0.00 | 300.00 T@S | 30.00 | 30.00 |
| 46878 TIME / 7/6/2005 / WIP / Read Noyes, Daws, note downward adjustments and analysis of multiple attorney time. Read Barrios for post-Buchanon prevailing analysis in 9th Circuit. | JWW +research BOA.Moore | 1.40 / 0.00 | 300.00 T@S | 420.00 | 420.00 |
| 46680 TIME / 7/6/2005 / WIP / Contingency as an enhancement under TLA and 1021.5. | JWW +research BOA.Moore | 1.00 / 0.00 | 300.00 T@S | 300.00 | 300.00 |
| 46690 TIME / 7/6/2005 / WIP / Call w/S. Jacobs re: resolving fee issue instead of briefing it. He indicates his client would rather brief it. | JWW +settlement BOA.Moore | 0.20 / 0.00 | 300.00 T@S | 60.00 | 60.00 |
| 46867 TIME / 7/6/2005 / WIP / Research re TLA experts, communications with potential experts, research re significance of importance of accuracy in credit reporting, telephone conference with R. Pearl to further discuss evidentiary support and case law for fee petition | RSG +research BOA.Moore | 1.40 / 0.00 | 425.00 T@S | 595.00 | 595.00 |
| 46879 TIME / 7/6/2005 / WIP / Outline topics for expert (Pearl) declaration based on review of legal research and unique aspects of this litigation. | JWW +pldgs/motions BOA.Moore | 1.60 / 0.00 | 300.00 T@S | 480.00 | 480.00 |
| 46868 TIME / 7/7/2005 / WIP | RSG +research BOA.Moore | 2.70 / 0.00 | 425.00 T@S | 1147.50 | 1147.50 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units DNB Time / Variance | Rate / Rate Info Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 46898 ... Review activities supporting and opposing fees requests in TLA actions and under California section 1021.5; assess strengths and weaknesses of arguments in fee petition and supporting evidence | | 0.00 | | | ● |
| 46664 TIME / 7/7/2005 / WIP / Outline memorandum in support of fees; include core case citations, general factual arguments; re-arrange for persuasive impact. | JWW +pldgs/motions BOA.Moore | 5.20 / 0.00 | 300.00 T@S | 1560.00 | 1560.00 |
| 46668 TIME / 7/7/2005 / WIP / List areas for billing adjustments to be calculated by K. Brown for us in attorney decl. in support of fee brief. | JWW +pldgs/motions BOA.Moore | 1.30 / 0.00 | 300.00 T@S | 390.00 | 390.00 |
| 46669 TIME / 7/7/2005 / WIP / Begin draft declaration in support of fee brief. Draft section on billing judgment reductions to the lodestar. | JWW +pldgs/motions BOA.Moore | 2.00 / 0.00 | 300.00 T@S | 600.00 | 600.00 |
| 46677 TIME / 7/7/2005 / WIP / Strategy and analysis w/ R. Green re: TILA basis or section 1021.5 basis for fee request. | JWW +pldgs/motions BOA.Moore | 0.60 / 0.00 | 300.00 T@S | 180.00 | 180.00 |
| 46869 TIME / 7/7/2005 / WIP / Conference with R. Le Febvre re TILA and significance of accuracy in credit reporting and potential expert testimony re same | RSG +meetings/commu BOA.Moore | 2.10 / 0.00 | 425.00 T@S | 892.50 | ● |
| 46895 TIME / 7/8/2005 / WIP / Draft attorney declaration in support of fee/costs motion. Draft overview of use of activity codes, describe each code and billing covenions. Detail hours expended in Court Appearances, and class cert sections. | JWW +pldgs/motions BOA.Moore | 8.00 / 0.00 | 300.00 T@S | 2400.00 | 2400.00 |

Ex. 2
100

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 46885 7/8/2005 ExP WIP — Retainer deposit for Richard F. Le Febvre | COST exp BOA.Moore | 1 | 2500.00 | 2500.00 | 2500.00 |
| 46896 7/9/2005 TIME WIP — Detail meetings/communications. Research/case assessment, and deposition hours expended in declaration for fee brief. | JWW +pldgs/motions BOA.Moore | 4.80 0.00 0.00 | 300.00 T@S | 1440.00 | 1440.00 |
| 46891 7/11/2005 TIME WIP — Email correspondence w/R. Pearl re: fee brief outline. Review recent briefing he drafted. Set up meeting time to discuss same. | JWW +pldgs/motions BOA.Moore | 0.70 0.00 0.00 | 300.00 T@S | 210.00 | 210.00 |
| 46893 7/11/2005 TIME WIP — Review pleadings and discovery indices for overall timeline of action for brief organization. | JWW +pldgs/motions BOA.Moore | 0.60 0.00 0.00 | 300.00 T@S | 180.00 | 180.00 |
| 46894 7/11/2005 TIME WIP — Review time slip detail by chron, activity, timekeeper, billable and un-billable to ensure is accurate. | JWW +pldgs/motions BOA.Moore | 1.70 0.00 0.00 | 300.00 T@S | 510.00 | 510.00 |
| 46892 7/11/2005 TIME WIP — Draft settlement portion of declaration in support of fee brief. | JWW +pldgs/motions BOA.Moore | 1.60 0.00 0.00 | 300.00 T@S | 480.00 | 480.00 |
| 46897 7/11/2005 TIME WIP — Go through all time entries to ensure entries are billed to most appropriate activity code and "Do Not Bill" entries are accurate. | JWW +pldgs/motions BOA.Moore | 1.30 0.00 0.00 | 300.00 T@S | 390.00 | 390.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into / Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 46898 7/11/2005 TIME WIP — Review notes, emails, etc. or settlement activities in preparation for drafting declaration re: same | JWW +pldgs/motions BOA.Moore | 2.90 0.00 Variance | 300.00 T@S | 870.00 | 870.00 |
| 46890 7/11/2005 TIME WIP — Conference with R. Pearl re: expert declaration and fee brief organization. | JWW +pldgs/motions BOA.Moore | 1.00 0.00 0.00 | 300.00 T@S | 300.00 | 300.00 |
| 46870 7/12/2005 TIME WIP — Conference with R. Pearl re: structure of outline for fee petition and documents on supporting declarations from other counsel | RSG +meetings/commu BOA.Moore | 0.40 0.00 0.00 | 425.00 T@S | 170.00 | 170.00 |
| 46889 7/13/2005 TIME WIP — Revise outline to reflect TILA, expert suggestions. | JWW +pldgs/motions BOA.Moore | 0.30 0.00 0.00 | 300.00 T@S | 90.00 | 90.00 |
| 46887 7/13/2005 TIME WIP — Draft document discovery section of declaration in support of fee motion. | JWW +pldgs/motions BOA.Moore | 5.00 0.00 0.00 | 300.00 T@S | 1500.00 | 1500.00 |
| 46888 7/13/2005 TIME WIP — Draft the pleadings section of declaration in support of fee brief. Re-calculate hours spent on basis litigation v those spent on fees | JWW +pldgs/motions BOA.Moore | 7.00 0.00 0.00 | 300.00 T@S | 2100.00 | 2100.00 |
| 46871 7/15/2005 TIME WIP — Research re: section 1021.5, review cases cited in outline, review and analyze publications regarding accuracy in credit reporting | RSG +research BOA.Moore | 3.60 0.00 0.00 | 425.00 T@S | 1530.00 | 1530.00 |

Ex. 2
101

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 46872<br>7/17/2006<br>WIP    TIME<br>Further research and analysis of publications regarding public importance of accuracy in credit reporting and historical underpinnings for provisions of TILA and the FCBA, work on drafting section 1021.5 portion of fee petition | RSG<br>+research<br>BOA.Moore | 3.10<br>0.00 | 425.00<br>T@5 | 1317.50 | 1317.50 |
| 46873<br>7/18/2005<br>WIP    TIME<br>Continue working on fee petition, organizing and communicating with experts re community risks and significance of TILA, review and assess internal time and billing records and continue drafting section 1021.5 portions of fee petition | RSG<br>+pldgs/motions<br>BOA.Moore | 2.50<br>0.00 | 425.00<br>T@5 | 1062.50 | 1062.50 |
| 46886<br>7/18/2005<br>WIP    TIME<br>Draft pleadings description in declaration in support of fee brief. | JWW<br>+pldgs/motions<br>BOA.Moore | 2.00<br>0.00 | 300.00<br>T@5 | 600.00 | 600.00 |
| 46874<br>7/19/2006<br>WIP    TIME<br>Continue working on fee petition and coordination of related expert declarations, section 1021.5 factors and legislative history for Fair Credit Billing Act. | RSG<br>+pldgs/motions<br>BOA.Moore | 3.20<br>0.00 | 425.00<br>T@5 | 1360.00 | 1360.00 |
| 46883<br>7/19/2005<br>WIP    TIME<br>Draft background section of brief in support of attorneys' fees. | JWW<br>+pldgs/motions<br>BOA.Moore | 3.90<br>0.00 | 300.00<br>T@5 | 1170.00 | 1170.00 |
| 46885<br>7/19/2005<br>WIP    TIME<br>Read through entire draft declaration. Turn over to K. Brown to make hand notations of hours calculated for certain tasks discussed in declaration. Edits to structure and content. | JWW<br>+pldgs/motions<br>BOA.Moore | 2.20<br>0.00 | 300.00<br>T@5 | 660.00 | 660.00 |

| Slip ID / Dates and Time / Posting Status / Description | Timekeeper / Activity / Case | Units / DNB Time / Variance | Rate / Rate Into Bill Status | Slip Value | Billed SV Adjustment Markup |
|---|---|---|---|---|---|
| 46875<br>7/20/2005<br>WIP    TIME<br>Review and edit Welling declaration in support of fee petition, continue drafting section 1021.5 portion of fee petition, complete review of applicable case law and supporting documentation re same, continue coordinating expert declarations | RSG<br>+pldgs/motions<br>BOA.Moore | 4.00<br>0.00 | 425.00<br>T@5 | 1700.00 | ● 1700.00 |
| 46884<br>7/20/2005<br>WIP    TIME<br>Complete billing judgment reductions, draft that portion of reductions, double check accuracy of reductions. | JWW<br>+pldgs/motions<br>BOA.Moore | 1.70<br>0.00 | 300.00<br>T@5 | 510.00 | ● 510.00 |
| 46876<br>7/21/2005<br>WIP    TIME<br>Telephone conversations with R. Pearl and R. La Fleire re declarations in support of fee petition, work on drafting factual sections and case chronology portions of fee petition, further review and editing of Welling declaration in support of fee brief | RSG<br>+meetings/commu<br>BOA.Moore | 9.00<br>0.00 | 425.00<br>T@5 | 3825.00 | 3825.00 |
| 46878<br>7/21/2005<br>WIP    TIME<br>Draft Notice of Motion, redraft number of hours claimed section, update declaration for cited evidence. | JWW<br>+pldgs/motions<br>BOA.Moore | 3.30<br>0.00 | 300.00<br>T@5 | 990.00 | 990.00 |
| 46880<br>7/21/2005<br>WIP    TIME<br>Draft TILA mandatory entitlement section of brief, hourly rate section | JWW<br>+pldgs/motions<br>BOA.Moore | 6.60<br>0.00 | 300.00<br>T@5 | 1960.00 | ● 1960.00 |
| 46881<br>7/21/2005<br>WIP    TIME<br>Draft adjustment to lodestar section, redraft portions of declaration per R. Pearl. | JWW<br>+pldgs/motions<br>BOA.Moore | 4.20<br>0.00 | 300.00<br>T@5 | 1260.00 | 1260.00 |

Ex. 2
102

| Slip ID<br>Dates and Time<br>Posting Status<br>Description | Timekeeper<br>Activity<br>Case | Units<br>DNB Time<br>Variance | Rate<br>Rate Info<br>Bill Status | Slip Value | Billed SV<br>Adjustment<br>Markup |
|---|---|---|---|---|---|
| 46880      TIME<br>7/21/2005<br>WIP<br>Draft legal context and cost sections of brief | JWW<br>+pldgs/motions<br>BOA.Moore | 2.90<br>0.00<br>0.00 | 300.00<br>T@5 | 870.00 | 870.00 |
| 46877      TIME<br>7/22/2005<br>WIP<br>Telephone conversations with R. Pearl and R. Le Febvre re declarations in support of fee petition, work on drafting factual sections and case chronology portions of fee petition, further review and editing of Welling declaration in support of fee brief | RSG<br>+pldgs/motions<br>BOA.Moore | 9.00<br>0.00<br>0.00 | 425.00<br>T@5 | 3825.00 | 3825.00 |
| 46879      TIME<br>7/22/2005<br>WIP<br>Proof declaration; ensure exhibits are accurately described; recheck calculations for lodestar and billing judgment reductions. | JWW<br>+pldgs/motions<br>BOA.Moore | 2.20<br>0.00<br>0.00 | 300.00<br>T@5 | 660.00 | 660.00 |

| Grand Total | | | | | |
|---|---|---|---|---|---|
| | Billable | 1554.62 | | 482201.11 | 482201.11 |
| | Unbillable | 56.62 | | 9566.83 | |
| | Total | 1611.24 | | 491767.94 | |

Legal Tabs Co. 1-800-322-3022

Recycled Stock #WEX-5-B

RECEIVED

03 FEB 14 PM 2:20

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA.

FILED

FEB 2 8 2003

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DADRA MITCHELL, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> BANKFIRST, PHILLIP A. GRAY, an individual, AMERICAN FAIR CREDIT ASSOCIATION, INC., a Colorado corporation, UICI, a Delaware corporation, UNITED MEMBERSHIP MARKETING GROUP, LLC, a Colorado limited liability company, <br><br> Defendants. | Case No. C-97-1421-MMC <br><br> ENTERED IN CIVIL DOCKET_____  2-28-03<br><br> [~~PROPOSED~~] ORDER GRANTING PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES |

The law firms approved by this Court as Class Counsel, in connection with the class action settlement in this case, have moved for an award of attorneys' fees in the amount of $2.2 million, and for reimbursement of expenses in the amount of $114,355. The Court heard the motion February 28, 2003. The Court finds and orders as follows.

Class Counsel seek their fee under the lodestar-multiplier approach. The requested fee represents Class Counsel's lodestar enhanced by a multiplier of approximately 1.19. The Court has evaluated Class Counsel's fee request under the factors set forth in <u>Kerr v. Screen Extras Guild, Inc.</u>, 526 F.2d 67 (9th Cir. 1975), <u>cert. denied</u>, 425 U.S. 951 (1976), and finds that the lodestar and

1  requested multiplier are reasonable under all the circumstances, including the length and complexity

2  of the federal litigation, the contingent risk borne by Class Counsel, the benefits obtained for the

3  class through the settlement, multipliers applied in similar cases, and a "cross-check" of the

4  requested fee under the percentage-of-recovery approach.

5      Therefore, the Court grants Class Counsel's request for an award of attorneys' fees in the

6  amount of $2.2 million. The Court also grants Class Counsel's request for reimbursement of

7  expenses in the amount of $114,355. These amounts are to be paid from the cash fund established

8  under the settlement, plus interest at the same rate earned by the fund.

9      It is so ordered.

12  DATED: ___FEB 2 8 2003___

THE HONORABLE MAXINE M. CHESNEY
UNITED STATES DISTRICT JUDGE

United States District Court
for the
Northern District of California
February 28, 2003

\* \* CERTIFICATE OF SERVICE \* \*


Case Number:3:97-cv-01421


Mitchell

    vs

Bankfirst NA

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Northern District of California.

That on  February 28, 2003, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office.

        Daniel C. Girard, Esq.
        Girard Gibbs & De Bartolomeo LLP
        601 California St.
        Ste 1400
        San Francisco, CA  94104

        Jane Michaels, Esq.
        Holland & Hart LLP
        555 17th Street, Suite 3200
        Denver, CO  80202

        Timothy M. Flaherty, Esq.
        Lanahan & Reilley, LLP
        120 Howard Street, Suite 600
        San Francisco, CA  94105

        Douglas L. Hendricks, Esq.
        Morrison & Foerster LLP
        425 Market St
        San Francisco, CA  94105-2482

        Christopher Murphy, Esq.
        Mayer Brown Rowe & Maw
        350 South Grand Avenue, 25th Floor
        Los Angeles, CA  90071-1503

Richard W. Wieking, Clerk

BY: _Tracy Lucero_
Deputy Clerk

1  Daniel C. Girard (State Bar No. 114826)
   Eric H. Gibbs (State Bar No. 178658)
2  Ann Saponara (State Bar No. 173099)
   **GIRARD GIBBS & De BARTOLOMEO LLP**
3  601 California Street, Suite 1400
   San Francisco, California 94108
4  Telephone: (415) 981-4800
   Facsimile: (415) 981-4846
5
   Robert S. Green (State Bar No. 136183)
6  Jenelle W. Welling (State Bar No. 209480)
   **GREEN & JIGARJIAN LLP**
7  235 Pine Street, 15th Floor
   San Francisco, California 94104
8  Telephone: (415) 477-6700
   Facsimile: (415) 477-6710
9
   Jane Michaels
10 Peter Houtsma
   Jennifer Harvey
11 **HOLLAND & HART LLP**
   555 Seventeenth Street, Suite 3200
12 Denver, Colorado 80202-3979
   Telephone: (303) 295-8000
13 Facsimile: (303) 295-8261

14 Class Counsel

15           IN THE UNITED STATES DISTRICT COURT

16        FOR THE NORTHERN DISTRICT OF CALIFORNIA

17
   DADRA MITCHELL, on behalf of herself )  Case No. C-97-1421-MMC
18 and all others similarly situated,    )
                                         )
19              Plaintiff,               )
                                         )  **DECLARATION OF DANIEL C. GIRARD**
20       v.                              )  **IN SUPPORT OF FINAL SETTLEMENT**
                                         )  **APPROVAL AND PLAINTIFFS' MOTION**
21 BANKFIRST, a South Dakota banking     )  **FOR AN AWARD OF ATTORNEYS' FEES**
   corporation, AMERICAN FAIR CREDIT     )  **AND REIMBURSEMENT OF EXPENSES**
22 ASSOCIATION, INC., a Colorado         )
   corporation, UNITED MEMBERSHIP        )
23 MARKETING GROUP, LLC, a Colorado      )
   limited liability corporation, UICI, a )  Date:   February 28, 2003
24 Delaware corporation, and PHILLIP A.  )  Time:   9:00 a.m.
   GRAY, an individual,                  )  Before: The Honorable Maxine M. Chesney
25              Defendants.              )
                                         )
26 _____ )

27

28

I, Daniel C. Girard, declare as follows:

1.     I am a member in good standing of the State Bar of California. I am a partner in Girard Gibbs & De Bartolomeo LLP ("Girard Gibbs"), one of the three firms appointed as Class Counsel by this Court's Order Provisionally Certifying Settlement Class, Directing Dissemination Of Notice Of Proposed Class Action Settlement, And Setting Hearing On Final Settlement Approval, dated December 27, 2002. Girard Gibbs was previously known as Girard & Green, LLP. Girard Gibbs filed this action as co-counsel with Robins Kaplan Miller & Ciresi. I have personal knowledge of the facts stated herein and, if called on to do so, could and would testify competently thereto.

2.     I submit this declaration in support of Plaintiffs' motion for final approval of the proposed class action settlement in this action and in support of Plaintiffs' motion for an award of attorneys' fees and reimbursement of expenses. I discuss, in the following order, (a) the history of the case, which sheds light on the amount of work required of Class Counsel in this matter; (b) issues relating to the fairness of the proposed settlement, including Class Counsel's responses to class member inquiries and class member reaction; and (c)  the time, rate, and expense figures underlying Plaintiffs' motion for fees and expenses.

I.     **HISTORY OF THE CASE**

    A.     **October 1996-April 1997:  Filing Of _Collins_; Motion To Dismiss Granted And Appeal Filed**

3.     On October 23, 1996, Class Counsel filed Collins v. Bankfirst, N.A., Case No. C-96-3845-MMC, in the United States District Court for the Northern District of California, on behalf of Doreen Collins and a class of other former and current members of the American Fair Credit Association, Inc. ("AFCA"). The case was assigned to this Court. Collins arose out of a credit repair program operated under the AFCA name by AFCA, United Membership Marketing Group ("UMMG"), and United Insurance Companies, Inc., now known as UICI ("UICI"). One of the benefits AFCA claimed to offer its members was the opportunity to apply for an "Affinity" Visa credit card, available to AFCA members only. When Collins was filed, the issuer of the Affinity credit card was Bankfirst, N.A., now BANKFIRST ("BANKFIRST"). The original complaint in

1 Collins was brought against BANKFIRST only, and alleged that it violated the Truth In Lending Act,

2 15 U.S.C. § 1601 et seq., by failing to disclose AFCA's monthly membership dues as a finance

3 charge for the Affinity credit card account.

4     4.    On November 25, 1996, plaintiff Collins filed a first amended complaint, adding

5 AFCA, UMMG, and UICI as additional defendants and asserting claims for violations of TILA, the

6 California Credit Services Act of 1984, Cal. Civ. Code § 1789.10 et seq., and section 17200 et seq.

7 of the California Business and Professions Code.

8     5.    On January 17, 1997, Defendants jointly filed a motion to dismiss the first amended

9 complaint for failure to state a claim. On March 14, 1997, this Court heard the motion. On

10 March 25, 1997, the Court issued an order dismissing the TILA claims with prejudice and the state-

11 law claims without prejudice.

12     6.    On April 18, 1997, plaintiff Collins filed her notice of appeal from the Court's

13 judgment.

14

15     **B**    **April-August 1997: Filing of Original Complaint And Motion To Dismiss In** *Mitchell*; **Filing Of Appellant's Brief in** *Collins*

16     7.    On April 21, 1997, Class Counsel filed the above-captioned action in the United

17 States District Court for the Northern District of California on behalf of Dadra Mitchell and a class

18 of other former and current AFCA members. The original complaint in Mitchell was brought against

19 BANKFIRST only, and alleged that it violated TILA by failing to disclose, in the initial disclosure

20 statement for the Affinity credit card, AFCA's requirement that to terminate membership, an AFCA

21 member must give 90 days' advance notice by hand delivery or certified mail and continue paying

22 membership dues during that 90-day period ("90-Day Requirement"). Mitchell was originally

23 assigned to United States District Judge Susan Illston.

24     8.    Pursuant to Civil Local Rule 3-13(b), Plaintiff filed a Notice Of Pendency Of Other

25 Action Or Proceeding on April 30, 1997, advising Judge Illston that the Collins appeal was pending

26 in the Ninth Circuit Court of Appeals.

27     9.    On May 21, 1997, Mitchell was ordered related to Collins, and assigned to this Court.

28

1 exclusion request. None of the people who submitted these exclusion requests cited any

2 dissatisfaction with the settlement as a basis for requesting exclusion.

3      77.    After evaluating the class member response to date, I continue to believe the proposed

4 settlement is fair, reasonable, and adequate for the class as a whole. Named Plaintiff Dadra Mitchell

5 has reviewed and approved the terms of the proposed settlement and authorized me to seek final

6 settlement approval.

7 **III.    CLASS COUNSEL'S FEE AND EXPENSE FIGURES**

8      78.    The firms of Girard Gibbs and Robins Kaplan Miller & Ciresi LLP ("Robins

9 Kaplan") were initially retained by Dadra Mitchell in this matter. Around March 2000, after the

10 previous settlement efforts in this action foundered after months of negotiation, the partner in charge

11 of this action on behalf of Robins Kaplan retired for reasons unrelated to the case. Thereafter,

12 Robins Kaplan stopped assigning attorneys to staff this matter and expressed no further interest in

13 working on the case. Robins Kaplan has not participated in the litigation or otherwise provided any

14 services in this case since 1999.

15      79.    Based on the records of Girard Gibbs and the Green Firm, in <u>Mitchell v.</u>

16 <u>BANKFIRST</u>, these two firms have expended at least 2,002 hours, representing a lodestar of

17 $808,046 at their current hourly rates, and incurred $1,284 in expenses to date. Based on such

18 records, in <u>Roe</u> and the ensuing arbitration actions brought in the United States District Court for the

19 Eastern District of North Carolina, these two firms have expended at least 1,231 hours, representing

20 a lodestar of $442,469 at their current hourly rates, and incurred $39,212 in expenses to date. As

21 stated in paragraph 54 of the accompanying Declaration Of Jane Michaels In Support Of Final

22 Approval Of Class Action Settlement And In Support Of Plaintiffs' Counsel's Application For Fees

23 And Expenses, in <u>Roe</u> and the arbitration actions, Holland & Hart has expended 2,129 hours,

24 representing a lodestar of $601,908.50 at its current hourly rates, and incurred $73,862.31 in

25 expenses to date. Thus, in <u>Mitchell v. BANKFIRST, Roe</u>, and the arbitration actions, Girard Gibbs,

26 the Green Firm, and Holland & Hart LLP have collectively expended 5,361 hours, representing an

27 aggregate lodestar of $1,852,426 at their current hourly rates, and incurred $114,355 in expenses to

28 date.

1    80.    Based on the records of Girard Gibbs, in <u>Collins</u>, the firm expended 736 hours,

2    representing a lodestar of $327,248 at its current hourly rates, and incurred $3,474 in expenses.

3    Plaintiffs, however, are not seeking compensation for this time or reimbursement of these expenses.

4        81.    The hourly rates for the timekeepers included in the lodestar figure for Girard Gibbs

5    and the Green Firm are as follows:

| | Timekeeper | Rate |
|---|---|---|
| Attorneys: | Amelia F. Burroughs | 280.00 |
| | Charles F. Carbone | 240.00 |
| | Anthony L. Critchlow | 260.00 |
| | A.J. De Bartolomeo | 440.00 |
| | Gordon M. Fauth | 400.00 |
| | Eric H. Gibbs | 440.00 |
| | Daniel C. Girard | 550.00 |
| | Robert S. Green | 420.00 |
| | Stephen W. Gruen | 175.00 |
| | Anthony K. Lee | 345.00 |
| | Martin S. Putnam | 300.00 |
| | Rosemary M. Rivas | 200.00 |
| | A. Saponara | 360.00 |
| | James A. Smith | 320.00 |
| | J. Welling | 300.00 |
| Paralegals: | Cary S. Davalos | 200.00 |
| | Rosanne L. Mah | 140.00 |

17        82.    Although most of the firm's practice consists of representing consumers and investors

18    in class action and contingent-fee litigation, Girard Gibbs also provides services on an hourly-rate

19    basis. During the pendency of this litigation, the firm has provided services on an hourly-rate basis

20    to such clients as NuSkin International, Inc., a company traded on the New York Stock Exchange;

21    Kennetech Corporation, a NASDAQ-listed company; the State of Wisconsin Investment Board, the

22    California Public Employees Retirement System ("CalPERS"), the California State Teachers'

23    Retirement System ("CalSTRS"), and the Kansas Public Employees Retirement System ("KPERS");

24    Certain Underwriters at Lloyd's, an insurance syndicate; and various professional-services firms and

25    individuals, including an accounting firm and the former chief executive officer of a publicly traded

26    company. The hourly rates set forth for Girard Gibbs' attorneys and paralegals are the firm's current,

27    customary rates for non-contingent matters.

28

John W. Pillette
**GREEN & JIGARJIAN, LLP**
235 Pine Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 477-6700
Fax: (415) 477-6710

Jonathan D. Fink
**BUCHALTER, NEMER,**
**FIELDS & YOUNGER**
A Professional Corporation
601 South Figueroa Street, 24th Floor
Los Angeles, CA 90017
Tel: (213) 891-0700
Fax: (213) 896-0400

July 23, 2004

<u>**VIA FACSIMILE**</u>
**(619) 557-7138**

United States Magistrate Judge Barbara L. Major
United States District Court, Southern District of California
940 Front Street
San Diego, CA 92101-8900

> Re: ***Moore v. Bank of America Corporation***
> **Case No. 93 CV-00520-K (BLM)**

Dear Judge Major:

As directed by your July 16 Order, the parties submit their Joint Letter Report, as follows.

**JOINT LETTER REPORT**

In accordance with the Court's July 16, 2004 tentative ruling the parties met and conferred on July 21, 2004, in an effort to resolve the issues raised by the court. The Court's ruling directed the parties to focus their efforts on (1) the breadth of Nos. 9,10, and 13 and (2) a more specific written definition of No. 11's "billing error dispute." The day before this meet and confer, Plaintiff's counsel sent a letter to Defendant's counsel, to serve as a starting point for discussions.

1. **Interrogatories Nos. 9 & 10**

The parties were not able to reach any agreement on Nos. 9 & 10.

## 1.1 Plaintiff's Proposal:

The Court tentatively ruled that Interrogatories Nos. 9 and 10 were "overbroad." The interrogatories ask BOA to identify and describe in detail any and all "systems, databases, procedures, processes and methods" used for (a) cardholder identity and address information (No. 9) and (b) communicating with cardholders (No. 10). Plaintiff's aim with these interrogatories is to gain a general overview of BOA's computer operating systems and how BOA's databases in particular are integrated into the larger system.

The depositions taken thus far – of Olivia Martinez (the CSR who dealt with Moore), Christine Perrino (Document Retention P/M/K), and Tina Buhrman (dispute claims process P/M/K) – indicate that Bank of America uses a rules-based business process management system wherein the help-desk customer service representatives have access to customer information held on one or more databases.

Based on the deposition testimony, there seem to be at least four operating systems in use: Pega; TSYS; RDARS; and Image. It does not seem that these systems are exclusively "databases" – that is, based on the descriptions given (which are from the perspective of the CSR end user and not from an IT professional) these systems add to and draw on database information, but themselves encompass larger functionalities. Therefore, to the extent that information relating to "databases" is more readily understood in the context of larger "systems," Plaintiff would appreciate a fuller rather than a narrower explanation.

As discussed at the hearing, it is an open question whether the systems, etc. inquired about through Interrogatory No. 9 (cardholder identity) and those systems, etc. inquired about through Interrogatory No. 10 (cardholder communications) are distinct. In fact, there may be significant overlap. In any event, a entity relationship diagram will be essential to our understanding of what these systems are and how they work. To that end, Plaintiff narrowed his request to seek at least the following initial information:

1. Please identify the databases used by BOA by name.
2. Are the databases at issue are created and maintained in the form of relational databases? If so, identify the tables by name and provide an entity relationship diagram. If not, identify the type of each database.
3. On what computer systems (hardware models and operating systems) do you run the database software that creates and maintains the database?
4. Are the databases backed up? If so how is this done (by vendor, product name, and version number)?

5.     Is the database software that is used to create and maintain the databases capable
       of exporting the database schema and the contents of the databases into some
       external format?  If so, what formats?

### 1. 2   Defendant's Response:

As an initial matter, Defendant's recollection and notes of the July 15, 2004 hearing in
front of Magistrate-Judge Major reflect that she did not give you leave to attempt to reword these
two Interrogatories in order to cure their defects but, rather, only to revise Interrogatory No. 13
to do so.  However, even if leave had been granted as to these two as well, Plaintiff's proposal
not only fails to cure any of the objections already made to these Interrogatories but, to the
contrary, exacerbates the problems giving rise to the objections.  Instead of narrowing the scope
of these Interrogatories, Plaintiff's proposal actually expands it, making the Interrogatories even
more compound and over-broad than they already were, thereby creating even more of an undue
burden on Bank of America.  The proposal also does nothing to address Magistrate-Judge
Major's observation that these Interrogatories are premature at best, nor Bank of America's
continuing concerns that they lack relevance to the subject matter of this action, particularly as
the sole explanation provided by Plaintiff as to relevance would seem to be fully covered by the
scope of Interrogatory No. 11(a), which the Court has already ordered be answered by Bank of
America.  In this regard, weren't all four of the systems described in Plaintiff's letter specifically
identified in those depositions as dispute processing systems used to handle billing errors (i.e.
encompassed by Interrogatory No. 11)?  As a correction to his argument, Plaintiff's supposition
as to the nature of the four systems and how they operate appears to be inconsistent with the
deposition testimony already given (hence incorrect) and, as Plaintiff has repeatedly been
informed, the PEGA system is not in use any more, having been replaced during the three year
period between when Plaintiff's claims were supposedly mishandled and when he finally decided
to file suit; however, to at least some extent, these issues should be resolved by the response
required to Interrogatory No. 11.  Plaintiff has not otherwise articulated why he needs these
particular Interrogatories and it is not sufficient to claim that he needs them just because he
wants them.

### 1.3   Plaintiff's Further Response:

Defendant responds by standing on its objections of relevancy, overbreadth,
burdensomeness and oppression.  Defendant further takes the position that Plaintiff's proposal is
not within the contemplation of the Court's order.  Defendant's reiteration of its overbroad
objection is not helpful.  Defendant has still not given a meaningful explanation of the basis of
the objection or offered some other compromise.

## 2.   Interrogatory No. 11(a)

The parties were able to reach some agreement as to No. 11(a), which seeks information relating to the systems, databases, etc. used for billing error disputes.

### 2.1   Plaintiff's Proposal:

The Court directed Plaintiff to give BOA "a more specific written definition of the type of billing error dispute" this interrogatory is talking about. 15 U.S.C. § 1666(b) reads as follows:

> **For the purpose of this section, a "billing error" consists of any of the following:**
>
> **(1)   A reflection on a statement of an extension of credit which was not made to the obligor or, if made, was not in the amount reflected on such statement.**
>
> **(2)   A reflection on a statement of an extension of credit for which the obligor requests additional clarification including documentary evidence thereof.**
>
> **(3)   A reflection on a statement of goods or services not accepted by the obligor or his designee or not delivered to the obligor or his designee in accordance with the agreement made at the time of a transaction.**
>
> **(4)   The creditor's failure to reflect properly on a statement a payment made by the obligor or a credit issued to the obligor.**
>
> **(5)   A computation error or similar error of an accounting nature of the creditor on a statement.**
>
> **(6)   Failure to transmit the statement required under section 1637(b) of this title to the last address of the obligor which has been disclosed to the creditor, unless that address was furnished less than twenty days before the end of the billing cycle for which the statement is required.**
>
> **(7)   Any other error described in regulations of the Board.**

Plaintiff's billing error dispute falls within § 1666(b)(2) and (3). The interrogatory is not limited to these two types, however, because we need an explanation of how BOA stores, retrieves, etc., all seven types of billing error disputes in order to understand how the system works. From what we understand so far, the systems used by BOA for billing error dispute qualification (including reason code assignment) are automated based on its interpretation of Visa's regulations and not the federal statutes and regulations at issue.

United States Magistrate Judge Barbara L. Major
Re:   ***Moore v. Bank of America Corporation***
     **Case No. 93 CV-00520-K (BLM)**
July 23, 2004
Page 5

Because the Visa "reason codes" used to classify billing error disputes are not entirely congruent with the language of the statute, we don't think it is possible to "carve out" § 1666(b)(2) and (3) from the rest. For example, while Plaintiff's dispute fits in § 1666(b)(2) and (3), no BOA representatives have been able to definitively say which precisely which Visa reason code should have been – or even was – assigned to his dispute. We have been able to narrow it down to five possible Visa reason codes (24i, 24v, 30i, 54, and 95), but not any further.

Therefore, as a matter of compromise, Plaintiff proffers that "billing error dispute," as used in this interrogatory, should be narrowed to mean TILA § 1666(b)(2)-(3), as well as Visa Reason Codes 24i, 24v, 30i, 54, and 95.

## 2.2   Defendant's Response:

The only "billing error" at issue in this case falls, if at all,  under 15 USC § 1666(b)(3), a contention that goods or services were not accepted or delivered in accordance with the terms of the  transaction. There has never been any claim by Plaintiff of an error under § 1666(b)(2), which involves disputes arising out of the  reflection on a billing statement of unrecognized charges for which  the card holder requests additional information.  Here, Plaintiff recognized the charges at issue but claimed that he was not obligated  to pay for them and filed suit against Bank of America because it did  not agree with that contention.  There is no claim that Plaintiff asked for a clarification or documentation which Bank of America then  failed to provide.  The VISA Reason Codes are not themselves "billing errors," rather they are categorizations for how various disparate  disputes should be handled; further, although the charges at issue  were indisputably travel charges, Plaintiff has sought to include  Reason Codes which specifically do not apply to travel charges, as  well as Reason Codes which do not apply to disputes where the claim is  non-receipt of a good or service. Nonetheless, as the depositions should already have made clear, the billing error disputes (and, of  course, the VISA Reason Codes used to categorize them) are all handled  on the same system, the information provided in response to No. 11 would not change.

## 2.3   Plaintiff's Further Proposal

Defendant agrees that Moore's billing error dispute falls within (b)(3), but disagrees that it falls within (b)(2).  Plaintiff asserts that his billing error dispute falls within both categories. The colloquy between Plaintiff and BOA's customer service representatives (as described in the Complaint at paragraphs 7-15) was necessarily a "request for clarification." Further, deposition testimony indicates that BOA itself does not distinguish (b)(2) billing errors from other types of billing errors. Given that BOA has no policies or procedures in place to identify a (b)(2) dispute

as such, its attempt to categorize Moore's billing error dispute as a non-(b)(2) dispute is meaningless.

**3.      Interrogatory No. 13**

The parties were able to reach some agreement as to what information is sought by No. 13, but the Bank is unwilling to commit to supplementing its response with a substantive answer.

**3.1    Plaintiff's Proposal:**

As explained above, BOA (and Visa's) billing error dispute "reason codes" do not precisely overlap with the TILA definition of "billing error dispute." The aggregate figure sought by Interrogatory No. 13(a), therefore, should at least encompass the five reason codes that could have been used with a billing error dispute of Plaintiff's type, i.e., 24i, 24v, 30i, 54, and 95.

The aggregate figure sought by No. 13(b) should encompass reason codes 24 and 30 ("merchant service error" and "services not rendered," respectively). The aggregate figures sought by No. 13(c) are simply the total number of chargebacks, sorted by all reason codes. Finally, No. 13(d) seeks the total number of chargebacks, sorted by all reason codes, that were resubmitted after representment by a merchant and investigation by BOA.

**3.2    Defendant's Response:**

Plaintiff's proposal sufficiently clarifies what he is seeking as to 13(a) and (b) so as to permit a response, even if that response turns out t be that it remains unduly burdensome and impractical because it would require a manual sorting. However, even without regard to this potential problem, 13(c) and (d) would remain improper, irrelevant and overbroad as Plaintiff did not get a chargeback here and this is not a case where Plaintiff is suing over chargebacks. Plaintiff's suit is over Bank of America's reporting to the credit bureaus, which he claims was done in violation of 15 USC §1666a(b), and its alleged failure to conduct a reasonable investigation after receiving an inquiry from the credit bureau as required by 15 USC § 1681s-2(b). Plaintiff's explanation that he wants an overall picture of how Bank of America operates is not a sufficient reason to require this discovery to be provided and his contention that chargebacks are (or can be) manipulated in any way to affect Bank of America's profits is a contention which, contrary to his assertion in his portion of this report, is not a claim asserted anywhere in his pleading. The closest he comes is an allegation in his BPC § 17200 claim that the Bank violates TILA and Regulation Z "by failing to charge back disputed transactions to merchants or, alternatively, failing to file lawsuits to collect withheld funds after notification by

a consumer that a charge is disputed and that a consumer attempted in good faith to resolve the dispute with the merchant." [FAC ¶ 44(f)]  However, this argument refers to a claimed violation of 15 USC § 1666i, which does not require a bank to issue chargebacks, and, in any event, Plaintiff's own § 1666i claim (which he had attempted to assert as a class action) has been dismissed by the Court. As such, as discussed by Judge Stiven of this Court in the recent (March 29, 2004) decision in Vongrabe v. Sprint PCS, Plaintiff would lack Article III standing to assert a claim under § 1666i on behalf of a 17200 class.

Moreover, as Plaintiff has been informed, is utterly incorrect-chargebacks have no substantive effect on Bank profits because the Bank is simply acting as a middleman between the card holder and the merchant; a chargeback solely goes to whether the merchant gets paid for goods or services. Than Bank itself neither makes nor loses money by processing a chargeback.

### 3.3    Plaintiff's Further Response:

As to 13(a) and (b), Defendant is willing to give a response, but is unwilling to say what its response will be – Defendant indicates that this response could simply be further objections of overbreadth, burden, etc. As to 13(c) and (d), Defendant asserts that these requests are overbroad and seek information that is not relevant.

Plaintiff is willing to limit No.13 (c) and (d) to the five reason codes 24i, 24v, 30i, 54, and 95, rather than the entire universe of reason codes (there are 44 altogether). The relevance of this information is as follows: at issue in this case is BOA's policies and procedures implementing TILA and Reg. Z. Moore asserts that BOA violates the TILA and Reg. Z (and therefore the UCL) by not issuing chargebacks to cardholders in situations when it should under TILA and Reg. Z. Moore seeks information that will enable him to draw a picture at trial of what BOA's *actual* – not just written – policies are with respect to chargebacks, and the reasons therefor (and at a minimum, there must be enterprise costs associated with the chargeback policy that serve as such reasons). Relevant to this endeavor are the total number of chargebacks issued by the bank and the number of those chargebacks that get resubmitted to the consumer for payment by the consumer.

BOA insists that chargebacks are not at issue in this case, but the Complaint tells otherwise. BOA does not explain why it is raising the standing issue here when it did not make this issue part of its motion to dismiss, and Plaintiff submits that this joint letter report is not a suitable vehicle for exploring this issue, nor is the bare assertion of non-standing (after the briefing has been completed) a proper objection. In any event, Plaintiff does have standing to bring his UCL claim.

Respectfully submitted,

**GREEN & JIGARJIAN, LLP**

By: _____
     John W. Pillette
235 Pine Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 477-6700
Fax: (415) 477-6710

Attorney for Plaintiff

**BUCHALTER, NEMER, FIELDS & YOUNGER**

By: _____
     Jonathan D. Fink

A Professional Corporation
601 South Figueroa Street, 24th Floor
Los Angeles, CA 90017
Tel: (213) 891-0700
Fax: (213) 896-0400

Attorney for Defendant

United States Magistrate Judge Barbara L. Major
Re:   *Moore v. Bank of America Corporation*
      Case No. 93 CV-00520-K (BLM)
July 23, 2004
Page 8

Respectfully submitted,

GREEN & JIGARJIAN, LLP

By: _____
     John W. Pillette
235 Pine Street, 15th Floor
San Francisco, CA 94104
Tel: (415) 477-6700
Fax: (415) 477-6710

Attorney for Plaintiff

BUCHALTER, NEMER, FIELDS & YOUNGER

By: _____
     Jonathan D. Fink

A Professional Corporation
601 South Figueroa Street, 24th Floor
Los Angeles, CA 90017
Tel: (213) 891-0700
Fax: (213) 896-0400

Attorney for Defendant

```
*********************
***   TX REPORT   ***
*********************
```

TRANSMISSION OK

| | |
|---|---|
| TX/RX NO | 0839 |
| CONNECTION TEL | 16195575175 |
| CONNECTION ID | |
| ST. TIME | 07/23 15:41 |
| USAGE T | 01'28 |
| PGS. SENT | 10 |
| RESULT | OK |



# G R E E N   &   J I G A R J I A N   L L P

# FACSIMILE COVER PAGE

| | |
|---:|---|
| To: | Hon. Barbara L. Major |
| Firm: | **USDC, Southern District of California** |
| Telephone Number: | (619) 557-7372 |
| Fax Number: | **(619) 557-5175** |
| From: | John W. Pillette, Jonathan D. Fink |
| Date: | July 23, 2004 |
| G&J Case Code: | 1085 |
| Number of Pages (including cover page) | 10 |

---

**Message:**      Re: *Moore v. Bank of America Corporation*
                        USDC Case No. 93 CV-00520-K (BLM)

Please see attached Joint Letter Report.

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO            0838
CONNECTION TEL              16195577138
CONNECTION ID
ST. TIME            07/23 15:34
USAGE T             01'27
PGS. SENT           10
RESULT              OK
```



G R E E N  &  J I G A R J I A N  L L P

# FACSIMILE COVER PAGE

|  |  |
|---:|:---|
| To: | Hon. Barbara L. Major |
| Firm: | **USDC, Southern District of California** |
| Telephone Number: | (619) 557-7372 |
| Fax Number: | **(619) 557-7138** |
| From: | John W. Pillette, Jonathan D. Fink |
| Date: | July 23, 2004 |
| G&J Case Code: | 1085 |
| Number of Pages (including cover page) | 10 |

---

**Message:**     Re: *Moore v. Bank of America Corporation*
USDC Case No. 93 CV-00520-K (BLM)

Please see attached Joint Letter Report.

Ex. 4
123

```
*********************
***    TX REPORT    ***
*********************

TRANSMISSION OK

TX/RX NO            0837
CONNECTION TEL                12138960400
CONNECTION ID
ST. TIME            07/23 14:44
USAGE T             01'18
PGS. SENT              9
RESULT              OK
```



# G R E E N   &   J I G A R J I A N   L L P

# FACSIMILE COVER PAGE

**To:** Jonathan D. Fink

**Firm:** **BUCHALTER, NEMER, FIELDS & YOUNGER**

**Telephone Number:** (213) 891-0700

**Fax Number:** (213) 896-0400

**From:** John W. Pillette

**Date:** July 23, 2004

**G&J Case Code:** 1085

**Number of Pages** 9
**(including cover page)**

---

**Message:**

Re: *Moore v. Bank of America Corporation*

Please see attached.

Ex. 4
124

| Batesrng | Doctitle | Summary |
|---|---|---|
| BofA/Moore0001 - BofA/Moore0002 | Alaska Airlines Visa Gold Account Statement | October 1999 Monthly Visa Summary. No finance charges assessed, one credit/refund for Mobile Solution charge. |
| BofA/Moore0003 - BofA/Moore0004 | Alaska Airlines Visa Gold Account Statement | November 1999 Monthly Visa Summary. Disputed charges appear at Bates 004. No finance charges assessed. |
| BofA/Moore0005 - BofA/Moore0006 | Alaska Airlines Visa Gold Account Statement | December 1999 Monthly Visa Summary. Bates 006 states "payment in the amount of dispute $107.74 not required," which amount is for a TLC Next Generation charge (cell phone company) on 9/23/99. Periodic finance charge of $45.37 assessed. |
| BofA/Moore0007 | Alaska Airlines Visa Gold Account Statement | January 2000 Monthly Visa Summary. No finance charges assessed. Purchase adjustment of -$107.74 applied for 9/23 TLC Next Generation unauthorized charge. APR, which has consistently been 16.24% for year 1999, increases to 16.49%. |
| BofA/Moore0008 - BofA/Moore0009 | Alaska Airlines Visa Gold Account Statement | February 2000 Monthly Visa Summary. Purchase adjustment of -$101.25 applied on 1/28 for disputed United Airlines charge. Add'l adjustment of -$64.64 (with corresponding -$0.86 finance charge adjustment) for 10/30 TLC Next Generation unauthorized charge. Statement notes "payment in the amount of dispute $315.00 not required," which amount is the total of the American & United Airlines charges. Annual fee of $45 assessed here, which Moore disputed in letter of 4/27/00 (see JRM 0092). No finance charges assessed. |
| BofA/Moore0010 - BofA/Moore0011 | Alaska Airlines Visa Gold Account Statement | March 2000 Monthly Visa Summary. Late charge fee of $25 applied. Periodic finance charge adjustment of -$3.60, possibly for remaining $213.75 disputed amount. Periodic finance charge of $42.40 assessed. Past due reminder at Bates 011. |
| BofA/Moore0012 | Alaska Airlines Visa Gold Account Statement | April 2000 Monthly Visa Summary. Previous balance minus payments received leaves balance equaling the disputed American Airlines charge and disputed Annual Fee ($258.75). Period finance charge of $22.49 assessed. APR, which has consistently been 16.49% for year 2000, increases to 16.74%. Total Credit Line, previously set at $10k, and Available Credit go to zero (0). |
| BofA/Moore0013 | Alaska Airlines Visa Gold Account Statement | May 2000 Monthly Visa Summary. No consumer charges posted. Periodic finance charge of $4.87 assessed. New balance of $286.11 = current finance charge + disputed charges ($213.75 American Airlines charge, $45 annual fee assessed 2/1/00, and $22.49 periodic finance charge assessed 4/17/00). APR increases to 16.99%. |
| BofA/Moore0014 | Alaska Airlines Visa Gold Account Statement | June 2000 Monthly Visa Summary. No consumer charges or payments posted. Periodic finance charge of $4.24 assessed. Late payment fee of $29 assessed. Past due reminder noted on statement. |
| BofA/Moore0015 | Alaska Airlines Visa Gold Account Statement | July 2000 Monthly Visa Summary. No consumer charges or payment posted. Periodic finance charge of $4.71 assessed. Late payment fee of $29 assessed. Referral of account to collections dept. for past due amounts noted on statement. APR increases to 17.49%. |
| BofA/Moore0016 | Alaska Airlines Visa Gold Account Statement | August 2000 Monthly Visa Summary. No consumer charges or payments posted. Periodic finance charge of $7.56 assessed. Late payment fee of $29 assessed. Credit reporting action noted on statement as follows: "Your account is over 60 days past due and closed to future use. The past due rating is being reported to the credit bureaus. To avoid futher action, remint the 'min payment due' immediately." APR increases to 24.49%. |
| BofA/Moore0017 | Alaska Airlines Visa Gold Account Statement | September 2000 Monthly Visa Summary. No consumer charges or payments posted. Periodic finance charge of $8.61 assessed. Late payment fee of $29 assessed. Credit reporting action noted on statement as follows: "Your account is over 90 days past due and closed to future use. The past due rating is being reported to the credit bureaus. To avoid futher action..." |
| BofA/Moore0018 | Alaska Airlines Visa Gold Account Statement | October 2000 Monthly Visa Summary. No consumer charges or payments posted. Periodic finance charge of $8.49 assessed. Late payment fee of $29 assessed. Statement notes: "Your account is five months delinquent. Pay the balance in full today." |

**Ex. 5**

**125**

| Batesrng | Doctitle | Summary |
|---|---|---|
| BofA/Moore0019 | Alaska Airlines Visa Gold Account Statement | November 2000 Monthly Visa Summary. No consumer charges or payments posted. Periodic finance charge of $9.87 assessed. Late payment fee of $29 assessed. Statement notes: "Your account is being reviewed for possible litigation or placement with a collection agency." |
| BofA/Moore0020 | Alaska Airlines Visa Gold Account Statement | December 2000 Monthly Visa Summary. No consumer charges or payments posted. No finance charges assessed. Late payment fee of $29 assessed. Purchase finance charge credits totaling $48.35 credited to account. Late fee credit of $203 applied to account. Statement notes: "Your account is being reviewed for possible litigation or placement with a collection agency." |
| BofA/Moore0021 - BofA/Moore0022 | Alaska Airlines Visa Gold Account Statement | January 2001 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. Statement notes that annual fee of $45 scheduled for next month, unless balance paid. Also notes that acct being reviewed for possible litigation or placement with collection agency. |
| BofA/Moore0023 | Alaska Airlines Visa Gold Account Statement | February 2001 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. Statement notes that acct being reviewed for possible litigation or placement with collection agency. |
| BofA/Moore0024 | Alaska Airlines Visa Gold Account Statement | March 2001 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. APR down to 23.49%. |
| BofA/Moore0025 | Alaska Airlines Visa Gold Account Statement | April 2001 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. |
| BofA/Moore0026 | Alaska Airlines Visa Gold Account Statement | May 2001 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. APR down to 22.99%. |
| BofA/Moore0027 | Alaska Airlines Visa Gold Account Statement | June 2001 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. APR down to 22.49%. |
| BofA/Moore0028 | Alaska Airlines Visa Gold Account Statement | July 2001 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. APR down to 21.99%. |
| BofA/Moore0029 | Alaska Airlines Visa Gold Account Statement | August 2001 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. APR down to 21.74%. |
| BofA/Moore0030 | Alaska Airlines Visa Gold Account Statement | Septebmer 2001 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. |
| BofA/Moore0031 | Alaska Airlines Visa Gold Account Statement | October 2001 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. APR down to 0%. |
| BofA/Moore0032 | Alaska Airlines Visa Gold Account Statement | November 2001 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. Statement (erroneously?) notes that bank will be converting Alaska Airlines Mastercard account to an Alaska Airlines Visa card account. |
| BofA/Moore0033 | Alaska Airlines Visa Gold Account Statement | December 2001 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. Statement notes enrollment in Alaska Airlines new mileage plan dining program. |
| BofA/Moore0034 | Alaska Airlines Visa Gold Account Statement | January 2002 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. |
| BofA/Moore0035 | Alaska Airlines Visa Gold Account Statement | February 2002 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. New statement format and leading numbers added to account number: 0014882 0028124 0028124 4023003260082101. "Statement Code" no longer on statement under finance section. All prior statements had the following "Statement Code" in the finance section: 012117769. |

| Batesrng | Doctitle | Summary |
|---|---|---|
| BofA/Moore0036 | Alaska Airlines Visa Gold Account Statement | March 2002 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. |
| BofA/Moore0037 | Alaska Airlines Visa Gold Account Statement | April 2002 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. |
| BofA/Moore0038 | Alaska Airlines Visa Gold Account Statement | May 2002 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. |
| BofA/Moore0039 | Alaska Airlines Visa Gold Account Statement | June 2002 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. |
| BofA/Moore0040 - BofA/Moore0041 | Alaska Airlines Visa Gold Account Statement | July 2002 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. |
| BofA/Moore0042 - BofA/Moore0043 | Alaska Airlines Visa Gold Account Statement | August 2002 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. |
| BofA/Moore0044 - BofA/Moore0045 | Alaska Airlines Visa Gold Account Statement | September 2002 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. |
| BofA/Moore0046 - BofA/Moore0047 | Alaska Airlines Visa Gold Account Statement | October 2002 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. |
| BofA/Moore0048 - BofA/Moore0049 | Alaska Airlines Visa Gold Account Statement | November 2002 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. |
| BofA/Moore0050 - BofA/Moore0051 | Alaska Airlines Visa Gold Account Statement | December 2002 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. |
| BofA/Moore0052 - BofA/Moore0053 | Alaska Airlines Visa Gold Account Statement | January 2003 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. |
| BofA/Moore0054 - BofA/Moore0055 | Alaska Airlines Visa Gold Account Statement | February 2003 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. |
| BofA/Moore0056 - BofA/Moore0057 | Alaska Airlines Visa Gold Account Statement | March 2003 Monthly Visa Summary. No consumer charges or payments posted. No finance charges or late fees assessed. Balance remains same. |
| BofA/Moore0058 - BofA/Moore0064 | Card Services Training Group: Dispute Guidlines Overview: Credit Card Disputes Rules and Regulations Participant Guide | Module reviews process of a credit card transaction and provides information and tools necessary to demonstrate comprehensive knowledge of chargebacks process. Partial Document: Only includes sections on TILA, Claim and Defense (Quality Disputes), and Travel and Entertainment Transactions. |
| BofA/Moore0065 | Visa Reason Code 24 - T&E - Merchant Service Error: Card Services Training Group Participant's Guide | Chargeback Reason Code 24: Services not provided, mail/phone order or electronic airline or passenger rail tickets were not received, shipped or delivered merchandise was not received. |
| BofA/Moore0066 - BofA/Moore0070 | Common Module: Regulation Z Overview Participant Guide | Module examines Regulation Z and the impact regulation has on the credit card industry. Teaches provisions of Reg. Z necessary to ensure compliance of Bank of America standards. |
| BofA/Moore0071 - BofA/Moore0073 | Card Services Training Group: Laws and Regulations Handout | Partial document: Regulation B (Equal Opportunity Act) and Regulation Z (Truth in Lending Act) |
| BofA/Moore0074 - BofA/Moore0179 | Consumer Card Services Credit Policy Manual | Designed to be source of all policy regarding credit extension and portfolio management for Consumer Card Services accounts. |

| Batesrng | Doctitle | Summary |
|---|---|---|
| BofA/Moore0180 - BofA/Moore0846 | InfoNet Consumer | Procedures: Contact Center |
| BofA/Moore0847 - BofA/Moore0944 | InfoNet Consumer | Procedures: Team Manager |
| BofA/Moore0945 - BofA/Moore1000 | InfoNet Consumer | Procedures: COR - Credit Balance Refund |
| BofA/Moore1001 - BofA/Moore1017 | InfoNet Consumer | Procedures: Plus Servicing |
| BofA/Moore1018 - BofA/Moore1141 | InfoNet Consumer | Procedures: Electronic Services |
| BofA/Moore1142 - BofA/Moore1179 | InfoNet Consumer | Procedures: Retention |
| BofA/Moore1180 - BofA/Moore1182 | Customer Services Claims Information | Billing Rights Summary, Chargeback Abbreviations, Claim Types |
| BofA/Moore1183 - BofA/Moore1187 | InfoNet Consumer | Claims Information: Billing Rights Summary, Chargeback Abbreviations, Claim Types |
| BofA/Moore1188 - BofA/Moore1200 | InfoNet Consumer | Dispute Requests: What Associates Need to Know, Dispute Charge Information & Assistance, FronTier, FronTier: Airline Mileage Disputes, Contingency Process, Scripting. Related Procedure: Transferring Calls |
| BofA/Moore1201 - BofA/Moore1220 | Card Services Training Group: Dispute Guidlines Overview: Credit Card Disputes Rules and Regulations Participant Guide | Module reviews process of a credit card transaction and provides information and tools necessary to demonstrate comprehensive knowledge of chargebacks process. |
| BofA/Moore1221 - BofA/Moore1227 | Card Services Training Group: Chargeback Reason Codes Overview | Module provides preliminary information necessary to prepare the Customer Claims associate for learning and applying the chargeback reason codes. |
| BofA/Moore1228 - BofA/Moore1236 | Card Services Training Group: Visa/Mastercard Compliance Violations Participant Guide | Module provides dispute representative with information and tools necessary to identify a compliance violation and to determine when a file should be referred to the compliance representative. |
| BofA/Moore1237 | Visa U.S.A. Chargeback Reason Codes | Chargeback reasons codes |
| BofA/Moore1238 - BofA/Moore1239 | Reason Code 20 - T&E - No Authorization: Visa U.S.A, Inc. Operating Regulations Volume II - Dispute Resolution Rules | Chargeback Reason Code 20: T&E Merchant did not obtain Authorization for a Transaction that exceeded the Merchant's Floor Limit. |
| BofA/Moore1240 - BofA/Moore1241 | Reason Code 30 - Services Not Rendered Non-ATM Transactions: Visa U.S.A, Inc. Operating Regulations Volume II - Dispute Resolution Rules | Chargeback Reason Code 30: Cardholder acknowledges participation in the Transaction and either Merchant was unwilling or unable to provide purchased services, or services were paid for using another method. |

| Batesrng | Doctitle | Summary |
|---|---|---|
| BofA/Moore1242 - BofA/Moore1245 | Reason Code 47 - Fraudulent Transaction - No Authorization: Visa U.S.A, Inc. Operating Regulations Volume II - Dispute Resolution Rules | Chargeback Reason Code 47: A Merchant processed a Transaction exceeding the Floor Limit without Cardholder permission, and did not obtain Authorization. |
| BofA/Moore1246 - BofA/Moore1253 | Reason Code 85 - Credit Not Processed: Visa U.S.A, Inc. Operating Regulations Volume II - Dispute Resolution Rules | Chargeback Reason Code 85: Merchant issued a Credit Transaction Receipt that was not processed through Interchange; the Merchant provided a refund acknowledgment, but a Credit Transaction was not processed through Interchange; the Cardholder returned merchandise or cancelled merchandise or services and the Merchant did not issue a Credit Transaction Receipt/refund acknowledgement; or the Cardholder cancelled an Advance Payment Service Transaction and the Merchant did not issue a Credit Transaction Receipt. |
| BofA/Moore1254 - BofA/Moore1259 | Reason Code 94 - T&E - Cancelled Guaranteed Reservation: Visa U.S.A, Inc. Operating Regulations Volume II - Dispute Resolution Rules | Chargeback Reason Code 94: A Lodging Merchant or Car Rental Company charged a Cardholder account for a No-Show Transaction after proper cancellation of a guaranteed reservation, or a Merchant issued a Credit Transaction Receipt that was not processed via Interchange. |
| BofA/Moore1260 - BofA/Moore1292 | Card Services Training Group: Laws and Regulations Handout | Regulation B (Equal Opportunity Act), Regulation Z (Truth in Lending Act), Regulation E (Electronic Fund Transfer Act), Regulation O (lending to insiders), Community Property States |
| BofA/Moore1293 - BofA/Moore1297 | Card Services Training Group: Goodfaith Request | Module familiarizes Customer Claims associate with the handling procedures of good-faith case and to provide the information necessary to identify potential good-faith situations. |
| BofA/Moore1298 - BofA/Moore1315 | Common Module: Regulation Z Overview Participant Guide | Module examines Regulation Z and the impact regulation has on the credit card industry. Teaches provisions of Reg. Z necessary to ensure compliance of Bank of America standards. |
| BofA/Moore1316 - BofA/Moore1327 | Card Services Training Group: Visa Travel and Entertainment Chargeback Reason Codes Participant Guide | Module provides Customer Claims associate with information and tools necessary for learning and applying the Visa Travel and Entertainment (T&E) Chargeback Reason Codes (domestic) that are most commonly used in the dispute area. The reason codes apply only to transactions that are processed by a merchant using the Travel and Entertainment Merchant Category Codes listed in the Visa Rules and Regulations Manual. |
| BofA/Moore1328 - BofA/Moore1344 | Card Services Training Group Participant's Guide | Chargeback Reason Codes in detail: 30- Services Not Rendered 31- Error in Addition 36- Incorrect Account Number 41- Cancelled Recurring 50- Credit Posted as a Purchase (debit) 51- Incorrect Transaction Amount 53- No as Described 54- Claim or Defense 56- Defective Merchandise 57- Fraudulent Processing of Transactions (Multiples) 61- Fraudulent Mail/Phone Order Transaction 81- Unauthorized Transaction - No Imprint Obtained 82- Duplicate Transaction 84- Unauthorized Transaction - No Signature Obtained 85- Credit Not Processed 86- Transaction Amount Changed 90- Merchandise Not Received |
| BofA/Moore1345 - BofA/Moore1689 | InfoNet Consumer | Procedures: Correspondence/ Flex Force |

| Batesrng | Doctitle | Summary |
|---|---|---|
| BofA/Moore1690 - BofA/Moore1697 | Reason Code 24 - T&E - Merchant Service Error: Visa U.S.A, Inc. Operating Regulations Volume II - Dispute Resolution Rules | Chargeback Reason Code 24i - 24v: Services Not Provided, Services or Merchandise Paid by Alternate Means, Addition or Transportation Error, Altered Amount, Credit Transaction Receipt Not Processed. |
| BofA/Moore1698 - BofA/Moore1703 | Reason Code 30 - Services Not Rendered: Visa U.S.A, Inc. Operating Regulations Volume II - Dispute Resolution Rules | Chargeback Reason Code 30 - Services Not Rendered: Non-ATM Transactions, ATM Transactions |
| BofA/Moore1704 - BofA/Moore1709 | Reason Code 54 - Cardholder Dispute Not Elsewhere Classified: Visa U.S.A, Inc. Operating Regulations Volume II - Dispute Resolution Rules | Chargeback Reason Code 54 - Cardholder made a claim authorized by local, state, or federal law, no other Chargeback right is available, and all requirements of Regulation Z or other applicable law have been met. |
| BofA/Moore1710 - BofA/Moore1822 | Credit Operations: Existing Accounts | Date range February 2001 - November 2003 |
| BofA/Moore1823 - BofA/Moore1920 | Credit Operations: New Accounts | Date range April 2003 - November 2003 |
| BofA/Moore1921 - BofA/Moore1923 | Associate Criteria Automation | Automating Associate Policies and Procedures in Loanstar. All Associate applications failing First Stage Criteria are reviewed by a Credit Analyst. |
| BofA/Moore1924 - BofA/Moore1925 | Card Fulfillment: New Accounts | Lending/Level Increases: Audits performed every month on every underwriter to ensure sound credit decisions and consistent lending. Audits used to review the Lending authority of the underwriters. |
| BofA/Moore1926 | Request a Mini-Card at Booking | To request a mini card in the Acaps system an M should be entered in the CF field on the CDE screen. |
| BofA/Moore1927 - BofA/Moore2232 | Image Procedures Guide | "Associate Success Is Our Business" Image Procedures Guide |
| BofA/Moore2233 - BofA/Moore2238 | Accidental Disconnection Procedures | Associate systems training to be able to perform the Accidental Disconnection procedures after losing a customer due to an accidental disconnection. Associate attempts to contact the customer via telephone to continue the claim. Associate will document what occured in the appropriate memos. |
| BofA/Moore2239 - BofA/Moore2243 | Alpha Lookup Procedures | Associate systems training to be able to perform Alpha Lookup procedures after receiving request from customer reporting problem with consumer card transaction. |
| BofA/Moore2244 - BofA/Moore2248 | Customer Authentication Procedures | Associate systems training to be able to perform Customer Authentication procedures after receiving request from customer reporting problem with consumer card transaction. |
| BofA/Moore2249 - BofA/Moore2252 | Customer Requests Account Closure Due to Fraud Procedures | Lost/Stolen Card Procedures: Associate systems training to be able to perform Customer Requests Account Closure procedures in event customer reports lost or stolen card. |
| BofA/Moore2253 - BofA/Moore2256 | Customer Requests Account Closure Due to Fraud Procedures | Lost/Stolen Card Procedures: Associate systems training to be able to perform Customer Requests Account Closure procedures in event customer reports lost or stolen card. |
| BofA/Moore2257 - BofA/Moore2258 | Emergency Procedures | Associate systems training: Used only if associate finds it necessary to disconnect from the customer and immediately evacuate the premises such as for a fire drill. |
| BofA/Moore2259 - BofA/Moore2261 | Add TSYS Memo Procedures | Associate systems training to be able to perform ICE Add TSYS Memo procedures. Associate adds free-form text memo to TSYS in this procedure. |

Ex. 5
130

| Batesrng | Doctitle | Summary |
|---|---|---|
| BofA/Moore2262 - BofA/Moore2270 | ICE Process Correspondence Initiated Claim Procedures | Associate systems training to be able to perform ICE Process Correspondence Initiated Claim procedures. Associate processes a correspondence initiated claim using Image and ICE. Associate identifies and indexes the related document in Image and further processes the claim using ICE. Decisions are made regarding action to be taken on the claim or a decision is made to invoke the Expert Decisioning Component (EDC) in ICE. |
| BofA/Moore2271 - BofA/Moore2294 | ICE Get Expert Decision (ED) Procedures | Associate systems training to be able to perform the ICE Get Expert Decision (ED) procedures. Associate invokes Expert Decisioning Component (EDC) to determine action to be taken on a claim. |
| BofA/Moore2295 - BofA/Moore2301 | ICE Login/Logout Procedures | Associate systems training to be able to perform the ICE Login/Logout procedures. |
| BofA/Moore2302 - BofA/Moore2309 | ICE Process Call Initiated Claim Procedures | Associate systems training to be able to perform the ICE Process Call Initiated Claim procedures. Associate processes call-initiated claim by searching for the disputed transaction and verifying that a credit has not already been posted. Decisions are made regarding action to be taken on the claim or a decision is made to invoke Expert Decisioning (ED). |
| BofA/Moore2310 - BofA/Moore2314 | ICE Retrieval Request | Associate systems training to be able to perform the ICE Retrieval Request procedures. Associate orders a Retrieval Request only when working a disputed transaction, and the Expert Decisioning Component (EDC) returns a failed result and states that a sales draft is required to complete the process. |
| BofA/Moore2315 - BofA/Moore2319 | ICE Visa Fast Track/MasterCard Expedited Billing Procedures | Associate systems training to be able to perform the ICE Visa Fast Track/MasterCard Expedited Billing procedures. Associate invokes the Expert Decisioning Component (EDC) to determine action to be taken on a claim. After ED returns a decision to the Associate and the decision is saved, the Associate answers several browser questions for Visa Fast Track and/or MasterCard Expedited Billing to perform the automatic chargeback. |
| BofA/Moore2320 - BofA/Moore2328 | Lost/Stolen Card Report Procedures | Associate systems training to be able to perform the Lost/Stolen Card Report procedures. If customer reports lost/stolen card, Associate uses TSYS2 to file report and cancel the card. |
| BofA/Moore2329 - BofA/Moore2333 | ICE Records Only | Associate systems training to be able to perform the ICE Records Only procedures. Associate will order a transaction subdraft when the customer requests verification of a specific transaction. |
| BofA/Moore2334 - BofA/Moore2337 | Postpone Procedures | Associate systems training to be able to perform Postpone procedures for a case after receiving a customer request in regard to a case that may need to be postponed for waiting additional information or routed to fraud. |
| BofA/Moore2338 - BofA/Moore2342 | Quick Kill (Small Balance Write Off) Procedures | Associate systems training to be able to perform Quick Kill (Small Balance Write Off) procedures after receiving customer request in regard to questionable charge that is non-recurring and falls within the acceptable limits for a small balance adjustment. |
| BofA/Moore2343 - BofA/Moore2347 | Quick Kill (Merchant Credit) Procedures | Associate systems training to be able to perform Quick Kill (Merchant Credit) procedures. Associate obtains information from customer and research to avoid opening a case. |
| BofA/Moore2348 - BofA/Moore2350 | Available Chargeback Period Job Aid: Quick Kill (Record Only) Procedures | Associate systems training to be able to perform Quick Kill (Record Only) procedures. Available Chargeback Period Job Aid to determine whether a claim may be processed or not based on the Central Processing Date. |
| BofA/Moore2351 | Dispute Charges Job Aid | Provides dispute categories and potential reason codes. |
| BofA/Moore2352 - BofA/Moore2353 | Effective Date Job Aid | Details how to calculate effective business date. December 2004 effective date calendar provided. |
| BofA/Moore2354 - BofA/Moore2355 | Exit Reason Job Aid | Provides exit reasons and when to use them |

| Batesrng | Doctitle | Summary |
|----------|----------|---------|
| BofA/Moore2356 - BofA/Moore2358 | ICE Dispute Entry Codes | Dispute entry codes identify the status of a case and are only an FYI to the associate. To accurately determine the case status, case comments should be reviewed. Exit Reason Job Aid provided. |
| BofA/Moore2359 - BofA/Moore2361 | "Fail" Result Job Aid | Provides the user questions to consider and continue as appropriate per the "ICE Get Expert Decisioning Procedures" if a "Fail" result is received from the Expert Decisioning Component. MasterCard Quality Claim Job Aid provided. |
| BofA/Moore2362 - BofA/Moore2363 | Merchant Category Codes | Provides online link to Merchant Category Codes. MasterCard Quality Claim Job Aid provided. |
| BofA/Moore2364 - BofA/Moore2365 | Merchant Category Codes POS/MOTO Job Aid | Provides online link to Merchant Category Codes. POS (Terminal entry Mode) and MOTO (Mail or Telephone Order) values provided in separate Job Aid. |
| BofA/Moore2366 - BofA/Moore2367 | Visa Quality Claim Job Aid | Provides table of reason codes and descriptions re chargebacks |
| BofA/Moore2368 | ICE: Workarounds for Reason Codes 30i and 90ii | Provides table of reason codes and descriptions re VISA International (9ii) and Visa Domestic (30i) |
| BofA/Moore2369 - BofA/Moore2374 | MasterCard Merchant ID Work Around | Associate systems training to be able to perform the Customer Authentication procedures. After creating a case in ICE, for all MasterCard related disputes, it is necessary for the user to document the Merchant ID in Image. If this step is not completed, a reject will occur if decisioned. |
| BofA/Moore2375 - BofA/Moore2429 | Pega Dispute File | Batch Query data display on Moore cccount for period 2/23/01-07/01/03. Query includes: Work Item Audit Display, Correspondence Display, Note Attachment, Allocation Attachment, and TagData Attachment. Bulk of query is correspondence display. |
| BofA/Moore2430 - BofA/Moore2467 | Regulations Overview: Consumer Products Training & Development Leader's Guide | Regulations Overview Leader's Guide |
| BofA/Moore2468 - BofA/Moore2490 | Regulations Overview: Consumer Products Training & Development Participant's Guide | Regulations Overview Participant's Guide |
| BofA/MooreSet2_0001 - BofA/MooreSet2_0002 | Alaska Airlines Credit Card Application | Alaska Airlines Visa Platinum Credit Application 2003 |
| BofA/MooreSet2_0003 | Letter from Card Services to Moore | Credit denial letter due to "Bank of America charge off." Denied Alaska Airlines Visa Platinum Credit Card. |
| BofA/MooreSet2_0004 - BofA/MooreSet2_0008 | Letter from Moore to Card Services | Letter requesting re-review and approval of credit application. Provides explanation of charge off, disputed charge, and violations of federal regulations by BofA. Requests Experian delete charge off as false and inaccurate from credit report. |
| BofA/MooreSet2_0009 - BofA/MooreSet2_0027 | Decision Summary | Decision summary on January 2003 application for Alaska Airlines Visa Platinum Credit Card. Includes customer data, Bank of America CIF ("customer information file"), history inquiry, and credit bureau report. |
| BofA/MooreSet2_0028 - BofA/MooreSet2_0029 | Alaska Airlines Credit Card Application | Alaska Airlines Visa Platinum Credit Application November 1999 |
| BofA/MooreSet2_0030 - BofA/MooreSet2_0044 | Credit Decision Summary | Decision summary on November 1999 application for Alaska Airlines Visa Platinum Credit Card. Includes customer data, Bank of America CIF ("customer information file"), history inquiry, and credit bureau report. |
| BofA/MooreSupp_0001 - BofA/MooreSupp_0052 | Pega Dispute File Revised | |

| Batesrng | Doctitle | Summary |
|---|---|---|
| BofA/MooreSupp_0053 | Pega Dispute File: Inquire Account Event Detail | Page from Pega dispute file detailing account event from 12/01/02 to 03/08/03. Shows dipute received from TRW 2/19/03. Verified as reported, c/o account. |
| BofA/MooreSupp_0054 | Consumer Card Services Credit Policy Manual: New Accounts Approval Authority | Credit approval authority delegated to officers. Approving officer completely accountable for credit decision anf fully responsible for results. Approval in two ways: singularly or in conjunction w/ more senior officer. |
| BofA/MooreSupp_0055 | Credit Analyst Authority Level Matrix | Describes authority levels of credit analysts and exceptions. |
| BofA/MooreSupp_0056 | Consumer Card Services Credit Policy Manual: Special Programs: High Value Client Programs | High Value Client programs include Private Banking Program (PBG) and Premier Banking. Programs enable lending associate to commit firm offer of credit to most valued customers w/o BOA credit card product. Document provides program eligibility criteria. |
| BofA/MooreSupp_0057 | Consumer Card Services Credit Policy Manual: Special Programs: Visa Signature Card | VISA Signature card available to Private and Premier customers. No pre-set spending limits w/ option to revolve portion of balance. Document provides program eligibility criteria. |
| BofA/MooreSupp_0058 - BofA/MooreSupp_0059 | Consumer Card Services Credit Policy Manual: Account Maintenance: Account Reinstatement | Provides criteria for re-opening customer-cancelled and bank-cancelled accounts. |
| BofA/MooreSupp_0060 | Consumer Card Services Credit Policy Manual: Account Maintenance: Delinquent Account Cancellations | Accounts systematically cancelled and blocked w/ status code to restrict future access when minimum payment not received by specific date. Certain situations arising from normal collection contact (prior to systematic cancellation) should prompt containment consideration, which may include line reductions or cancellation. In most instances, whatever action is determined necessary must apply to ALL other BOA credit card accounts in the member's name. Common conditions provided. Cancellations require supervisor. Adverse action notice must be provided to all cardholders who are cancelled. Default accounts receive collection or limit control letters. |
| BofA/MooreSupp_0061 | Consumer Card Services Credit Policy Manual: Collection Programs: Multiple Account Relationship | Customers w/ more than one BOA credit card classified as having Multiple Account Relationship (MAR). Document provides policies for handling these accounts, including Account Closure, Delinquent Account Consolidation, etc. |
| BofA/MooreSupp_0062 | Consumer Card Services Credit Policy Manual: Account Maintenance: Account Reinstatement | Provides criteria for re-opening bank-cancelled accounts: closed account not overlimit or past due. |
| BofA/MooreSupp_0063 - BofA/MooreSupp_0070 | Card Customer Service (Westclaims) Resolution Codes | Prodvides resolution codes under the following categories: 1st Chargeback Resolution; 1st Chargeback Reactivated; Quality Representment; Arbitration Compliance; Teamleaders & Supervisors Approval Queues; Goodfaith & Recovery Queues; AutoCBNR & Auto Provisional |

**Ex. 5**

**133**

Legal Tabs Co. 1-800-322-3022

Recycled     Stock # R-EX-5-B

1   BUCHALTER, NEMER, FIELDS & YOUNGER
        Abraham J. Colman (State Bar No. 146933)
2       Scott H. Jacobs (State Bar No. 81980)
        Jonathan D. Fink (State Bar No. 110615)
3   601 South Figueroa Street, Suite 2400
    Los Angeles, California 90017-5704
4   Telephone: (213) 891-0700
    Facsimile: (213) 896-0400
5
    Attorneys for Defendant
6   BANK OF AMERICA, N.A. (USA)

7

8              **UNITED STATES DISTRICT COURT**

9              **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  JAMES R. MOORE, individually      )   **CASE NO. 03 CV 00520K (POR)**
    and on behalf of the general public )
12  and all others similarly situated,  )   **RESPONSE TO**
                                         )   **REQUESTS FOR ADMISSION**
13              Plaintiff,               )
                                         )
14      v.                               )
                                         )
15  BANK OF AMERICA, N.A. (USA),        )
                                         )
16              Defendants.              )
                                         )
17  ─────────────────────────────────────)

18  **PROPOUNDING PARTY:**   **Plaintiff JAMES R. MOORE**

19  **RESPONDING PARTY:**    **Defendant BANK OF AMERICA, N.A. (USA)**

20  **SET NO.:**             **One**

21                  **GENERAL OBJECTIONS**

22      A.     Defendant Bank of America, N.A. (USA) ("Defendant") objects to the

23  requests for admission ("requests") propounded by Plaintiff James R. Moore

24  ("Plaintiff") to the extent they seek information which is neither relevant to the

25  subject matter of this action nor reasonably calculated to lead to the discovery of

26  admissible evidence with respect to the issues in this action.

27      B.     Defendant objects to the term "dispute" as calling for a legal conclusion,

28  speculation and being vague and ambiguous.

Ex. 6
134
PRINTED ON RECYCLED PAPER

146132                          1

─────────────────────────────────────

           **RESPONSE TO REQUESTS FOR ADMISSION**

C.     Defendant objects to the requests as burdensome and as designed, in whole or in part, to harass Defendant, rather than to serve any legitimate discovery purpose.

D.     Defendant objects to the requests as overbroad and not limited to a reasonable time period.

E.     Defendant objects to the requests to the extent they seek information of a commercially sensitive nature. Revealing such information would substantially and irreparably injure Defendant by revealing information which derives independent economic value from not being generally known or which has been acquired primarily through confidential research and development efforts by or on behalf of Defendant.

F.     Defendant objects to the requests to the extent they seek information protected by the attorney-client privilege or the attorney work-product doctrine. Such privileged information includes, but is not limited to, the following:

1.     Information which constitutes, reflects, refers to or relates to confidential communications between officers, directors or employees of Defendant and counsel; and

2.     Information which constitutes, reflects, refers to or relates to the impressions, conclusions, opinions or mental process of counsel, their agents or employees.

G.     Defendant objects to the requests to the extent they seek information relating to employees or customers of Defendant, the disclosure of which would invade their right to privacy.

H.     Defendant objects to the requests to the extent they seek information which is equally or more accessible to Plaintiff and which is maintained primarily by persons or entities other than Defendant.

I.     Defendant is continuing its discovery into the subject matter of this litigation and, therefore, reserves the right to rely upon, utilize and adduce during

Ex. 6
135

PRINTED ON RECYCLED PAPER

146132

2

**RESPONSE TO REQUESTS FOR ADMISSION**

these proceedings any information or documentation which it may locate or obtain
subsequent to the responses and objections herein.

## SPECIFIC RESPONSES

**REQUEST NO. 1:**

Admit that YOU did not determine that American Airlines actually delivered
services to Plaintiff prior to construing the disputed AMERICAN AIRLINES
TRANSACTION amount as correctly shown on YOUR billing statement.

**RESPONSE TO REQUEST NO. 1:**

Defendant objects to this request on the ground that it is vague and ambiguous
as to the term "delivered services" and also objects to this request on the ground that
the question presumes a duty not imposed by law. Without waiving the foregoing
objections, and based upon Defendant's understanding of this request, it is denied.

**REQUEST NO. 2**

Admit that YOU received written notice from Plaintiff that the amount of the
AMERICAN AIRLINES TRANSACTION was still in dispute after notifying Plaintiff
that no billing error occurred.

**RESPONSE TO REQUEST NO. 2:**

Admit.

**REQUEST NO. 3:**

Admit that YOU received written notice from Plaintiff that the amount of the
AMERICAN AIRLINES TRANSACTION was still in dispute within the time
allowed for payment after notifying Plaintiff that no billing error occurred.

**RESPONSE TO REQUEST NO. 3:**

Defendant objects to this request on the ground that it is vague and ambiguous
as to the term "within the time allowed for payment" and is also vague and ambiguous
as to the time period referred to as "after notifying Plaintiff that of billing error
occurred." Without waiving the foregoing objections, Defendant admits that it
received written notice from Plaintiff that the AMERICAN AIRLINES

3

PRINTED ON RECYCLED PAPER

1 TRANSACTION was in dispute after Defendant notified Plaintiff that there no billing

2 error had occurred.

3 **REQUEST NO. 4:**

4     Admit that American Airlines billed Plaintiff $213.75 in error.

5 **RESPONSE TO REQUEST NO. 4:**

6     Defendant objects to this request on the ground that it calls for speculation as to

7 the actions of a third party, and is vague and ambiguous as to the terms "billed" and

8 "in error." Without waiving the foregoing objections, and based upon Defendant's

9 understanding of this request, it is denied.

10 **REQUEST NO. 5:**

11     Admit that after YOU determined that Plaintiff owed the disputed amount for

12 the AMERICAN AIRLINES TRANSACTION, YOU reported the amount as

13 delinquent.

14 **RESPONSE TO REQUEST NO. 5:**

15     Defendant admits that Plaintiff's account was reported 30 days delinquent

16 beginning in or about July 2000.

17 **REQUEST NO. 6:**

18     Admit that after YOU determined that Plaintiff owed the disputed amount for

19 the AMERICAN AIRLINES TRANSACTION, YOU reported the amount as

20 delinquent and did not report the amount was in dispute.

21 **RESPONSE TO REQUEST NO. 6:**

22     Defendant objects to this request on the ground that it is vague and

23 ambiguous as to the phrase "report the amount was in dispute," and also on the

24 ground that this request is compound. Without waiving the foregoing objections,

25 Defendant admits that, after notifying Plaintiff that no billing error occurred, it

26 reported the amount as delinquent, and did not specifically report the amount of

27 the AMERICAN AIRLINES TRANSACTION as in dispute.'

28 ///

Ex. 6
137

PRINTED ON RECYCLED PAPER

146132

**RESPONSE TO REQUESTS FOR ADMISSION**

**REQUEST NO. 7:**

Admit that after YOU determined that Plaintiff owed the disputed amount for the AMERICAN AIRLINES TRANSACTION, YOU reported the amount as delinquent and did not deliver to Plaintiff written notice of the name and address of each PERSON to whom YOU made a report.

**RESPONSE TO REQUEST NO. 7**

Defendant objects to this request on the ground that it is vague and ambiguous as to the meaning of the phrase "each PERSON to whom YOU made a report," and also on the ground that the request is compound. Without waiving the foregoing objections, Defendant admits that it reported the amount of the AMERICAN AIRLINES TRANSACTION as delinquent, and did not deliver to Plaintiff notice of the name and address of each PERSON to whom it reported the amount of the AMERICAN AIRLINES TRANSACTION as delinquent.

**REQUEST NO. 8:**

Admit the sole reason Plaintiff's application for the Mileage Plan Alaska Airlines Visa credit card was denied [was] the charge off of the AMERICAN AIRLINES TRANSACTION on Plaintiff's credit report.

**RESPONSE TO REQUEST NO. 8:**

Defendant admits that Plaintiff's application was originally declined on January 10, 2003, due to the previous charge off of the AMERICAN AIRLINES TRANSACTION.

**REQUEST NO. 9:**

Admit that YOUR written policies do not mandate a determination that services were actually delivered before construing a disputed amount to be correctly shown on YOUR billing statements when a card holder alleges that goods or services were not delivered.

///

///

Ex. 6

138

5

## RESPONSE TO REQUEST NO. 9:

Defendant objects to this request on the ground that it is overbroad as to time and scope, vague and ambiguous as to the terms "written policies," "actually delivered" and "correctly shown," and also upon the ground that the request presumes a duty not imposed by law.

Dated: April 9, 2004

BUCHALTER, NEMER, FIELDS & YOUNGER

BY: _____
JONATHAN D. FINK
Attorneys for Defendant
BANK OF AMERICA, N.A. (USA)

**RESPONSE TO REQUESTS FOR ADMISSION**

Recycled          Stock # R-EX-5-B



G R E E N   &   J I G A R J I A N   L L P

ATTORNEYS AT LAW

May 7, 2004

**VIA FACSIMILE**
**(213) 896-0400**

Jonathan D. Fink
**BUCHALTER, NEMER, FIELDS & YOUNGER,**
A Professional Corporation
601 South Figueroa Street, 24th Floor
Los Angeles, California 90017

      Re:    **Moore v. Bank of America Corporation,**
                **Case No. 03 CV-00520-K (BLM)**

Dear Jonathan:

This letter will serve to confirm the telephone conversation we had today concerning the outstanding discovery responses in the above-captioned case. Please let me know if any of the following does not confirm to your recollection of our conversation.

1.     With respect to Interrogatory No. 1, we agreed that you would confirm that Kelly Smith is reachable at her last known business address and that, should Plaintiff not be able to establish sufficient contact with her through use of this address, we would revisit the issue.

2.     With respect to Interrogatory No. 2, we agreed that it may be understood as follows and responded to accordingly: "With respect to Plaintiff's AMERICAN AIRLINES TRANSACTION dispute case, please state which Chargeback Reason Code(s) were assigned to the case, and, if more than one Chargeback Reason Code was assigned, please state the sequence and duration for each Chargeback Reason Code assigned."

3.     With respect to Interrogatory No. 4, we agreed to limit this interrogatory to "those PERSONS to whom BOA transmitted credit report information relating to the AMERICAN AIRLINES TRANSACTION dispute."

4.     With respect to Interrogatories Nos. 6 and 7, you agreed to IDENTIFY each employee who worked on Plaintiff's AMERICAN AIRLINES TRANSACTION dispute case.

**Ex. 7**
**140**

5.     We were unable to reach agreement and therefore are at an impasse as to Interrogatories Nos. 9-13. Plaintiff's position is that these are now discoverable matters. These Interrogatories relate to class and representative issues, not merits issues. In any event, because there has been no motion to bifurcate discovery, there is no good reason to phase discovery in this manner. Further, class issues go beyond well beyond numerosity (which you indicated a willingness to stipulate to); there is also ascertainability and commonality to consider, and these Interrogatories address those issues.

You made the point that the Court's April 30, 2004 Order narrowed the Complaint's TILA claims. However, the factual issues related to the dismissed TILA claims are nonetheless still present, because the TILA claims remain in the litigation as UCL predicate violations. You indicated that you are standing on your objections. Plaintiffs are willing to narrow this request to cover only those systems used by BOA for billing error claims and disputes. At present, such systems appear to be TYSYS, PEGA, and IMAGE/ICE. And Plaintiffs are of course willing to accept the production of responsive documents in lieu of an interrogatory answer.

6.     With respect to Plaintiff's Request for Production of Documents ("RPD") No. 2, you indicated that all responsive documents have been produced. With respect to Plaintiff's concerns regarding the PEGA system, you explained the that the first two PEGA printouts provided by Defendants were "screen prints," while the third was a "report," such that the third printout was as complete of a document as is available. You further explained that any information missing from that report – such as form letters with missing text – is in fact not maintained anywhere on the PEGA system.

7.     With respect to RPD No. 4, you indicated that it is your understanding that BOA does not utilize any non-electronic form of communication with the credit reporting agencies ("CRAs") and that BOA does not keep a record of either the consumer information that it furnishes to the CRAs, or the electronic communications that it receives from the CRAs. As a result, the only record of such communications is the appearance of the information on the credit report itself.

However, it is our understanding that electronic communications from a furnisher to a CRA (in the standard "Metro 2" format) normally take the form of a monthly "computer dump" and that a record of each dump is then archived for some period of time. It is also our understanding that communications from the CRAs to furnishers (in the standard "ACDV" format) are likewise archived for a period of time. If for some reason BOA does not follow industry standards in this regard, please provide an explanation of why it does not, and what procedures it does follow for archiving this information.

8.     With respect to RPD No. 5, you indicated that an exhaustive search has not turned up any communications between BOA and American Airlines.

9.     With respect to RPD Nos. 8 and 9, we stipulated that they were re-served as of today; that you would retrieve them from your files and examine them; and that would revisit the issue of BOA's response to them next week.

10.    With respect to RPD (Set Two) Nos. 1, 3 and 5, you indicated that an exhaustive search has not turned up any organizational charts. With respect to RPD (Set Two) No. 6, you indicated that all responsive documents have been produced.

As for response times for the above, you stated that you would have to contact BOA in order to get some idea of what this would be, that you would email BOA today, and that you would be communicating the response time to me as soon as possible.

One other matter we discussed was that of FRCP 33(a)'s limit of 25 interrogatories. Your position is that Interrogatories Nos. 1-12 should be counted as Nos. 1-25. Plaintiff disagrees. Interrogatories Nos. 1-13 are properly drafted such that any interrogatory subparts are logically and necessarily related to the interrogatory's primary question and are subsumed under it. In any event, you have objected to answering Interrogatories Nos. 9-13, so this issue is probably best addressed in the context of our Motion to Compel.

Please call me should you have any questions, and I look forward to discussing the outstanding issues with you next week.

                        Yours very truly,

                        GREEN & JIGARJIAN LLP
                        A Limited Liability Partnership


                        John W. Pillette

JWP/lrc

Writer's Direct E-Mail
jwp@classcounsel.com

```
**********************
***   TX REPORT   ***
**********************

TRANSMISSION OK

TX/RX NO            0438
CONNECTION TEL              12138960400
CONNECTION ID
ST. TIME            05/07 16:57
USAGE T             03'19
PGS. SENT              4
RESULT              OK
```



G R E E N　　&　　J I G A R J I A N　　L L P

# FACSIMILE COVER PAGE

|  |  |
|---:|:---|
| To: | Jonathan D. Fink |
| Firm: | **BUCHALTER, NEMER, FIELDS & YOUNGER** |
| Telephone Number: | (213) 891-0700 |
| Fax Number: | *(213) 896-0400* |
| From: | John W. Pillette |
| Date: | May 7, 2004 |
| G&J Case Code: | 1085 |
| Number of Pages (including cover page) | 4 |

**Message:**

Legal Tabs Co. 1-800-322-3022

Recycled    Stock # R-EX-5-B



G R E E N  &  J I G A R J I A N  L L P

October 1, 2004

<u>VIA FACSIMILE</u>
**(213) 896-0400**

Jonathan D. Fink
**BUCHALTER, NEMER, FIELDS & YOUNGER,**
A Professional Corporation
601 South Figueroa Street, 24th Floor
Los Angeles, California 90017

      Re:   <u>**Moore v. Bank of America Corporation,**</u>
             **Case No. 03 CV-00520-K (BLM)**

Dear Jonathan:

      I write to address Bank of America's refusal to designate and produce the person most knowledgeable about the Bank's current dispute resolution procedures as requested in Plaintiff's April 16, 2004 Amended Deposition Notice. Although I have not been actively engaged in all of the prior meet and confer efforts on this issue, I understood that the parties' positions were clear and, in fact, at impasse necessitating motions practice. Much to my surprise, yesterday, you told me that you were unclear as to Plaintiff's contentions regarding the relevance of the Bank's current dispute resolution procedures. We had a discussion about the relevance, namely that should the Court need to fashion injunctive relief (a remedy sought pursuant to two causes of action), the Court needs to understand the Bank's current practices. At the end of the conversation, you requested I outline in writing the basis for the deposition. This letter serves that purpose.

      On October 30, 2003, the Court ordered the Bank to produce all documents concerning the Bank's policies and procedures for compliance with TILA. In response to the Court's Order, the Bank produced only 16 pages of documents. Plaintiff moved for enforcement of the Order. On January 13, 2004, the Court ordered the Bank "to make a diligent and complete search for all responsive documents . . . " and made it clear that sanctions would be awarded if compliance with the order was not timely or complete. Thereafter, the Bank delivered three installments of document productions, totaling over 2,400 pages. The Bank also supplemented its written responses, stating that it has "fully complied" with the Court's Order to the "best of its ability."

      As we understand the Bank's representation, Plaintiff now has all relevant policy and procedures manuals. A review of these materials suggests that the same policies the Bank applied to Plaintiff's billing error dispute are still in place today. If no change in policy has been made, and Plaintiff alleges he was injured by the Bank's policies, then a deposition covering Bank's

235 PINE ST • FIFTEENTH FLOOR • SAN FRANCISCO • CALIFORNIA 94104
TEL (415)477-6700 • FAX (415)477-6710 • EMAIL GJ@CLASSCOUNSEL.COM • WWW CLASSCOUNSEL.COM

current policies in detail is relevant and discoverable (and, indeed, necessary for the Court to craft injunctive relief). If a change of policy was made that is not reflected in the documents produced, this would raise questions about the Bank's compliance with the Court's document production order, but would not render the deposition irrelevant. In fact, exploring why and when any changes were made is discoverable.

To take the discussion to a more detailed level, one of Plaintiff's contentions is that the Bank failed to determine services were "actually delivered" as Section 1666(a)(B)(ii) requires. He alleges that the Bank similarly fails to do so for other consumers. Stated another way, it was not the Bank's policy at the time it handled Plaintiff's dispute to determine that services were actually delivered prior to determining that no billing error occurred. This is apparently still the case. In none of the written policies or training materials does the Bank specify that it must be determined that goods or services were actually delivered in Section 1666(b)(3) disputes prior to determining no billing error occurred. Testimony from the person most knowledgeable about the Bank's current policies will clarify what the policies are (and are not), how they are implemented, and how they are enforced.

In prior correspondence, you stressed that, "Mr. Moore's dispute was handled in 1999-2000 and the system changed in the three years it took him to get around to filing suit." You further contended that, "If Mr. Moore lacks the standing to challenge the current system, which differs from the one under which his dispute was processed, then he is not entitled to any discovery concerning that system or process." This view is misguided. First, as reflected in John Pillette's letters to you, a change in computer and/or software systems does not render the deposition we seek irrelevant. The Bank's compliance with TILA (or the lack thereof) does not rise and fall with the computer interface used by the Bank's employees.

Second, as stated earlier, all evidence produced suggests that the Bank's current policies are similar to those that were in place at the time the Bank handled Plaintiff's dispute. Hence, the assumption inherent in your opposition — that today is different from a few years ago — appears to be incorrect. Moreover, the scope of discovery is broad, such that even if the "system" is different, Plaintiff is entitled to learn how and why it is different. As the Court's recent order compelling the Bank to produce additional information confirms, obtaining information about the Bank's current dispute claims processing is relevant to class certification.

The fact that Plaintiff deposed Olivia Martinez, the Bank employee who handled Plaintiff's dispute, is not a basis for objecting to designating and producing the person most knowledgeable about the Bank's current policies and procedures. First, Ms. Martinez does not speak for the company in the same manner a Rule 30(b)(6) deponent does. Second, Ms. Martinez testified that she was not familiar with the Bank's current software such that she could shed no light on whether any differences were meaningful.

My call to you yesterday and this letter today stem from Plaintiff's attempt to schedule time for the Court to resolve this impasse. I am hopeful that after you consider the positions presented here, Court intervention will not be necessary. Should this matter need to be briefed, however, the Court requests we do so promptly. (Indeed, the Court will be calling you to advance the briefing schedule and hearing on the Bank's motions.) I understand that the Court may be able to address our impasse more quickly if we submit the matter on the papers without oral argument. Plaintiff is willing to do so. I request that you similarly agree to waive oral argument to allow the matter to be resolved quickly and without a formal hearing. In any event, I would like to know whether you intend to stand on your objections as soon as possible because the Court is trying to reschedule several other matters and would like to know when this matter will be presented. To that end, please endeavor to get back to me by October 6th.

Very truly yours,

GREEN & JIGARJIAN LLP
A Limited Liability Partnership

Jenelle Welling

```
***********************
***   TX REPORT   ***
***********************

TRANSMISSION OK

TX/RX NO            1115
CONNECTION TEL                 12138960400
CONNECTION ID
ST. TIME            10/01 14:10
USAGE T             00'40
PGS. SENT           4
RESULT              OK
```



# GREEN & JIGARJIAN LLP

# FACSIMILE COVER PAGE

| | |
|---:|:---|
| To: | Jonathan D. Fink |
| Firm: | **BUCHALTER, NEMER, FIELDS & YOUNGER** |
| Telephone Number: | (213) 891-0700 |
| Fax Number: | (213) 896-0400 |
| | |
| From: | Jenelle Welling |
| Date: | October 1, 2004 |
| G&J Case Code: | 1085 |
| Number of Pages (including cover page) | **4** |

---

**Message:**    Re: *Moore v. Bank of America Corporation*

Please see attached.

Ex. 8
147

Recycled ♻ Stock # R-EX-5-B



GREEN & JIGARJIAN LLP

October 7, 2004

ATTORNEYS AT LAW

**VIA FACSIMILE**
**(213) 896-0400**

Jonathan D. Fink
**BUCHALTER, NEMER, FIELDS & YOUNGER,**
A Professional Corporation
601 South Figueroa Street, 24th Floor
Los Angeles, California 90017

     Re:    <u>Moore v. Bank of America Corporation,</u>
              **Case No. 03 CV-00520-K (BLM)**

Dear Jonathan:

     I appreciate your getting back to me so quickly regarding designating a witness to address the Bank's current practices as to handling 1666a(b) issues. I am encouraged that you are discussing with your client providing such a witness and will advise me in a few days as to the decision. It appears then, that the parties have narrowed their disagreement about depositions to just one area — the Bank's current billing error dispute resolution policies and procedures.

     My reference to 15 USC §§ 1666(a)(B)(ii) was not a mistake. We do believe that Plaintiff is entitled to depose the Bank's pmk in this area. In addition to the points made in my initial letter (that whether there are differences, what they are, why they were made, when they were made, etc, is discoverable), the Bank's position that Plaintiff lacks Article III standing is incorrect.

     As you will recall from <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555 (1992), the standing inquiry involves constitutional and prudential considerations. As for the constitutional limitations, a plaintiff must have suffered (1) an "injury in fact" which is concrete and particularized, for which (2) there is a causal connection between the injury and the conduct complained of, and (3) that which can likely be redressed by a favorable decision. <u>Lujan</u>, at 560. <u>See also</u> <u>McMichael v. County of Napa</u>, 709 F. 2d 1268, 1269 (9th Cir. 1983). The prudential limitations focus on whether the plaintiff asserts his own rights which are not generalized grievances inappropriate for judicial resolution and that are within the zone of interests intended to be protected by the statute. <u>McMichael</u>, at 1269.

     Here, Plaintiff has suffered an injury in fact caused by the Bank's alleged unlawful and unfair conduct and the relief sought will redress his injury. Plaintiff asserts his own rights and his grievances are not generalized, but specific as to the practices to which he was subject and that he alleges are unfair and unlawful. Plaintiff, thus, is not like that in <u>Lee v. American National</u>

235 PINE ST • FIFTEENTH FLOOR • SAN FRANCISCO • CALIFORNIA 94104
TEL (415)477-6700 • FAX (415)477-6710 • EMAIL GJ@CLASSCOUNSEL.COM • WWW.CLASSCOUNSEL.COM

Ex. 9
148

Insurance Company, 260 F. 3d 997 (9th Cir. 2001), for example, who did not buy a life insurance policy from the defendant as thus did not suffer any injury caused by the defendant. Instead, Plaintiff actually has been injured by the Bank's conduct. Stated another way, Plaintiff's UCL cause of action is not premised on a private attorney general theory for which Article III standing is lacking, but rather is rooted in conduct actually experienced by him. Because he was actually injured by the Bank's conduct, he has Article III standing to redress the injury.

That his Section 1666(a) claims were dismissed based on TILA's statute of limitations is neither here nor there. The relevant statute of limitations is the four year statute under the UCL, a cause of action over which the Court exercises supplemental jurisdiction. The Bank's unlawful conduct is within the UCL's four year statute of limitations. Plaintiff has standing to seek injunctive relief for the Bank's alleged unlawful violations of the UCL premised on its violations of Section 1666(a) because Plaintiff was actually injured by the Bank's conduct. In the context of injunctive relief, Article III standing to pursue a UCL claim requires only that the injury be actual or imminent. See e.g. Hangarter v. Provident Life & Accident Ins. Co., 373 F. 3d 998, 1022 (9th Cir. 2004) citing Clark v. City of Lakewood, 259 F. 3d 996 (9th Cir. 2001). Plaintiff satisfies that requirement because he is a current Bank of America consumer credit card holder, and because the Bank's failure to follow TILA continues to cause injury to him today. Cf Hangarter, at 1022 (finding no Article III standing for UCL injunctive relief because plaintiff had no current contractual relationship with defendant).

Finally, the Bank's current billing error dispute resolution policies and procedures are an integral component to the Bank's current policies for reporting a charge as disputed after receipt of a timely further written notice of dispute, considering that Section 1666a's requirements necessarily flow from a determination that no billing error occurred under Section 1666. The principles of discovery are sufficiently broad to permit Plaintiff to obtain testimony about current Section 1666 procedures in order to have a full understanding of Section 1666a procedures. Thus, even if all of the above regarding standing is not enough, Plaintiff believes the Court would grant a motion requesting the deposition because it is within the scope of relevant discovery.

The Court is aware that we are attempting to resolve the impasse, and based on your letter, I believe we have made significant progress. The Court has requested that I provide a final indication of whether motions practice is expected by October 13, 2004, however. I would be grateful, therefore, if you would let me know by then if the Bank will designate a witness for both areas.

Very truly yours,

GREEN & JIGARJIAN LLP
A Limited Liability Partnership

Jenelle Welling

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO              0026
RECIPIENT ADDRESS     12138960400
DESTINATION ID
ST. TIME              10/07 16:32
TIME USE              00'40
PAGES SENT            3
RESULT                OK
```



GREEN   &   JIGARJIAN   LLP

# FACSIMILE COVER PAGE

|  |  |
|---:|:---|
| To: | Jonathan D. Fink |
| Firm: | **BUCHALTER, NEMER, FIELDS & YOUNGER** |
| Telephone Number: | (213) 891-0700 |
| Fax Number: | **(213) 896-0400** |
| From: | Jenelle Welling |
| Date: | October 7, 2004 |
| G&J Case Code: | 1085 |
| Number of Pages<br>(including cover page) | 3 |

**Message:**

Ex. 9
150

Legal Tabs Co.  1-800-322-3022

Recycled  Stock # R-EX-5-B

## SETTLEMENT AGREEMENT AND RELEASE

James R. Moore ("Moore") and Bank of America, N.A. (USA), its affiliates, parents, subsidiaries and assigns ("BofA"), are the parties and signatories hereto and do hereby enter into this Settlement Agreement and Release (this "Agreement") with reference to the following facts:

## RECITALS

A.  There is pending in the United States District Court, Southern District of California, a civil action to which Moore and BofA are parties, bearing Case No. 03 CV 00520 IEG (BLM) (the "Action").

B.  Moore commenced the Action by filing a complaint against BofA on or about March 14, 2003. On or about March 9, 2004, Moore filed a first amended complaint for alleged violations of the Truth and Lending Act (15 U.S.C. § 1666, *et seq.*), on behalf of himself and a purported class; violations of the Fair Credit Reporting Act (15 U.S.C. § 1681S-2(b)); violations of the Unfair Competition Law (California Business and Professions Code § 17200 *et seq.*); unlawful discrimination pursuant to the Equal Credit Opportunity Act, 15 U.S.C., § 1691(a)(3); and breach of contract (the "Dispute"). The claims asserted by Moore arose out of his purchase of an airline ticket using his BofA Visa Credit Card, Account No. ____ ____ ____ 2101 (the "Account").

C.  In or about May 2004, BofA filed its answer to Moore's amended complaint.

D.  The parties hereto wish to settle any and all claims against each other, arising out of or related to the Account, the Dispute, the first amended complaint or the Action, including the filing thereof, on the terms and conditions set forth below, without admission of any liability and to avoid the uncertainty and costs of further litigation.

WHEREFORE, in consideration of the promises, covenants, representations and warranties contained herein, and for good and valuable consideration given hereunder, the sufficiency of which is hereby acknowledged by the signatories to this Agreement, the parties hereby agree as follows:

## AGREEMENT

1.  Effective Date

This Agreement shall become effective on the last date of full execution by all parties hereto (the "Effective Date").

2.  Consideration

2.1.  Obligations of Moore.

2.1.1  Moore shall execute a Stipulation for Dismissal, with prejudice, pursuant to Paragraph 3.7.

2.1.2.  Within 10 days after the Effective Date, Moore shall file such documents and take all actions reasonably necessary to dismiss the Action on behalf of the putative class.

2.2.  <u>Obligations of BofA</u>.

2.2.1.  Conditioned upon entry of the dismissal required by Paragraph 2.1.2, BofA shall Pay to Moore the sum of $1,000.00 as full and final settlement of his claims for damages within 10 business days of the Effective Date. Moore authorizes and instructs BofA to make that payment to his counsel, Green Welling LLP, client trust account.

2.2.2.  BofA shall execute a Stipulation for Dismissal, with prejudice, pursuant to the provisions of Paragraph 3.7, and such other documents that may be reasonably necessary to dismiss the Action.

2.2.3.  Conditioned upon entry of the dismissal required by Paragraph 2.1.2, within 10 business days of the Effective Date, BofA agrees to take all necessary and reasonable steps to request that the three credit bureaus to which it reports (Trans Union, Experian and Equifax) delete any reporting of the Account from Moore's credit history. Moore understands that BofA is not a credit bureau, and it may take 60-90 days for the bureaus to update his credit history. If, at any time following 90 days after the Effective Date, Moore determines that one or more of the above credit bureaus have not complied with BofA's request, Moore agrees to provide prompt written notice to BofA's counsel, at the address provided in Paragraph 10, and provide full copies of any credit bureau report(s) for which Moore contends the Account was not deleted. In that event, BofA shall, within 15 business days following receipt of such notice and reports, re-contact the credit bureau(s) at issue that have not updated Moore's credit report and again request that the Account be deleted from his report. However, Moore understands that BofA has no control over the credit bureaus and shall not hold BofA liable for any credit bureau's actions or inactions beyond those responsibilities agreed to in this Agreement.

2.2.4.  Conditioned upon entry of the dismissal required by Paragraph 2.1.2, within 10 business days of the Effective Date, BofA shall provide a letter to Moore, in the form attached hereto as Exhibit "A."

2.2.5.  Conditioned upon entry of the dismissal required by Paragraph 2.1.2, within 10 business days of the Effective Date, BofA shall provide an Affidavit attesting to the fact that BofA complies with the provisions of 15 U.S.C. § 1666a(b), and describing the procedures currently in place which implement the provisions of that statute. The affidavit shall also attest to the effective date of the current written policies. BofA shall also provide an exemplar of actual correspondence from and to BofA customers, appropriately redacted to protect confidential and private information, which demonstrate the procedures described.

2.2.6.  Within six months after the Effective Date, BofA shall include in its ongoing consumer education program a notice to statemented cardholders regarding the advisability of periodically reviewing credit reports, and the provisions of the Fair Credit Reporting Act which provide for the availability of one free credit report during a 12-month period. By way of example only, this notice may be accomplished in the form of a "statement

stuffer" or in the "customer corner" section of the statement; however, the exact manner of this notice shall be determined by BofA in its sole discretion.

2.2.7. Within six months after the Effective Date, BofA shall include in its policy and training manuals a reference to the portion of 15 USC § 1666 which states that, "In the case of a billing error where the obligor alleges that the creditor's billing statement reflects goods not delivered to the obligor or his designee in accordance with the agreement made at the time of the transaction, a creditor may not construe such amount to be correctly shown unless he determines that such goods were actually delivered, mailed, or otherwise sent to the obligor and provides the obligor with a statement of such determination." BofA shall include this reference in the portion of its procedures, and in a fashion as it deems appropriate, in the exercise of its sole discretion. No cause of action for breach of this Agreement shall arise from the manner in which BofA complies with the provisions of this sub-paragraph.

3. <u>Resolution of Moore's Claim for Reimbursement of Attorneys' Fees</u>

The parties agree that Moore's claim for reimbursement of attorneys' fees and costs arising out of or related to the Action shall be resolved as follows:

3.1. Moore's claim for reimbursement of attorneys' fees shall be submitted to the District Judge for decision, in accordance with a briefing and hearing schedule agreeable to the parties and the Court (hereinafter, the "Decision").

3.2. Solely for the purpose of deciding Moore's claim for reimbursement of attorneys' fees, BofA agrees that Moore is deemed to be the prevailing party only on his claim against BofA pursuant to 15 U.S.C. § 1666a(b). By so agreeing, BofA does not intend to admit, and specifically denies, any liability or wrongdoing, and, except as expressly stated herein, reserves all rights, claims and defenses which it otherwise would have to Moore's claim for reimbursement of attorneys' fees.

3.3. BofA may appeal a Decision in the amount of $225,000 or more, inclusive of costs. If the Decision is in the amount of $225,000 or more, inclusive of costs, BofA shall pay to Moore's counsel, Green Welling ("GW"), the sum of $225,000 within 10 business days after service of the Decision by the Court which shall be a credit against the amount, if any, which may be due from BofA pursuant to the terms of this paragraph. The parties hereby stipulate that, upon payment of that amount by BofA, all action to enforce the Decision shall be stayed, pending a final decision of the Court of Appeal. If BofA intends to exercise its right to appeal, it shall give written notice to Moore, in accordance with Paragraph 10, no later than 30 days after service of the Decision by the Court. If BofA does not appeal, any balance due on the Decision shall be paid no later than 30 days after service of the Decision. If the Decision is affirmed by the Court of Appeal, then within 10 business days after service of the decision of the Court of Appeal, BofA shall pay to GW the difference between $225,000 and the amount of the final Decision, with interest on the difference calculated at the rate of 10% per annum from the date the $225,000 was paid. If the Decision is reversed by the Court of Appeal, then within 10 business days after there is a final and non-appealable Decision, GW shall pay to BofA the amount, if any, by which the final Decision is less than $225,000, together with interest at the rate of 10% per annum on that difference from the date the $225,000 was paid.

3.4. Moore may appeal a Decision which is less than the sum of $225,000, inclusive of costs. If Moore intends to exercise his right to appeal, he shall give written notice to BofA, in accordance with Paragraph 10, no later than five business days after service of the Decision by the Court. If Moore exercises his right to appeal, BofA shall have no obligation to pay anything to Moore during the pendency of the appeal and no interest shall accrue on the amount of the Decision. If Moore does not appeal, BofA shall pay the amount of the Decision within 10 business days after service of the Decision by the Court.

3.5. The appellate rights and procedures defined in this Agreement supersede any other appellate rights and procedures that may be provided by any statute or rule.

3.6. The parties agree that the District Court shall retain jurisdiction to enforce the provisions of Paragraph 3, and all other terms and conditions of this Agreement. Without in any way limiting the generality of the foregoing, the District Court shall have jurisdiction to enter judgment in favor of and against any party hereto to aid in enforcement of the provisions of this Paragraph 3.

3.7. Within 10 business days after there is a final and non-appealable Decision, and BofA has paid the amount, if any, required by the final Decision, Moore shall execute and file a Stipulation for Dismissal and such other documents that may be reasonably necessary to dismiss the Action with prejudice.

3.8. Moore represents and warrants that, other than as set forth in this Agreement, no other person or entity has a claim for reimbursement of attorneys' fees and costs, and that the provisions of this paragraph, and any payment received hereunder, shall constitute full and final settlement of such claims.

4. Discharge

Except for the rights, duties and obligations set forth in this Agreement, Moore and BofA, for themselves and their agents, servants, employees, representatives, assigns, heirs, executors, trustees, joint venturers, partners and attorneys, and each of them, do hereby absolutely, fully and forever release, relieve, waive, relinquish and discharge each other and, as applicable, their current, former and future parents, affiliates, subsidiaries, collection agencies, and each of their respective officers, directors, shareholders, members, agents, servants, employees, insurers, representatives, predecessors, successors, assigns, and attorneys, of and from any and all causes of action, suits and liabilities, now, heretofore existing at law or in equity, whether known or unknown, arising out of or relating to the Dispute, the Account or the Action. Moore further agrees that he shall not file any claims, complaints, affidavits, arbitrations or proceedings with any regulatory or administrative agency with respect to the matters released in this Agreement against any of the aforementioned, and any such claims, complaints, affidavits, arbitrations or proceedings filed prior to the execution of this Agreement shall be dismissed or withdrawn with prejudice. This release is not intended to, and does not, affect any other credit card account, loan or business relationship that may exist between Moore and BofA.

Ex. 10
154

5.    Waiver and Relinquishment of Rights

    5.1.    Waiver of Rights Under California Civil Code § 1542.    Moore and BofA hereby acknowledge that they may hereafter discover facts different from, or in addition to, those which they now claim or believe to be true with respect to the claims released herein, and agree that this Agreement shall be and remain effective in all respects, notwithstanding the discovery of such different or additional facts with respect to the claims released herein. In furtherance of the release given in Paragraph 3 above, Moore hereby acknowledges that he is knowingly and voluntarily waiving his rights under California Civil Code § 1542 to the full extent that he may lawfully waive all such rights and benefits pertaining to the subject matter hereof, and that the consequence of such waiver has been explained to him by his counsel and/or advisors. Moore acknowledges that he is familiar with the provisions of Section 1542 which provides:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR."

    Notwithstanding the provisions of Section 1542, and for the purpose of implementing a full and complete waiver/release in accordance with the terms set forth in Paragraph 4 above, Moore and BofA expressly acknowledge that this release is intended to include in its scope all claims against each other arising from the present dispute which Moore and BofA do not know or suspect to exist in their favor at the time of execution of this Agreement, and that this release contemplates the extinguishment of any such claim or claims. Moore and BofA expressly waive any right to assert hereafter that any claims were excluded from this Agreement through ignorance, oversight, error or otherwise.

6.    Representations and Indemnity

    Each of the parties represents and warrants that he or it has not heretofore assigned, hypothecated or otherwise transferred, or attempted to assign, hypothecate or transfer, any claim or claims being released herein and that there is no other person or legal entity that has not executed this Agreement as a releasing party that has any interest in any such claim or claims. Each party hereby agrees to indemnify and hold the other harmless from any and all liabilities, claims, demands, obligations, damages, costs, expenses and attorneys' fees arising from or related to any claim which, if true, would constitute a breach of this representation and warranty including, but not limited to, all claims resulting from anyone asserting such interest, assignment, hypothecation or transfer. The mutual covenants contained in this Agreement are intended solely for the benefit of the parties hereto, and are not intended to benefit, and are not enforceable by, any person or entity other than the parties to this Agreement.

7.    Authority

    Each party represents and warrants to the other party that the person executing this Agreement on his or its behalf has full authority and capacity to execute this Agreement and to give the releases and other promises contained herein.

Ex. 10
155

8.     No Admission of Liability

This Agreement affects the settlement of claims which are denied and contested, and nothing contained herein shall be construed as an admission by either party of any liability of any kind. Each party denies any liability in connection with any such claims and intends merely to avoid litigating the Action and to buy peace.

9.     Confidentiality

Except for any motions or applications that must be filed in connection with this Agreement, Moore, BofA and their respective counsel agree to keep confidential and shall not reveal, and/or communicate in any way to any person the negotiations leading to or the terms of this Agreement. However, Moore shall have the right to disclose said terms to his accountant or tax advisor and to state and federal tax authorities. As to BofA, the provisions of this paragraph do not prohibit disclosure by BofA to any auditor, regulator, examiner, accountant or any other person or entity entitled to such disclosure or to whom BofA is required to disclose pursuant to any state or federal statute, rule or regulation. Moore, BofA and their respective counsel, agree that, if asked, they shall only reveal that the Action has been settled, and they shall not reveal any other terms of the settlement, without the prior written consent of the other party. If either party receives a subpoena or is ordered by any court to reveal information concerning this settlement which is precluded from disclosure under this paragraph, such party shall give notice of such disclosure to all other party and his or its counsel at least 48 hours prior to any such disclosure unless otherwise ordered by the court.

10.    Notices

Any notice or communication required under this Agreement shall be effective when received and sufficient if given in writing and addressed as follows:

If to Moore:          Jenelle Welling
                      GREEN WELLING LLP
                      235 Pine Street, 15th Floor
                      San Francisco, CA 94104

If to BofA:           Scott H. Jacobs
                      BUCHALTER NEMER FIELDS & YOUNGER
                      601 S. Figueroa Street, Suite 2400
                      Los Angeles, CA 90017-5704

11.    General Provisions

11.1.   Attorneys' Fees and Costs. Except as expressly provided herein, each of the parties hereto shall bear his or its own attorneys' fees, costs and expenses incurred in connection with the disputes between the parties which are the subject of, or related to, this Agreement including, without limitation, the negotiation, drafting and consummation of this Agreement.

11.2. Further Cooperation. Each party hereto agrees to execute all such further and additional documents and instruments, as shall be necessary or expedient to carry out the provisions of this Agreement, and shall promptly and in good faith undertake all reasonable acts to effectuate the provisions of this Agreement.

11.3. Entire Agreement. This Agreement contains the entire agreement and understanding between the parties concerning the subject matter hereof, and any and all prior oral or written agreements or understandings between the parties related hereto are superseded. No representations, oral or otherwise, express or implied, other than those specifically referred to in this Agreement, have been made by either party hereto.

11.4. Choice of Law and Jurisdiction. This Agreement is being executed in the State of California, and it shall be deemed to be made under, and shall be interpreted in accordance with, the internal laws of the State of California.

11.5. Legal Advice. Each party hereto has had the opportunity to consult with independent legal counsel with respect to the advisability of making the settlement provided for herein and of executing this Agreement and all other matters contained herein.

11.6. Investigation. The parties hereby acknowledge that they have been represented in the negotiations for, and in preparation of, this Agreement by counsel of their choice; that they have read this Agreement and have had it fully explained to them by such counsel; and that they are fully aware of the contents of this Agreement and of the legal effect of each and every provision thereof. Each party to this Agreement has made such investigation of the facts pertaining to this Agreement and of all of the matters pertaining thereto as he or it deems necessary.

11.7. Waiver, Modification and Amendment. No provision of this Agreement may be waived unless in writing signed by both of the parties hereto. Waiver of any one provision shall not be deemed to be a waiver of any other provision hereof. This Agreement may not be altered, amended or otherwise changed or modified, except in writing signed by both of the parties.

11.8. Severability. If any part of this Agreement is void or otherwise invalid and hence, unenforceable, such invalid or void portion shall be deemed to be separate and severable from the balance of this Agreement, which shall be given full force and effect as though the void or invalid provision had never been a part of this Agreement.

11.9. Construction. In construing this Agreement, none of the parties hereto shall have any term or provision, or any uncertainty or ambiguity as to any term or provision herein, construed against such party solely by reason of such party having drafted the same, as a result of the manner of the preparation of this Agreement, or otherwise. Each term and provision of this Agreement shall be construed and interpreted so as to render it enforceable. In the event any provision of this Agreement is held to be illegal or unenforceable, the remainder of this Agreement shall be binding and enforceable.

11.10. Execution in Counterparts. This Agreement may be executed in counterparts and all of said counterparts shall collectively constitute one agreement binding on both parties.

Ex. 10
157

11.11. Headings or Pronouns. Headings or captions contained in this Agreement are solely for the convenience of the parties, are not a part of this Agreement, and shall not be used for the interpretation of, or determination of the validity of, this Agreement or any provision hereof. Whenever the context may so require, the masculine gender shall be deemed to refer to and include the feminine and neuter, and the singular shall be deemed to refer to and include the plural, and *vice versa*.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the dates set forth below.

DATED: *May 3, 2005*

JAMES R. MOORE, an individual

DATED:_____

BANK OF AMERICA, N.A. (USA)

By:_____
Name:_____
Title:_____

**AGREED AS TO THE PROVISIONS OF PARAGRAPH 3:**

DATED *May 9, 2005*

GREEN WELLING LLP

By:_____
JENELLE WELLING
Attorneys for JAMES R. MOORE

**AGREED AS TO CONFIDENTIALITY:**

DATED *May 9, 2005*

GREEN WELLING LLP

By:_____
JENELLE WELLING
Attorneys for JAMES R. MOORE

DATED_____

BUCHALTER, NEMER, FIELDS & YOUNGER

By:_____
SCOTT H. JACOBS
Attorneys for BANK OF AMERICA, N.A. (USA)

[SIGNATURES CONTINUE ON PAGE 9]

8

Ex. 10
158

**APPROVED AS TO FORM AND CONTENT:**

DATED _May 9, 2005_          GREEN WELLING LLP

By: _Jenelle W_____
    JENELLE WELLING
Attorneys for JAMES R. MOORE

DATED_____       BUCHALTER, NEMER, FIELDS & YOUNGER

By:_____
    SCOTT H. JACOBS
Attorneys for BANK OF AMERICA, N.A. (USA)

**EXHIBIT "A"**
**TO SETTLEMENT AGREEMENT AND MUTUAL RELEASE**
**BETWEEN JAMES R. MOORE AND BANK OF AMERICA, N.A.**


[BANK LETTERHEAD]


[DATE]


James Randall Moore
[address to be provided]


Re:    . Visa Gold Account No. 4023003260082101 (the "Account")


Dear Mr. Moore:

With regard to the Account, Bank of America can confirm the following information:

1.      The Account was established in January 1999;

2. '    In November of 1999, you notified Bank of America of a dispute with regard to a transaction posted to the Account;

3.      The dispute has been resolved; and

4.      Bank of America has requested that the credit bureaus to which it reports delete any reporting of the account from your credit history.

Very truly yours,

1  BUCHALTER, NEMER, FIELDS & YOUNGER
   A Professional Corporation
2       Scott H. Jacobs, State Bar No. 81980
        Jonathan D. Fink, State Bar No. 110615
3  601 South Figueroa Street, Suite 2400
   Los Angeles, CA 90017-5704
4  Telephone: (213) 891-0700
   Facsimile: (213) 896-0400
5
   Attorneys for Defendant
6  BANK OF AMERICA, N.A. (USA)

7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10

11  JAMES R. MOORE,                    | Case No. 03 CV-00520 IEG (BLM)

12          Plaintiff,                 | **DECLARATION
                                       | OF TAMARA LEASE**
13      vs.                            | **PURSUANT TO CONFIDENTIAL
                                       | SETTLEMENT AGREEMENT**
14  BANK OF AMERICA
    CORPORATION, et al.,
15  Defendants.

16

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///                                          **Ex. 11**

28  BNFY 556437v1                                  **161**

:HALTER, NEMER,
LDS & YOUNGER
.TTORNEYS AT LAW
 LOS ANGELES

       **DECLARATION OF TAMARA LEASE PURSUANT TO
          CONFIDENTIAL SETTLEMENT AGREEMENT**

# DECLARATION OF TAMARA L. LEASE

I, Tamara L. Lease, declare:

1.    I am employed by Bank of America, N.A. (USA) ("BofA") in the capacity of Senior Vice President, Compliance Risk Management. In that capacity, I, and others who work in that department with me, have oversight and training responsibility with regard to various other departments of BofA to monitor and ensure compliance with regulatory requirements. In cooperation with other departments, we work to implement controls, and monitoring and reporting procedures, to ensure that the policies established by BofA are implemented and followed.

2.    The areas of responsibility of Compliance Risk Management include the Card Services department. As a result, I am familiar with the policies and procedures that are specific to that department, including the policy regarding reassertions and reactivations of disputes. That policy provides, among other things, that if a customer disagrees with BofA's resolution of a credit billing dispute, the customer may reassert that dispute in writing within 30 days of the resolution date. If the customer reasserts or reactivates the claim in writing within that time period, the policy provides that BofA may not report the account as delinquent unless BofA:

   a)    reports to the credit bureaus that the customer disagrees with BofA's resolution;

   b)    mails a letter to the customer with the names and addresses of the credit bureaus to which BofA reports; and

   c)    promptly reports any subsequent resolution to the credit bureaus.

3.    BofA's written policy with regard to reassertions and reactivations of disputes was last updated on January 31, 2005, and that is the effective date of the most current written policy.

///

ICHALTER, NEMER,
IELDS & YOUNGER
ATTORNEYS AT LAW
LOS ANGELES

BNFY 547928v1                           I

DECLARATION TAMARA L. LEASE

Ex. 11
162

1    4.    To the best of my knowledge, based upon information that I have
2    obtained personally in the course of performing my duties as well as information
3    provided to me by others whose responsibility it is to provide such information to
4    me, BofA is complying with this policy.

5    5.    Attached hereto, marked as **Exhibits "1"** through **"5,"** are exemplar
6    letters from an actual customer file reflecting BofA's execution of this policy.
7    Based upon my familiarity with the policies and procedures of BofA, and based
8    upon the information provided to me by those individuals who researched the
9    records of BofA to locate these letters, I am able to provide the following
10   explanation of each of these exhibits:

11       Exhibit 1:    This is a letter sent by BofA to the customer acknowledging the
12   inquiry regarding the disputed transaction;

13       Exhibit 2:    This is the "Cardholder Statement of Disputed Item" which was
14   completed and returned by the customer;

15       Exhibit 3:    This is the letter sent by BofA at the conclusion of its
16   investigation which notified the customer that no billing error had occurred;

17       Exhibit 4:    This is additional correspondence received from the customer
18   which BofA considered to be a reassertion of the dispute; and

19       Exhibit 5:    This is a screen print from BofA's computer tracking system
20   which reflects the text of a letter sent to the customer on April 27, 2005. This is a
21   system-generated letter, and it is not BofA's practice to keep hard copies. BofA's
22   computer tracking system keeps a chronological record of the events occurring on
23   customer accounts, including the transmission of letters such as this.

24       I declare under penalty of perjury that the foregoing is true and correct.
25   *Executed at Charlotte, North Carolina.*

26

27   Dated: _05-23-05_                          *Tamara P. Lease*
28                                              TAMARA L. LEASE

BUCHALTER, NEMER,
FIELDS & YOUNGER
ATTORNEYS AT LAW
LOS ANGELES

BNFY 551550v1                           2

DECLARATION OF TAMARA L. LEASE

Ex. 11
163

EXHIBIT 1

DECEMBER 22, 2004

█████████████

ENCINO, CA 91316

RE:  Merchant Name(s):  █████████████
     Amount(s):         $922.44
     Account Number:    XXXXXXXXXXXX█████
     Case Id:           ████████

Dear █████████████:

Thank you for your recent inquiry concerning the above-referenced charge(s), which appeared on Bank of America credit card account.

Our goal is to research and resolve this matter for you in the shortest amount of time possible. Before we can proceed, however, we will need to receive the following information:

- Details of your most recent attempts to resolve this issue with the merchant, including all dates and their responses.
- Indicate if you were informed of a cancellation/refund policy at the time of cancellation and its nature
- The date of cancellation and a cancellation code or number
- A copy of your cancellation letter, reflecting the date and reason for cancellation
- Any pertinent information to support your dispute, including a copy of your telephone bill reflecting the date and time of the call requesting cancellations
- The date you received or expected to receive the merchandise or services for this charge.
- If you were informed of a policy concerning returns or refunds at the time of the transaction and if so, the nature of that policy.
- A copy of the signed UPS, FedEx or postal service tracer as proof the Merchant received the returned merchandise. If returned in person, a copy of the credit slip is needed.
- A detailed description of the merchandise and/or service you requested versus what you received, including how the merchandise was defective, damaged or not as described.
- Any pertinent information, which will support your dispute such as a copy of the sales draft, invoice, contract, credit slip or travel itinerary.
- A detailed Statement explaining your reason(s) for disputing this charge.
- An authorized cardholder's signature. Please complete the enclosed Dispute Form- or, if you prefer, write a letter providing all the information requested on the Dispute Form.

So that we may provide you with efficient service, we ask for your response
within ten days from the date of this letter. You may use the business
reply envelope enclosed for your convenience, or fax your information to
the number listed below. If we do not receive a response from you in the
required time, we will conclude you are in agreement that no billing error
has occurred.

Please contact us if you have any additional questions or if we may assist
you further. Bank of America is committed to Higher Standards and we look
forward to servicing all your banking needs. Thank you for choosing Bank
of America.

Sincerely,

███████████

CLAIMS DEPARTMENT
800.759.2334 (Phone Number)
800.290.9217 (Fax Number)
Enclosure

**EXHIBIT 2**




Encino CA 9131L

PHone M:

Cardholder Statement of Disputed Item   CASE

| NAME | | ACCOUNT # | 4619 |
| MERCHANT | | TRANSACTION DATE 11/26 | POSTING DATE 11/26/04 |
| AMOUNT | 922.44 | REFERENCE # | |
| SIGNATURE | | DAYTIME PHONE | 818- |

I HAVE EXAMINED THE CHARGE(S) MADE TO MY ACCOUNT AND WISH TO DISPUTE
ABOVE ITEM FOR THE FOLLOWING REASON:
**PLEASE CHECK ONLY ONE**

1. ___   I certify that the charge listed above was not made by me nor
a person authorized by me to use my card. I did not receive
any goods or services from this transaction nor did any person
authorized by me.

2. _X_   Although I did engage in a transaction with the above merchant,
I have no knowledge of the particular transaction noted above
and it was not authorized by me or anyone representing me.
My cards were in my possession at the time of the above
transaction. The correct transaction took place on
_11/25_ (date) in the amount of $_922.44_

3. ___   Although I did engage in the above transaction (complete ONE of
the following statements and provide as much detail as possible
to support your statement):

a.___ The dollar amount of the sale was increased from $_____ to
$_____. I am enclosing a copy of my credit card sales receipt
which reflects the correct dollar amount.

b.___ I dispute the entire charge or a portion of it in the amount
of $_____. I have contacted the merchant and asked that a credit
be applied to my account. (Please provide details of the
circumstances surrounding this transaction and your calculations
used to derive the correct amount, if amount is less than total
billed to your account.)

c.___ I have never received the merchandise. I expected to
receive it during the week of _____ (date). I have since
contacted the merchant and asked that a credit be applied to
my account.

d.___ All or part of the shipped or delivered merchandise was
defective or damaged when received. I returned the merchandise
on _____ (date) but have not received a credit for the amount of
$_____. I am enclosing a detailed statement describing the
defects of the merchandise and am enclosing a copy of my proof
of return (receipt from UPS, FedEx, Post Office, a credit voucher
from the the merchant, etc.). In addition, enclosed is an
itemized list of the merchandise received, the items returned
and the cost of each item.

Total Fax 3 Page

EXHIBIT "2"
[Page 1 of 3]

I · d

e.___ The above transaction is a duplication of an authorized transaction that took place on _____(posting date). The reference number of the authorized transaction as shown on my credit card statement is:_____.

f.___ I am enclosing a detailed explanation of the reason(s) the merchant was not able or willing to provide the requested merchandise/services. I am also providing details of my attempts to resolve this matter with the merchant, including date(s) and the merchant response(s).

4.___ I received a credit slip, but it was applied to my account as a charge. I am enclosing a copy of this credit slip.

5.___ I received a credit slip, but it has not yet been applied to my account. I am enclosing a copy of this credit slip.

6.___ I notified the merchant on _____(date) to cancel preauthorized recurring charges (i.e., insurance premium, membership fee). I have cancelled with the merchant and am enclosing a copy of my dated correspondence to the merchant, if available. The merchant provided me with the cancellation number:_____.

7.___ I guaranteed a hotel reservation for late arrival and subsequently cancelled it on _____(date) at _____(AM/PM).

8.___ Other. Please explain on reverse side

I called This ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮
I ask him woth are this charge For
Performing any Service he told me the charge
To My Estimate Work Perform no More Than 4 th.
no Bills proving Ther Part was Replaw, noa
Right installatin for new water heate including
part labour, This water Heata was Rongly install
Secondly his Rong intallin cause Damdgy
To the appliance and new Carpet By water
linking From The Water Heater. I was
Chargi For non Performy The jos. As To Be
Finaly no Authougalin To charge my credit
card under no circumstances. Before opology me

Toping The Situation I found out he has no Pl. Sing license na Work License

I ask him To provide me The Bill For Purchase of material he Pretend intally in My Building no ansir up To Today Dec 30 200



Dec 31. 2004

P.s. On november The 28 2004 I called custimer service To stop The Paymi, The Charge To VISA connected To my checking _____ The cancel hi To supt my Pligation agaunt This Merchant

? Do merchant To clien charger From custimer The Bank I Believe need To have all information about his Busonen saquely his license?

Please cannant By calling. Me AT 817 _____

Happy New Year To All Thank You

EXHIBIT 3



**Bank of America.**

Bank of America
Card Services
2 Commercial Place, 4th Floor
PO Box 1390
Norfolk, VA 23501-1390

Tel 800.759.2334

April 8, 2005

████████████████
████████████████

Encino                    CA 91316

Re:    Merchant Name:     ████████████
       Amount:            $922.44
       Account Number:    XXXX-XXXX-XXXX-1███
       Case Id:           ████████

Dear ████████████:

Thank you for your recent inquiry concerning the above-referenced charge, which appeared on your Bank of America credit card account.

During dispute investigations, Bank of America will act to help resolve disputes with merchants. However, when the dispute involves the quality of goods or services purchased, our ability to assist is limited. These limitations are outlined in the Billing Rights Summary printed on the back of your monthly statement as follows:

1. The amount of the charge must exceed $50.00.
2. The purchase must have been made in your home state or within 100 miles of your mailing address at the time of the transaction.
3. Only the portion of the charge that remains unpaid at the time we are notified of the dispute is subject to being disputed.
4. The cardholder must have made a reasonable attempt to resolve the dispute with the merchant.

When it comes to the area of dispute investigation, I can assure you Bank of America pursues every available channel to resolve these matters with merchants. We have concluded our investigation and determined that no billing error has occurred in this instance as the second opinion provided was invalid. In order for a second opinion to be considered valid it must be written on company letterhead including a contact persons name and telephone number stating that the work performed by the billing merchant was unnecessary, incomplete or of inferior quality, along with an estimate of the cost to correct the problem(s),



**EXHIBIT "3"**
[Page 1 of 2]

Ex. 11
172

Although we are unable to assist you further with this dispute, it may be in your best interest to pursue the matter directly with the merchant. The fact is if you are able to obtain a valid credit slip from the merchant, all you have to do is promptly forward it to us to ensure your account is properly credited.

You have the right to request the documents upon which we relied to determine no billing error occurred.

You're a valuable Bank of America customer, and we're committed to your service satisfaction. If you have any additional questions in this regard, please don't hesitate to call us.

Sincerely,

████████

Card Customer Service
800.759.2334 (Telephone Number)
800.290.9217 (Fax Number)

r0408c11

**EXHIBIT 4**

As per your request
I Fax To To
Chor Slip From
The Merchant.
My Final statement
is I never authorize
This Transaction
I even ask Bank
Bank of Attauca
not Pay IT

Give a fee
Idea of F Bondmont
of Customer Sue
1967

Thank you

~~[redacted]~~
~~[redacted]~~ From
~~[redacted]~~ Fax

Than your letter of 4/8/05
Ref; acct ~~[redacted]~~
C45214 ~~[redacted]~~

Manual Batch Utility :
CREDIT Close Batch
-----------------------
FDR C/D TERM. BASE
Merchant_ID: ~~[redacted]~~

Device_ID: ~~[redacted]~~
                              7259

Batch Number:                    2
Response CLOSE       922.44
Batch ID: ~~[redacted]~~

**Batch Report**
11/26/2004 12:50

EDC:            CREDIT

Sale:
Transaction #          922.44
Trans. Date:                 1
Trans. Time:       11/26/04
M Acc: ~~[redacted]~~   12:50
Exp. Date: ~~[redacted]~~
Reference No.:            1009
Response                   001
                        101624

CREDIT TOTAL:        922.44
=========================

Overall:              922.44

End of Report

Signature
not available
~~[redacted]~~
~~[redacted]~~
LAS VEGAS, NV 89117
702-~~[redacted]~~

11/26/2004  12:49
Sale:

Transaction #              1
Card Type:              VISA
Acc: ~~[redacted]~~
Exp. Date: ~~[redacted]~~
Entry:                  1009
Sale:                 Manual
            922.44
Reference No.:           001
Auth.Code:            101624
Respon. AUTH/TKT     101624
AVS Response :
        Match of address
      and 5-digit ZIP code.

I AGREE TO PAY ABOVE
TOTAL AMOUNT ACCORDING
TO CARD ISSUER AGREEMENT
(MERCHANT AGREEMENT IF
   CREDIT VOUCHER)

X..........................
        SIGNATURE

IMPRINT CARD

BRANCH 01  EC    126 RETRIEVAL REQUEST/FULFILLMENT FORM

CARDHOLDER NUMBER   ACQUIRER REFERENCE NO.   TRANSACTION AMOUNT
                                             8922.44

| ISSUER TYPE | REASON | STATEMENT | ACQUIRING | RETRIEVAL | ISSUER | TRANSA |
| ICA/BIN COPY | CODE | OR POST DT | ICA/BIN | REQUEST DT | CONTROL | IDENTI |
| 0461912 IMAG | 28 | 11/26/84 | C446825 | 02/17/05 | 98035858999 | |

RQID 315048048013 PCID 88605
RCFBIN 443244

5497/8946

ATTN:
LAS VEGAS NV 89117-1377

MERCHANT SERVICES
P.O BOX 5009
HAGERSTOWN MD 21741-500

MERCHANT NUMBER

For chek- Paper 1526
+ correct
Waiting for Bill copy
Frank Blanda

Manual Batch Utility :
CREDIT Close Batch
_____
FDR C/D TERM. BASE
Merchant_ID:

Device_ID:        7259

Batch Number:       2
Response CLOSE  922.44
Batch ID:

**Batch Report**
11/26/2004  12:50

EDC:          CREDIT

Sale:          922.44

Signature
not availa

NV 89
702-

11/26/2004  12:
Sale:

Transaction #
Card Type:
Acc:
Exp. Date:
Entry:
Sale:          922
Reference No.:
Auth.Code:
Respon. AUTH/TKT
AVS Response :

EXHIBIT "4"
[Page 2 of 3]

p.2

To. Whom it may concern,

I ▓▓▓▓ ▓▓▓▓ made plumbing repairs at ▓▓▓▓▓▓▓▓▓▓▓▓ done L.V. NV 89104, for ▓▓▓▓▓▓▓▓ these repairs cost approximately $6,000.00 in labor, plus materials.

The work completed previously was not completed properly + poorly maintained, which caused the problems that Mr. ▓▓▓▓▓▓▓ hired me to make the proper repairs + replacements.

Any questions Please give me a Call at 702-▓▓▓▓

_FAX_

| FROM ▓▓▓▓
| PHONE # 818-▓▓▓▓
| To
| Bank America claim Dept
| Fax # 800-▓▓▓▓
| Fax  800-▓▓▓▓

Sincerely, ▓▓▓▓▓

This For your Request I AM Faxed in To you The Second opinion Request By your Dept on March 2008 Please Credit my acct ending XXXX XXXX XXXX ▓▓▓▓

CASE # ▓▓▓▓▓▓▓

EXHIBIT "4"
[Page 3 of 3]



EXHIBIT 5

```
WCRC KEY  ████████████████                          CLIENT 2330
                                    VIEW LETTER
  ACTION V       ALT TEXT 000     LANG CODE ENU  RGT MRG 75  LAST MAINT 09/24/2004
  01 BANK OF AMERICA
  02 PO BOX 1390
  03 NORFOLK,  VA    23501-1390
  04
  05
  06
  07                                              April 27, 2005
  08
  09 ████████████
  10 ████████████
  11 ████████████████
  12 Encino,   CA    91316-4439
  13
  14
  15
  16
  17
  18
                                                             PAGE 001

  F1=HELP F3=EXIT F7=PBWD F8=PFWD F10=RETURN                     F
```

**EXHIBIT "5"**
[Page 1 of 4]

WCRC KEY ██████████████                                    CLIENT 2330
                                    VIEW LETTER
ACTION V      ALT TEXT 000      LANG CODE ENU  RGT MRG 75  LAST MAINT 09/24/2004
19 RE: XXXXXXXXXXXX█████
20
21
22 Dear ██████████████:
23
24
25 We have received your inquiry regarding the charge(s) totaling $922.44
26 which appeared on your Bank of America credit card account.
27
28 Previously you were advised that we would be unable to assist you further
29 with this claim.  As a result, the disputed amount was removed from
30 dispute status and again became part of your balance owed.  We understand
31 that you disagree with the outcome of your dispute.  In an effort to
32 assist you, we have placed a message on your credit report(s) indicating
33 that you still dispute the portion of your balance associated with your
34 claim.   In the meantime, it may be in your best interest to work directly
35 with the merchant to resolve this matter.
36
                                                              PAGE 002

F1=HELP F3=EXIT F7=PBWD F8=PFWD F10=RETURN                              F

EXHIBIT "5"
[Page 2 of 4]

Date: 4/27/2005 Time: 4:26:15 PM

WCRC KEY ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓                                    CLIENT 2330
                                    VIEW LETTER
ACTION V     ALT TEXT 000     LANG CODE ENU  RGT MRG 75  LAST MAINT 09/24/2004
37 While you disagree with the outcome of your claim, the balance on your
38 account is still due and owing.  Bank of America regularly provides
39 information regarding the status of your credit card account to the
40 following credit bureaus:
41
42 TransUnion                    Equifax Credit Information Services, Inc
43 P.O. Box 2000                 P.O. Box 740241
44 Chester, PA 19022             Atlanta, GA 30374
45 800.916.8800                  888.766.0008
46 www.transunion.com            www.equifax.com
47
48 Experian                      Innovis
49 P.O. Box 9595                 P. O. Box 1358
50 Allen, TX 75013               Columbus, OH 43216-1358
51 888.397.3742                  800.540.2505
52 www.experian.com              www.innovis.com
53
54 We do regret any inconvenience this matter may have caused you.  Please
                                                                    PAGE 003

F1=HELP F3=EXIT F7=PBWD F8=PFWD F10=RETURN                              F

EXHIBIT "5"
[Page 3 of 4]

WCRC KEY ██████████████                           CLIENT 2330

                              *VIEW LETTER*

ACTION V      ALT TEXT 000     LANG CODE ENU  RGT MRG 75  LAST MAINT 09/24/2004
55 contact us if you have any additional questions or if we may assist you
56 further.  Bank of America is committed to Higher Standards and we look
57 forward to servicing all your banking needs.  Thank you for choosing
58 Bank of America.
59
60
61 Sincerely,
62
63
64 ████████████
65 Bank of America Card Services
66 Claims Department
67 Telephone: 1.800.759.2334
68 Fax: 1.800.290.9217
69
70
71
72
                                                                  PAGE 004


F1=HELP F3=EXIT F7=PBWD F8=PFWD F10=RETURN                           F


EXHIBIT "5"
[Page 4 of 4]

Recycled Stock #WEX-5-B

 

## MOORE, BREWER & BURBOTT
A PROFESSIONAL CORPORATION
4180 LA JOLLA VILLAGE DRIVE, SUITE 540
LA JOLLA, CALIFORNIA  92037-1474
TELEPHONE: (858) 626-2880
FAX:  (858) 626-2899

Randy Moore
Direct Dial:  (858) 626-2881
Email:  rmor-mbb@pacbell.net

LOS ANGELES COUNTY OFFICE
924 OVERLAND COURT
SAN DIMAS, CALIFORNIA  91773-1750
TELEPHONE: (909) 394-6590

TEXAS OFFICE
HARTLAND PLAZA BUILDING
1717 WEST SIXTH STREET, SUITE 350
AUSTIN, TEXAS  78703
TELEPHONE: (512) 322-5120

FILE NO.

March 15, 2000

Ms. Olivia Martinez
Credit Card Division
Bank of America
P.O. Box 53137
Phoenix, AZ  85072

      RE:    Account # 4023003260082101
              File # 7939420DEC99

Dear Ms. Martinez:

Your letter of March 8, 2000, puts Bank of America in violation of the federal Truth in Lending Act, its implementing Regulation Z and the federal Fair Credit Billing Act.

Since you refuse to provide me a telephone number at which I can reach legal counsel for Bank of America, I request that you ask Bank of America's legal counsel to contact me.  I can be reached at the above phone number.

Yours very truly,

MOORE, BREWER & BURBOTT,
a Professional Corporation

Randy Moore

RM:wld

February 7, 2003


Bryan Wallace
Department Manager
Card Services,
Bank of America,
    Credit Operations, No AZ9-504-02-01
P.O. Box 53143
Phoenix, AZ 85972-3143

RE:  1) Denial of Credit Card Application
     2) Violation of Federal Truth in Lending Act, Regulation Z
     3) Violation of Federal Fair Credit Reporting Act
     4) Violation of Federal Equal Credit Opportunity Act,
        Regulation B


Dear Mr. Wallace:

I write to give Bank of America one last opportunity to approve my recently submitted credit card application, and in addition, to take all necessary steps to correct various violations of law brought to my attention as a consequence of the Bank's denial of my credit card application. I enclose for your ready reference a copy of your notice of denial letter to me dated January 10, 2003.

I urge you to give this letter your careful attention. Should the action requested here be "above your pay grade" you would do your employer, Bank of America, a great service by being sufficiently persistent to see to it that a person in a position of authority acts on these requests.

Your letter of January 10 recites as the reason for denial of my credit card application, "Bank of America charge off". Upon investigation, I discover that this charge off represents an unpaid charge on a Bank of America Visa card, number 4023-0032-6008-2101.

The facts of the matter in regard to this "charge off" are as follows. The underlying charge which was (evidently) charged off was a $213.75 charge initiated by American Airlines. When this item appeared on my bill, I initiated to Bank of America a billing rights notice concerning the item. The charge represented a charge, in part, for services not delivered by American Airlines. I had, previous to initiating the billing

rights notice to Bank of America, attempted to correct the problem with the initiating merchant, American Airlines.

After many months of aggravation, correspondence and phone calls between Bank of America and me, Bank of America refused to reverse the entry and charge it back to the initiating merchant. Indeed, Bank of America turned the matter to two different collection agencies: one operating under the name of Penncro Associates, Inc., out of Southampton, Pa; the other operating as NCO Financial Systems, Inc., out of Philadelphia, Pa.

Allow me to recite to you language from the reverse side of Bank of America's credit card billing statement:

> **Special Rule for Credit Card Purchases**
> If you have a problem with the quality of goods or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may not have to pay the remaining amount due on the goods or services. You have this protection only when the purchase price was more than $50 and the purchase was made in your home state or within 100 miles of your mailing address (if we own or operate the merchant, or if we mailed you the advertisement for the property or services, all purchases are covered regardless of amount or location of purchase).

Bear with me now as I correlate the facts of my billing rights notice to the foregoing statement. The American Airlines charge related to *a service* not delivered by American Airlines, namely, passage I did not take and for which I was entitled to a refund (on a fully refundable *electronic* ticket). This satisfies the first condition, *a problem with the quality of goods or services that you purchased with a credit card.* I attempted to resolve the problem directly with American Airlines, but ultimately to no avail; indeed I dealt with American Airlines both in writing and telephonically (in the person of Arthur Perez, who identified himself as AA Supervisor of Domestic Sales). This satisfies the second condition, *tried in good faith to correct the problem with the merchant.* The disputed charge is, on its face greater than $50, thus satisfying the third condition, *the purchase price was more than $50.* I purchased the ticket originally while I was in San Diego, California. I assure you a quick reference to a map will show you that San Diego encircles my mailing address in La Jolla, and San Diego is know to be in California – my home state, and thus the fourth condition is satisfied, *the purchase was made in your home state or within 100 miles of your mailing address.*

Mr. Wallace, with all parts of this **Special Rule for Credit Card Purchases** satisfied, at that point the customary practice in the industry would be for Bank of America to reverse the charge in question to American Airlines. Allow me to explain the underlying rationale for this rule, which flows from the Federal Consumer Credit Protection Act. By barring the credit card issuer from collecting on disputed claims, the intent is to have the charge reversed back to the originating merchant in circumstances like this. Then the merchant is left to pursue the consumer in the courts or other available dispute resolution forum. When/if the merchant initiates action to recover the disputed claim, the consumer can present his/her defense and counterclaim. In contrast, without this rule and its underlying legislative policy, the pursuit of the consumer by the bank presents the consumer with a "holder in due course" environment, wherein the consumer's opportunity to present available defenses (e.g. failure to deliver the paid-for service) might be cut off (though, in fact, the defenses are preserved as noted below). The Congress' public policy determination was to the effect it was best to leave the disputed transaction between the direct parties to the dispute – hence the practice that the card issuer reverse the charge back to the originating merchant.

A consumer in the circumstance such as I found myself has additional rights. Regulation Z provides, "When a person who honors a credit card [American Airlines, in this case] fails to resolve satisfactorily a dispute as to property or services purchased with the credit card in a consumer credit transaction, the cardholder may assert against the card issuer [Bank of America, in this case] all claims (other than tort claims) and defenses arising out of the transaction and relating to the failure to resolve the dispute. *The cardholder may withhold payment up to the amount of credit outstanding for the property or services that gave rise to the dispute and any finance or other charges imposed on that amount.*" (Emphasis added, 12 CFR § 226.12(c)(1).) Mr. Wallace, this means I had the right, granted by law, not to pay Bank of America once Bank of America declined to follow the more customary practice of reversing the charge back to American Airlines. (Alternatively, of course, Bank of America could simply have absorbed the charge on its own initiative.)

Federal law provides additional protection to the consumer. "If, in accordance with paragraph (c)(1) [the passage quoted in the immediately preceding paragraph] of this section, the cardholder withholds payment of the amount of credit outstanding for the disputed transaction, the card issuer [Bank of America] *shall not* report that amount as delinquent until the dispute is settled *or judgment is rendered*." (Emphasis added, 12 CFR §226.12(c)(2).) Mr. Wallace, this dispute was surely never settled, and no

judgment was ever rendered. Yet, Bank of America reported this account, not only as delinquent, but as a charge off as well.

Mr. Wallace, I'd like to turn now to my rights and Bank of America's responsibilities under the Federal Fair Credit Reporting Act. As your letter to me of January 10, 2003, so succinctly states, the denial of my credit card application was based up (and solely based upon) a Bank of America charge off, which information was contained in the consumer credit file obtained by Bank of America from the credit reporting agency, Experian based in Allen, Texas. Indeed, I requested and received a copy of this credit report, and sure enough, at page 2 of 16, it shows a charge off of $281 by Bank of America and an account closed at the request of the credit grantor (Bank of America). (Incidentally, the remainder of the 16 page credit report reveals an otherwise high-quality credit profile that would doubtless rank near 700 on a FICO score, including a Bank of America revolving account with a $15,000 credit limit—currently open and never late.) The act of reporting the charged off account, which never should have been classified either delinquent or charged off, is a violation of the Federal Fair Credit Reporting Act. Section 623 of that Act provides, "A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or consciously avoids knowing that the information is inaccurate." 12 U.S.C. §1681s-2(a)(1)(A). And at the same section, it is provided, "A person shall not furnish information relating to a consumer to any consumer reporting agency if (i) the person has been notified by the consumer, at the address specified by the person for such notices, that specific information is inaccurate; and (ii) the information is, in fact, inaccurate." 12 U.S.C. §1681s-2(a)(1)(B). Mr. Wallace, the record (and undoubtedly, Bank of America's files) will reflect I spent, literally, months in conversation and correspondence with Bank of America representatives attempting to cause Bank of America to fulfill its legal obligations and responsibilities. Multiple violations of the Fair Credit Reporting Act are self evident.

This brings us now to the Equal Credit Opportunity Act and Regulation B. As noted above, Bank of America's denial of my application for a credit card was based upon (and solely upon) a Bank of America charge off and an adverse credit report reciting the charge off. I bring to your attention the requirements of the Equal Credit Opportunity Act and its implementing regulation, Regulation B. "It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction--(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract); (2) because all or part of the applicant's income derives from any public assistance program; or (3) *because the applicant has in good faith exercised any right under this chapter* (emphasis added).

15 U.S.C. §1691. The reference to "this chapter" encompasses all of chapter 41 of Title 15 of the United States Code, the entirety of the Truth in Lending Act and the Fair Credit Reporting Act. Mr. Wallace, I suggest to you and to Bank of America that my efforts throughout this situation represent a textbook example of a "good faith exercise" of rights granted under the Consumer Credit Protection Act. Accordingly, the denial of my credit card application was, at its root, "because the applicant has in good faith exercised any right under ..." the Consumer Credit Protection Act.

## ACTION REQUESTED

I request that my application for a credit card be reconsidered, immediately, approved, and issued within thirty (30) days of the date of this letter. More formal action will follow thirty (30) days from the date of this letter.

Respectfully submitted,

/S/

James R. Moore
4180 La Jolla Village Dr., #540
La Jolla, CA 92037
(858) 626-2880

SS# 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

Cc    Experian
      NCAC
      P.O. BOX 9595
      ALLEN, TX 75013

Dear Experian:

I request that the Bank of America charge off reported as your item 1 on my credit report be deleted as false and inaccurate, as amplified in the foregoing correspondence.

/S/

Recycled Stock #WEX-5-B



The Federal Reserve Board eagle logo links to
home page

# Testimony of Governor Edward M. Gramlich
*Regulation Z (Truth in Lending Act)*
**Before the Committee on Banking, Housing, and Urban Affairs, U.S. Senate**
**May 17, 2005**

Chairman Shelby, Senator Sarbanes, and members of the Committee, I appreciate the
opportunity to appear today to discuss consumer credit card accounts. The Board of
Governors of the Federal Reserve System administers the Truth in Lending Act (TILA).
Enacted in 1968, TILA is the primary federal law governing disclosures for consumer
credit, including credit card accounts. It is implemented in the Board's Regulation Z.

TILA has distinct rules for two categories of consumer credit: open-end (revolving) credit
plans, such as credit card accounts and other lines of credit; and closed-end (installment)
transactions, such as auto loans and home-purchase loans. Amendments targeting specific
loan products or practices have been added over TILA's nearly forty-year history and the act
was substantially revised by the Truth in Lending Simplification and Reform Act of 1980.

TILA's purpose is to assure a meaningful disclosure of credit terms so that consumers can
compare more readily the various credit terms available and avoid the uninformed use of
credit. TILA fulfills this purpose by requiring the uniform disclosure of costs and other
terms to consumers. TILA is also intended to protect consumers against inaccurate and
unfair credit billing and credit card practices, which the act seeks to accomplish through
procedural and substantive protections, including special rules for cardholders.

*Regulation Z review.* Regulation Z and its staff commentary have been reviewed and
updated almost continuously, but not comprehensively since 1980. In December 2004, the
Board began a comprehensive review of Regulation Z, starting with the publication of an
advance notice of proposed rulemaking (ANPR) on the rules for open-end credit that is not
home-secured, such as general-purpose credit cards.[1] The goal of the review is to improve
the effectiveness and usefulness of open-end disclosures and substantive protections. The
public comment period recently closed, and the Board's staff will be carefully reviewing the
comment letters as they consider possible changes to the regulations. We also believe that
consumer testing should be used to test the effectiveness of any proposed revisions, and
anticipate publishing proposed revisions to Regulation Z in 2006.

Ex. 13
189

We recognize the hard work that is ahead. The landscape of credit card lending has changed
since TILA's disclosure rules for credit card accounts were first put in place. Products and
pricing are complex. Credit card accounts can be used for purchases, cash advances, and
balance transfers, and each means of access may carry different rates. Promotional rates and
deferred interest plans for limited time periods are commonly layered onto these basic
features. However, under some credit card agreements, paying late or exceeding a credit
limit may trigger significant fees and a penalty rate that is applied to the entire outstanding
balance, and may trigger higher rates on other credit card accounts. Moreover, the amount
of consumers' payments, how creditors allocate those payments to outstanding balances, and

how the balances are calculated all affect consumers' overall cost of credit under open-end plans.

The question is, of course, how might the Board revise its rules under TILA in a way that will enable consumers to more effectively use disclosures about the key financial elements of a particular credit card over the life of the account? Simplifying the content of disclosures may be one way; finding ways to enhance consumers' ability to notice and understand disclosures may be another. Reviewing the adequacy of TILA's substantive protections is a third, and the ANPR asks questions about each of these areas. As the Regulation Z review proceeds, the Board will be grappling with the challenge of issuing clear and simple rules for creditors that both provide consumers with key information about complicated products (while avoiding so-called "information overload") and provide consumers adequate substantive protections, consistent with TILA. For example, TILA contains procedures for resolving billing errors on open-end accounts, prohibits the unsolicited issuance of credit cards, and limits consumers' liability when a credit card is lost or stolen.

To assist the Committee in its deliberations, I will provide an overview of TILA's rules affecting open-end credit plans, focusing on rules for credit card accounts. I will discuss some of the major issues raised in the ANPR, and commenters' views on these issues. I will also address compliance and enforcement issues, along with the role of consumer education in improving consumers' informed use of credit.

**Disclosures for Open-end Credit Plans**
TILA disclosures for open-end plans are provided to consumers:

- On or with credit card applications and solicitations, such as applications sent by direct mail.
- At account opening.
- Throughout the account relationship, such as on periodic statements of account activity and when the account terms change.

*Content.* Generally, the disclosures provided with credit card applications, at account-opening and on periodic statements, address the same aspects of the plan; that is, in each case consumers receive information about rates, fees, and grace periods to pay balances without incurring finance charges. The level of detail differs, however.

Disclosures received with a direct-mail credit card account application are intended to provide a snapshot to help the consumer decide whether or not to apply for the credit card account. For example, revolving open-end accounts involve calculating a balance against which a rate is applied. The method for calculating that balance may differ from creditor to creditor, however. Under TILA, identifying a balance calculation method by title, such as the "average daily balance method (including new purchases)," is sufficient at application. Account-opening disclosures are more detailed and complex, however, in part because the account-opening disclosures required under TILA are typically incorporated into the account agreement. The periodic statement discloses information specific to the statement cycle. In the case of balance calculation methods, the disclosure is typically identical to the account-opening disclosure.

Creditors must also tell consumers about their rights and responsibilities under the Fair Credit Billing Act, a 1974 amendment to TILA that I will discuss later, which governs the

Ex. 13
190

process for resolving billing disputes. In addition to explaining these rights in the account-opening disclosures, creditors must send reminders throughout the account relationship. Under TILA, a detailed explanation must be sent about once a year; typically, however, creditors instead send an abbreviated reminder on the reverse side of each periodic statement, as permitted by Regulation Z.

*Format.* Generally, disclosures must be in writing and presented in a "clear and conspicuous" manner. For credit card application disclosures, the "clear and conspicuous" standard is interpreted to mean that application disclosures must be "readily noticeable." Disclosures that are printed in a twelve-point type size have a safe harbor in the regulation under this standard.

Disclosures for direct-mail credit card account applications have the most regimented format requirements. The disclosures must be presented in a table with headings substantially similar to those published in the Board's model forms. Regulation Z's sole type-size requirement also applies to direct-mail application disclosures; the annual percentage rate for purchases must be in at least eighteen-point type size. Format requirements for credit card account applications available to the general public ("take-one's") are quite flexible. At the card issuer's option, take-one disclosures may be in the form required for direct-mail applications, an abbreviated narrative, or a simple statement that costs are involved that provides information about where details can be obtained.

Compared to application disclosures, account-opening and periodic statement disclosures are governed by few specific format requirements. Except in the context of recently enacted amendments to TILA contained in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("2005 Bankruptcy Act"), disclosures need not be presented in any particular order, nor is there any detailed guidance on the "clear and conspicuous" standard other than a requirement that the terms "finance charge" and "annual percentage rate" must be more conspicuous than any other term.

The 2005 Bankruptcy Act contains several amendments to TILA, three of which are particularly relevant here. The act generally requires creditors to provide on the front page of periodic statements a warning about the effects of making minimum payments and a standardized example of the time it would take to pay off an assumed balance if the consumer makes only the minimum payment, along with a toll-free telephone number that consumers can use to obtain estimates of how long it would take to pay off their actual account balance. In addition, the act provides that if a temporary rate is offered on solicitations and applications, or promotional materials that accompany them, the term "introductory" must be "immediately proximate" to each listing of the temporary rate. The expiration date and the rate that will apply when the introductory rate expires must be "closely proximate" to the first listing of the introductory rate in promotional materials. Under the act, the Board must issue guidance regarding a "clear and conspicuous" standard applicable only to these minimum payment and introductory rate disclosures, including model disclosures.

The Board has published model forms and clauses to ease compliance for many of TILA's disclosure requirements. Creditors are not required to use these forms or clauses, but creditors that use them properly are deemed to be in compliance with the regulation regarding these disclosures. The Board has published model forms for direct-mail credit card account application disclosures, but there are no model forms illustrating account-

**Ex. 13**
**191**

opening or periodic statement disclosures.

*Regulation Z review.* Considering how consumers' use of open-end credit, and credit cards in particular, has grown, and the increased diversity in credit products and pricing, the Board's ANPR asked a number of detailed questions about how to improve the effectiveness and usefulness of TILA's open-end disclosures, including how to address concerns about "information overload." The Board also invited comment on how the format of disclosures might be improved, and whether additional model disclosures would be helpful. The Board announced its intent to use focus groups and other research to test the effectiveness of any new disclosures.

In general, commenters representing both consumers and industry believe that the regimented format requirements for TILA's credit card account application disclosures have proven useful to consumers, although a variety of suggestions were made to add or delete specific disclosure requirements. Many, however, noted that typical account-opening disclosures are lengthy and complex, and suggested that the effectiveness of account-opening disclosures could be improved if key terms were summarized in a standardized format, perhaps in the same format as TILA's direct-mail application disclosure. These suggestions are consistent with the views of some members of the Board's Consumer Advisory Council, who advise the Board on consumer financial services matters. Industry commenters support the Board's intention to use focus groups or other consumer research tools to test the effectiveness of any proposed revisions.

To combat "information overload," many commenters asked the Board to emphasize only the most important information that consumers need at the time the disclosure is given. They asked the Board to avoid rules that require the repetitive delivery of complex information, not all of which is essential to comparison shopping for credit cards, such as a lengthy explanation of the creditor's method of calculating balances that is now required at account-opening and on periodic statements. Commenters suggested that the Board would more effectively promote comparison shopping by focusing on essential terms in a simplified way. They believe some information could also be provided to consumers through educational, non-regulatory methods. Taken together, this approach could lead to simpler disclosures that consumers might be more inclined to read and understand.

**Truth in Lending's Cost Disclosures for Open-end Credit Plans**
As I have indicated, TILA is designed to provide consumers with information about the costs and terms of a particular form of credit, to enable consumers to make comparisons among creditors or different credit programs, or to determine whether they should obtain credit at all.

*Finance charges and other charges.* Creditors offering open-end credit must disclose fees that are "finance charges" and "other charges" that are part of the credit plan. A "finance charge" is broadly defined as any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor, as an incident to or a condition of the extension of credit. Interest, cash advance fees, and balance transfer fees are examples of finance charges. Fees that are not incident to the extension of credit, but are significant charges imposed as part of an open-end plan must also be disclosed as "other charges." Late payment fees, application fees, and recurring periodic membership fees that are payable whether or not the consumer uses the credit plan ("annual fees") are examples of other charges.

Ex. 13
192

*Annual percentage rate.* Under TILA, the finance charge is also expressed as an annualized rate, called the Annual Percentage Rate, or APR. Interestingly, within the Truth in Lending structure, the term represents three distinct calculations, one under TILA's rules for closed-end credit and two under the rules for open-end credit.

For closed-end (installment) credit, the APR includes interest and finance charges other than interest, such as points or origination fees on mortgage loans. Thus, the APR on closed-end transactions can be somewhat higher than the interest rate identified in the loan agreement, whenever other fees are present in the finance charge.

APRs for open-end credit are calculated differently. Interest is the only component of the APR that can be disclosed on credit card solicitations and applications, account-opening disclosures, and advertisements for open-end plans. This is because the actual cost of credit to the consumer is unknown when these disclosures are provided, since the amount and timing of advances and the imposition of fees generally are in the consumer's control.

Periodic statements must also disclose an "effective" or "historic" APR that reflects interest as well as finance charges other than interest, such as a cash advance fee, that were imposed during the past billing cycle. Because non-interest finance charges are amortized over one billing cycle for purposes of disclosing the effective APR, such fees can result in a high, double-digit (or sometimes triple-digit) effective APR on periodic statements. To avoid a skewed APR that could possibly mislead consumers, non-recurring loan fees, points, or similar finance charges related to the opening, renewing, or continuing of an open-end account are currently excluded from the effective APR that is disclosed for a particular billing cycle, under Regulation Z and the Board's official staff commentary.

*Regulation Z Review.* A major focus of the Board's Regulation Z review is how to disclose more effectively the cost of open-end credit. For the industry as a whole, the types of fees charged on open-end consumer credit accounts have grown in number and variety. To the extent these fees are not specifically addressed in TILA or Regulation Z, creditors are sometimes unsure whether the fee should be disclosed under TILA as a "finance charge" or an "other charge," or not disclosed under TILA at all. The Board asked for comment in the ANPR on how to provide more certainty in classifying fees, and whether consumers would benefit from other disclosures that address the cost of credit, such as how creditors allocate payments.

Commenters provided a variety of views. Some suggested that creditors should disclose only interest as the "finance charge" and simply identify all other fees and charges. Others suggested that all fees associated with an open-end plan should be disclosed as the "finance charge." Above all, to mitigate the risks and potential liability for non-compliance, creditors seek clear rules that allow them to classify, with confidence, fees as a "finance charge" or an "other charge" under TILA, or as fees that are disclosed pursuant to the credit agreement or state law. Under the statute, a creditor's failure to comply with TILA could trigger a private right of action by consumers and administrative sanctions by the federal agency designated in TILA to enforce its provisions with regard to that creditor.

One of the Board's most difficult challenges in the Regulation Z review is to address the adequacy of periodic statement APRs. TILA mandates the disclosure of the effective APR on periodic statements, but its utility has been controversial. Consumer advocates believe it is a key disclosure that is helpful, and provides "shock value" to consumers when fees cause

Ex. 13
193

the APR to spike for the billing cycle. Commenters representing industry argued that the effective APR is not meaningful, confuses consumers, and is difficult to explain. They said the disclosure distorts the true cost of credit because fees are amortized over one billing cycle--typically thirty days--when the credit may be repaid over several months. Several commenters urged the Board to include in the effective APR calculation only charges that are based on the amount and duration of credit (interest). In response to the Board's ANPR, some commenters believe the effective APR might be more effectively understood if a disclosure on the periodic statement provided additional context.

Comments received on the merits of requiring creditors to disclose payment allocation methods illustrate the competing interests in improving the overall effectiveness of cost disclosures. Some commenters believe any additional disclosure about payment allocation methods would be excessive and that many card issuers already make such disclosures. Others believe such a disclosure could be helpful to consumers but worry that descriptions might be overly detailed; some asked the Board to publish model disclosures to ensure clarity and uniformity.

*Rate increases.* Credit card account agreements typically allow card issuers to change interest rates and other fees during the life of the account. Agreements spell out with specificity some potential changes, such as that the rate will increase if the consumer pays late. Credit card agreements also more generally reserve the right to increase rates, fees, or other terms.

The statute does not address changes in terms to open-end plans. Regulation Z, however, requires additional disclosures for some changes. The general rule is that fifteen days' advance notice is required to increase the interest rate (or other finance charge) or an annual fee. However, advance notice is not required in all cases. A notice is required, but not in advance, if the interest rate increases due to a consumer's default or delinquency. And if the creditor specifies in advance the circumstances under which an increase to the finance charge or an annual fee will occur, no change-in-terms notice is required when those circumstances are met before the change is made. This is the case, for example, when the agreement specifies that the interest rate will increase if the consumer pays late. Under Regulation Z, because the card issuer has specified when rates will increase in the account agreement, the creditor need not provide advance notice of the rate increase; the new rate will appear on the periodic statement for the cycle in which the increase occurs.

*Regulation Z review.* The ANPR asked how consumers were informed about rate increases or other changed terms to credit card accounts, and whether the current rules were adequate to allow consumers to make timely decisions about how to manage their accounts.

Comments were sharply divided on this issue. Some consumers believe there is not enough advance notice for changes in terms, and believe a much longer time period is needed to find alternative credit sources. Creditors generally believe the current rules are adequate. The fifteen days' advance notice is sufficient, they stated, because change-in-term notices are typically sent with periodic statements, which means as a practical matter consumers receive about a month's notice before the new term becomes effective. Creditors noted that many states require at least thirty days' advance notice and allow consumers to "opt-out" of the new terms by closing the account and paying the outstanding balance under the former terms. For rate (and other) changes not involving a consumer's default, a number of creditors support a thirty-day notice rule and a few support a consumer "opt-out" right under

Ex. 13
194

Regulation Z.

Where triggering events are set forth in the account agreement, creditors believe there is no need to provide additional notice when the event occurs; they are not changing a term, they stated, but merely enforcing the agreement. Some suggested this is a case where consumer education is the best solution, and that perhaps Board-published model forms would result in uniformity and greater consumer understanding. Consumers and consumer groups agreed that change-in-term policies should be more prominently displayed, including in the credit card application disclosures.

## Procedures and Substantive Protections

TILA and Regulation Z provide protections to consumers when a lost or stolen credit card is used ("unauthorized use"), when the consumer believes a charge on a billing statement is in error ("billing error"), and when a purchase is made with a credit card and the consumer cannot resolve with the merchant honoring the card a dispute about the quality of goods or services ("claim or defense"). The Fair Credit Billing Act was enacted, in part, to provide a procedure for resolving disputes between cardholders and merchants who honor credit cards, and to allocate to card issuers some responsibility for providing relief to the consumer if the merchant fails to accommodate the cardholder.

In general, these protections allow the consumer to avoid paying the disputed amount while the card issuer investigates the matter. The card issuer cannot assess any finance charge on the disputed amount or report the amount as delinquent until the investigation is completed.

Depending on the facts, a dispute could trigger one or more of the protections discussed below. The applicability of a protection can hinge on timing (when the cardholder notifies the card issuer about the problem), the outstanding balance (how much of the sale price remains unpaid at the time the cardholder notifies the card issuer), and receipt of the good or services (nothing was delivered, or something was delivered but didn't meet the cardholder's expectations).

*Unauthorized use of a credit card.* A cardholder cannot be held liable for more than $50 for the unauthorized use of a card. State law or other applicable law determines whether the cardholder "authorized" the use of the card. There are no specific timing or procedural requirements to trigger this protection (other than notifying the card issuer). An unauthorized charge may also be raised as a billing error or a claim or defense.

*Billing error.* The billing error provisions contain the strictest timing and procedural requirements of TILA's substantive protections for open-end plans. For example, the consumer's claim must be in writing and sent to the address specifically designated for this purpose. The consumer triggers the billing error rules by notifying the creditor about the dispute. The notice must be received, and creditors must respond, within a set time period. If asserted in a timely manner, a billing error can be asserted even if the consumer previously paid the charge in full.

*Claim or defense for a credit card purchase.* Cardholders may assert against the card issuer any claim or defense they could assert against the merchant. Cardholders trigger the rule by notifying the card issuer that they have been unable to resolve a dispute with a merchant about a sales transaction where a credit card was used. There is no specific time period within which the cardholder must give notice or the card issuer must respond. However, the

Ex. 13
195

cardholder must try to resolve the matter with the merchant before involving the card issuer. Unlike the billing error provision, this remedy is available only if the cardholder has an unpaid balance on the disputed purchase at the time notice is given.

Under TILA, the claim or defense remedy cannot be used to assert tort claims (for example, product liability) against the card issuer. Also, the remedy is available only for sales exceeding $50 and for sales that occur in the state the cardholder has designated as his address or within 100 miles of that address.

*Unsolicited issuance.* Credit cards may be issued to consumers only upon request. Nevertheless, credit cards may be issued to cardholders in renewal of, or substitution for, a previously accepted card (including supplemental cards for the existing account).

*Regulation Z Review.* The Board's ANPR asked whether there was a need to revise the regulations' provisions implementing TILA's substantive protections, for example, whether the rules need to be updated to address particular types of accounts or practices or to address technological changes. To illustrate, TILA requires creditors to credit payments on open-end plans on the day the payment is received. Regulation Z permits creditors to set reasonable cut-off hours, which must be disclosed to consumers. The ANPR solicited comment on payment process systems, where mail delivery and electronic payments may be continuous twenty-four hours a day, seven days a week, and whether further guidance was needed on what constitutes a "reasonable" cut-off hour.

Most industry commenters stated that cut-off hours vary among creditors due to a number of internal and external factors, and asked that creditors' flexibility in processing payments be maintained. The Board also received suggestions for standardizing cut-off hours in ranges, such as between 3 p.m. and 5 p.m. for mail delivery and 6 p.m. and 8 p.m. for electronic payments.

Consumers and some consumer groups suggested that payments be credited as of the date payments are received regardless of the time. They asked the Board to consider rules that would provide greater certainty to consumers with regard to determining when the payment is received, because creditors more frequently than in the past exercise their right under the account agreement to impose late fees when a payment is not received by the due date. Moreover, consumer groups stated, many credit card agreements allow creditors to increase rates when the creditor learns the cardholder was late on another account even if the cardholder makes timely payments to the creditor.

**Supervision and Enforcement**
As part of the bank supervision process, the Federal Reserve enforces safe and sound banking practices and compliance with federal banking laws, including the Truth in Lending rules, with respect to the approximately 915 state-chartered banks that are members of the Federal Reserve System. Other regulators enforce these rules with respect to other institutions. For the vast majority of state member banks, credit card lending is not a significant activity. In fact, of the banks supervised by the Federal Reserve, the issuance of credit cards is the principal business activity of only two of these banks.

In January 2003, the Federal Reserve, along with the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, and the Office of Thrift Supervision, issued interagency guidance on credit card account management practices. Federal Reserve

Ex. 13
196

supervisory staff have applied the principles of this guidance through constructive discussions with bank management about individual institutions' portfolio management practices. In the limited instances where formal or informal enforcement actions have proven necessary to ensure sound management of an institution's credit card portfolio, the Federal Reserve has appropriately exercised this authority.

The Board also investigates consumer complaints against state member banks and forwards complaints it receives involving other creditors to the appropriate enforcement agencies. In 2004, the Board received approximately 5,100 consumer complaints. Of this number, approximately 2,300, or 45 percent, were against state member banks, while about 2,800, or 55 percent, were against other creditors not under the Board's supervisory authority and were forwarded to the appropriate agencies.

About 39 percent of the 2,300 complaints against state member banks processed by the Board were complaints about credit cards. The data show that complainants' main concerns were about interest rates and terms, penalty charges and fees such as late fees, over-the-limit fees, and annual fees. In addition, consumers were concerned that their credit information was incorrectly reported to consumer reporting agencies. By way of comparison, industry estimates suggest there are more than 600 million credit cards in consumers' hands and annual domestic transactions involving credit cards exceed $1 trillion.

**Role for Consumer Financial Education**
This detailed description of the issues of concern in our review of Regulation Z is illustrative of both the complexity of and the growth in today's consumer credit markets. Technology has significantly changed consumers' payment options, with the credit card becoming an accepted payment medium for virtually any consumer good or service. In addition, credit scoring models, the mathematical formulations lenders use to predict credit risk, have enabled creditors to price credit more efficiently, and charge rates of interest commensurate with a consumer's repayment risk. This technology has contributed to the expansion of the subprime market, which has significantly increased access to credit for consumers who, more than likely, would have been denied credit in the past.

As a result, concerns surrounding consumer protection relate as much to issues of fair pricing practices as they do to fair access to credit. In addition, as the industry has become more competitive on interest rate pricing, it has adopted more complex fee structures that, if triggered, affect a consumer's overall cost associated with the credit card.

The use of disclosure rules as a consumer protection strategy is predicated on the assumption that consumers have an understanding of consumer credit and personal financial management principles. By dictating disclosure requirements, regulators and lawmakers rely on consumers to be familiar with basic financial principles and to be able to evaluate personal financial scenarios and options, once they have access to pertinent financial information. Indeed, this is the fundamental premise of our free market system, in which information increases market efficiency. In recent years, however, there has been an increase in concern that consumers' level of financial literacy has not kept pace with the increasingly complex consumer financial marketplace and the expansion of financial service providers and products.

Lenders, regulators, and consumer and community advocacy groups have agreed that there is an increased need for consumer financial education, and have pointed to a variety of

**Ex. 13**
**197**

factors, including record personal bankruptcy filings, high consumer debt levels, and low personal savings rates, to support this assertion. Financial education could encourage consumers to focus on their credit contracts in addition to the TILA disclosures, which highlight the key terms of the contract. Toward this end, many public and private initiatives have been undertaken at both the local and national level to highlight the importance of financial education.

As you know, Congress has established the Financial Literacy and Education Commission and the Financial and Economic Literacy Caucus--further demonstration of the degree of interest and concern in helping consumers obtain the knowledge they need to effectively manage their personal finances. The Federal Reserve System has also been active in promoting consumer financial education, and is an active participant in initiatives to further policy, research, and collaboration in this area.

In closing, I would like to note that disclosure and financial education work in tandem in the interest of consumer protection, and I believe that it is important to continue to focus our collective attention on both fronts.

**Footnotes**

1. The Board's advance notice of proposed rulemaking for Regulation Z. Return to text

[x] Return to top      Return to top

2005 Testimony

Ex. 13
198

Recycled Stock #WEX-5-B

# Credit Report Accuracy and Access to Credit

*Robert B. Avery, Paul S. Calem, and Glenn B. Canner, of the Board's Division of Research and Statistics, prepared this article. Shannon C. Mok provided research assistance.*

Information that credit-reporting agencies maintain on consumers' credit-related experiences plays a central role in U.S. credit markets. Creditors consider such data a primary factor when they monitor the credit circumstances of current customers and evaluate the creditworthiness of prospective borrowers. Analysts widely agree that the data enable domestic consumer credit markets to function more efficiently and at lower cost than would otherwise be possible.

Despite the great benefits of the current system, however, some analysts have raised concerns about the accuracy, completeness, timeliness, and consistency of consumer credit records and about the effects of data limitations on the availability and cost of credit. These concerns have grown as creditors have begun to rely more on "credit history scores" (statistical characterizations of an individual's creditworthiness based exclusively on credit record information) and less on labor-intensive reviews of the detailed information in credit reports. Moreover, decision-makers in areas unrelated to consumer credit, including employment screening and underwriting of property and casualty insurance, increasingly depend on credit records, as studies have shown that such records have predictive value.

A previous article in this publication examined in detail the credit records of a large, nationally representative sample of individuals as of June 30, 1999.[1] That analysis revealed the breadth and depth of the information in credit records. It also found, however, that key aspects of the data may be ambiguous, duplicative, or incomplete and that such limitations have the potential to harm or to benefit consumers.

Although the earlier analysis contributed to the debate about the quality of the information in credit records, it did not attempt to quantify the effects of data limitations on consumers' access to credit. To

date, publicly available information about the extent of data quality problems has been limited, as has research on the effects of those problems.[2] The lack of information has inhibited discussion of the problems and of the appropriate ways to address them.

The main reason for the lack of information is that conducting research on the effects of data limitations on access to credit is complicated. Two factors account for the complexity. First, the effects vary depending on the overall composition of the affected individual's credit record. For example, a minor error in a credit record is likely to have little or no effect on access to credit for an individual with many reported account histories, but the same error may have a significant effect on access to credit for someone with only a few reported account histories. Second, assessments of the effects of data limitations require detailed knowledge of the model used to evaluate an individual's credit history and of the credit-risk factors that compose the model. Because information about credit-scoring models and their factors is ordinarily proprietary, it is difficult to obtain.

In this article, we expand on the available research by presenting an analysis that tackles these complexities and quantifies the effects of credit record limitations on the access to credit.[3] The analysis considers the credit records of a nationally representative sample of individuals, drawn as of June 30, 2003, that incorporates improvements in the reporting system over the past few years and, consequently, better reflects today's circumstances. We examine the possible effects of data limitations on consumers by estimating the changes in consumers' credit history scores that would result from "correcting" data problems in their credit records. We also investigate

1. Robert B. Avery, Raphael W. Bostic, Paul S. Calem, and Glenn B. Canner (2003), "An Overview of Consumer Data and Credit Reporting," *Federal Reserve Bulletin*, vol. 89 (February), pp. 47–73.

2. General Accounting Office (2003), *Consumer Credit: Limited Information Exists on Extent of Credit Report Errors and Their Implications for Consumers*, report prepared for the Senate Committee on Banking, Housing, and Urban Affairs, GAO-03-1036T, July 31, pp. 1–18. In 2004, the General Accounting Office became the Government Accountability Office.

3. This analysis builds on recent research that attempted to quantify the effects of credit record limitations on the access to credit. See Robert B. Avery, Paul S. Calem, and Glenn B. Canner (2003), "Credit Reporting and the Practical Implications of Inaccurate or Missing Information in Underwriting Decisions," paper presented at "Building Assets, Building Credit: A Symposium on Improving Financial Services in Low-Income Communities," Joint Center for Housing Studies, Harvard University, November 18–19.

whether different patterns emerge when individuals in the sample are grouped by strength of credit history (credit history score range), depth of credit history (number of credit accounts in a credit record), and selected demographic characteristics (age, relative income of census tract of residence, and percentage of minorities in census tract of residence). Such segmentation allows us to determine whether the effects of data limitations differ for various subgroups of the population.

## CONSUMER CREDIT REPORTS

A consumer credit report is the organized presentation of information about an individual's credit record that a credit-reporting agency communicates to those requesting information about the credit history of an individual. It includes information on an individual's experiences with credit, leases, non-credit-related bills, collection agency actions, monetary-related public records, and inquiries about the individual's credit history. Credit reports, along with credit history scores derived from the records of credit-reporting agencies, have long been considered one of the primary factors in credit evaluations and loan pricing decisions. They are also widely used to select individuals to contact for prescreened credit solicitations. More recently, credit reports and credit history scores have often been used in identifying potential customers for property and casualty insurance and in underwriting and pricing such insurance.[4]

The three national credit-reporting agencies— Equifax, Experian, and Trans Union—seek to collect comprehensive information on all lending to individuals in the United States, and as a consequence, the information that each agency maintains is vast. Each one has records on perhaps as many as 1.5 billion credit accounts held by approximately 210 million individuals.[5] Together, these agencies generate more than 1 billion credit reports each year, providing the vast majority of the reports for creditors, employers, and insurers. One study found that con-

sumers receive only about 16 million of the credit reports distributed each year.[6]

Credit-reporting agencies collect information from "reporters"—creditors, governmental entities, collection agencies, and third-party intermediaries. They generally collect data every month, and they typically update their credit records within one to seven days after receiving new information. According to industry sources, each agency receives more than 2 billion items of information each month. To facilitate the collection process and to reduce reporting costs, the agencies have implemented procedures to have data submitted in a standard format, the so-called Metro format.[7] Data may be submitted through various media, including CD-ROM and electronic data transfer. Reporters submit information voluntarily: No state or federal law requires them to report data to the agencies or to use a particular format for their reporting. As a result, the completeness and frequency of reporting can vary.

## Using Credit Records to Evaluate Creditworthiness

In developing credit history scores, builders of credit-scoring models consider a wide variety of summary factors drawn from credit records. In most cases, the factors are constructed by combining information from different items within an individual's credit record. These factors compose the key elements of credit models used to generate credit history scores. Although hundreds of factors may be created from credit records, those used in credit-scoring models are the ones proven statistically to be the most valid predictors of future credit performance. The factors and the weights assigned to each one can vary across evaluators and their different models, but the factors generally fall into four broad areas: payment history, consumer indebtedness, length of credit history, and the acquisition of new credit.[8]

4. For purposes of insurance, the scores are typically referred to as insurance scores.

5. John A. Ford (2003), chief privacy officer of Equifax, Inc., in *Fair Credit Reporting Act: How It Functions for Consumers and the Economy*, hearing before the Subcommittee on Financial Institutions and Consumer Credit of the House Committee on Financial Services, House Hearing 108-33, 108 Cong. 2 Sess. (Washington: Government Printing Office), June 4. Also see Consumer Data Industry Association (formerly Associated Credit Bureaus), "About CDIA," www.cdiaonline.org.

6. Loretta Nott and Angie A. Welborn (2003), *A Consumer's Access to a Free Credit Report: A Legal and Economic Analysis*, report to the Congress by the Congressional Research Service, September 16, pp. 1–14.

7. Currently, reporters may submit data in the Metro I or Metro II format. As of 2005, the Metro II format will be required for all submissions.

8. For a more detailed discussion of factors considered in credit evaluation, including the relative weights assigned to different factors, see the description on the website of Fair Isaac Corporation, www.myfico.com. Also see Robert B. Avery, Raphael W. Bostic, Paul S. Calem, and Glenn B. Canner (1996), "Credit Risk, Credit Scoring, and the Performance of Home Mortgages," *Federal Reserve Bulletin*, vol. 82 (July), pp. 621-48.

## Payment History

The most important factors considered in credit evaluation are those that relate to an individual's history of repaying loans and any evidence of non-credit-related collections or money-related public actions. Credit evaluators consider whether an individual has a history of repaying balances on credit accounts in a timely fashion. The analysis takes into account not only the frequency of any repayment problems but also their severity (lateness), date of occurrence (newness), and dollar magnitude. Evaluators assess repayment performance on the full range of accounts that an individual holds, distinguishing accounts by type (such as revolving, installment, or mortgage) and by source (such as banking institution, finance company, or retailer). In general, an individual with serious deficiencies in repayment performance, such as a credit account that is currently delinquent, will find qualifying for new credit difficult, may face higher interest rates for the credit received, or may be limited in further borrowing on existing revolving accounts.

## Consumer Indebtedness

When evaluating credit, creditors consider the type and amount of debt an individual has and the rate of credit utilization. For revolving accounts, the rate of credit utilization is measured as the proportion of available credit in use (outstanding balance divided by the maximum amount the individual is authorized to borrow, referred to as the credit limit). For installment and mortgage accounts, credit utilization is generally measured as the proportion of the original loan amount that is unpaid. High rates of credit utilization are generally viewed as an additional risk factor in credit evaluations, as they may indicate that an individual has tapped all available credit to deal with a financial setback, such as a loss of income.

## Length of Credit History

Credit evaluators consider the length of a person's credit history because it provides information about how long the individual has been involved in credit markets and about whether he or she has obtained credit recently. The age of the account is relevant to an evaluation of credit quality because the longer the account has been open, the more information it con-

veys about an individual's willingness and ability to make payments as scheduled. New accounts may convey little information other than that a consumer has had a recent need for additional credit and has been approved for credit.

## Acquisition of New Credit

Whether a person is seeking new credit provides information about the credit risk posed by the individual. The number of new accounts the individual has recently established and the number of attempts to obtain additional loans, as conveyed by records of recent creditor inquiries (requests for credit reports), all provide a picture of the individual's recent credit profile.[9] Attempts to open a relatively large number of new accounts may signal that a person risks becoming overextended.

## Calculating a Credit History Score

Statistical modelers working with data from credit-reporting agencies construct credit history scores using selected factors of the types described above. Modelers divide each factor into ranges and assign each range a point count. The score for an individual is the sum of these points over all factors considered in the model. Typically, the points and the factors used in the model are derived from a statistical analysis of the relationship between the factors at an initial date and the credit performance over a subsequent period.

## Role of the Fair Credit Reporting Act

Although participation by reporters in the credit-reporting process is voluntary, reporters are subject to rules and regulations spelled out in the Fair Credit Reporting Act (FCRA). The FCRA regulates access to credit information and prescribes how the agencies are to maintain each credit report they hold.[10] Under the FCRA, only persons with a permissible pur-

---

9. Inquiries made to create a mailing list for sending prescreened solicitations or to monitor existing account relationships are omitted from the credit reports. Also omitted are individuals' requests for copies of their own reports.

10. For a discussion of how the FCRA governs and encourages accurate credit reporting, see Michael Staten and Fred Cate (2003), "Does the Fair Credit Reporting Act Promote Accurate Credit Reporting?" paper presented at "Building Assets, Building Credit: A Symposium on Improving Financial Services in Low-Income Communities," Joint Center for Housing Studies, Harvard University, November 18–19.

## Provisions of the Fair and Accurate Credit Transactions Act of 2003

The Fair and Accurate Credit Transactions Act of 2003 amended the Fair Credit Reporting Act in several ways. The amendments, known collectively as the FACT Act, seek to (1) improve the use of credit information and give consumers greater access to such information, (2) prevent identity theft and facilitate credit history restitution, (3) enhance the accuracy of consumer report information, (4) limit the sharing and use of medical information in the financial system, and (5) improve financial literacy and education.

The amendments that address the use and availability of credit information provide the following consumer rights and protections:

• **The right to obtain a free copy of a consumer report.** A consumer may request a free credit report once a year from each of the national credit-reporting agencies, and each agency must establish a toll-free telephone number to receive the requests. A consumer may also obtain a credit history score and related information from each agency for a "fair and reasonable" fee. For a given credit history score, related information includes the range of possible scores under the model used to produce the score, a list of the key factors (not to exceed four) that adversely affected the score, the date the score was established, and the name of the entity that provided the score.

• **The right to be told when, as a result of negative information in a credit report, a creditor has offered a consumer credit on terms that are materially less favorable than those offered to most consumers.** At the time of notification, the creditor must provide a statement that explains the consumer's right to obtain a free credit report from a credit-reporting agency and that provides contact information for obtaining the report (as of this writing, the rules for implementing this provision were not yet final).

• **Protection against faulty reporting of credit record data.** Federal supervisors of financial institutions must establish and maintain guidelines regarding the accuracy and integrity of the information that data reporters submit to credit-reporting agencies. In certain circumstances, a data reporter must reinvestigate a dispute involving the information it reported.

pose for obtaining a credit report—for example, to facilitate a credit transaction, to screen prospective employees, or to underwrite property and casualty insurance involving a consumer—may have access to this credit information. The FCRA prohibits a reporter from furnishing any information to a credit-reporting agency if the reporter knows or consciously avoids knowing that the information is inaccurate, and the act requires reporters to help correct errors that consumers have identified.

The FCRA also prescribes the responsibilities of the reporters and the agencies when a consumer challenges the accuracy of information in a credit record. Within thirty days after a dispute has been filed, a credit-reporting agency must remove or correct inaccurate, incomplete, or unverified information in a consumer's credit record. In addition, anyone using information in a credit report to take adverse action against a consumer (for example, denying a request for credit) must notify the consumer that the report has been used in the decision. Such consumers are entitled to free copies of their reports.[11]

Amendments to the FCRA—enacted December 4, 2003, as the Fair and Accurate Credit Transactions Act (FACT Act)—expand consumer access to credit reports and credit history scores and address issues of data accuracy and identity theft (see box "Provisions of the Fair and Accurate Credit Transactions Act of 2003"). The provisions also expand the duties of creditors to advise a consumer when, as a consequence of information in a credit report, the consumer is offered credit on terms materially less favorable than those made available to most other customers. For the most part, the amendments will become effective at the end of 2004.

*Accuracy, Completeness, Timeliness, and Consistency of Credit Record Information*

Credit-reporting agencies use various techniques and editing procedures to process the information they receive and to assess its accuracy, completeness, timeliness, and consistency. If they discover or suspect that the data contain errors, they return the data to the reporter for resubmission with any necessary corrections.[12] Otherwise, the agencies compile and process the newly received data to create or update the record of an individual's credit experiences. This processing can sometimes be difficult and has the

---

11. About 85 percent of the credit reports that consumers receive each year are associated with adverse actions. See Nott and Welborn, *A Consumer's Access to a Free Credit Report,* p. 10.

12. For example, if a reporter submits a file that includes a much larger or a much smaller number of records than have historically been received, then the agency will flag the file for review. Similarly, if an unexpectedly large or an unexpectedly small percentage of the data items have a given characteristic (for example, the number of accounts sixty or more days late exceeds a designated threshold), then the agency will also flag the data for review.

potential for error. For example, because data reporting is voluntary and because the ability of the agencies to enforce certain standards is limited, the agencies have had to devise techniques for recognizing that sometimes data items reported with the same identifying information, such as the same name, may actually be associated with different individuals. Similarly, a social security number may be missing from or may be reported incorrectly in reported information on an individual. In such cases, the likelihood of associating the reported item with the wrong person increases significantly.

Although the agencies' data are extensive, they are incomplete in two respects. First, not all information on credit accounts held by individuals is reported to the agencies. Some small retailers and mortgage and finance companies do not report to the agencies, and individuals, employers, insurance companies, and foreign entities typically do not report loans they extend. Also, information on student loans is not always reported. Second, some accounts that are reported contain incomplete or out-of-date information. Sometimes creditors do not report or update information on the credit accounts of consumers who consistently make their required payments as scheduled or on the accounts of those who have been seriously delinquent in their payments, particularly accounts with no change in status. Similarly, credit limits established on revolving accounts, such as credit cards, are not always reported or updated. Moreover, creditors may not notify the agencies when an account has been closed, transferred, or assigned a new payment status. For example, sometimes creditors fail to report delinquent payments that are fewer than thirty or sixty days past due, and they report changes in payment status only when a more serious payment problem arises. Each of these possibilities contributes to problems of data completeness and integrity, and each has the potential to compromise the evaluation of an individual's creditworthiness.

Another problem that may compromise credit evaluations concerns the timeliness of the data. The information reported on credit accounts reflects each account's payment status and outstanding balance as of a date shortly before the information is forwarded to the agencies. Thus, the information is sensitive to the date on which the information is forwarded. For example, a credit account reported the day after a creditor has posted a payment to the account will show a smaller balance than will the same account reported the day before the posting. Similarly, the payment status reflected in a credit report is sensitive to timing; the record on an account may indicate no

late payment problems on a given day but may show a delinquency if reported to the agency one or two days later.

Besides the accuracy, completeness, and timeliness of information in a given credit record, the consistency of information about an individual across agencies is an issue of concern. The information may differ from agency to agency for several reasons. First, the rules governing the processing of reported information differ across agencies. For example, each agency has its own rules for determining whether identifying information is sufficient to link reported information to a single individual. The inability to link reported information accurately in all cases can be an important source of data quality concerns because it results in the creation of "fragmentary files"—that is, multiple and therefore incomplete credit reports for the same individual—and sometimes in the assignment of the wrong credit records to an individual. Fragmentary files often result because consumers use different addresses or names (for example, after a marriage or a divorce), in some cases fraudulently, to obtain credit or other services. Each agency also has its own rules governing the treatment of out-of-date information, such as accounts last reported to have a positive balance. Second, the agencies receive and post information at different times. Third, a given reporter may provide information to one or two of the agencies but not to all three. Finally, changes made to disputed information may be reflected only in the credit records of the agency that received the disputed claim.

Although the agencies endeavor to maintain high-quality data and accurate files, the degree to which consumer credit reports are accurate, complete, timely, or consistent across agencies is in dispute. Moreover, analysts disagree on the extent to which data errors and omissions affect credit history scores. A recent analysis by the General Accounting Office (GAO) cites information drawn from the relatively few studies that have attempted to address data accuracy and importance.[13] Specifically, the GAO cites a 2002 joint study by the Consumer Federation of America and the National Credit Reporting Association that found evidence that the information included in the credit reports of any given individual can differ widely across agencies.[14] This study also found that credit history scores based on data from the agencies can vary substantially regardless of whether the individual has a generally good or a generally bad credit

---

13. General Accounting Office, *Consumer Credit.*
14. Consumer Federation of America and National Credit Reporting Association (2002), *Credit Score Accuracy and Implications for Consumers,* December 17. www.consumerfed.org.

history. As a consequence, the study concluded, "millions of consumers are at risk of being penalized by inaccurate credit report information and inaccurate credit scores."[15]

The GAO report also discusses research on errors and omissions that occur within the credit files of a single agency. The report highlights different perspectives on the data quality issue. For example, one investigation by a consumer organization estimated that up to 79 percent of credit reports may contain some type of error and that about 25 percent of all consumer credit reports may contain errors that can result in the denial of access to credit.[16] A study by Arthur Andersen and Company reviewing the outcomes for individuals who were denied credit and then disputed information in their credit reports concluded, however, that only a small proportion of the individuals were denied credit because of inaccurate information in their credit reports.[17]

## THE FEDERAL RESERVE SAMPLE OF CREDIT RECORDS

The Federal Reserve Board obtained from one of the three national credit-reporting agencies the credit records (excluding any identifying personal or creditor information) of a nationally representative random sample of 301,000 individuals as of June 30, 2003.[18] The sample data omitted home addresses but included census tracts, states, and counties of residence. We used this geographic information with census 2000 files—which provide population characteristics, such as income, race, and ethnicity, by census tract of residence—to analyze the credit record data.

Four general types of credit-related information appear in credit records, including those in the Federal Reserve sample: (1) detailed information from creditors (and some other entities such as utility companies) on credit accounts—that is, current and past loans, leases, and non-credit-related bills; (2) information reported by collection agencies on actions associated with credit accounts and non-credit-related bills, such as unpaid medical or utility bills; (3) information purchased from third parties about monetary-related public records, such as records of bankruptcy, foreclosure, tax liens (local, state, or federal), lawsuits, garnishments, and other civil judgments; and (4) information about inquiries from creditors regarding an individual's credit record.

Credit accounts constitute the bulk of the information in the typical individual's credit record, and thus they compose the bulk of the information that the agencies maintain. Credit account records contain a wide range of details about each account, including the date that an account was established; the type of account, such as revolving, installment, or mortgage; the current balance owed; the highest balance owed; credit limits if applicable; and payment performance information, such as the extent to which payments are or have been in arrears for accounts in default.

A basic element of agency data is information on the open or closed status of each account. An account is considered open if a credit relationship is ongoing and closed if the consumer can no longer use the account. Another important element of account information is the date on which the information was most recently reported. The date is critical in determining whether the information on the account in the credit agency files is current or stale (unreported for some time and therefore potentially in need of updating).

Significantly less-detailed information is available on collection agency accounts, public records, and creditor inquiries about a consumer's credit history. Generally, only the amount of the collection or public record claim, the name of the creditor, and the date last reported are available. For creditor inquiries, information is even more limited and includes just the type of inquirer and the date of the inquiry. The

15. Consumer Federation of America and National Credit Reporting Association, *Credit Score Accuracy and Implications for Consumers*. The study found that the difference between the high and the low credit history scores for an individual across the three agencies averaged 41 points (on a scale of 300 to 850) and that about 4 percent of individuals had score differences of 100 points or more.

16. Alison Cassady and Edmund Mierzwinski (2004), *Mistakes Do Happen: A Look at Errors in Consumer Credit Reports*, National Association of State Public Interest Research Groups, June, www.uspirg.org. Also see Jon Golinger and Edmund Mierzwinski (1998), *Mistakes Do Happen: Credit Report Errors Mean Consumers Lose*, U.S. Public Interest Research Group, March, www.uspirg.org.

17. Consumer Data Industry Association (1998), press release, March 12, www.cdiaonline.org. Also see Robert M. Hunt (2002), "The Development and Regulation of Consumer Credit Reporting in America," Working Paper No. 02-21 (Philadelphia: Federal Reserve Bank of Philadelphia, November). The study found that 8 percent of the consumers who were denied credit requested copies of their credit reports. Of these consumers, 25 percent found and disputed errors. Of those consumers who found errors, about 12 percent (3 percent of those who requested credit reports) eventually received credit because of favorable dispute resolutions.

18. Agency files include personal identifying information that enables the agency to distinguish among individuals and construct a full record of each individual's credit-related activities. The records received by the Federal Reserve excluded the personal identifying information that agency files contain—the consumer's name, current and previous addresses, and social security number—as well as other personal information that credit files sometimes contain telephone numbers, name of spouse, number of dependents, income, and employment information. Under the terms of the contract with the credit-reporting agency, the data received by the Federal Reserve cannot be released to the public.

1. Individuals with credit-reporting agency records,
   by type of information in credit record,
   as of June 30, 2003

| Type of information in credit record | Number | Share of sample (percent) |
|---|---|---|
| **Sample size** | **301,536** | **100.0** |
| Credit account | 259,211 | 86.0 |
| Collection agency account | 109,964 | 36.5 |
| Public record | 36,742 | 12.2 |
| Creditor inquiry[1] | 188,616 | 62.6 |
| None of the above | 15 | * |
| **MEMO** | | |
| Credit account only | 63,501 | 21.1 |
| Collection agency account only | 34,978 | 11.6 |
| Public record only | 53 | * |
| Creditor inquiry only[1] | 31 | * |
| Credit account and | | |
| Collection agency account | 67,747 | 22.5 |
| Public record | 34,715 | 11.5 |
| Creditor inquiry[1] | 182,553 | 60.5 |

NOTE. In this and subsequent tables, components may not sum to totals because of rounding.

1. Item includes only inquiries made within two years of the date the sample was drawn.

* Less than 0.5 percent.

1. Distribution of individuals, by credit history score



**Credit history score**

NOTE. Data are from a Federal Reserve sample drawn as of June 30, 2003. The distribution is composed of individuals in the sample who had been assigned credit history scores. Authors have adjusted the scores, which are proprietary, to match the distribution of the more familiar FICO credit history scores, developed by Fair Isaac Corporation.

agencies generally retain inquiry information for twenty-four months.

In aggregate, the Federal Reserve sample contained information on about 3.7 million credit accounts, more than 318,000 collection-related actions, roughly 65,000 monetary-related public record actions, and about 913,000 creditor inquiries. Not every individual had information of each type. In the sample, approximately 260,000, or 86 percent, of the individuals had records of credit accounts as of the date the sample was drawn (table 1).[19] Although a large portion of individuals had items indicating collection agency accounts, public record actions, or creditor inquiries, only a very small share (well less than 1 percent) of the individuals with credit records had only public record items or only records of creditor inquiries. However, for about 12 percent of the individuals, the only items in their credit records were collection actions.

### Credit History Scores in the Sample

The credit-reporting agency provided credit history scores for about 250,000, or 83 percent, of the individuals in the sample. The agency used its propri-

19. The credit account information was provided by 92,000 reporters, 23,000 of which had reported within three months of the date the sample was drawn.

etary credit-risk-scoring model as of the date the sample was drawn to generate the scores (one for each individual), which it constructed from selected factors of the type described previously. The proprietary credit-risk score is like other commonly used consumer credit history scores in that larger values indicate greater creditworthiness. The agency did not assign scores to anyone who did not have a credit account. A small proportion of individuals without scores did have credit accounts, but most of these individuals were not legally responsible for any debt owed.

To facilitate this discussion, we have adjusted the proprietary credit-risk scores assigned to individuals in the Federal Reserve sample to match the distribution of the more familiar FICO credit history scores, for which information is publicly available.[20] Among the individuals in our sample who had scores, about 60 percent had adjusted scores of 701 or above (chart 1). Individuals with FICO scores in this range are relatively good credit risks. According to Fair Isaac Corporation, less than 5 percent of such con-

20. For a national distribution of FICO scores, see www.myfico.com/myfico/creditcentral/scoringworks.asp. All three agencies use versions of the FICO score, which is generated from software developed by the Fair Isaac Corporation. Each agency gives the score a different name. Equifax calls it the Beacon score; Experian, the Experian/Fair Isaac Risk score; and Trans Union, the Empirica score. In developing the scores, Fair Isaac used the same methods at each agency but estimated the FICO model differently at each one, using separate samples. Thus, just as the information about an individual can differ across the three companies, so can the FICO model.

sumers are likely to become seriously delinquent on any debt payment over the next two years.[21] In contrast, about 13 percent of individuals in our sample had adjusted scores at or below 600. According to Fair Isaac, more than half of these consumers are likely to become seriously delinquent on a loan over the next two years.

Because credit history scores can be used to measure credit risk, creditors use them, along with other measures of creditworthiness, such as collateral, income, and employment information, to determine whether to extend credit and, if so, on what terms. Credit history scores are closely aligned with the interest rates offered on loans—that is, higher scores are associated with lower interest rates. For example, as of August 30, 2004, the national average interest rate for a thirty-year fixed-rate conventional mortgage for an individual with a FICO score of 720 or more was 5.75 percent, whereas the average interest rate for someone with a score below 560 was 9.29 percent.[22]

### Assessing the Effects of Data Limitations

The analysis to assess the potential effects of data limitations on an individual's access to credit involves two steps: identifying data problems in an individual's credit record and simulating the effects of "correcting" each problem on the availability or price of credit as represented by the change in the individual's credit history score. To conduct this exercise, one must know (1) the factors used to construct the score, (2) the points assigned to these factors in deriving an individual's score, and (3) the process used to create the underlying factors from the original credit records.

The Federal Reserve's sample includes all the information that would be necessary to construct any credit history score and its underlying factors from the original credit records. However, the details of the credit-reporting agency's credit-scoring model, including the factors and point scales used in the model, are proprietary and were not made available to the Federal Reserve. Nevertheless, we were able to approximate the model by using three types of infor-

mation: (1) the proprietary credit-risk score assigned to each individual in our sample; (2) a large set of credit factors for each individual—a subset of which was known to comprise the factors used in the proprietary credit-scoring model; and (3) detailed account-level information in each individual's credit record. We used the first two items to construct an approximation of the proprietary credit-scoring model, employing regression techniques to estimate the points to assign to each factor. We used the second and third items to "reverse-engineer" the credit factors included in our version of the credit-scoring model. This information enabled us to recalculate how the factors—and ultimately the credit history scores—would change if alterations were made to the underlying credit records so that we could simulate the effects of correcting a data problem or omission.

Because of the numerous potential factors and specifications that could have been used to construct the proprietary credit-risk score, our version of the credit-scoring model undoubtedly differs from the actual proprietary model. However, we were able to identify almost exactly the process used to construct the factors in the actual model from the underlying credit records. Moreover, the approximated and actual model scores corresponded quite closely. Thus, we believe that our approximation of the scoring process provides a reasonable estimate of the potential effects of a change in a credit record item on an individual's credit history score.

Other model builders consider different credit-risk factors in creating their scoring models, assign different points to the factors, and employ different rules for constructing the factors. As a consequence, even if we had identified the proprietary model exactly, the results of our analysis would not necessarily have been the same as those implied by other models. Nevertheless, our results should be viewed as indicative of the implications of data quality issues for scoring models in general and as applicable in many, if not all, respects.

### Data Quality Issues

As noted earlier, a previous article in this publication examined in detail the credit records of a sample of individuals as of June 30, 1999, and found that key aspects of the data were ambiguous, duplicative, or incomplete. The article highlighted four areas of concern: (1) The current status of "stale" accounts, which show positive balances (amounts owed that are greater than zero) but are not currently reported, is ambiguous; (2) some creditors fail to report

---

21. The term "seriously delinquent" means falling behind on a loan payment ninety days or more, defaulting on a loan, or filing for bankruptcy.

22. See www.myfico.com. Loan rate includes 1 discount percentage point and is based on a loan amount of $150,000 for a single-family, owner-occupied property and on an 80 percent loan-to-value ratio. As the data on the web site show, interest rates vary little by credit history score for individuals with scores above 700.

credit account information, including nonderogatory accounts (accounts whose payments are being made as scheduled) or minor delinquencies (accounts 30 to 119 days in arrears); (3) credit limits are sometimes unreported; and (4) the reporting of data on collection agency accounts and public records may be inconsistent or may contain redundancies, and some of the items regarding creditor inquiries are often missing. Our simulations, discussed below, address these areas of concern.

### *Ambiguous Status of Stale Accounts*

A primary concern about data quality involves stale accounts. About 29 percent of all accounts in the sample showed positive balances at their most recent reporting, but the report date was more than three months before the sample was drawn. These accounts fell into one of three categories based on their status when last reported: major derogatory (accounts that are 120 days or more in arrears and involve a payment plan, repossession, charge-off, collection action, bankruptcy, or foreclosure), minor delinquency, or paid as agreed. Of all stale accounts with a positive balance at last report, about 15 percent were reported to be major derogatories, 3 percent were minor delinquencies, and 82 percent were paid as agreed.

Analysis of the credit records in the sample suggests that many of these stale accounts, particularly those involving mortgages and installment loans, were likely to have been closed or transferred but were not reported as such. Many were reported by creditors that were no longer reporting data to the agency about any individuals when the sample was drawn, and thus information on these accounts was unlikely to be up to date. The significant fraction of positive-balance stale accounts that were likely closed or transferred implies that some consumers will show higher current balances and a larger number of open accounts than they actually hold.

Because the current status of stale accounts is often unclear, users of consumer credit reports must obtain additional information or make assumptions about the status. In credit-scoring models, such assumptions are inherent in "stale-account rules" that credit modelers typically apply when they calculate an individual's credit history score. A stale-account rule defines the period for which reporting is considered current and thus identifies stale accounts. The rule also dictates how accounts identified as stale should be treated. In most cases, the rule treats them as closed accounts with zero balances.

To some extent, rules that consider stale accounts closed and paid off may mitigate concerns about stale account information. Another possible mitigating factor is that consumers who review their credit reports for mistakes are likely to catch stale-account errors and to have them corrected. Nevertheless, stale-account rules and consumer action can only partially correct the problem of noncurrent information in credit account records. For example, a rule that is conservative in identifying stale accounts may permit noncurrent information to be used over an extended period, whereas an overly aggressive rule may nullify information that is still current.

### *Failure to Report Credit Account Information*

Some reporters provide incomplete performance information on their accounts, and others fail to report any information about some credit accounts. For example, in the Federal Reserve sample, 2.7 percent of the large creditors reported only credit accounts with payment problems.[23] The failure to report accounts in good standing likely affected the credit evaluations of consumers with such accounts. The way in which credit evaluations are affected depends on the circumstances of an account. For consumers with a low utilization of nonreported accounts, the failure to report may worsen their credit evaluations. For consumers with a high utilization of nonreported accounts, however, the failure to report may result in better credit evaluations than are warranted.

In addition, some creditors report minor delinquent accounts as performing satisfactorily until the accounts become seriously delinquent. Almost 6 percent of the large creditors in the Federal Reserve sample followed this practice. Because the credit histories for consumers who fall behind in their payments to such lenders appear somewhat better in the credit records than they actually are, these consumers may benefit from such underreporting.

Finally, some lenders withhold account information. For example, in 2003, Sallie Mae, the nation's largest provider of student loans, decided to withhold information on its accounts from two of the three credit-reporting agencies. Clearly, while this policy was in effect, the failure to report information harmed some consumers and benefited others depending on

---

23. Some lenders, particularly those that specialize in lending to higher-risk individuals (referred to here as subprime lenders), choose to withhold positive performance information about their customers for competitive advantage.

whether the withheld information was favorable or unfavorable.

## Unreported Credit Limits

A key factor that credit evaluators consider when they assess the creditworthiness of an individual is credit utilization. If a creditor fails to report a credit limit for an account, credit evaluators must either ignore utilization or use a substitute measure such as the highest-balance level—that is, the largest amount ever owed on the account. Substituting the highest-balance level for the credit limit generally results in a higher estimate of credit utilization because the highest-balance amount is typically lower than the credit limit; the higher estimate leads, in turn, to a higher perceived level of credit risk for affected consumers.

For the June 30, 1999, sample of individuals, proper utilization rates could not be calculated (the highest-balance levels had to be used) for about one-third of the open revolving accounts because the creditors had not reported the credit limits. At that time, about 70 percent of the consumers in the sample had missing credit limits on one or more of their revolving accounts. Circumstances have improved substantially since then because public and private efforts to encourage the reporting of credit limits have resulted in more-consistent reporting. Nevertheless, in the sample drawn as of June 30, 2003, credit limits were missing for about 14 percent of revolving accounts, and the omissions affected about 46 percent of the consumers in the sample. Thus, although the incidence of missing credit limits has fallen substantially, it remains an important data quality issue.

## Problems with Collection Agency Accounts, Public Records, and Creditor Inquiries

Data on collection agency accounts, public records, and creditor inquiries are a source of inconsistency, redundancy, and missing information in credit records.

## Collection Agency Accounts

Evidence suggests that collection agencies handle claims in an inconsistent manner. Most notably, some collection agencies may report only larger collection amounts to credit-reporting agencies, whereas others

may report claims of any size.[24] Inconsistent reporting does not imply inaccuracy of the information that does get reported, but it does imply some arbitrariness in the way individuals with collections are treated. Those whose collection items happen to be reported to the credit-reporting agency will have lower credit history scores than will those whose collection items go unreported. This situation raises the question as to the extent and effect of such arbitrary differences in treatment, particularly for small collection amounts. In addition, anecdotes abound about consumers who have had difficulty resolving disputes over collection items or who have had trouble removing erroneous items from their credit records.

Another potentially important data quality issue for collection agency accounts is duplication of accounts within collection agency records. Duplications can occur, for example, when a collection company transfers a claim to another collection company. Duplications can also occur when a debt in collection is satisfied but the paid collection is recorded as a separate line item by the collection agency. Analysis of the collection agency accounts in the latest Federal Reserve sample suggests that about 5 percent of collection items are likely duplications resulting from such transfers or payouts.

Credit evaluators also have some concern about the appropriateness of using medical collection items in credit evaluations because these items (1) are relatively more likely to be in dispute, (2) are inconsistently reported, (3) may be of questionable value in predicting future payment performance, or (4) raise issues of rights to privacy and fair treatment of the disabled or ill. The last concern recently received special attention with the inclusion of provisions in the FACT Act that address medical-related collections. One provision requires the credit-reporting agencies to restrict information that identifies the provider or the nature of medical services, products, or devices unless the agencies have a consumer's affirmative consent. In the future, the agencies may be able to meet this requirement by using a code, with the name of the creditor suppressed, to distinguish medical-related collections from other collections. Because the coding system is prospective, however, even if implemented today, years may pass before all the collection items in the agency files have this code. In the interim, if the name of the creditor is suppressed, distinguishing medical collection items

---

24. One indication of the inconsistent reporting of collection items is the wide dispersion across states in the ratio of small collection items to all collection agency accounts. The percentage ranges from 30 percent to 60 percent.

will depend on the ability of the credit-reporting agencies to mechanically code historical data. If such coding is done imperfectly, it may adversely affect consumers who deal with creditors that want to discount collection items involving medical incidents. (As of September 2004, at least one of the agencies had developed a system that suppresses the name of the creditor and uses a code to distinguish medical-related collections.)

## Public Records

Public records suffer from similar consistency and duplication problems that affect collection items. In particular, a single episode can result in one or more public record items depending on how it is recorded. For example, tax liens can be recorded on a consolidated basis or treated as separate items. Similarly, amendments to a public record filing, such as a bankruptcy or a foreclosure, can be treated as updates, which result in no change in the number of items, or as new filings.

In addition, evidence suggests that the credit-reporting agencies inconsistently gather information on lawsuits that the courts have not yet acted on, in part because some agency officials believe that the mere filing of a lawsuit does not necessarily relate to future credit performance. For the most part, such lawsuits are missing from the public records. However, for idiosyncratic reasons, some lawsuits have been reported in nonrandom ways. Specifically, 80 percent of the lawsuits in the Federal Reserve sample came from only two states, an indication that residents of these states may be at a disadvantage in credit evaluations.

About one-fourth of non-bankruptcy-related public records reflect dismissals. In such cases, the courts seem to have determined that the individuals are not legally liable. Such information may be of questionable value for credit evaluations.

## Creditor Inquiries

Although credit evaluators use information on creditor inquiries to predict future loan performance, the value of this information is limited in an important way. Ideally, credit evaluators would use such information to distinguish the consumers who are seeking multiple loans to greatly expand their borrowing from the consumers who are shopping for the best terms for a single loan. However, the information that evaluators need to make this distinction—that is, a

code that identifies the type of credit sought from the inquiring lender—is generally not available in inquiry records (it is missing from 99 percent of the inquiries in the Federal Reserve sample). Consequently, credit evaluators must use less reliable rules, potentially harming consumers who are simply shopping for a single loan by failing to distinguish them sufficiently from consumers who are seeking an excessive amount of credit.

## DESIGN OF THE SIMULATIONS

We designed a series of simulations to estimate the potential effects of the data quality issues identified in the preceding section. Each simulation identified a set of "data problems" or potential problems, applied a plausible "correction" to each problem, and used an approximation of the proprietary credit-risk model to evaluate the effect of the correction on the credit history scores of individuals who had the problem in their credit records.[25] We estimated how many consumers each data problem affected; and for those who were affected, we estimated how many would see a decrease or an increase in their scores and by how much when the problem was corrected.

### Selecting Factors in the Approximated Model

The first step in setting up the simulations was selecting the factors to be used in the approximated credit-scoring model. The approximated model used seventy-three factors, including the number of credit accounts of different types and the various characterizations of payment history patterns, such as the number of accounts with all payments made on time, in various stages of delinquency, or with major derogatory status. Also included were measures of outstanding balances, credit limits on revolving accounts, ages of credit accounts, variables derived from collection agency accounts and public records, and account inquiry information. Our discussions with credit evaluators suggested that most credit history models are based on a smaller number of factors than were included here. However, most of the "additional" variables in our model were decompositions or interactions that involved more general factors and were unlikely to lead to significant distortions in our representations of the effects of data quality issues.

---

25. We use the terms "data problem" and "correction" in their broadest sense. For example, "data problem" may mean an actual problem or only a potential problem. Similarly, "correction" may mean a solution to a problem or simply a "best guess" at a solution.

2. Share of individuals with selected factors used in credit evaluation, distributed by type of account
Percent except as noted

| Factor used in credit evaluation | Type of account | | | | Factor used in credit evaluation | Type of account | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Revolving | Installment | Mortgage | Total | | Revolving | Installment | Mortgage | Total |
| *Number of credit accounts* | | | | | *Number of credit accounts 30 days past due in past 12 months* | | | | |
| No account | 3 | 26 | 55 | 0 | 0 | n.a. | n.a. | n.a. | 75 |
| 1 | 13 | 16 | 14 | 9 | 1 | n.a. | n.a. | n.a. | 13 |
| 2 | 7 | 12 | 11 | 5 | 2 | n.a. | n.a. | n.a. | 5 |
| 3-5 | 18 | 22 | 16 | 12 | 3 or more | n.a. | n.a. | n.a. | 7 |
| 6-8 | 16 | 11 | 3 | 11 | Total | n.a. | n.a. | n.a. | 100 |
| 9 or more | 43 | 12 | 1 | 62 | | | | | |
| Total | 100 | 100 | 100 | 100 | *Number of credit accounts 60 days past due in past 12 months* | | | | |
| *Number of open credit accounts paid as agreed* | | | | | 0 | n.a. | n.a. | n.a. | 82 |
| 0 | 17 | 58 | 71 | 10 | 1 | n.a. | n.a. | n.a. | 10 |
| 1 | 13 | 25 | 24 | 13 | 2 | n.a. | n.a. | n.a. | 4 |
| 2 | 9 | 10 | 4 | 9 | 3 or more | n.a. | n.a. | n.a. | 4 |
| 3-5 | 23 | 6 | 1 | 21 | Total | n.a. | n.a. | n.a. | 100 |
| 6-8 | 16 | 1 | 0 | 17 | | | | | |
| 9 or more | 22 | 0 | 0 | 30 | *Number of credit accounts 90 days past due in past 12 months* | | | | |
| Total | 100 | 100 | 100 | 100 | 0 | n.a. | n.a. | n.a. | 86 |
| *Number of credit accounts opened in most-recent 12 months*[1] | | | | | 1 | n.a. | n.a. | n.a. | 8 |
| 0 | 75 | 79 | 89 | 46 | 2 | n.a. | n.a. | n.a. | 3 |
| 1 | 17 | 15 | 9 | 25 | 3 or more | n.a. | n.a. | n.a. | 3 |
| 2 or more | 8 | 6 | 2 | 29 | Total | n.a. | n.a. | n.a. | 100 |
| Total | 100 | 100 | 100 | 100 | | | | | |
| *Years since most-recent credit account opened*[1] | | | | | *Number of credit accounts more than 90 days past due* | | | | |
| 0 | 26 | 26 | 55 | 0 | 0 | n.a. | n.a. | n.a. | 68 |
| Less than 1 | 22 | 20 | 10 | 51 | 1 | n.a. | n.a. | n.a. | 11 |
| 1-2 | 23 | 25 | 11 | 29 | 2 | n.a. | n.a. | n.a. | 6 |
| 3-4 | 10 | 13 | 7 | 9 | 3 or more | n.a. | n.a. | n.a. | 15 |
| 5 or more | 19 | 16 | 17 | 11 | Total | n.a. | n.a. | n.a. | 100 |
| Total | 100 | 100 | 100 | 100 | | | | | |
| *Age of oldest credit account (years)*[2] | | | | | *Worst delinquency ever on credit account (number of days delinquent)* | | | | |
| No oldest account | 7 | 54 | 55 | 0 | 0 | n.a. | n.a. | n.a. | 51 |
| Less than 1 | 2 | 2 | 1 | 2 | 30 | n.a. | n.a. | n.a. | 12 |
| 1-4 | 14 | 10 | 9 | 13 | 60 | n.a. | n.a. | n.a. | 5 |
| 5-9 | 19 | 19 | 12 | 20 | 90 | n.a. | n.a. | n.a. | 2 |
| 10 or more | 58 | 15 | 22 | 65 | 120 | n.a. | n.a. | n.a. | 4 |
| Total | 100 | 100 | 100 | 100 | More than 120 | n.a. | n.a. | n.a. | 26 |
| *Amount owed on nonmortgage credit accounts (dollars)* | | | | | Total | n.a. | n.a. | n.a. | 100 |
| 0 | n.a. | n.a. | ... | 19 | *Balance owed on collection accounts (dollars)* | | | | |
| 1-499 | n.a. | n.a. | ... | 11 | No collection account or zero balance owed | ... | ... | ... | 73 |
| 500-999 | n.a. | n.a. | ... | 5 | 1-99 | ... | ... | ... | 2 |
| 1,000-4,999 | n.a. | n.a. | ... | 16 | 100-499 | ... | ... | ... | 9 |
| 5,000-9,999 | n.a. | n.a. | ... | 10 | 500-999 | ... | ... | ... | 5 |
| 10,000 or more | n.a. | n.a. | ... | 39 | 1,000 or more | ... | ... | ... | 11 |
| Total | n.a. | n.a. | ... | 100 | Total | ... | ... | ... | 100 |
| *Utilization rate for revolving accounts (percent)*[3] | | | | | *Number of public records* | | | | |
| No account or not calculable | 13 | ... | ... | n.a. | 0 | ... | ... | ... | 86 |
| 0 | 24 | ... | ... | n.a. | 1 | ... | ... | ... | 9 |
| 1-24 | 33 | ... | ... | n.a. | 2 or more | ... | ... | ... | 5 |
| 25-49 | 11 | ... | ... | n.a. | Total | ... | ... | ... | 100 |
| 50 or more | 19 | ... | ... | n.a. | *Number of creditor inquiries in past 6 months* | | | | |
| Total | 100 | ... | ... | n.a. | 0 | ... | ... | ... | 55 |
| *Share of individuals with credit accounts never delinquent* | | | | | 1 | ... | ... | ... | 20 |
| 0 | n.a. | n.a. | n.a. | 7 | 2 | ... | ... | ... | 11 |
| 1-20 | n.a. | n.a. | n.a. | 2 | 3 | ... | ... | ... | 6 |
| 21-60 | n.a. | n.a. | n.a. | 14 | 4 or more | ... | ... | ... | 8 |
| 61-90 | n.a. | n.a. | n.a. | 21 | Total | ... | ... | ... | 100 |
| 91 or more | n.a. | n.a. | n.a. | 56 | | | | | |
| Total | n.a. | n.a. | n.a. | 100 | | | | | |

NOTE. Data include only individuals with at least one credit account (of any type) and a credit history score.

1. Data for revolving accounts include only bank-issued credit cards.
2. Data for installment accounts include only bank-issued installment loans.
3. Utilization rate is the proportion of available credit in use (outstanding balance divided by the credit limit—that is, the maximum amount an individual is authorized to borrow). The rate cannot be calculated in all cases because of unreported information on credit limit, highest balance, or outstanding balance.

... Not applicable.
n.a. Not available.

We report many of the factors used in our model and show the distribution of individuals in the sample across each factor (table 2). For example, more than 60 percent of the individuals in the sample who had a record of a credit account had information on nine or more accounts, and more than half the individuals had opened at least one new account within twelve months of the date the sample was drawn. The patterns show that payment performance varies greatly among individuals: Although about two-thirds of individuals had never been more than ninety days past due on a credit account, 15 percent had been this late on three or more accounts. In addition, nearly 15 percent had a record of at least one bankruptcy, tax lien, or other monetary-related public action, each of which weighs heavily in credit evaluations.

*Estimating the Approximated Model*

To estimate our approximation of the proprietary credit-scoring model, we used standard statistical regression techniques to fit the actual proprietary credit-risk score against the selected credit factors for the individuals in the sample data. Although credit modelers typically break factors into ranges, because we did not know the break points that had been selected, we approximated the process with linear splines.[26] For the estimation, the sample included only individuals with proprietary credit-risk scores who had not filed for bankruptcy. Our simulations were also restricted to this sample.[27]

We estimated the regression equation separately for three subpopulations. The first group consisted of individuals with one or more major derogatory credit accounts in their credit records. Both the second and third groups consisted of individuals who had no major derogatory accounts, but individuals in the second group had no more than two credit accounts whereas those in the third group had more than two credit accounts. We conducted the analysis in this way because allowing the estimated coefficients to

differ across population subgroups provided a noticeably better fit. The approach was also consistent with the common industry practice of using different "scorecards" for different subpopulations. The $R^2$ (a statistic characterizing how well a model fits the data) for each of the three subpopulation regressions was about 0.85, and the combined $R^2$ for the full population was about 0.94.

Proprietary considerations constrain our ability to report details of the regression equation specification or the coefficient estimates. However, a few variables in the estimated credit-scoring model were statistically insignificant and sometimes exhibited an unexpected relationship to the credit history score. As a consequence, as will be seen below, simulations of the effects of changes in an individual's credit record led in a few instances to anomalous outcomes in the sense that some scores moved in unexpected directions when changes in the individual's credit record were simulated.

*Conducting the Simulations*

As noted, the simulations identified problems in the data and applied hypothetical corrections to them. Only in the case of missing credit limits, however, could we identify the problem unambiguously. In other cases—specifically, stale accounts and the data quality issues associated with collections, public records, and inquiries—we could determine only that the information was *likely* inaccurate, incomplete, or of questionable value.[28] Finally, in other situations, a data problem was unobservable, such as when accounts were unreported or inconsistently reported. In these situations, we could identify only the potential effect on credit history scores of correcting the problem but not the proportion of people affected.

We conducted fifteen simulations: three that addressed issues related to stale credit accounts, four that pertained to nonreported credit account information, and eight that addressed data quality issues for collection agency accounts, public record items, and creditor inquiries.

*Stale Accounts Last Reported as Paid as Agreed or as Minor Delinquencies*

Recognizing the prevalence of stale accounts in credit records, most credit-scoring modelers apply stale-

---

26. The use of linear approximations rather than ranges is likely to mean that our simulations implied more small but consistent changes in credit history scores when factors were altered than would the "true" model, which divides consumers into two groups: those whose scores did not change because they stayed within the same range and those whose scores changed more substantially because they moved to a different range.

27. Although individuals who had filed for bankruptcy or did not have a proprietary credit-risk score were excluded from our analysis, these individuals may also have been affected by data quality problems. However, because they had not been scored or they had filed for bankruptcy, they were likely subject to a different type of credit review process, one that may have provided greater opportunities for the loan underwriter to identify and address data quality problems.

28. In the case of stale accounts, the information was clearly outdated. In the case of inquiries, the information was incomplete in that we could not determine whether the inquiries were associated with shopping for a single loan.

account rules to such accounts when they develop credit evaluation models. For credit accounts that have never been in major derogatory status (paid-as-agreed accounts or accounts with only minor delinquencies recorded), the rules typically retain the historic information on payment performance but dictate that certain accounts that have gone unreported for an extended period no longer have balances outstanding. Any balances shown at last report for these accounts are reset to zero.

In reverse-engineering the factors used in this analysis, we discovered that the credit-reporting agency had imposed a one-year stale-account rule when it created most factors related to paid-as-agreed accounts and to accounts with only minor delinquencies. Our simulation examined the effects on these accounts of a more-aggressive stale-account rule, one that redefined stale accounts on the basis of a three-month period for current reporting.[29]

### Stale Accounts with Major Derogatories

Some stale accounts were last reported in major derogatory status. Here the payment status was more likely to have remained the same since the last report than it was in the case of stale accounts that were paid as agreed or showed only minor delinquencies at last report. Many seriously delinquent accounts can remain in that state for an extended period with no change in status (and thus the account information need not be updated). However, in several situations, the reported account status is likely to be no longer accurate, such as when a consumer has taken out a new mortgage after the date on which the stale major derogatory was last reported. Generally, a mortgage lender will not extend a new loan until a consumer pays off (or otherwise addresses) all major derogatories. Another situation in which the reported account status is likely to be inaccurate is when the account creditor no longer reports about any individuals. In this case, the account has probably been paid off or transferred.

We evaluated the effect of non-updating of credit account information in these situations by treating as paid off all stale major derogatories for which (1) the consumer had taken out a new mortgage after the date on which the major derogatory was last reported

or (2) the creditor for the derogatory account had not reported information on any consumer within three months of the date on which the sample was drawn. The credit-reporting agency had imposed a one-year stale-account rule when it created factors related to major derogatory accounts. The rule implied that paying off a major derogatory account that had not been reported within a year generally would have no effect on an individual's credit history score. Thus, we again restricted our analysis of the effect of stale accounts to those that had last been reported three to twelve months before the date on which the sample was drawn.

### Failure of Some Subprime Creditors to Report Accounts

As a potential source of data inaccuracy, the failure of some subprime creditors (lenders that specialize in loans for high-risk individuals) to report accounts differs from the others studied here in that non-reporting is by definition unobservable. Consequently, the task for researchers is conceptually more difficult, and simulations cannot address the incidence of such nonreporting. To simulate the potential effect of such creditor behavior, we chose a random, never-delinquent mortgage, installment, or revolving account at a subprime lender for each individual with such an account and rescored the individual as if the account had not been reported. We defined subprime lenders as those that were reporting credit accounts as of the date the sample was drawn and for which more than one-half of their customers in the sample had credit history scores in the high-risk range (a score below 600).

### Failure of the Largest Student Loan Creditor to Report Any Accounts

As noted above, in 2003 Sallie Mae stopped reporting information on its accounts to two of the three largest credit-reporting agencies. Moreover, Sallie Mae asked that the agencies suppress all historic information on the accounts it had previously reported. By the time the Federal Reserve sample was drawn, Sallie Mae had reversed its initial decision. Our sample omits information that would allow us to identify Sallie Mae specifically. Thus, to approximate the potential effect of Sallie Mae's original decision, we deleted information on the loans of random student-loan lenders—representing approximately the same number of student loans that Sallie

---

29. Analysis of the patterns of verification showed that the vast majority of open accounts were verified by the reporter every month or two. Thus, in choosing a three-month rule, we simulated the effect of a maximally aggressive stale-account rule on the likely inaccuracy associated with the account information. We had no obvious way of simulating the effect of lengthening the time period.

Mac stopped reporting—from the credit records in the Federal Reserve sample, and we rescored the affected individuals.

### Failure of Some Creditors to Report Minor Delinquencies

Our review of the sample indicates that a small percentage of lenders fail to report that paid-as-agreed accounts have become minor delinquencies. Rather, the lenders report the accounts as paid as agreed until the accounts become major derogatories. To simulate the potential effects of unreported minor delinquencies, for each individual we randomly selected a currently reported account that was not in major derogatory status, was associated with a lender that did report minor delinquencies for each individual, and had been thirty or sixty days delinquent at least once. We assigned "paying as agreed" performance status to each thirty- and sixty-day delinquency in the selected account's performance record. This adjustment replicates what the credit record would show for a lender that reported thirty- and sixty-day minor delinquencies to be paid as agreed.

### Failure of Some Creditors to Report Credit Limits on Revolving Accounts

As noted, about 14 percent of revolving credit accounts were reported without information about credit limits, affecting roughly 46 percent of the individuals in the Federal Reserve sample. Therefore, credit evaluators must use other means to derive credit utilization rates for these individuals. The most common approach (and the one that model developers customarily use for credit-risk factors) is to substitute the highest balance for the missing credit limit; the typical result is higher calculated utilization rates than if the credit limits had been reported.

We simulated the effects of the nonreporting of credit limits on individuals by creating an estimated credit limit for each revolving account without a reported limit. Because information on the true credit limit in these cases was missing, the simulation in effect compared our method of calculating credit utilization rates with that of the credit-reporting agency. The primary difference between the two estimation procedures is that our approach is statistically unbiased, whereas the agency's method, which relies on the highest-balance amount, tends to be biased upward. That is, our estimates reflect the "best guess" for the missing credit limit based on other information in the individual's credit record. Specifi-

cally, we used samples of accounts of individuals with reported credit limits to estimate a regression model that predicted the credit limits for revolving accounts with missing limits.[30]

### Duplications in Collection Agency Accounts

A review of the sample credit records suggests that some collection agency accounts may be duplicated. Duplication can occur because of changed account numbers or transfers of accounts from one collection agency to another. To address the potential effects of this problem, we conducted simulations that consolidated likely duplicated collection account records into single items. We identified simulated duplicates in two ways. One procedure was to match the collection amount and the identity of the creditor when one account was reported paid and the other unpaid. The second procedure was to identify likely account transfers that were not reported as such to the credit-reporting agencies.

Additional duplicate collection agency accounts likely exist in the data but are difficult to identify. For example, accounts that match on collection amount and identity of the original creditor but that are reported by a single agency with reporting dates that are close in time may be duplicates, but they may just as likely result from repeated missed payments of the same amount. Accounts that match on identity of the original creditor and are spaced apart in time but do not match on amount could indicate a new report filed after a partial payment was received, in which case they would involve duplication. Alternatively, they could reflect separate incidents of missed payments with the same creditor.

### Inconsistent Reporting of Small Collection Agency Accounts

Analysis of collection accounts reveals that many are for very small amounts that may be inconsistently reported. Recognizing this possibility, some credit evaluators choose to exclude small collection accounts from credit evaluations. To test the effect of inconsistently reported small collection items on

---

30. Independent factors used in the estimation included outstanding balance and highest-balance level, the age and type of account, the type of lender, balances and limits on other accounts, and payment performance information. The resulting distribution of estimated credit limits and utilization for accounts with imputed limits was virtually identical to the distribution of accounts with reported limits within the population, an indication that missing limits are primarily a function of the lender and are almost always unrelated to the characteristics of the account.

credit history scores, we removed all collection records involving items under $100 from the credit records.

## Medical Collection Items

Some credit evaluators report that they remove collection accounts related to medical services from credit evaluations because such accounts often involve disputes with insurance companies over liability for the accounts or because the accounts may not indicate future performance on loans. Unfortunately, evaluators must use manual overrides based on the creditors' identities to remove medical collection accounts because the credit record data lack a code identifying claims associated with medical services. The absence of a code means that this process cannot be used in automated calculations of credit history scores. To test the potential effect of including medical collection items in the calculation of credit history scores, we developed a medical collection code based on an inspection of the creditor name, and we used the code to identify medical collection accounts to drop from the credit history score calculation (as noted earlier, as of this writing, at least one of the agencies had developed such a code, potentially reducing the relevance of this simulation).

## Potentially Misassigned Collection Agency Accounts

Most (72 percent) of the individuals in the sample with a non-credit-related collection agency account also had a credit-related major derogatory. About 45 percent of those individuals with information reported by a single collection agency had no credit-related major derogatories. In contrast, only about 15 percent of those with information reported by more than one collection agency had no credit-related major derogatories. These patterns suggest that misassigned collection agency accounts may be more common among those with information reported by a single collection agency. We simulated the effects of correcting such misassigned collections by dropping the collection accounts of individuals who had information reported by one collection agency but had no credit-related major derogatories.

## Duplications in Public Records

As with our analysis of collection agency accounts, our review of the sample public record reports suggests that some records may be duplicated. To address the potential effects of this problem, we conducted simulations that removed likely duplicates of public record items. We identified duplicates by matches on the recording date, amount owed, and creditor. In many instances, the duplicates involved the original filing of a judgment or lien, which was followed by a record of a paid judgment or lien with all information identical to that in the first record. In other instances, second or third filings may have ended up as duplicates with the same (or almost identical) information.

## Inconsistent Reporting of Lawsuits and Dismissed Items in Public Records

As noted earlier, our analysis of credit record files in the Federal Reserve sample suggests that lawsuits are inconsistently included in the credit-reporting agency files. An additional issue concerns the inclusion in the public records of dismissed liens, judgments, or suits, which may be of questionable value for predicting credit performance. To simulate the potential effects of including these items in the calculation of credit history scores, we removed all lawsuits and dismissals from the credit records of individuals with such items.

## Failure to Consolidate Multiple Inquiries for the Same Loan

Analysts have cautioned that simple counts of inquiries in scoring models may unfairly penalize consumers who shop for credit. However, the information needed to help distinguish consumers shopping to obtain a single loan from those seeking to obtain multiple loans is generally not available in credit records because of incomplete reporting of the type of inquiry.

To simulate the potential magnitude of the effect of incomplete reporting of the type of inquiry, we conducted two experiments. First, we identified all individuals in the sample who had taken out a mortgage or an auto loan in the two years before the sample was drawn. For each loan type, we consolidated into a single inquiry the multiple inquiries that had occurred in the two-month period preceding the date on which the loan was opened (if any non-auto or non-mortgage loans were also taken out during this period, we did not consolidate any inquiries). The second simulation was somewhat broader. We divided all inquiries into three groups based on the type of inquirer as a proxy for the likelihood that

the consumer was shopping for a single loan or potentially "bulking up on credit." The first group represented inquiries that were unlikely to be credit-related, including inquiries from insurance companies, utilities, and collection agencies. The second group involved inquiries likely related to the purchase of a single large item, such as inquiries from auto companies or real estate firms. We put all other inquiries in the third group. Inquiries from the first group were dropped in the simulation because they did not appear to be credit related. For the second group, we consolidated all inquiries within a two-week period into a single inquiry. Only inquiries from the third group were left unchanged.

### Analyzing the Populations of Interest

Each of the data quality issues that we focus on may have different implications for different individuals depending on the individuals' credit characteristics. For example, the effect of a missing credit limit will be different for individuals who have many open revolving accounts than for those who have few. Therefore, we also examined the effect of these data quality issues for three subpopulations of interest. Because data quality problems are less likely to affect the access to credit of individuals with relatively high credit history scores, we divided the analysis population (the same one used to estimate the approximated model) into categories based on credit history score. We also categorized the analysis population by depth of credit file and by selected demographic characteristics.

For the analysis by credit history scores, we sorted individuals into one of three risk groups based on their proprietary credit-risk scores. The first group included individuals whose scores were 661 or above (74 percent of the sample population), the second group included individuals with scores between 600 and 660 (13 percent of the sample), and the third group included individuals whose scores were below 600 (13 percent of the sample).[31]

---

31. Individuals with credit scores above 660 have scores sufficiently high that they are likely to qualify for the lowest interest rates available on loans, and individuals with scores below 600 have scores sufficiently low that they are likely to be denied credit or to pay substantially higher rates than those charged to better-qualified borrowers. Individuals in the middle category have scores that place them at the margin.

The credit history score ranges used here are not immutable: in practice, the bounds of these ranges vary somewhat by loan product and by the appetite for risk of individual market participants. Moreover, credit history is only one factor considered in credit underwriting, although an important one, and so a low credit history score may be offset by, for example, a low debt-to-income ratio, a significant down payment, collateral, or potential for strong future earnings.

2.  Distribution of individuals, by credit history score and by selected demographic characteristics



Note. See note to chart 1. Income categories are defined as follows: *low* or *moderate*, less than 80 percent of the median family income of individual's metropolitan statistical area (MSA) or of nonmetropolitan portion of individual's state; *middle*, 80–119 percent of the median family income of individual's MSA or of nonmetropolitan portion of individual's state; *high*, 120 percent or more of the median family income of individual's MSA or of nonmetropolitan portion of individual's state.

For the analysis by depth of credit file, we sorted individuals with records of credit accounts into two groups based on the number of credit accounts in their credit records. One group consisted of individuals with "thin files"—that is, files with fewer than four credit accounts. The second group consisted of all other individuals. Individuals with thin files, who

accounted for about 19 percent of the sample, are an important segment of the population to examine because their credit history scores may exhibit relatively greater sensitivity to data problems. A data problem affecting a particular account may be more likely to have a substantial effect on the credit history score of an individual with a thin file because of a lack of information from other accounts that could dilute the effect of the problem.

For the other analyses, we investigated whether different patterns emerge when individuals are grouped by age, relative income of census tract of residence, and percentage of minorities in census tract of residence. Such segmentation allows us to determine whether issues of data accuracy and completeness likely affect various subgroups of the population in different ways. For example, residents of higher-income census tracts may, on average, have more revolving accounts than residents of lower-income areas and therefore may face a greater probability of encountering a missing credit limit. We report the distribution of proprietary credit-risk scores

for these various subgroups (chart 2).[32] In general, younger individuals, those who live in lower-income areas, and those who live in areas with high minority populations have lower scores.

## RESULTS

First, we report the proportion of individuals who are affected by a simulated change in (correction to) the credit records—that is, the proportion subject to the data quality issue in question (table 3). Second, we report the proportion among those affected by the simulated change in credit records for which the net effect on approximated credit history scores was zero. Third, we report the proportions of individuals among those affected by the simulated change for which approximated credit history scores changed

---

32. Scores in chart 2 are somewhat higher than scores for individuals in the simulation samples, which exclude individuals who have had bankruptcies.

---

3. Estimated effects of data "corrections" on the credit history scores of individuals, by data problem corrected
Percent except as noted

| Data problem corrected | Individuals affected | Distribution of individuals affected | | | | | | Memo | |
|---|---|---|---|---|---|---|---|---|---|
| | | Effect on credit history score | | | | | | Mean change in points | |
| | | No change | Decrease | | Increase | | Total | Individuals with decrease in score | Individuals with increase in score |
| | | | 1–9 points | 10 or more points | 1–9 points | 10 or more points | | | |
| *Involving credit accounts* | | | | | | | | | |
| Failure to close a | | | | | | | | | |
| Paid-as-agreed account | 12.9 | 10.9 | 27.0 | 8.1 | 48.7 | 5.2 | 100.0 | −8.1 | 4.4 |
| Minor delinquent account | 1.3 | 4.5 | 20.0 | 17.8 | 43.1 | 14.5 | 100.0 | −12.6 | 8.6 |
| Major derogatory account | 4.7 | 82.3 | 9.2 | .3 | 8.2 | .0 | 100.0 | −1.9 | 1.2 |
| Failure of a subprime lender to report | | | | | | | | | |
| a paid-as-agreed account | n.c. | 28.5 | 41.0 | 8.9 | 17.9 | 3.7 | 100.0 | −6.0 | 6.2 |
| Failure of largest student loan | | | | | | | | | |
| creditor to report | 3.5 | 16.1 | 45.0 | 13.1 | 21.5 | 4.4 | 100.0 | −7.0 | 7.5 |
| Failure to report a | | | | | | | | | |
| Minor delinquency | n.c. | 15.1 | 39.3 | 20.8 | 22.4 | 2.4 | 100.0 | −11.0 | 4.0 |
| Credit limit | 33.0 | 31.7 | 1.7 | .0 | 53.3 | 13.3 | 100.0 | −1.4 | 6.1 |
| *Involving collection agency accounts* | | | | | | | | | |
| Failure to eliminate duplicate | | | | | | | | | |
| collection agency accounts | 1.2 | 6.8 | 1.1 | .0 | 67.4 | 24.7 | 100.0 | −1.4 | 8.5 |
| Reporting of | | | | | | | | | |
| Collection agency accounts | | | | | | | | | |
| under $100 | 11.1 | 41.2 | 7.0 | 1.2 | 41.7 | 8.9 | 100.0 | −4.3 | 5.8 |
| Medical collection accounts | 15.5 | 11.8 | 5.4 | 1.5 | 49.6 | 31.6 | 100.0 | −5.9 | 11.2 |
| Potentially misassigned collection | | | | | | | | | |
| accounts | 8.2 | 12.8 | 9.0 | 3.4 | 42.8 | 31.9 | 100.0 | −6.9 | 13.4 |
| *Involving public records* | | | | | | | | | |
| Reporting of duplicate public records | .4 | 38.6 | 1.9 | .0 | 59.4 | .1 | 100.0 | −1.9 | 1.3 |
| Inclusion of lawsuits and dismissals | 1.1 | 18.5 | 3.8 | 1.0 | 53.1 | 23.6 | 100.0 | −5.9 | 9.1 |
| *Involving creditor inquiries* | | | | | | | | | |
| Failure to consolidate | | | | | | | | | |
| Multiple inquiries for auto and | | | | | | | | | |
| mortgage loans | 3.7 | 16.8 | 8.3 | .5 | 73.8 | .7 | 100.0 | −2.9 | 2.3 |
| Other multiple inquiries | 14.6 | 5.2 | 4.9 | .1 | 85.4 | 4.4 | 100.0 | −2.3 | 4.2 |

NOTE. The table reports the effect of "correcting" a data problem. Individuals whose scores increase because of a correction would be better off if the problem were corrected.

n.c. Not calculable.

materially—that is, increased or decreased 10 or more points. These calculations provide insight into the proportion of consumers who may or may not face a change in credit terms (either a higher or a lower interest rate) or who may be unable to gain access to credit because of the particular data problem. Also, to provide another basis for determining how much variation in credit history scores may occur when simulated corrections are made to individuals' credit records, we present the overall mean change in credit history scores for the individuals who were materially affected. Because the hypothesized correction may increase or decrease an individual's credit history score depending on the nature of the problem and the composition of the individual's credit record, the mean change for individuals with a decrease in score and the mean change for those with an increase in score are shown separately.

For each simulation, the overall effect of a simulated change on an individual can be either positive or negative. Some of the effect is undoubtedly due to imprecision in our approximation of the credit-scoring model or to consumers' being shifted from one "scorecard" to another. However, we believe the results mainly reflect the complexity of interactions among the various factors that produce a credit history score. For example, a failure to report a paid-as-agreed account as closed can help individuals with few active and paid-as-agreed credit accounts but can hurt individuals with a substantial number of accounts that have high balances and utilization rates.

### Effects of Stale Accounts

The first group of simulations presented in the table involved hypothetical corrections to selected credit account records. The first three of these pertained to the use of a more aggressive stale-account rule that designated accounts as stale after three months of nonreporting and treated the accounts as being closed and having a zero balance. Several conclusions emerged from these simulations. On the one hand, a significant proportion of consumers appeared to be subject to stale credit account issues. Almost one-fifth of the individuals in the Federal Reserve sample had at least one stale credit account as defined by the assumptions of the first three simulations. Further, 21 percent of the individuals with stale major derogatories (percentage not shown in table) had at least one account that met the conditions of the third simulation and thus had potentially been paid off.

On the other hand, the application of the more aggressive stale-account rule appeared to have only a modest effect on the credit history scores of these individuals. Our simulations suggest that more than 80 percent of the individuals with stale major derogatories would have shown no change in score if they had paid off the account the month after the date on which the lender last reported it and the lender had reported the payoff to the credit-reporting agency. The effect of paying off accounts was somewhat larger for paid-as-agreed accounts and for those with minor delinquencies, but even here most consumers showed changes of fewer than 10 points. One likely explanation for the relatively minor effect of the corrections on individuals is the large number of credit accounts in the typical consumer's file. For example, consumers with a stale paid-as-agreed account had, on average, almost sixteen credit accounts, and 90 percent of these consumers had at least five.

Many of the credit-risk factors reflect "extreme" values such as the age of the oldest account or the number of months since the most-recent delinquency. These factors will change as the result of a correction only if the affected account is the "marginal" account—for example, the oldest or the most recently delinquent. Moreover, although factors reflecting sums, such as total balances, will be sensitive to changes in any account, the effect of the change will be reduced if many other accounts contribute to the factor. Another explanation for the relatively minor effects of the corrections for stale accounts probably lies in the rules used to calculate the factors employed by credit modelers. For example, modelers appear to place little weight on outstanding balances for major derogatory accounts, perhaps recognizing the inconsistency in the reporting of account payoffs. Thus, when payoffs are recorded, the effect on scores is minimal.

### Effects of Unreported Credit Account Information

We conducted an additional four simulations for data problems in credit accounts. The simulations addressed the nonreporting of certain categories of accounts (paid-as-agreed accounts of a subprime lender and accounts of the largest student loan creditor) and of certain types of information (minor delinquencies and credit limits).

We could not determine the incidence of subprime creditors' failure to report paid-as-agreed credit accounts. By our estimates, Sallie Mae's failure to report loans affected less than 4 percent of individuals. Nonreporting of these types of accounts appeared

4.  Estimated effects of data "corrections" on the credit history scores of individuals, by data problem corrected,
    for selected credit history score ranges
    Percent except as noted

| Data problem corrected | Individuals affected | Distribution of individuals affected | | | | | | Memo | |
|---|---|---|---|---|---|---|---|---|---|
| | | Effect on credit history score | | | | | Total | Mean change in points | |
| | | No change | Decrease | | Increase | | | Individuals with decrease in score | Individuals with increase in score |
| | | | 1–9 points | 10 or more points | 1–9 points | 10 or more points | | | |
| | | Individuals with credit history scores above 660 | | | | | | | |
| *Involving credit accounts* | | | | | | | | | |
| Failure to close a | | | | | | | | | |
| Paid-as-agreed account .............. | 13.6 | 11.3 | 22.0 | 4.7 | 55.8 | 6.2 | 100.0 | –6.1 | 4.5 |
| Minor delinquent account ............. | .2 | 3.1 | 19.2 | 52.9 | 21.7 | 3.1 | 100.0 | –20.2 | 5.0 |
| Major derogatory account ........... | 1.2 | 89.1 | 6.1 | .2 | 4.6 | .0 | 100.0 | –1.8 | 1.0 |
| Failure of a subprime lender to report | | | | | | | | | |
| a paid-as-agreed account ......... | n.c. | 45.5 | 30.1 | 2.8 | 20.3 | 1.3 | 100.0 | –4.3 | 3.0 |
| Failure of largest student loan | | | | | | | | | |
| creditor to report .................. | 3.2 | 19.3 | 50.4 | 9.7 | 19.3 | 1.3 | 100.0 | –6.1 | 3.8 |
| Failure to report a | | | | | | | | | |
| Minor delinquency .................. | n.c. | 19.6 | 45.7 | 20.0 | 14.2 | .6 | 100.0 | –9.3 | 3.0 |
| Credit limit ......................... | 35.8 | 34.8 | 1.4 | .0 | 54.1 | 9.7 | 100.0 | –1.1 | 5.1 |
| *Involving collection agency accounts* | | | | | | | | | |
| Failure to eliminate duplicate | | | | | | | | | |
| collection agency accounts ........ | .1 | 11.7 | .4 | .0 | 81.4 | 6.6 | 100.0 | –1.0 | 4.6 |
| Reporting of | | | | | | | | | |
| Collection agency accounts | | | | | | | | | |
| under $100 ........................ | 3.6 | 21.8 | 9.3 | 2.7 | 42.8 | 23.4 | 100.0 | –5.8 | 10.6 |
| Medical collection accounts .......... | 6.5 | 5.2 | 8.0 | 2.9 | 35.7 | 48.3 | 100.0 | –6.8 | 16.6 |
| Potentially misassigned collection | | | | | | | | | |
| accounts ......................... | 5.4 | 4.7 | 11.0 | 4.4 | 31.4 | 48.6 | 100.0 | –1.6 | 6.4 |
| *Involving public records* | | | | | | | | | |
| Reporting of duplicate public records ... | .2 | 39.1 | 2.3 | .0 | 58.6 | .0 | 100.0 | –1.0 | 1.1 |
| Inclusion of lawsuits and dismissals ..... | .7 | 19.2 | 5.0 | 1.7 | 45.5 | 28.7 | 100.0 | –7.0 | 10.8 |
| *Involving creditor inquiries* | | | | | | | | | |
| Failure to consolidate | | | | | | | | | |
| Multiple inquiries for auto and | | | | | | | | | |
| mortgage loans .................... | 3.4 | 10.9 | 3.8 | .0 | 84.7 | .7 | 100.0 | –1.6 | 2.3 |
| Other multiple inquiries .............. | 12.2 | 3.1 | 1.4 | .0 | 94.0 | 1.5 | 100.0 | –1.4 | 3.6 |
| | | Individuals with credit history scores between 600 and 660 | | | | | | | |
| *Involving credit accounts* | | | | | | | | | |
| Failure to close a | | | | | | | | | |
| Paid-as-agreed account .............. | 12.1 | 11.0 | 49.4 | 13.0 | 25.4 | 1.3 | 100.0 | –6.4 | 3.3 |
| Minor delinquent account ............. | 2.6 | 4.0 | 27.2 | 22.6 | 41.7 | 4.6 | 100.0 | –11.9 | 4.9 |
| Major derogatory account ........... | 10.2 | 87.9 | 6.4 | .1 | 5.7 | .0 | 100.0 | –1.7 | 1.3 |
| Failure of a subprime lender to report | | | | | | | | | |
| a paid-as-agreed account ......... | n.c. | 22.2 | 48.6 | 6.4 | 19.4 | 3.5 | 100.0 | –4.2 | 4.9 |
| Failure of largest student loan | | | | | | | | | |
| creditor to report .................. | 3.8 | 8.1 | 33.7 | 17.6 | 33.0 | 7.6 | 100.0 | –9.5 | 6.0 |
| Failure to report a | | | | | | | | | |
| Minor delinquency .................. | n.c. | 11.0 | 33.1 | 21.5 | 31.2 | 3.2 | 100.0 | –11.7 | 3.7 |
| Credit limit ......................... | 28.4 | 14.4 | 2.3 | .0 | 57.2 | 26.1 | 100.0 | –1.8 | 7.8 |
| *Involving collection agency accounts* | | | | | | | | | |
| Failure to eliminate duplicate | | | | | | | | | |
| collection agency accounts ........ | 3.0 | 8.6 | .8 | .0 | 80.7 | 9.9 | 100.0 | –1.0 | 5.3 |
| Reporting of | | | | | | | | | |
| Collection agency accounts | | | | | | | | | |
| under $100 ........................ | 28.1 | 43.6 | 5.7 | 1.2 | 42.7 | 6.9 | 100.0 | –5.1 | 4.4 |
| Medical collection accounts .......... | 38.8 | 11.1 | 4.4 | 1.7 | 56.5 | 26.4 | 100.0 | –7.2 | 9.2 |
| Potentially misassigned collection | | | | | | | | | |
| accounts ......................... | 11.8 | 18.1 | 9.7 | 6.9 | 48.1 | 17.2 | 100.0 | –9.8 | 9.6 |
| *Involving public records* | | | | | | | | | |
| Reporting of duplicate public records ... | .7 | 44.3 | 1.0 | .0 | 54.7 | .0 | 100.0 | –1.0 | 1.1 |
| Inclusion of lawsuits and dismissals ..... | 2.1 | 20.8 | 2.2 | .2 | 62.2 | 14.7 | 100.0 | –4.2 | 6.4 |
| *Involving creditor inquiries* | | | | | | | | | |
| Failure to consolidate | | | | | | | | | |
| Multiple inquiries for auto and | | | | | | | | | |
| mortgage loans .................... | 5.0 | 32.7 | 15.1 | .1 | 51.6 | .6 | 100.0 | –1.9 | 2.0 |
| Other multiple inquiries .............. | 17.0 | 10.0 | 7.8 | .0 | 80.9 | 1.3 | 100.0 | –1.5 | 3.9 |

4. Continued

| Data problem corrected | Individuals affected | Distribution of individuals affected | | | | | | Memo | |
|---|---|---|---|---|---|---|---|---|---|
| | | Effect on credit history score | | | | | Total | Mean change in points | |
| | | No change | Decrease | | Increase | | | Individuals with decrease in score | Individuals with increase in score |
| | | | 1-9 points | 10 or more points | 1-9 points | 10 or more points | | | |
| | | Individuals with credit history scores below 600 | | | | | | | |
| *Involving credit accounts* | | | | | | | | | |
| Failure to close a | | | | | | | | | |
| Paid-as-agreed account ............. | 9.1 | 7.0 | -46.0 | 35.8 | 10.4 | .8 | 100.0 | -16.8 | 3.3 |
| Minor delinquent account ........... | 7.1 | 5.0 | 17.3 | 9.9 | 47.4 | 20.4 | 100.0 | -9.7 | 9.8 |
| Major derogatory account ........... | 22.9 | 77.3 | 11.7 | .4 | 10.6 | .1 | 100.0 | -2.0 | 1.3 |
| Failure of a subprime lender to report | | | | | | | | | |
| a paid-as-agreed account ......... | n.c. | 7.2 | 52.4 | 19.8 | 13.1 | 7.6 | 100.0 | -8.1 | 12.4 |
| Failure of largest student loan | | | | | | | | | |
| creditor to report ................ | 4.8 | 8.5 | 30.0 | 24.7 | 21.3 | 15.7 | 100.0 | -13.1 | 16.1 |
| Failure to report a | | | | | | | | | |
| Minor delinquency .................. | n.c. | 5.8 | 26.0 | 22.7 | 38.5 | 7.0 | 100.0 | -17.0 | 5.3 |
| Credit limit ....................... | 19.3 | 19.9 | 4.2 | .1 | 37.7 | 38.1 | 100.0 | -1.9 | 13.1 |
| *Involving collection agency accounts* | | | | | | | | | |
| Failure to eliminate duplicate | | | | | | | | | |
| collection agency accounts ........ | 6.8 | 5.2 | 1.4 | .0 | 58.9 | 34.6 | 100.0 | -1.5 | 10.6 |
| Reporting of | | | | | | | | | |
| Collection agency accounts | | | | | | | | | |
| under $100 ...................... | 43.2 | 50.7 | 6.7 | .3 | 40.4 | 2.0 | 100.0 | -2.4 | 2.6 |
| Medical collection accounts ......... | 51.6 | 18.0 | 4.1 | .2 | 55.9 | 21.7 | 100.0 | -2.7 | 8.0 |
| Potentially misassigned collection | | | | | | | | | |
| accounts ........................ | 23.5 | 22.6 | 5.7 | .1 | 57.8 | 13.9 | 100.0 | -1.6 | 6.4 |
| *Involving public records* | | | | | | | | | |
| Reporting of duplicate public records .... | 1.0 | 34.1 | 1.8 | .0 | 63.7 | .4 | 100.0 | -3.8 | 1.8 |
| Inclusion of lawsuits and dismissals ..... | 2.6 | 15.1 | 3.1 | .3 | 59.8 | 21.7 | 100.0 | -2.5 | 8.5 |
| *Involving creditor inquiries* | | | | | | | | | |
| Failure to consolidate | | | | | | | | | |
| Multiple inquiries for auto and | | | | | | | | | |
| mortgage loans ................. | 4.3 | 27.7 | 23.5 | 3.7 | 44.4 | .8 | 100.0 | -4.6 | 2.2 |
| Other multiple inquiries .............. | 28.2 | 8.5 | 13.1 | .6 | 62.9 | 14.9 | 100.0 | -2.9 | 6.5 |

NOTE. See note to table 3.   n.c. Not calculable.

to have only a modest effect on the credit history scores of affected individuals. For example, the simulation results indicate that if nonreporting by a subprime lender or by Sallie Mae had been corrected, in each case less than 5 percent of affected individuals would have gained 10 percentage points or more in their credit history scores. Moreover, such nonreporting may help or hurt the individuals. For example, the simulations suggest that, on average, consumers were helped by Sallie Mae's not reporting their loans, a somewhat surprising result. Fifty-eight percent of affected individuals would have experienced decreases in their credit history scores if the accounts had been reported. However, the median number of credit accounts for individuals with a corrected student loan account was twenty-two, a figure well above average for all individuals. Thus, the positive effects on credit history scores of reducing indi-

viduals' outstanding balances by not reporting their student loans may have outweighed the negative effects of eliminating one additional paid-as-agreed account.

We also could not determine the proportion of individuals affected by creditors' suppression of minor delinquencies; however, we could estimate the impact of the suppression on affected individuals. The simulation suggests that when suppression occurs, it is likely to improve the credit history scores of many affected individuals by a significant amount.

*Effects of Unreported Credit Limits*

Nonreporting of credit limits affects a substantial number of individuals (33 percent of the individuals

in the simulations), but the effect tends to be small. The likely reason for this result is that affected individuals tend to have a large number of credit accounts in their credit records (eighteen on average), while the frequency of accounts missing limits is low. Thus, accounts with missing limits tend to have a small effect on the overall utilization rates of individuals.

Unlike the results in most of the other simulations, the effects of missing credit limits were predominantly in one direction—most affected individuals' scores would have likely been higher if missing credit limits had been reported. This finding suggests that the rule that credit modelers typically adopt for addressing missing limits—use of the reported highest-balance amount—is likely biased. To further test this conjecture, we examined credit accounts for which the credit limit was reported and compared the actual limit with the estimated limit that credit modelers would have applied if the limit had not been reported. On average, the rule that the credit-reporting agencies used when they constructed utilization rates would imply a credit limit of less than one-half the actual limit. The rule would imply a lower credit limit than the actual limit in about 90 percent of the cases. In contrast, our rule, as noted earlier, was statistically unbiased.

*Effects of Problems with Collection Agency Accounts, Public Records, and Creditor Inquiries*

Results for eight simulations involving collection agency accounts, public records, and creditor inquiries were varied.

### Collection Agency Accounts

The proportion of individuals affected by potential data problems or inconsistencies in reporting by collection agencies ranged from 16 percent for reporting of medical collection items to only about 1 percent for duplication of collection items, although, as noted, our ability to detect such duplications was limited. However, the effect of corrections on affected individuals tended to be large, particularly in comparison with simulated problems in credit accounts, and was generally associated with increases in credit history scores. For example, for three of the four collection account simulations, one-fourth or more of the affected individuals showed increases of 10 points or more in their scores. These results illustrate that

collection accounts weigh heavily in the scoring model and that most individuals have relatively few such accounts and thus are affected more significantly when a problem occurs in any given account.

### Public Records

Both simulations that addressed potential data problems or inconsistencies in public records indicated that the proportion of individuals affected was small (1 percent or less). However, the effects of the corrections differed significantly between the two simulations. In the simulation involving duplicate public record items, less than 1 percent of affected individuals experienced increases in their credit history scores of 10 points or more, whereas in the simulation involving lawsuits and dismissals, nearly one-fourth of affected individuals did so. This dichotomy reflects an important distinction between duplicate public records and lawsuits and dismissals. Whereas removing a lawsuit or a dismissal may completely eliminate adverse public record items from an individual's credit record, eliminating a duplicate record cannot do so.

### Creditor Inquiries

The simulation that consolidated inquiries related to auto and mortgage loans affected only 4 percent of individuals in the sample; the broader consolidation simulation affected about 15 percent of individuals. In both cases, the size of the effect was modest and almost always resulted in a higher score. Only a small percentage of individuals experienced increases in their scores of more than 10 points.

### Differences across Subpopulations

Individuals with scores below 600 tended to have the highest frequency of data problems, and those with scores above 660 had the lowest incidence (table 4). Two exceptions to this pattern occurred in the simulations involving the failure to close stale paid-as-agreed accounts and the failure to report a credit limit. Here individuals in the highest score range showed the largest incidence of data problems primarily because they tended to have more credit accounts. Significant differences were also apparent in the impact of simulated corrections on affected individuals across the three groups. Generally, individuals with scores below 600 were the most likely to experience a score increase of 10 points or more in

5.   Estimated effects of data "corrections" on the credit history scores of individuals with "thin" files, by data problem corrected
Percent except as noted

| Data problem corrected | Individuals affected | Distribution of individuals affected | | | | | | Memo | |
|---|---|---|---|---|---|---|---|---|---|
| | | Effect on credit history score | | | | | | Mean change in points | |
| | | No change | Decrease | | Increase | | Total | Individuals with decrease in score | Individuals with increase in score |
| | | | 1-9 points | 10 or more points | 1-9 points | 10 or more points | | | |
| *Involving credit accounts* | | | | | | | | | |
| Failure to close a | | | | | | | | | |
| Paid-as-agreed account | 3.2 | 3.6 | 21.7 | 44.1 | 15.8 | 14.9 | 100.0 | -17.0 | 11.3 |
| Minor delinquent account | .7 | 8.1 | 22.4 | 22.0 | 45.1 | 2.4 | 100.0 | -16.0 | 3.7 |
| Major derogatory account | 2.4 | 88.7 | 5.4 | .0 | 5.9 | .0 | 100.0 | -1.8 | 1.5 |
| Failure of a subprime lender to report | | | | | | | | | |
| a paid-as-agreed account | n.c. | 4.4 | 35.9 | 38.0 | 16.4 | 5.4 | 100.0 | -12.3 | 6.8 |
| Failure of largest student loan | | | | | | | | | |
| creditor to report | 1.0 | 3.4 | 33.6 | 51.8 | 8.0 | 3.2 | 100.0 | -20.8 | 6.8 |
| Failure to report a | | | | | | | | | |
| Minor delinquency | n.c. | 4.3 | 18.1 | 46.6 | 14.1 | 16.9 | 100.0 | -24.9 | 9.8 |
| Credit limit | 9.1 | 18.2 | 1.4 | .0 | 36.0 | 44.3 | 100.0 | -1.2 | 13.2 |
| *Involving collection agency accounts* | | | | | | | | | |
| Failure to eliminate duplicate | | | | | | | | | |
| collection agency accounts | 1.9 | 7.4 | .8 | .0 | 82.4 | 9.5 | 100.0 | -1.0 | 5.1 |
| Reporting of | | | | | | | | | |
| Collection agency accounts | | | | | | | | | |
| under $100 | 15.2 | 48.0 | 3.0 | .6 | 35.8 | 12.6 | 100.0 | -5.1 | 9.5 |
| Medical collection accounts | 20.9 | 10.6 | 1.7 | .9 | 52.0 | 34.9 | 100.0 | -8.7 | 14.7 |
| Potentially misassigned collection | | | | | | | | | |
| accounts | 8.6 | 16.3 | 4.1 | 3.1 | 32.7 | 43.7 | 100.0 | -10.7 | 26.6 |
| *Involving public records* | | | | | | | | | |
| Reporting of duplicate public records ... | .3 | 50.4 | 1.7 | .0 | 47.9 | .0 | 100.0 | -1.0 | 1.0 |
| Inclusion of lawsuits and dismissals .... | .7 | 22.4 | 1.6 | .6 | 52.3 | 23.0 | 100.0 | -6.3 | 13.4 |
| *Involving creditor inquiries* | | | | | | | | | |
| Failure to consolidate | | | | | | | | | |
| Multiple inquiries for auto and | | | | | | | | | |
| mortgage loans | .9 | 19.1 | 7.2 | .0 | 69.2 | 4.5 | 100.0 | -2.1 | 3.4 |
| Other multiple inquiries | 9.5 | 4.9 | 3.4 | .0 | 87.0 | 4.7 | 100.0 | -1.5 | 4.8 |

Note. See note to table 3. A "thin" file has a record of a credit account but has fewer than four such accounts.   n.c. Not calculable.

response to corrections of data problems. Collection account problems provided an exception to this pattern: Affected individuals in the credit history score range above 660 were the most likely to experience large score increases. The reason for this result is that relatively high-score individuals with collection agency accounts generally have no other major derogatory information in their credit records and thus can show significant score increases when a derogatory is corrected.

For individuals with thin files, the incidence of data quality issues involving credit accounts was generally lower than that for all individuals, but the incidence of issues involving collection agency accounts was somewhat higher (compare table 5 with table 3). The result regarding credit accounts reflects the smaller number of accounts in the credit records of individuals with thin files and, consequently, the generally lower probability that such individuals will have data quality issues. The result concerning collection agency accounts is due to the higher probability that people with thin files will have such accounts. However, in simulations involving corrections to

credit accounts, the effects on the credit history scores of individuals with thin files were either similar to or substantially larger than the effects on the scores of persons in the general population. For example, correcting a failure to close a paid-as-agreed account resulted in a decline in credit history score that was twice as large, on average, for individuals with thin files as it was for those in the population at large.

In general, older individuals and those living in higher-income and nonminority neighborhoods had the lowest incidence of data problems (table 6). The most-notable exception to this pattern was for failure to report a credit limit, which was less common among younger individuals and among individuals living in lower-income and predominantly minority neighborhoods. We do not report the changes in credit history scores of affected individuals for these decompositions of the sample because the comparisons are difficult to interpret without also accounting for differences in the incidence of thin files and in credit history scores across groups. In most cases, the effects of data quality problems were similar across groups after controlling for the differences in depth of

6. Share of individuals affected by data problems in credit records, distributed by selected demographic characteristics

Percent except as noted

| Data problem | Age (years) | | | Income of census tract[1] | | | Share of minorities in census tract (percent) | | |
|---|---|---|---|---|---|---|---|---|---|
| | Under 35 | 35–55 | Over 55 | Low or moderate | Middle | High | Less than 10 | 10–80 | More than 80 |
| *Involving credit accounts* | | | | | | | | | |
| Failure to close a | | | | | | | | | |
| Paid-as-agreed account | 16.9 | 16.6 | 10.1 | 11.3 | 13.1 | 13.7 | 13.4 | 12.9 | 11.3 |
| Minor delinquent account | 2.0 | 1.4 | .6 | 1.8 | 1.3 | .8 | 1.0 | 1.3 | 2.1 |
| Major derogatory account | 5.5 | 6.2 | 2.9 | 6.8 | 4.7 | 3.1 | 3.2 | 5.1 | 8.0 |
| Failure of a subprime lender to report | | | | | | | | | |
| a paid-as-agreed account | n.c. | n.c. | n.c. | n.c. | n.c. | n.c. | n.c. | n.c. | n.c. |
| Failure of largest student loan | | | | | | | | | |
| creditor to report | 9.0 | 3.2 | .8 | 3.4 | 3.3 | 3.8 | 3.0 | 3.8 | 3.3 |
| Failure to report a | | | | | | | | | |
| Minor delinquency | n.c. | n.c. | n.c. | n.c. | n.c. | n.c. | n.c. | n.c. | n.c. |
| Credit limit | 31.5 | 40.3 | 37.4 | 27.7 | 31.7 | 40.0 | 33.7 | 33.5 | 28.0 |
| *Involving collection agency accounts* | | | | | | | | | |
| Failure to eliminate duplicate | | | | | | | | | |
| collection agency accounts | 1.9 | 1.2 | .4 | 2.3 | 1.1 | .6 | .7 | 1.4 | 2.7 |
| Reporting of | | | | | | | | | |
| Collection agency accounts | | | | | | | | | |
| under $100 | 15.1 | 11.5 | 5.0 | 17.0 | 11.1 | 6.4 | 8.7 | 11.7 | 16.9 |
| Medical collection accounts | 19.5 | 16.5 | 8.3 | 22.8 | 15.7 | 9.3 | 12.7 | 16.1 | 22.3 |
| Potentially misassigned collection | | | | | | | | | |
| accounts | 10.8 | 8.8 | 5.3 | 11.6 | 7.9 | 6.1 | 6.4 | 8.5 | 13.1 |
| *Involving public records* | | | | | | | | | |
| Reporting of duplicate public records | .2 | .5 | .3 | .4 | .4 | .3 | .4 | .4 | .3 |
| Inclusion of lawsuits and dismissals | .6 | 1.7 | 1.1 | 1.2 | 1.1 | 1.1 | 1.0 | 1.2 | 1.4 |
| *Involving creditor inquiries* | | | | | | | | | |
| Failure to consolidate | | | | | | | | | |
| Multiple inquiries for auto and | | | | | | | | | |
| mortgage loans | 5.4 | 5.3 | 2.1 | 3.3 | 3.7 | 3.9 | 3.8 | 3.7 | 3.3 |
| Other multiple inquiries | 19.6 | 17.7 | 10.0 | 15.9 | 14.1 | 14.6 | 12.8 | 15.3 | 17.5 |

Note. See note to table 3.

1. For definition of income of census tract, see note to chart 2.

n.c. Not calculable.

file and in credit history score. Exceptions generally involved instances in which either the youngest or the oldest age group was disproportionately affected. For example, individuals over age 55 were more likely to have increases of more than 10 points in their credit history scores when medical collections were dropped, and individuals under age 35 were more likely to have large increases in their scores when nonreporting of a credit limit was corrected.

*SUMMARY AND CONCLUSIONS*

Available evidence indicates that the information that credit-reporting agencies maintain on the credit-related experiences of consumers, and the credit history scoring models derived from these experiences, have substantially improved the overall quality of credit decisions while reducing the costs of such decisionmaking. The availability of these data has also greatly enhanced the process of screening prospective customers to facilitate the marketing of credit and insurance products, thereby reducing the costs of such marketing by limiting solicitations to

customers who are most likely to qualify for the products. If not for the information that the agencies maintain, consumers on the whole would receive less credit at higher prices. Moreover, the credit-reporting system has become more comprehensive over the past decade or so with notable improvements, such as the adoption of common formats for reporting information and the enhanced reporting of information on credit limits and mortgages. Recent congressional amendments to the FCRA have advanced prospects for future improvements as consumer access to credit records and credit history scores has improved.

Despite the benefits of the credit-reporting system, analysts have raised concerns about the accuracy, completeness, timeliness, and consistency of agency records and about the effects of these shortcomings on the cost and availability of credit. Clearly, for the benefits of the credit-reporting system to be realized, some reasonable degree of accuracy and completeness of credit reports is required. Moreover, the more accurate and complete the information assembled by credit-reporting agencies, the greater the potential for more efficiency in the credit-granting process and a reduction in costs to the advantage of both consumers

and creditors. Over the years, a number of studies have focused on the contents of credit records but have reached quite different conclusions about the degree to which such information is accurate and complete and about the implications of data limitations for credit availability and pricing.

This study extends earlier research and assesses the effects of data limitations and ambiguities in credit reports on the availability and pricing of credit by using a large, nationally representative sample of individuals with credit records from one of the three national credit-reporting agencies. Specifically, we estimate the proportion of individuals who are likely to be materially affected by a number of different data problems, and we quantify the likely effect of each problem on the credit history scores of individuals. Because such effects can vary across different populations, we also separately evaluate the effects on individuals in different credit-risk categories and in different groups classified by age and by income and minority population of the neighborhoods where they live. We emphasize that we use the terms "data problem" and "correction" in their broadest sense, as we do not necessarily observe actual errors and the appropriate correction is sometimes unclear.

This analysis of the effects of data problems on credit history scores indicates that the proportion of individuals affected by any single type of data problem appears to be small, with the exception of missing credit limits, which affected almost one-third of the individuals in the sample used for the simulations. Moreover, in most cases, the effect of each type of problem on the credit history scores of affected individuals was modest. Two principal reasons explain this result. First, most individuals have a large number of credit accounts, and thus problems in any given account have only a relatively small effect on the individuals' overall credit profiles. Second, credit modelers recognize many of these data problems when they construct and weight the factors used in credit history scoring models. Therefore, correcting the problems identified here is unlikely to substantially change the risk evaluation and access to credit for the typical individual.

The analysis suggests, however, that the effects of data problems may be more substantial in some cases than in others. In particular, problems with collection accounts are much more likely to have significant effects on the credit history scores of affected individuals. Missing credit limits, simply because they occur so frequently, also represent an important data quality problem. In general, individuals with relatively low credit history scores or those with thin files are more likely to experience significant effects when

a data problem arises. The incidence of problems also varies across groups, with older individuals, those with higher credit history scores, and those living in higher-income and nonminority neighborhoods showing the lowest incidence.

Our analysis shows that predicting the effects of "correcting" errors is not straightforward. Sometimes, effects were counterintuitive. For example, our analysis suggests that about one-fourth of the individuals affected by lenders' failure to report student loans would show increases in their credit history scores as a result. This outcome occurs in part because, somewhat surprisingly, individuals with student loans have more accounts than does the average individual. The complexity of the results is underscored by the fact that some individuals show increases and some show decreases for every simulation. In large part, this result occurs because the corrections typically affect more than one factor, moving scores in different directions. This is particularly true for problems with credit accounts, which are likely to involve multiple factors.

The research here highlights the importance of data reporters' supplying complete information in a timely manner. How such reporting can be fully achieved in a voluntary system is unclear. The current system relies heavily on consumers to identify and dispute "incorrect" or missing items in their credit reports. One problem with this approach is that consumers have no incentive to challenge information that is favorable to them, even if it is in error. Our research indicates that even when data are incomplete or in error, they often have little or no bearing on an individual's credit history score or access to credit.

Currently, consumers have access only to general information about the types of factors that are weighed in credit evaluation, or in the case of credit denials, the chief reasons for the adverse action. On the one hand, lack of specific information may lead some consumers to believe that virtually any data quality issue is pertinent and should be disputed, causing the credit-reporting agencies and reporters to incur unnecessary costs to correct or update files. On the other hand, consumers may be unaware of the potential importance of specific data issues, such as missing credit limits, and may not take appropriate action. Some of these problems may be addressed by consumer education, whereas others are likely to continue for the foreseeable future.

Before these results are taken as definitive estimates of the effects of data quality issues on credit availability, several important caveats must be made. First, we have investigated only some potential sources of error. Most notably, we can say nothing

about the consequences of mistakenly including account records that do not belong to an individual in the individual's file. Second, we have used only one credit-scoring model to simulate our results and have relied on our approximation to the model to quantify our results. Third, we have omitted manual reviews of credit records, which are part of many underwriting systems. Such systems identify and address many data quality issues. Finally, we have used data from only one credit-reporting agency. Creditors, particularly in the mortgage market, typically obtain data from all three national credit-reporting agencies for credit underwriting. Reconciling inconsistencies in data across the three agencies can lead to corrections of many of the data quality issues we have identified.

Moreover, we have analyzed only the potential effects on credit history scores of addressing data quality issues. We have said nothing about how such problems could be corrected, how much the corrections might cost, or what potential gains in efficiency might result from developing models based on more complete and accurate data. If the current level of accuracy and completeness is socially inefficient, reaching the optimal level may be difficult. Credit information has aspects of a classic public good. The parties that bear the costs of correcting errors or providing more timely and complete information may not receive much benefit from the improvement in accuracy. Further remedies, such as imposing additional legal liability penalties, may, in a system of voluntary reporting, lead to unintended consequences, including less information reporting and a less efficient and effective system. Policymakers need to weigh all of these considerations when they determine whether the current credit-reporting system should be changed and, if so, what changes should be made.                                      □